# EXHIBIT 10

AGENT

1  DENNIS K. BURKE
   United States Attorney
2  District of Arizona

3  DAVID A. PIMSNER
   Assistant U.S. Attorney
4  Two Renaissance Square
   40 N. Central Avenue, Suite 1200
5  Phoenix, Arizona 85004-4408
   Arizona State Bar No. 007480
6  Telephone (602) 514-7500
   david.pimsner@usdoj.gov
7

8              UNITED STATES DISTRICT COURT

9                  DISTRICT OF ARIZONA

10                                              10-3568 MB

11 IN RE APPLICATION AND                    APPLICATION OF THE
   CERTIFICATION OF THE UNITED         UNITED STATES FOR AN ORDER
12 STATES OF AMERICA FOR AN ORDER     PURSUANT TO 18 U.S.C.§ 2703(d)
   PURSUANT TO 18 U.S.C. §§ 2703(d)
13 (Google)
                                          (FILED UNDER SEAL)
14

15

16       ·      The United States of America, moving by and through its undersigned counsel,

17 respectfully submits under seal this ex parte application for an Order pursuant to 18 U.S.C. §

18 2703(d). The proposed Order would require Google, an Internet service provider, to disclose

19 certain records and other information pertaining to the email account haneen.jabar@gmail.com

20 as described in Part I of Attachment A. The records and other information to be disclosed

21 include the contents of communications and other stored files and are described in Attachment

22 A to the proposed Order. In support of this application, the United States asserts:

23 LEGAL BACKGROUND

24 1.      Google is a provider of an electronic communications service, as defined in 18 U.S.C.

25 § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly,

26 the United States may use a court order issued under § 2703(d) to require Google to disclose the

27 items described in Part II of Attachment A. See 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment

28

024056                              U.S. v AIA 024056

A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A); 18 U.S.C. § 2703(b) (Part II.C of Attachment A).

2.     A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, Attachment B of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

SPECIFIC & ARTICULABLE FACTS

3.     The Federal Bureau of Investigation ("FBI") is investigating Ahmad Al-Ahmad for violations of Title 18, United States Code, Section 2332(b)(2), Conspiracy to Commit Murder of a United States National Abroad.   Attachment B contains specific and articulable facts showing that there are reasonable grounds to believe that the records, other information, and the contents of electronic communications found in account haneen.jabar@gmail.com are relevant and material to the ongoing criminal investigation. The information contained in Attachment B was provided to undersigned counsel by the investigating case agent, FBI Special Agent Dina McCarthy.

REQUEST FOR ORDER

4.     The facts set forth in Attachment B show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the crimes described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that Google be directed to produce all items described in Part II of Attachment A to the proposed Order.

2

1    5.      This Court has jurisdiction to issue the proposed Order because it is "a court of
2    competent jurisdiction," as defined in 18 U.S.C. § 2711. See 18 U.S.C. § 2703(d). Specifically,
3    the Court is a district court of the United States that has jurisdiction over the offense being
4    investigated. See 18 U.S.C. § 2711(3)(A)(I).
5    6.      The United States further requests that the Order require Google not to notify any
6    person, including the subscribers or customers of the account(s) listed in Part I of Attachment
7    A, of the existence of the Order until further order of the Court. See 18 U.S.C. § 2705(b). Such
8    a requirement is justified because the Order relates to an ongoing criminal investigation that is
9    neither public nor known to all of the targets of the investigation, and its disclosure may alert
10   the targets to the ongoing investigation. Accordingly, there is reason to believe that notification
11   of the existence of the Order will seriously jeopardize the investigation, including by giving
12   targets an opportunity to flee or continue flight from prosecution, destroy or tamper with
13   evidence, change patterns of behavior, or notify confederates.
14   7.      The United States further requests that the Order delay any notification by the
15   government that may be required by § 2703(b) for a period of ninety days because notification
16   of the existence of the order may seriously jeopardize the investigation, as discussed in the
17   previous paragraph. See 18 U.S.C. § 2705(a).
18   //
19   //
20   //
21   //
22   //
23   //
24   //
25   //
26   //
27
28                                          3

1    8.    The United States further requests that the Court order that this application and any

2    resulting order be sealed until further order of the Court. As explained above, these documents

3    discuss an ongoing criminal investigation that is neither public nor known to all of the targets

4    of the investigation. Accordingly, there is good cause to seal these documents because their

5    premature disclosure may seriously jeopardize that investigation.

6          Dated this 21 st day of December, 2010.

7

8                      DENNIS K. BURKE
                         United States Attorney

9                      District of Arizona

10

11                      DAVID A. PIMSNER
                         Assistant U.S. Attorney

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                      4

024059

ATTACHMENT A

I.    The Account

The Order applies to certain records and information associated with the following email account: haneen.jabar@gmail.com.

II.    Records and Other Information to Be Disclosed

Google is required to disclose the following records and other information, if available, to the United States for each account or identifier listed in Part I of this Attachment ("Account"), from January 1, 2005 to the present:

A.    The following information about the customers or subscribers of the Account:

1.    Names (including subscriber names, user names, and screen names);

2.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3.    Local and long distance telephone connection records;

4.    Records of session times and durations;

5.    Length of service (including start date) and types of service utilized;

6.    Telephone or instrument numbers (including MAC addresses);

7.    Other subscriber numbers or identities (including temporarily assigned network addresses and registration Internet Protocol ("IP") addresses); and

8.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

B.    All records and other information (not including the contents of communications) relating to the Account, including:

1.    Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses; and

2. Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers).

C. The contents of the following wire and electronic communications:

1. Wire and electronic communications associated with the Account that have been in electronic storage in Google's electronic communications system for more than 180 days.

## ATTACHMENT B

Special Agent Dina L. McCarthy with the FBI is the investigating case agent and provided the following information:

1)      The FBI is investigating Ahmad Ibrahim Al-Ahmad (hereinafter Al-Ahmad) who is believed to be engaged in the procurement and shipment of dual-use components to be used in improvised explosive devices (IED) that are employed against Coalition Forces in Iraq. Further, Al-Ahmad is believed to be involved in the research and development of new technologies and methods for the manufacture of IEDs and accordingly, is believed to be in violation of 18 U.S.C. § 2332(b)(2). 2)      An analytical group within Department of Defense (DoD) informed FBI Phoenix of a raid executed in August 2006 that discovered one of the largest improvised explosive device (IED) caches (hereinafter referred to as the Omar Cache) found in Iraq.  The following information was conveyed to the Case Agents regarding Al-Ahmad by DoD personnel:

3)      On August 30, 2006, Coalition Forces conducted a raid on 50 Omar Street, Baghdad, Iraq.  It was discovered that the premises has been used by Al-Ahmad, who vacated the premises prior to the raid, leaving behind numerous IED-related construction materials, test equipment, schematics and other items related to IED construction.  The items discovered at the Omar Cache were submitted for exploitation.  Forensic processing of these items developed 207 latent fingerprints of value.

4)      Items of interest included one initiator, ready to be used in an IED, hundreds of components for various types of radio-controlled improvised explosive devices (RCIEDs),

1

and extensive bomb-making training aids. Also found were internet printouts bearing Al-Ahmad's name which featured diagrams and instructions on the process of wiring and controlling a fixed or cellular telephone and documents with electrical and electronics equipment diagrams featuring transistor connections. Additionally, media recovered from the site contained a collection of radical Islamic articles and materials from extremist Islamic web sites.

5) The IED cache contained documents linking Al-Ahmad to the Beirut, Lebanon company SES Lebanon, aka Serpico Sarl. One undated letter to "Ahmad" from Newman Elmayan, a principal of SES Lebanon, stated Elmayan was arranging a shipment from an unidentified company in Hong Kong "by your account to Baghdad direct, signed Newman." A second undated letter from SES Lebanon's, Nore Nahe, to Wenshing Electronics in Taipei, Taiwan concerning Wenshing model TRW-400 transmitter/receiver indicated Al-Ahmad, through SES Lebanon, was seeking samples of the item which had a range of more than one kilometer. This type of transmitter/receiver can be used in an IED.

6) Further analysis was conducted on the Omar Cache. Numerous documents clearly indicated that Al-Ahmad was interested in improving the functionality of the IED designs through incorporation of innovative technologies and advanced electronic components. For instance:

      a. Technical specifications for the TRW-400-5 transceiver: while this specific device has not been found in IEDs, similar devices operating

2

at the same frequency have been employed in IED circuits in Iraq since June 2005. Al-Ahmad's e-mail discussions about this component occurred in August 2005.

b.  Technical notes on dual-tone multiple-frequency (DTMF) technology used in touch-tone telephones: this technology was introduced in Iraqi IEDs in November 2005. The DTMF circuits, believed to have been built by Al-Ahmad at his facility on Omar Street, represent some of the first of this type of device employed in IEDs in Iraq.

c.  Schematics and technical notes on IED design incorporating the Microchip PIC16F84A and a DTMF decoder chip. This design is typical of many IED circuits employed in Iraq. Headquartered in Chandler, AZ, Microchip Technology Inc. is a leading provider of microcontroller and analog semiconductors. Items with the acronym 'PIC' in the model number are manufactured by Microchip.

d.  Technical specifications of the Princeton Technologies PT2262 and PT2272 remote control devices. These components were used in IEDs prior to the Microchip PIC16F84A. The conversion to PIC16F84A may have been attributed to research done by Al-Ahmad.

7)  Copies of known thumb prints belonging to Al-Ahmad were sent to the FBI Laboratory in Quantico, Virginia, so they could conduct a fingerprint analysis of the Omar

3

Cache. On January 21, 2010, the known prints of Al-Ahmad were enrolled into a fingerprint database. To date, the FBI Lab found twenty six matches to the following items found at the Omar Cache:

    a.    One on Q14, an unknown electronics device in light blue metal case

    b.    One on part of Q38, a piece of white electrical tape [1]

    c.    Seventeen on parts of Q112, documents, notepad page 10, and a book pages 1, 20 and 38

    d.    Three on parts of Q113, documents

    e.    One on part of Q115, a pamphlet in Arabic and English

    f.    One on part of Q117, a magazine page 18

    g.    One on part of Q144, a voltage control oscillators in original packaging

    h.    One on part of Q184, a lid to a power meter

8)    This fingerprint analysis confirmed that Al-Ahmad was associated with the Omar Cache.

9)    Additionally, the agent has learned that DTMF circuits have been used to target

---

[1] The electrical tape was wrapped around a typical IED switch in order to provide structural support to allow proper functioning. The switch itself is based upon a super-regenerative receiver (Shenzhen Szsaw JDQ-3A). Upon receipt of a signal from a matching transceiver, a connection is made between two 6-volt batteries and an electrical blasting cap, causing the IED to detonate. A matching transmitter was also recovered with this device. Hundreds of similar devices have been used in Iraq since 2005.

4

U.S. v AIA 024065

American soldiers in Iraq and include the following examples.

    a.    On March 11, 2006, near Abu Ghurayb in Iraq, one U.S. soldier was injured in action by a cellular phone initiated IED – DTMF circuit attached to a phone that matched those recovered at the Omar Street facility;

    b.    On April 6, 2007, in the outskirts of southern Baghdad, near Baghdad International Airport; three U.S. soldiers were killed in action by a cellular-phone initiated IED – cellular phone and attached DTMF circuit matched those recovered at Omar Street facility; and

    c.    On May 14, 2007, in northern Baghdad, approximately one half mile from the Omar Street facility; one U.S. soldier was killed in action and four wounded in action by a cellular phone initiated IED – DTMF circuit and attached cellular phone matched those recovered at the Omar Street facility.

10)    It is believed that Al-Ahmad, after leaving Iraq, initially fled to Syria, and then in approximately 2007, moved to China. Based on a review of emails obtained, pursuant to 18 U.S.C. § 2703(d) orders in connection with various accounts used by Al-Ahmad, Al-Ahmad established various companies in China, with the support of his Chinese assistant Ying Gong (aka Beverly Gong, aka Huarong Gong). These companies appear to function as exporters, where Al-Ahmad received orders for products that can be obtained in China for his associates

5

located primarily in Iraq, Syria, Sudan and Yemen. Al-Ahmad receives the orders, normally through email, and arranges the purchase and shipment of these orders. Case Agents have discovered that Al-Ahmad utilizes many email addresses to conduct business and/or communicate with his associates worldwide. Moreover, Beverly Gong also established email accounts, which are used to facilitate Al-Ahmad's business.

11)    Between December 31, 2009 and April 21, 2010, FBI Phoenix obtained a 2703(d) court order for three of Al-Ahmad's email accounts: john_john2008812@yahoo.com, ahmsah1977@yahoo.com and sozan_sozan1981@yahoo.com. Additionally, on February 3, 2010, FBI Phoenix obtained a 2703(d) court order for Al-Ahmad's assistant, Beverly Gong's, email address beverlygong@yahoo.com. Agents also determined that Al-Ahmad also operates businesses in Asia, selling international telephone services to users of Voice Over Internet Protocol (VoIP) telephones. According to open source information, the websites for Al-Ahmad's companies provide the following email addresses for Al-Ahmad as ahmed.voip@yahoo.com, ahmed.voip@hotmail.com and ahmedvoip@ahmedgroup.biz (an email address linked to one of his business domains). These email accounts appear to be fronts for the URL www.just4voip.com.

12)    After review of these accounts, FBI Phoenix, in concert with Task Force Quiet Storm,[2] found the following email messages:

---

[2] Task Force Quiet Storm is a joint initiative between the National Ground Intelligence Center and the Department of Commerce targeting IED facilitation networks abroad and the procurement of controlled export items used in the development and employment of IEDs.

6

**In the john_john2008812@yahoo.com Account**

a. On July 2, 2009, Al-Ahmad received an email message from fenon_net@yahoo.com containing images of an Iraqi passport for Jabbar Sattar Abdullah, date of birth 1/1/1971, place of birth Diyala, Iraq, and passport number G1951786. On April 26, 2010, Jabbar Sattar 'Abdullah Husayn al-Zuhayri (aka Abu Ali) was detained in Iraq in connection with Talib Ibrahim Hamdan and an IED network. Talib Ibrahim Hamdan, aka Abu Ghassan, is a 1920 Revolutionary Brigade leader with ties to Al-Qaeda in Iraq (AQI). According to officials with the Department of Defense, Hamdan is a major distributor of IED initiators from Fallujah to western Baghdad and is considered a crucial player for the 1920 Revolutionary Brigade and AQI because of his capability to build IEDs and conduct lethal IED attacks.

b. On October 12, 2008, Al-Ahmad sent an e-mail to "Dr. Mahdi" (m4d4_m4d4@yahoo.com) concerning an order for mobile phones. Three of the five mobile phone models listed in that message have been recovered in IED-related events in Iraq:

(1) The Sheng Bao N98+ "Spiderman" mobile phone was recovered in six IED-related events in Iraq from December 2008 to January 2010.

7

(2)    The NKTEL C5000 mobile phone was recovered in an IED- related event that occurred in Iraq in May 2009.

(3)    The NEC N880 mobile phone was recovered in an IED - related event that occurred in Iraq in October 2009.

c.    On September 2, 2008, Al-Ahmad received an e-mail from "memo memo" (memo_memo1984@yahoo.com) which included a list of electronic components. Six of these nine components are commonly used in IED circuits employed by insurgents in Iraq. Based on the quantities of various components requested, the purchaser could construct 2,000 IED circuits (1,000 each of two different circuits). The component list also included "finger magnets" which are consistent with magnets that are used to attach IED circuits to vehicles, a technique that has been used in assassination incidents in Iraq.

d.    On December 31, 2009, 'Asif al-Rawi (hight.tecnology@yahoo.com) sent an e-mail to Al-Ahmad requesting three items: a man's belt with a 5 megapixel video camera, a man's watch with a 5 megapixel video camera, and an ink pen with a 5 megapixel camera. The agent believes these items may have been requested for use in surveillance activity.

e.    Al-Ahmad sent three e-mail messages listed below to the address dhari_jamal@yahoo.com. This address is known to belong to Jamal al-

8

Dhari, the nephew of Muthana Harith al-Dhari. According to Interpol, Muthana provided both logistical and financial support for the 1920 Revolutionary Brigade, an Iraqi Sunni insurgent group. Muthana al-Dhari was designated by the United States Department of Treasury as a Specially Designated National (SDN) for providing financial, material, or technological support to al-Qai'da in Iraq.

f.   On November 11, 2008, Al-Ahmad sent Jamal al-Dhari a message with an attachment entitled "Your Friend MUKTAR". The document described an eavesdropping application that can be installed on a person's mobile phone without their knowledge. The application enables a person to monitor the communications of another person's mobile phone, and to use that person's mobile phone as a microphone to listen to conversations that take place near the mobile phone. The agent believes, based on training and experience, that the application discussed in the document appeared to be a surveillance tool.

g.   On November 11, 2008, Al-Ahmad sent Jamal al-Dhari another message which included the phrases, "Receiving unit: 100 pieces", and "Transmitting unit: 10 pieces." The agent believes, based on training and experience, that the phrases refer to receivers and transmitters that are part of initiation systems for radio-controlled IEDs.

9

h.    On December 19, 2008, Al-Ahmad sent Jamal al-Dhari a message containing a list of four magnets with their dimensions. A quantity of 150 was listed for each magnet, and Al-Ahmad stated, "This material is ready for shipping only by sea." Based on the dimensions included in the message, two of the magnets listed by Al-Ahmad are similar to magnets recovered from IED attacks in Iraq. Iraqi insurgents are known to glue magnets to IED initiation systems, which makes it possible to easily attach those devices to vehicles.

i.    On February 2, 2009, Al-Ahmad sent an e-mail message with the subject "Shipment List" to Hasan al-Ani (hasan_j79@yahoo.com). A table of items found in that message included a wireless transmitting unit, a wireless receiving unit, and electronic boards which are consistent with items intended for use in radio-controlled IED devices.

13)    Al-Ahmad used a number of aliases such as Nore Nahe, Ahmad Al-Wafi and Anas Abdul Karim Khadir, which were discovered at the Omar Cache. In the above-named 2703(d) court orders, the agent found several different email messages containing passport photographs of Al-Ahmad under two different aliases.

a.    On November 21, 2008, Al-Ahmad sent a message to maher_a99@yahoo.com containing his passport photograph and the following information:

10

        (1)     Name: Ahmed Hassan Farhan
                   Surname: Farhan
                   Mother Name: Sanaa Fadhil
                   Birth Date: 4/7/1975
                   Birth Place: Baghdad, Iraq
                   Passport Number: Iraqi, G214301
            (This represents another alias of Al-Ahmad.)

    b.     On April 21, 2009, Al-Ahmad sent a second email message to merafcom@hotmail and merafcom@yahoo and provided the following information:

        (1)     Given Name: Ahmed
                   Surname: Alahmedalabdaloklah
                   Father Name: Ebrahim
                   Mother Name: Subhieh
                   Birth Date: 1/1/1977
                   Birth Place: Deir Azzor
                   Passport Number: Syrian, 004365665
            (This represents another alias of Al-Ahmad.)

## In the beverlygong@yahoo.com.cn Account

14)    On April 22, 2009, Al-Ahmad's assistant in China, Beverly Gong, sent two e-mail messages from beverlygong@yahoo.com.cn to ramy_naeef@yahoo.com, whom she addressed as Mr. Jabar Abu Ali. Telephone numbers listed for the recipient in these message are Iraqi numbers. The messages included a commercial invoice for five models of GSM/CDMA mobile phone signal jamming devices. Four of those devices are designed to jam mobile phone signals from a fixed facility and one is pocket-sized, designed to jam mobile phone signals up to eight meters away. Based on training and experience, the agent believes that the jamming devices may be intended to provide an electronic-warfare

11

capability to insurgents in Iraq. Cellular phone signal jamming devices have been used as an insurgent counter-countermeasure. A jamming device can be employed to render nearby IEDs incapable of accepting radio, cellular and other initiation codes. Beverly Gong sent Mr. Ali the DHL tracking number for the shipment of the jamming devices in one of the e-mail messages.

**In the ahmsah1977@yahoo.com Account**

15) The email account designated ahmsah1977@yahoo.com was also identified at the Omar Cache. Also of note were the following email messages:

    a. On September 1, 2008, Ahmad sent an email message to rima.salha@mbc.net, which said (translated from Arabic), "Greetings, I am a friend of Wa'il Issam. He asked me to send the letters pertaining to you at the special forums for Al-Qaida. Peace, Ibrahim al-Iraqi".

    b. On September 22, 2007, an email was sent from email address asmhdd@hotmail.com (Mohamed Tunsi) to email address haneen.jabar@gmail.com and forwarded to Al-Ahmad. The message said (translated from Arabic), "Peace be upon you companion brother. I am doing excellent, thanks be to Allah. I got married. I am very worried about you and the brothers around you. Please send me a message. Do not leave me worried. You have been away for a while. I pray that you are doing well. I pray to Allah to give us steadfastness on what is true. Peace from the poor brother,

12

lover of martyrdom Abu Al-Khatab Al-Tunsi. Abu Jasem."

**In the sozan_sozan1981@yahoo.com Account**

16)     Through review of the john_john2008812@yahoo.com and beverlygong@yahoo.com

accounts, agents discovered that the account sozan_sozan1981@yahoo.com was listed on a

visa application for Al-Ahmad's wife concerning a Mandarin language course in China.

Review of sozan_sozan1981@yahoo.com account showed that Al-Ahmad is the primary user

of the email address as many messages are addressed to or signed by "Abu Ibrahim."

Analysis of the account yielded the following message of interest:

>           a.      On March 26, 2008, Al-Ahmad received an email message from Logan
>
>                   Robo (toyrobo@yahoo.com) in which (translated from Arabic) the
>
>                   sender explains how to design a jamming device from components of
>
>                   a microwave oven. In the message, the sender states such a device is
>
>                   capable of jamming "Israeli unmanned planes." The email contains a
>
>                   document featuring both English and Arabic writing along with detailed
>
>                   diagrams accompanied by mathematical formulas.

**Detainee Information**

17)     On July 24, 2010, Muhammad Husayn 'Ali Ways (Alzawba'i) (hereinafter Ways) was

captured by Coalition Forces (CF) in Iraq. On July 28 and 29, 2010, while still in custody

of the CF, Ways was interviewed by special agents with the Federal Bureau of Investigation.

18)     While in custody, Ways was shown a photograph of Al-Ahmad, whom he identified

13

U.S. v AIA 024074

as Ahmad. When initially questioned about Al-Ahmad, Ways stated that Al-Ahmad was a Lieutenant for the Iraq Customs (IC). Ways claimed that he last saw Al-Ahmad in approximately 2006 at the Baghdad Custom Building.

19)     Ways advised he last interacted with Al-Ahmad in approximately 2006 and originally stated he never telephonically or electronically contacted Al-Ahmad. Ways later corrected his statement by stating he might have had telephonic contact with Al-Ahmad in 2006 in the performance of his official IC duties. Ways stated that in 2006 he also received an email containing scanned copies of Al-Ahmad's documents which he was supposed to use to expedite Ahmad's passport request.

20)     Ways further advised his neighborhood was heavily populated with members of the 1920 Revolutionary Brigade. Ways reaffirmed that his mother's cousin, Hamdan Ibrahim Hadman was a member of the 1920 Revolutionary Brigade. Ways acknowledged that his father-in-law, Talib Ibrahim Hadman, aka Abu Ghassan, was a member of the 1920 Revolutionary Brigade as well. Ways stated Hamdan and Talib are brothers.

21)     On August 2, 2010, Ways submitted to another interview with FBI agents in Iraq and advised he wanted to rectify information provided in prior interviews. Ways stated he specifically wanted to provide information regarding Al-Ahmad, residing in China, and Dual Tone Multi Frequency (DTMF) boards. Ways asked that his information be considered to expedite his and his brother's release from custody.

22)     Ways clarified Al-Ahmad was never a Lieutenant for the Iraqi Customs, but rather a

14

member of the 1920 Revolutionary Brigade. Ways explained that Al-Ahmad and Ways's father-in-law, Talib Ibrahim Hamdan, a.k.a. Abu Ghassan, had been long time associates. Ways denied knowing the nature of their relationship.

23) Ways indicated he met Al-Ahmad approximately six times, always in Baghdad, even though Ahmad was originally from Syria. Ways first met Ahmad in either 2005 or 2006, when Talib was detained by Coalition Forces. Al-Ahmad traveled to Raduania, Baghdad, canvassing for Talib's relatives willing to organize a 1920 Revolutionary Brigade group. Al-Ahmad was introduced to Ways, who eventually directed Ahmad to Talib's brother, Hamdan Ibrahim Hamdan. Ways claimed he was too young to become involved in the resistance and directed Al-Ahmad to Hamdan.

24) Ways recalled that in 2007, Al-Ahmad relocated to China, via Syria, with his wife and child. Ways did not know where Al-Ahmad settled in China and whether anyone else, other than his family, joined him.

25) Ways advised that while in China, Al-Ahmad designed DTMF boards to remotely detonate IEDs and commissioned a Chinese factory to manufacture them. Al-Ahmad confided to Ways that he had designed the DTMF boards, and that he was selling them solely to the 1920 Revolutionary Brigade to assist in the resistance against American Forces (AF). Ways acknowledged that Al-Ahmad was aware the DTMF boards were being used in IEDs against AF. Al-Ahmad told Ways he "would do anything against Americans." Ways explained the DTMF boards shipped by Al-Ahmad did not have any other purpose, or

15

U.S. v AIA 024076

commercial value, other than being used to detonate IEDs.

26) Ways advised he had seen a DTMF board early in 2007,[3] when Al-Ahmad brought it to Raduania to show it to 1920 Revolutionary Brigade members. Upon being released from prison in 2009, Ways attempted to learn the design and programming of DTMF boards to profit from their sales to 1920 Revolutionary Brigade members. Al-Ahmad provided Ways with online instructions on how the boards functioned and how they could be rendered inoperable. Ways found the programming to be too complicated and decided to disregard the money making opportunity. Ways and Al-Ahmad interacted solely via Yahoo Chat. According to the FBI agents conducting the interview, that although Ways described their interaction as email based, upon detailed explanation it was evident that Ways referred to Yahoo Chat as email and to chat rooms as chat.

27) Ways explained that during his Yahoo Chat sessions with Al-Ahmad he learned that Al-Ahmad's DTMF's boards operated exclusively on frequency 422. Ways stated Al-Ahmad programmed the board's to work between frequency 422,000 and 422,999. Ways surmised that if Coalition Forces blocked frequency 422 the boards would become inoperable.

28) Ways indicated each board was labeled with its specific frequency channel, being any of the 999 channels between 422,000 and 423,000. The labeling was done by handwriting. Ways believed engineers, or trained individuals, could switch the boards frequency channels

---

[3]The agent believes that Al-Ahmad fled after the Omar Cache was discovered on August 30, 2006. Although the agent believes that Al-Ahmad traveled to Syria before moving to China, as to this time frame, Al-Ahmad's exact whereabouts were unknown.

024077

U.S. v AIA 024077

to any of the 999 channels within frequency 422. Ways advised Al-Ahmad's network included engineers in China, Syria and Iraq.

29)     Ways stated Al-Ahmad incurred troubles with the 1920 Revolutionary Brigade approximately one and half year ago, mostly due to lack of payments for the DTMF boards. Al-Ahmad decided he would become strictly business oriented and he would provide the boards only upon full up-front payment.

30)     Ways denied knowing shipment details or payment methods for the boards, but stated his uncle Hamdan was the individual responsible for handling 1920 Revolutionary Brigade's finances. Ways surmised Al-Ahmad shipped the boards to only one individual, possibly a close associate of Hamdan, who stored them in different locations to avoid detection. Ways believed that the boards would then be distributed by 1920 Revolutionary Brigade as deemed necessary.

31)     Ways indicated DTMF board shipments were in 1,000 unit increments, including 1,000 receivers and 1 transmitter. Ways described the transmitter as model GB338, but could only describe the DTMF receivers as gray in color and approximately 3 by 4 inches.

32)     According to Ways, Al-Ahmad told Ways the shipments could be received via container, taking two months, or via air within one week. Al-Ahmad stated he knew people at an unidentified Chinese airport who would facilitate the air shipment of illicit merchandise, but that the recipient of the shipment also required facilitation at the receiving airport. Al-Ahmad claimed he did not know anyone at the Baghdad International Airport

17

who would assist with the shipments.

33)     Ways did not believe Al-Ahmad had a formal business in China, but rather a small operation.  Ways described Al-Ahmad as greedy, and charging tenfold the price of manufacturing for the DTMF boards.  Ways claimed not to have specific information regarding the pricing of the DTMF boards.

34)     Ways never communicated telephonically with Al-Ahmad due to the high costs.  Ways advised his interaction with Al-Ahmad was limited to online chats.  Ways and Al-Ahmad would communicate via online chat irregularly, sometimes multiple times in a week, other times only once quarterly.

35)     Ways claimed he last conducted an online chat with Al-Ahmad approximately seven to twenty days prior to Ways's July 24, 2010, date of capture.

36)     Ways indicated that during a recent chat session, Al-Ahmad inquired if Talib had been detained by Coalition Forces and what the underlying charges were.  Ways confirmed Talib's detention, but stated he did not know who had originally notified Al-Ahmad of Talib's arrest.

37)     Ways met with Talib upon his release from Coalition Forces' custody, approximately two months prior to Ways' detention.  Talib tasked Ways with contacting Al-Ahmad and alerting him that CF were aware about Al-Ahmad activities.  Ways relayed the message to Al-Ahmad via online chat.

38)     Ways described Al-Ahmad as wealthy, greedy, private and not trusting of anyone. Ways believed Al-Ahmad would do anything for money, and that he might have chosen to

024079

sell DTMF boards, to be used against American Forces, solely for financial gain.

39)     On August 8, 2010, Ways was interviewed again by FBI agents in Iraq. Ways advised he communicated via Internet with Al-Ahmad approximately two months prior to Ways date of capture. During that online chat session, Al-Ahmad asked Ways to pick up three "walkie-talkies" (personal mobile radio-PMR) to be used as transmitters in conjunction with Dual Tone Multi Frequency (DTMF) boards. Al-Ahmad explained to Ways that Talib Ibrahim Hamdan had ordered and paid for the PMR but he could not pick them up because he was incarcerated. Ways denied knowing where in Baghdad the transmitters were stored and how they were shipped from China to Iraq. WAYS stated Talib and Hamdan Ibrahim Hamdan never discussed shipment routes with Ways. Ways believed Hamdan would be the most likely individual to know details about the shipping routes for DTMF boards because of his position within the 1920's Revolutionary Brigade.

40)     Ways advised that approximately fifteen to twenty days prior to the aforementioned chat, Al-Ahmad tasked Ways with relaying to Talib the pricing for the transmitters. Al-Ahmad confided that Talib inquired regarding ordering PMR. Al-Ahmad wanted Ways to relay to Talib that the pricing for the Walkie-Talkie was $350 U.S. per unit.

41)     Based on a review of emails obtained, pursuant to 18 U.S.C. § 2703(d) Court Order (sealed), 10-335MB, Dr. Mahdi Ibrahim Thamir has been identified as the user of email account m4d4_m4d4@yahoo.com. Dr. Mahdi is suspected of serving as the Political Director of the 1920 Revolutionary Brigade and also serving in the same capacity for the

Jihad & Change Front. Both of these organizations are Iraqi Sunni insurgent groups and have conducted attacks against Coalition Forces in Iraq.

42) On August 23, 2007, Dr. Mahdi received an email message from account haneen.jabar@gmail.com that stated that the email contained the sender's account number at the Chinese bank and the rest of the details that the recipient may need. The email included bank account number 4766907-0188-067789-7 for "Ahamed H. Farhan" at the Bank of China in Shenzhen. In an email described in Paragraph 13(a) above, Al-Ahmad sent a message to maher_a99@yahoo.com from his john_john2008812@yahoo.com account containing his passport photograph and the name Ahmed Hassan Farhan.

43) Ahmed Hassan Farhan is an alias used by Al-Ahmad. The agent believes, based on training and experience, that Al-Ahmad established a bank account in China using his Ahmed H. Farhan alias, and utilized email account haneen.jabeer@gmail.com to communicate with suspected members of Iraqi insurgent groups. In an email sent on August 20, 2007, Dr. Mahdi sent an email to Al-Ahmad at the haneen.jabeer@gmail.com account requesting an address to send the first half of a payment of $26,000 for 2000 receivers. In the same email, Dr. Mahdi asks that the other 100 hand units continue to be worked on. Based on training and experience, the agent believes that the receivers and hand units referenced in the email were intended for use as part of the remote detonating system for Improvised Explosive Devices (IEDs). Additionally, on September 10, 2007, Al-Ahmad sent an email to Dr. Mahdi from the haneen.jabeer@gmail.com account that referenced hand held

20

devices that he was shopping for that met their technical specifications and had a speed dial function that would preclude them from having to manufacture a speed dial because it would be in the handle that they would purchase. Al-Ahmad also mentions in the email that there are devices for tracking vehicles and persons via satellite that are available. Al-Ahmad signed the email as "Mukhtar". In other emails sent by Al-Ahmad, such as an email he sent on November 11, 2008 from his john_john2008812@yahoo.com account to sent Jamal al-Dhari, the message was signed "Your Friend MUKTAR". The use of the moniker "Muktar" has been used by Al-Ahmad in the past to sign emails and its use to sign emails from the haneen.jabar@gmail.com account provides additional evidence that Al-Ahmad is in fact the user of this account.

44)     Al-Ahmad has demonstrated a pattern of using numerous email accounts and chat rooms to communicate with others about the procurement, sale and distribution of items which have commonly been used as component parts for IED's in Iraq targeting American Forces. Corroborated by Ways, Al-Ahmad continues to use e-mail and chat room communications in furtherance of the crimes listed in the application. Based on training and experience, the agent believes that Al-Ahmad will continue to use email accounts and chat rooms to communicate with others regarding supplying DTMF boards and other component parts for use in IEDs.

024082                                                                U.S. v AIA 024082