# EXHIBIT 11

# UNITED STATES DISTRICT COURT

### for the

_____ District of _____

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Yahoo!<br>701 First Avenue<br>Sunnyvale, California 94089 | )<br>)<br>)<br>)<br>)<br>)   Case No. 10-7383MB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____**Central**_____ District of _____**California**_____, there is now concealed *(identify the person or describe the property to be seized):*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2339A and | Provision of Material Support or Resources to Terrorists and |
| 18 U.S.C. § 2332(b)(2) | Conspiracy to Commit Extraterritorial Murder |

The application is based on these facts:

See Attached Affidavit in Support of an Application for a Search Warrant

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of \_\_\_\_\_ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by David A. Pimsner, AUSA.

_____
*Applicant's signature*

Dina L. McCarthy, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **September 9, 2010**

_____
*Judge's signature*

City and state:  Phoenix, Arizona

Honorable Edward C. Voss, U.S. Magistrate Judge
*Printed name and title*

U.S. v. AIA 000642

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with john_john2008812@yahoo.com, beverlygong@yahoo.com, ahmsah1977@yahoo.com, sozan_sozan1981@yahoo.com, ahmadabuibrahim@yahoo.com, abuibrahimahmad@yahoo.com, and mohamed_alwes@yahoo.com that is stored at premises owned, maintained, controlled, or operated by Yahoo!, a company headquartered at 701 First Avenue, Sunnyvale, California 94089.

1

## ATTACHMENT B
## Particular Things to be Seized

I. Information to be disclosed by Yahoo!

To the extent that the information described in Attachment A is within the possession, custody, or control of Yahoo!, Yahoo! is required to disclose the following information to the government for each account or identifier listed in Attachment A:

The contents of all e-mails stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

The contents of archives of web messenger communications.

All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

All records pertaining to communications between Yahoo! and any person regarding

1

the account, including contacts with support services and records of actions taken.

II. <u>Information to be seized by the government</u>

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2339A, Provision of Material Support or Resources to Terrorists, and 18 U.S.C. § 2332(b)(2), Conspiracy to Commit Extraterritorial Murder involving Ahmad Ibrahim Al-Ahmad since January 1, 2005 that relates to the procurement, sale and distribution of component parts with potential use in improvised explosive devices, the identification of co-conspirators, information about their whereabouts, along with information and records about the identity of who created, used or were involved in the email communications and web messenger communications for the accounts listed in Attachment A.

U.S. v. AIA 000645

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Dina L. McCarthy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1)      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Yahoo!, an e-mail provider headquartered at 701 First Avenue, Sunnyvale, California 94089. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo! to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2)      I am a Special Agent with the Federal Bureau of Investigation (FBI) Phoenix Division. I have been employed in this capacity since approximately March 11, 2001. Prior to my employment with the FBI, I was a Military Intelligence Officer with the United States Army for approximately 10 years. I have been assigned to a counter terrorism (CT) squad for approximately 8 years. As a result, I have investigated a number of CT cases, and have successfully indicted CT subjects for a variety of criminal violations.

3)      I am a criminal investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 1515(4), charged with the duty of

1

investigating violations of the laws of the United States, collecting evidence in cases in which the United States is or may be a party in interest, empowered to serve warrants and subpoenas and to make arrests for violations of federal law. In the course of my duties as a Special Agent with the FBI, I have investigated Federal crimes perpetrated by individuals against the U.S. Government. As a result of my training and experience, I have become familiar with the Federal laws relating to the Provision of Material Support or Resources to Terrorists, in violation of 18 U.S.C. § 2339A, and Conspiracy to Commit Extraterritorial Murder, in violation of 18 U.S.C. § 2332(b)(2).

4)      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5)      I am participating in the investigation of Ahmad Ibrahim Al-Ahmad (hereinafter Al-Ahmad) who is believed to be engaged in the procurement and shipment of dual-use components to be used in improvised explosive devices (IED) that are employed against Coalition Forces in Iraq. Further, Al-Ahmad is believed to be involved in the research and development of new technologies and methods for the manufacture of IEDs and accordingly, is believed to be in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2332(b)(2). This affidavit is made in support of an application for a warrant to search the following e-mail accounts belonging to and utilized by Al-Ahmad, specifically,

2

john_john2008812@yahoo.com,    beverlygong@yahoo.com,   ahmsah1977@yahoo.com

sozan_sozan1981@yahoo.com,    ahmadabuibrahim@yahoo.com    and

abuibrahimahmad@yahoo.com more fully described in Attachment A (incorporated herein

by reference).   Additionally, this affidavit is made in support of an application for a warrant

to search the email account mohamed_alwes@yahoo.com which is utilized by Muhammad

Husayn 'Ali Ways (Alzawba'i).   Based on my training and experience and the facts as set

forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2339A,

Provision of Material Support or Resources to Terrorists, and 18 U.S.C. § 2332(b)(2),

Conspiracy to Commit Extraterritorial Murder,  have been committed by Al-Ahmad and

others known and unknown.   There is also probable cause to search the information

described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

6)     An analytical group within Department of Defense (DoD) informed FBI Phoenix of

a raid executed in August 2006 that discovered one of the largest improvised explosive

device (IED) caches (hereinafter referred to as the Omar Cache) found in Iraq.   The

following information was conveyed to the Case Agents regarding Al-Ahmad by DoD

personnel:

7)     On August 30, 2006, Coalition Forces conducted a raid on 50 Omar Street, Baghdad,

Iraq.  It was discovered that the premises has been used by Al-Ahmad, who vacated the

premises prior to the raid, leaving behind numerous IED-related construction materials, test

3

equipment, schematics and other items related to IED construction.  The items discovered at the Omar Cache were submitted for exploitation.  Forensic processing of these items developed 207 latent fingerprints of value.

8)      Items of interest included one initiator, ready to be used in an IED, hundreds of components for various types of radio-controlled improvised explosive devices (RCIEDs), and extensive bomb-making training aids.  Also found were internet printouts bearing Al-Ahmad's name which featured diagrams and instructions on the process of wiring and controlling a fixed or cellular telephone and documents with electrical and electronics equipment diagrams featuring transistor connections.  Additionally, media recovered from the site contained a collection of radical Islamic articles and materials from extremist Islamic web sites.

9)      The IED cache contained documents linking Al-Ahmad to the Beirut, Lebanon company SES Lebanon, aka Serpico Sarl.  One undated letter to "Ahmad" from Newman Elmayan, a principal of SES Lebanon, stated Elmayan was arranging a shipment from an unidentified company in Hong Kong "by your account to Baghdad direct, signed Newman." A second undated letter from SES Lebanon's, Nore Nahe, to Wenshing Electronics in Taipei, Taiwan concerning Wenshing model TRW-400 transmitter/receiver indicated Al-Ahmad, through SES Lebanon, was seeking samples of the item which had a range of more than one kilometer. This type of transmitter/receiver can be used in an IED.

10)     Further analysis was conducted on the Omar Cache.  Numerous documents clearly

4

indicated that Al-Ahmad was interested in improving the functionality of the IED designs through incorporation of innovative technologies and advanced electronic components. For instance:

a.   Technical specifications for the TRW-400-5 transceiver: while this specific device has not been found in IEDs, similar devices operating at the same frequency have been employed in IED circuits in Iraq since June 2005. Al-Ahmad's e-mail discussions about this component occurred in August 2005.

b.   Technical notes on dual-tone multiple-frequency (DTMF) technology used in touch-tone telephones: this technology was introduced in Iraqi IEDs in November 2005. The DTMF circuits, believed to have been built by Al-Ahmad at his facility on Omar Street, represent some of the first of this type of device employed in IEDs in Iraq.

c.   Schematics and technical notes on IED design incorporating the Microchip PIC16F84A and a DTMF decoder chip. This design is typical of many IED circuits employed in Iraq. Headquartered in Chandler, AZ, Microchip Technology Inc. is a leading provider of microcontroller and analog semiconductors. Items with the acronym 'PIC' in the model number are manufactured by Microchip.

d.   Technical specifications of the Princeton Technologies PT2262 and

5

PT2272 remote control devices.  These components were used in IEDs prior to the Microchip PIC16F84A.  The conversion to PIC16F84A may have been attributed to research done by Al-Ahmad.

11)     Copies of known thumb prints belonging to Al-Ahmad were sent to the FBI Laboratory in Quantico, Virginia, so they could conduct a fingerprint analysis of the Omar Cache.  On January 21, 2010, the known prints of Al-Ahmad were enrolled into a fingerprint database.  To date,  the FBI Lab found twenty six matches to the following items found at the Omar Cache:

     a.     One on Q14, an unknown electronics device in light blue metal case

     b.     One on part of Q38, a piece of white electrical tape [1]

     c.     Seventeen on parts of Q112, documents, notepad page 10, and a book pages 1, 20 and 38

     d.     Three on parts of Q113, documents

     e.     One on part of Q115, a pamphlet in Arabic and English

     f.     One on part of Q117, a magazine page 18

     g.     One on part of Q144, a voltage control oscillators in original

---

[1] The electrical tape was wrapped around a typical IED switch in order to provide structural support to allow proper functioning.  The switch itself is based upon a super-regenerative receiver (Shenzhen Szsaw JDQ-3A).  Upon receipt of a signal from a matching transceiver, a connection is made between two 6-volt batteries and an electrical blasting cap, causing the IED to detonate.  A matching transmitter was also recovered with this device.  Hundreds of similar devices have been used in Iraq since 2005.

U.S. v. AIA 000651

packaging

    h.      One on part of Q184, a lid to a power meter

12)    This fingerprint analysis confirmed that Al-Ahmad was associated with the Omar Cache.

13)    Additionally, your affiant has learned that DTMF circuits have been used to target American soldiers in Iraq and include the following examples.

    a.      On March 11, 2006, near Abu Ghurayb in Iraq, one U.S. soldier was injured in action by a cellular phone initiated IED – DTMF circuit attached to a phone that matched those recovered at the Omar Street facility;

    b.      On April 6, 2007, in the outskirts of southern Baghdad, near Baghdad International Airport; three U.S. soldiers were killed in action by a cellular-phone initiated IED – cellular phone and attached DTMF circuit matched those recovered at Omar Street facility; and

    c.      On May 14, 2007, in northern Baghdad, approximately one half mile from the Omar Street facility; one U.S. soldier was killed in action and four wounded in action by a cellular phone initiated IED – DTMF circuit and attached cellular phone matched those recovered at the Omar Street facility.

14)    Your affiant believes that Al-Ahmad, after leaving Iraq, initially fled to Syria, and

7

then in approximately 2007, moved to China. Based on a review of emails obtained, pursuant to 18 U.S.C. § 2703(d) orders in connection with various accounts used by Al-Ahmad, Al-Ahmad established various companies in China, with the support of his Chinese assistant Ying Gong (aka Beverly Gong, aka Huarong Gong). These companies appear to function as exporters, where Al-Ahmad received orders for products that can be obtained in China for his associates located primarily in Iraq, Syria, Sudan and Yemen. Al-Ahmad receives the orders, normally through email, and arranges the purchase and shipment of these orders. Case Agents have discovered that Al-Ahmad utilizes many email addresses to conduct business and/or communicate with his associates worldwide. Moreover, Beverly Gong also established email accounts, which are used to facilitate Al-Ahmad's business.

15)     Between December 31, 2009 and April 21, 2010, FBI Phoenix obtained a 2703(d) court order for three of Al-Ahmad's email accounts: john_john2008812@yahoo.com, ahmsah1977@yahoo.com and sozan_sozan1981@yahoo.com. Additionally, on February 3, 2010, FBI Phoenix obtained a 2703(d) court order for Al-Ahmad's assistant, Beverly Gong's, email address beverlygong@yahoo.com. After review of these accounts, FBI Phoenix, in concert with Task Force Quiet Storm,[2] found the following email messages:

//

---

[2] Task Force Quiet Storm is a joint initiative between the National Ground Intelligence Center and the Department of Commerce targeting IED facilitation networks abroad and the procurement of controlled export items used in the development and employment of IEDs.

8

**In the john_john2008812@yahoo.com Account**

a.  On July 2, 2009, Al-Ahmad received an email message from fenon_net@yahoo.com containing images of an Iraqi passport for Jabbar Sattar Abdullah, date of birth 1/1/1971, place of birth Diyala, Iraq, and passport number G1951786.  On April 26, 2010,  Jabbar Sattar 'Abdullah Husayn al-Zuhayri (aka Abu Ali) was detained in Iraq in connection with Talib Ibrahim Hamdan and an IED network.  Talib Ibrahim Hamdan, aka Abu Ghassan, is a 1920 Revolutionary Brigade leader with ties to Al-Qaeda in Iraq (AQI). According to officials with the Department of Defense, Hamdan is a major distributor of IED initiators from Fallujah to western Baghdad and is considered a crucial player for the 1920 Revolutionary Brigade and AQI because of his capability to build IEDs and conduct lethal IED attacks.

b.  On October 12, 2008, Al-Ahmad sent an e-mail to "Dr. Mahdi" (m4d4_m4d4@yahoo.com) concerning an order for mobile phones. Three of the five mobile phone models listed in that message have been recovered in IED-related events in Iraq:

(1)  The Sheng Bao N98+ "Spiderman" mobile phone was recovered in six IED-related events in Iraq from December 2008 to January 2010.

9

U.S. v. AIA 000654

(2)     The NKTEL C5000 mobile phone was recovered in an IED- related event that occurred in Iraq in May 2009.

(3)     The NEC N880 mobile phone was recovered in an IED - related event that occurred in Iraq in October 2009.

c.      On September 2, 2008, Al-Ahmad received an e-mail from "memo memo" (memo_memo1984@yahoo.com) which included a list of electronic components.  Six of these nine components are commonly used in IED circuits employed by insurgents in Iraq.  Based on the quantities of various components requested, the purchaser could construct 2,000 IED circuits (1,000 each of two different circuits).  The component list also included "finger magnets" which are consistent with magnets that are used to attach IED circuits to vehicles, a technique that has been used in assassination incidents in Iraq.

d.      On December 31, 2009, 'Asif al-Rawi (hight.tecnology@yahoo.com) sent an e-mail to Al-Ahmad requesting three items:  a man's belt with a 5 megapixel video camera, a man's watch with a 5 megapixel video camera, and an ink pen with a 5 megapixel camera.  Your affiant believes these items may have been requested for use in surveillance activity.

e.      Al-Ahmad sent three e-mail messages listed below to the address

10

U.S. v. AIA 000655

dhari_jamal@yahoo.com. This address is known to belong to Jamal al-Dhari, the nephew of Muthana Harith al-Dhari. According to Interpol, Muthana provided both logistical and financial support for the 1920 Revolutionary Brigade, an Iraqi Sunni insurgent group. Muthana al-Dhari was designated by the United States Department of Treasury as a Specially Designated National (SDN) for providing financial, material, or technological support to al-Qai'da in Iraq.

f.       On November 11, 2008, Al-Ahmad sent Jamal al-Dhari a message with an attachment entitled "Your Friend MUKTAR". The document described an eavesdropping application that can be installed on a person's mobile phone without their knowledge. The application enables a person to monitor the communications of another person's mobile phone, and to use that person's mobile phone as a microphone to listen to conversations that take place near the mobile phone. Your affiant believes, based on training and experience, that the application discussed in the document appeared to be a surveillance tool.

g.       On November 11, 2008, Al-Ahmad sent Jamal al-Dhari another message which included the phrases, "Receiving unit: 100 pieces", and "Transmitting unit:  10 pieces." Your affiant believes, based on training and experience, that the phrases refer to receivers and

U.S. v. AIA 000656

transmitters that are part of initiation systems for radio-controlled IEDs.

h.   On December 19, 2008, Al-Ahmad sent Jamal al-Dhari a message containing a list of four magnets with their dimensions. A quantity of 150 was listed for each magnet, and Al-Ahmad stated, "This material is ready for shipping only by sea." Based on the dimensions included in the message, two of the magnets listed by Al-Ahmad are similar to magnets recovered from IED attacks in Iraq. Iraqi insurgents are known to glue magnets to IED initiation systems, which makes it possible to easily attach those devices to vehicles.

i.   On February 2, 2009, Al-Ahmad sent an e-mail message with the subject "Shipment List" to Hasan al-Ani (hasan_j79@yahoo.com). A table of items found in that message included a wireless transmitting unit, a wireless receiving unit, and electronic boards which are consistent with items intended for use in radio-controlled IED devices.

16)   Al-Ahmad used a number of aliases such as Nore Nahe, Ahmad Al-Wafi and Anas Abdul Karim Khadir, which were discovered at the Omar Cache. In the above-named 2703(d) court orders, Your affiant found several different email messages containing passport photographs of Al-Ahmad under two different aliases.

a.   On November 21, 2008, Al-Ahmad sent a message to maher_a99@yahoo.com containing his passport photograph and the

12

following information:

    (1)    Name: Ahmed Hassan Farhan
            Surname: Farhan
            Mother Name: Sanaa Fadhil
            Birth Date: 4/7/1975
            Birth Place: Baghdad, Iraq
            Passport Number: Iraqi, G214301
    (This represents another alias of Al-Ahmad.)

b.    On April 21, 2009, Al-Ahmad sent a second email message to merafcom@hotmail and merafcom@yahoo and provided the following information:

    (1)    Given Name: Ahmed
            Surname: Alahmedalabdaloklah
            Father Name: Ebrahim
            Mother Name: Subhieh
            Birth Date: 1/1/1977
            Birth Place: Deir Azzor
            Passport Number: Syrian, 004365665
    (This represents another alias of Al-Ahmad.)

### In the beverlygong@yahoo.com.cn Account

17)    On April 22, 2009, Al-Ahmad's assistant in China, Beverly Gong, sent two e-mail messages from beverlygong@yahoo.com.cn to ramy_naeef@yahoo.com, whom she addressed as Mr. Jabar Abu Ali. Telephone numbers listed for the recipient in these message are Iraqi numbers. The messages included a commercial invoice for five models of GSM/CDMA mobile phone signal jamming devices. Four of those devices are designed to jam mobile phone signals from a fixed facility and one is pocket-sized, designed to jam mobile phone signals up to eight meters away. Based on training and experience, Your

U.S. v. AIA 000658

affiant believes that the jamming devices may be intended to provide an electronic-warfare capability to insurgents in Iraq. Cellular phone signal jamming devices have been used as an insurgent counter-countermeasure. A jamming device can be employed to render nearby IEDs incapable of accepting radio, cellular and other initiation codes. Beverly Gong sent Mr. Ali the DHL tracking number for the shipment of the jamming devices in one of the e-mail messages.

**In the ahmsah1977@yahoo.com Account**

18)    The email account designated ahmsah1977@yahoo.com was also identified at the Omar Cache. Also of note were the following email messages:

a.    On September 1, 2008, Ahmad sent an email message to rima.salha@mbc.net, which said (translated from Arabic), "Greetings, I am a friend of Wa'il Issam. He asked me to send the letters pertaining to you at the special forums for Al-Qaida. Peace, Ibrahim al-Iraqi".

b.    On September 22, 2007, an email was sent from email address asmhdd@hotmail.com (Mohamed Tunsi) to email address haneen.jabar@gmail.com and forwarded to Al-Ahmad. The message said (translated from Arabic), "Peace be upon you companion brother. I am doing excellent, thanks be to Allah. I got married. I am very worried about you and the brothers around you. Please send me a message. Do not leave me worried. You have been away for a while. I pray that you are doing well. I pray to

14

U.S. v. AIA 000659

Allah to give us steadfastness on what is true.  Peace from the poor brother, lover of martyrdom Abu Al-Khatab Al-Tunsi.  Abu Jasem."

**In the sozan_sozan1981@yahoo.com Account**

19)   Through review of the john_john2008812@yahoo.com and beverlygong@yahoo.com accounts, agents discovered that the account sozan_sozan1981@yahoo.com was listed on a visa application for Al-Ahmad's wife concerning a Mandarin language course in China. Review of sozan_sozan1981@yahoo.com account showed that Al-Ahmad is the primary user of the email address as many messages are addressed to or signed by "Abu Ibrahim." Analysis of the account yielded the following message of interest:

      a.    On March 26, 2008, Al-Ahmad received an email message from Logan Robo (toyrobo@yahoo.com) in which (translated from Arabic) the sender explains how to design a jamming device from components of a microwave oven.  In the message, the sender states such a device is capable of jamming "Israeli unmanned planes."  The email contains a document featuring both English and Arabic writing along with detailed diagrams accompanied by mathematical formulas.

**Detainee Information**

20)   On July 24, 2010, Muhammad Husayn 'Ali Ways (Alzawba'i) (hereinafter Ways) was captured by Coalition Forces (CF) in Iraq.  On July 28 and 29, 2010, while still in custody of the CF, Ways was interviewed by special agents with the Federal Bureau of Investigation.

15

21)     While in custody, Ways was shown a photograph of Al-Ahmad, whom he identified as Ahmad.  When initially questioned about Al-Ahmad, Ways stated that Al-Ahmad was a Lieutenant for the Iraq Customs (IC).  Ways claimed that he last saw Al-Ahmad in approximately 2006 at the Baghdad Custom Building.

22)     Ways advised he last interacted with Al-Ahmad in approximately 2006 and originally stated he never telephonically or electronically contacted Al-Ahmad.  Ways later corrected his statement by stating he might have had telephonic contact with Al-Ahmad in 2006 in the performance of his official IC duties.  Ways stated that in 2006 he also received an email containing scanned copies of Al-Ahmad's documents which he was supposed to use to expedite Ahmad's passport request.

23)     Ways further advised his neighborhood was heavily populated with members of the 1920 Revolutionary Brigade.  Ways reaffirmed that his mother's cousin, Hamdan Ibrahim Hadman was a member of the 1920 Revolutionary Brigade.  Ways acknowledged that his father-in-law, Talib Ibrahim Hadman, aka Abu Ghassan, was a member of the 1920 Revolutionary Brigade as well.  Ways stated Hamdan and Talib are brothers.

24)     On August 2, 2010, Ways submitted to another interview with FBI agents in Iraq and advised he wanted to rectify information provided in prior interviews. Ways stated he specifically wanted to provide information regarding Al-Ahmad, residing in China, and Dual Tone Multi Frequency (DTMF) boards. Ways asked that his information be considered to expedite his and his brother's release from custody.

16

U.S. v. AIA 000661

25)    Ways clarified Al-Ahmad was never a Lieutenant for the Iraqi Customs, but rather a member of the 1920 Revolutionary Brigade. Ways explained that Al-Ahmad and Ways's father-in-law, Talib Ibrahim Hamdan, a.k.a. Abu Ghassan, had been long time associates. Ways denied knowing the nature of their relationship.

26)    Ways indicated he met Al-Ahmad approximately six times, always in Baghdad, even though Ahmad was originally from Syria. Ways first met Ahmad in either 2005 or 2006, when Talib was detained by Coalition Forces. Al-Ahmad traveled to Raduania, Baghdad, canvassing for Talib's relatives willing to organize a 1920 Revolutionary Brigade group. Al-Ahmad was introduced to Ways, who eventually directed Ahmad to Talib's brother, Hamdan Ibrahim Hamdan. Ways claimed he was too young to become involved in the resistance and directed Al-Ahmad to Hamdan.

27)    Ways recalled that in 2007, Al-Ahmad relocated to China, via Syria, with his wife and child. Ways did not know where Al-Ahmad settled in China and whether anyone else, other than his family, joined him.

28)    Ways advised that while in China, Al-Ahmad designed DTMF boards to remotely detonate IEDs and commissioned a Chinese factory to manufacture them. Al-Ahmad confided to Ways that he had designed the DTMF boards, and that he was selling them solely to the 1920 Revolutionary Brigade to assist in the resistance against American Forces (AF). Ways acknowledged that Al-Ahmad was aware the DTMF boards were being used in IEDs against AF. Al-Ahmad told Ways he "would do anything against Americans." Ways

17

explained the DTMF boards shipped by Al-Ahmad did not have any other purpose, or commercial value, other than being used to detonate IEDs.

29)    Ways advised he had seen a DTMF board early in 2007,[3] when Al-Ahmad brought it to Raduania to show it to 1920 Revolutionary Brigade members.  Upon being released from prison in 2009, Ways attempted to learn the design and programming of DTMF boards to profit from their sales to 1920 Revolutionary Brigade members.  Al-Ahmad provided Ways with online instructions on how the boards functioned and how they could be rendered inoperable.  Ways found the programming to be too complicated and decided to disregard the money making opportunity.  Ways and Al-Ahmad interacted solely via Yahoo Chat.  According to the FBI agents conducting the interview, that although Ways described their interaction as email based, upon detailed explanation it was evident that Ways referred to Yahoo Chat as email and to chat rooms as chat.

30)    Ways provided the email address he used to interact with Al-Ahmad as mohamedalwes@yahoo.com  and  stated  Al-Ahmad  used  either  email  address ahmadabuibrahim@yahoo.com or abuibrahimahmad@yahoo.com.  Ways partially recalled Al-Ahmad previous email address as sozan_sozan@yahoo.com.

31)    Ways explained that during his Yahoo Chat sessions with Al-Ahmad he learned that Al-Ahmad's DTMF's boards operated exclusively on frequency 422.  Ways stated Al-Ahmad

---

[3]Your affiant believes that Al-Ahmad fled after the Omar Cache was discovered on August 30, 2006.  Although your affiant believes that Al-Ahmad traveled to Syria before moving to China, as to this time frame, Al-Ahmad's exact whereabouts were unknown.

18

programmed the board's to work between frequency 422,000 and 422,999. Ways surmised that if Coalition Forces blocked frequency 422 the boards would become inoperable.

32) Ways indicated each board was labeled with its specific frequency channel, being any of the 999 channels between 422,000 and 423,000. The labeling was done by handwriting. Ways believed engineers, or trained individuals, could switch the boards frequency channels to any of the 999 channels within frequency 422. Ways advised Al-Ahmad's network included engineers in China, Syria and Iraq.

33) Ways stated Al-Ahmad incurred troubles with the 1920 Revolutionary Brigade approximately one and half year ago, mostly due to lack of payments for the DTMF boards. Al-Ahmad decided he would become strictly business oriented and he would provide the boards only upon full up-front payment.

34) Ways denied knowing shipment details or payment methods for the boards, but stated his uncle Hamdan was the individual responsible for handling 1920 Revolutionary Brigade's finances. Ways surmised Al-Ahmad shipped the boards to only one individual, possibly a close associate of Hamdan, who stored them in different locations to avoid detection. Ways believed that the boards would then be distributed by 1920 Revolutionary Brigade as deemed necessary.

35) Ways indicated DTMF board shipments were in 1,000 unit increments, including 1,000 receivers and 1 transmitter. Ways described the transmitter as model GB338, but could only describe the DTMF receivers as gray in color and approximately 3 by 4 inches.

19

U.S. v. AIA 000664

36)     According to Ways, Al-Ahmad told Ways the shipments could be received via container, taking two months, or via air within one week. Al-Ahmad stated he knew people at an unidentified Chinese airport who would facilitate the air shipment of illicit merchandise, but that the recipient of the shipment also required facilitation at the receiving airport. Al-Ahmad claimed he did not know anyone at the Baghdad International Airport who would assist with the shipments.

37)     Ways did not believe Al-Ahmad had a formal business in China, but rather a small operation. Ways described Al-Ahmad as greedy, and charging tenfold the price of manufacturing for the DTMF boards. Ways claimed not to have specific information regarding the pricing of the DTMF boards.

38)     Ways never communicated telephonically with Al-Ahmad due to the high costs. Ways advised his interaction with Al-Ahmad was limited to online chats. Ways and Al-Ahmad would communicate via online chat irregularly, sometimes multiple times in a week, other times only once quarterly.

39)     Ways claimed he last conducted an online chat with Al-Ahmad approximately seven to twenty days prior to Ways's July 24, 2010, date of capture. Ways indicated that during the last online chat session he used email address muhammed_alwes@yahoo.com, while Al-Ahmad utilized the ahmadabuibrahim@yahoo.com email address.

40)     Ways indicated that during a recent chat session, Al-Ahmad inquired if Talib had been detained by Coalition Forces and what the underlying charges were. Ways confirmed Talib's

20

detention, but stated he did not know who had originally notified Al-Ahmad of Talib's arrest.

41)     Ways met with Talib upon his release from Coalition Forces' custody, approximately two months prior to Ways' detention. Talib tasked Ways with contacting Al-Ahmad and alerting him that CF were aware about Al-Ahmad activities. Ways relayed the message to Al-Ahmad via online chat using mohamed_alwes@yahoo.com and ahmadabuibrahim@yahoo.com.

42)     Ways described Al-Ahmad as wealthy, greedy, private and not trusting of anyone. Ways believed Al-Ahmad would do anything for money, and that he might have chosen to sell DTMF boards, to be used against American Forces, solely for financial gain.

43)     On August 8, 2010, Ways was interviewed again by FBI agents in Iraq. Ways advised he communicated via Internet with Al-Ahmad approximately two months prior to Ways date of capture. During that online chat session, Al-Ahmad asked Ways to pick up three "walkie-talkies" (personal mobile radio-PMR) to be used as transmitters in conjunction with Dual Tone Multi Frequency (DTMF) boards. Al-Ahmad explained to Ways that Talib Ibrahim Hamdan had ordered and paid for the PMR but he could not pick them up because he was incarcerated. Ways denied knowing where in Baghdad the transmitters were stored and how they were shipped from China to Iraq. WAYS stated Talib and Hamdan Ibrahim Hamdan never discussed shipment routes with Ways. Ways believed Hamdan would be the most likely individual to know details about the shipping routes for DTMF boards because of his position within the 1920's Revolutionary Brigade.

21

44)     Ways advised that approximately fifteen to twenty days prior to the aforementioned chat, Al-Ahmad tasked Ways with relaying to Talib the pricing for the transmitters.  Al-Ahmad confided that Talib inquired regarding ordering PMR.  Al-Ahmad wanted Ways to relay to Talib that the pricing for the Walkie-Talkie was $350 U.S. per unit.

45)     On August 18, 2010, your affiant confirmed with Yahoo! that the e-mail accounts belonging to and utilized by Al-Ahmad, that is, john_john2008812@yahoo.com, beverlygong@yahoo.com.cn, ahmsah1977@yahoo.com and sozan_sozan1981@yahoo.com are still active accounts.

46)     Al-Ahmad has demonstrated a pattern of using these accounts to communicate with others about the procurement, sale and distribution of items which have commonly been used as component parts for IED's in Iraq targeting American Forces.  Corroborated by Ways, Al-Ahmad continues to use e-mail and chat room communications in furtherance of the crimes listed in the affidavit.  Based on my training and experience, your affiant believes that Al-Ahmad will continue to use email accounts to communicate with others regarding supplying DTMF boards and other component parts for use in IEDs.

47)     Additionally, your affiant believes, based on the interviews of Ways, there is probable cause to search the email account and chat room communications utilized by Ways and Al-Ahmad at mohamed_alwes@yahoo.com, ahmadabuibrahim@yahoo.com and abuibrahimahmad@yahoo.com.

//

22

U.S. v. AIA 000667

## TECHNICAL BACKGROUND

48)     In my training and experience, I have learned that Yahoo! provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public.  Yahoo! allows subscribers to obtain e-mail accounts at the domain name  yahoo.com, like the e-mail accounts listed in Attachment A.  Subscribers obtain an account by registering with Yahoo!.  During the registration process, Yahoo! asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo! are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo! subscribers) and information concerning subscribers and their use of Yahoo! services, such as account access information, e-mail transaction information, and account application information.

49)     In general, an e-mail that is sent to a Yahoo! subscriber is stored in the subscriber's "mail box" on Yahoo! servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Yahoo! servers indefinitely.

50)     When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Yahoo!'s servers, and then transmitted to its end destination.  Yahoo! often saves a copy of the e-mail sent.  Unless the sender of the e-mail specifically deletes the e-mail from the Yahoo! server, the e-mail can remain on the system indefinitely.

51)     A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail.  If an e-mail user writes a draft message but does not send it, that message may

U.S. v. AIA 000668

also be saved by Yahoo! but may not include all of these categories of data.

52) A Yahoo! subscriber can also communicate via instant messaging on the web messenger communications system. These messages are also stored in Yahoo! archives.

53) A Yahoo! subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Yahoo!.

54) Subscribers to Yahoo! might not store on their home computers copies of the e-mails stored in their Yahoo! account. This is particularly true when they access their Yahoo! account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

55) In general, e-mail providers like Yahoo! ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

56) Yahoo! typically retains certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via

24

Yahoo!'s website), and other log files that reflect usage of the account. In addition, e-mail Yahoo!s often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

57)     In some cases, e-mail account users will communicate directly with an e-mail service Yahoo! about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Yahoo! typically retains records about such communications, including records of contacts between the user and the Yahoo!'s support services, as well records of any actions taken by the Yahoo! or user as a result of the communications.

58)     In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

59)     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Yahoo! to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in

25

Section II of Attachment B.

## CONCLUSION

60)     Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(I).

61)     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

62)     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into Al-Ahmad and others known and unknown. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

//

//

//

26

U.S. v. AIA 000671

63)     These materials constitute evidence of Provision of Material Support or Resources to

Terrorists, in violation of 18 U.S.C. § 2339A, and Conspiracy to Commit Extraterritorial

Murder, in violation of 18 U.S.C. § 2332(b)(2).

Respectfully submitted,

DINA L. MCCARTHY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on September  9th 2010:

HONORABLE EDWARD C. VOSS
UNITED STATES MAGISTRATE JUDGE

27

U.S. v. AIA 000672