# EXHIBIT 12

# UNITED STATES DISTRICT COURT

for the

District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Google Inc.<br>2400 Bayshore Parkway<br>Mountain View, CA 94043 | )<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 11-7345MB |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

### SEE ATTACHMENT A

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized):*

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☒ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2332(b)(2) | Conspiracy to Commit Extraterritorial Murder |

The application is based on these facts:

### See attached Affidavit incorporated herein by reference

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Reviewed by AUSA David A. Pimsner

Special Agent Dina L. McCarthy, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 9, 2011

_____
*Judge's signature*

City and state: Phoenix, Arizona

Honorable Edward C. Voss, U.S. Magistrate Judge
*Printed name and title*

U.S. v. AIA 000246

**ATTACHMENT A**
**Property to Be Searched**

This warrant applies to information associated with email account haneen.jabar@gmail.com

that is stored at premises owned, maintained, controlled, or operated by Google Gmail, a

company headquartered at 2400 Bayshore Parkway; Mountain View, CA 94043.

1

U.S. v. AIA 000247

## ATTACHMENT B
## Particular Things to be Seized

I. Information to be disclosed by Google Gmail

To the extent that the information described in Attachment A is within the possession, custody, or control of Google Gmail, Google Gmail is required to disclose the following information to the government for each account or identifier listed in Attachment A for the time period of **January 1, 2005 through July 1, 2010**:

The contents of all e-mails stored in the account, including copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

The contents of archives of web messenger communications.

All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

U.S. v. AIA 000248

All records pertaining to communications between Google Gmail and any person regarding the account, including contacts with support services and records of actions taken.

II. <u>Information to be seized by the government</u>

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violation of 18 U.S.C. § 2332(b)(2), Conspiracy to Commit Extraterritorial Murder involving Ahmad Ibrahim Al-Ahmad and others known and unknown that relates to the procurement, sale and distribution of component parts with potential use in improvised explosive devices, the identification of co-conspirators, information about their whereabouts, along with information and records about the identity of who created, used or were involved in the email communications and web messenger communications for the accounts listed in Attachment A.

2

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Dina L. McCarthy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1)      I make this affidavit in support of an application for a search warrant for information associated with a certain email account that is stored at premises owned, maintained, controlled, or operated by Google Gmail, an e-mail provider headquartered at 2400 Bayshore Parkway, Mountain View, CA 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google Gmail to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2)      I am a Special Agent with the Federal Bureau of Investigation (FBI) Phoenix Division. I have been employed in this capacity since approximately March 11, 2001. Prior to my employment with the FBI, I was a Military Intelligence Officer with the United States Army for approximately 10 years. I have been assigned to a counterterrorism (CT) squad for approximately 8 years.

3)      I am a criminal investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 1515(4). In the course of my duties as a Special Agent with the FBI,

1

U.S. v. AIA 000250

I have investigated federal crimes perpetrated by individuals against the U.S. Government. As a result of my training and experience, I have become familiar with the Federal laws relating to the Conspiracy to Commit Extraterritorial Murder, in violation of 18 U.S.C. § 2332(b)(2).

4)     The facts in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation (including other law enforcement officers, analysts, Arabic language specialists, subject matter experts, and U.S. Department of Defense personnel); my training and experience; and a review of public, commercial, law enforcement and U.S. Department of Defense records and reports. Because this affidavit is being submitted for the limited purpose of securing a search warrant, my recitation of facts in support of a probable cause determination does not include each and every fact known to me concerning this investigation. Where statements of others are set forth in this affidavit, they are set forth in substance and in part.

5)     I am participating in the investigation of Ahmad Ibrahim Al-Ahmad (hereinafter "Al-Ahmad") who your affiant submits supplied component parts to members and associates of the 1920 Revolution Brigades, an Iraqi insurgent group. These parts were then used in improvised explosive devices (IEDs) that were employed against United States soldiers in Iraq. Further, your affiant believes that Al-Ahmad was involved in the research and development of new technologies and methods for the manufacture of IEDs which were also used against United States soldiers. Based on my training and experience and the facts as set

2

forth in this affidavit, there is probable cause to believe that the email account haneen.jabar@gmail.com contains evidence of a crime beginning in or about 2005 and continuing to in or about July 2010, whereby Al-Ahmad and others known and unknown, committed a violation of 18 U.S.C. § 2332(b)(2), Conspiracy to Commit Extraterritorial Murder. Consequently, this affidavit is made in support of an application for a warrant to search an e-mail account belonging to or utilized by Al-Ahmad, specifically, haneen.jabar@gmail.com which is more fully described in Attachment A (incorporated herein by reference), for the time period of **January 1, 2005 until July 1, 2010**, and to seize evidence of this crime, as described in Attachment B.

## LAW

## Conspiracy to Commit Extraterritorial Murder

## (18 U.S.C. § 2332(b)(2))

6)      Section 2332(b)(2) of Title 18 of the United States Code provides, in relevant part, that

> Whoever outside the United States . . . engages in a conspiracy to kill a national of the United States . . . that is a murder as defined by section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy . . .

is guilty of a crime.

## Elements of the Offense

7)      The Government must establish each of the following elements:

First, that two or more persons entered into a conspiracy, the object of which was to

3

murder a national of the United States;

Second, that the defendant knowingly and voluntarily became a member of the conspiracy, with the intent to further its unlawful purpose;

Third, that the defendant engaged in the conspiracy while outside the United States;

Fourth, that one or more of the conspirators knowingly committed an overt act to effect the object of the conspiracy.

8)     A "national of the United States" is a citizen of the United States or a person owing permanent allegiance to the United States.[1]

## PROBABLE CAUSE

### I.     The 1920 Revolution Brigades

#### A.     Origins

9)     The 1920 Revolution Brigades (Kataib Thawrat al-Ishreen) ("the Brigades") is an armed Iraqi resistance group that opposes foreign occupation in Iraq. During the height of the group's operational activities from approximately 2003 to 2007, the Brigades was among the most prominent jihadist groups in Iraq. According to a Brigades' publication, "Al-Kata'ib," the group's name dates back to the 1920 revolution when Iraqis revolted against the British occupation. The name was selected to remind Iraqis of their history of resistance against "occupation" forces.

10)     On September 6, 2007, the Brigades announced that they joined eight other

---

[1] 8 U.S.C. § 1101(a)(22).

4

like-minded Iraqi armed factions in forming a unified front against the U.S.-led coalition under the name of "Jihad and Change Front (JACF)." In its first public statement, the JACF announced that it rejected the so-called occupation and its consequences, including the political process, government, constitution, parties, and agreements. In a 2007 interview with the Al-Jazirah Satellite Channel, a spokesman for JACF and a representative of the Brigades noted that, among the reasons for forming the JACF, the resistance must fight as one rank and contended that the "coming stage" required a political council that represented all factions of the Iraqi resistance. The "coming stage" was likely a reference to the "post-occupation" stage following an expected draw down of U.S. forces.

**B. Goals**

11) Communiqués published independently by the Brigades media office and jointly with the JACF media office from July 2003 to date reflect that the goal of the Brigades and the JACF is to defeat all consequences of the U.S. presence in Iraq, including the current political regime and process as it is viewed as an "occupation government." For example, in 2010, in a statement addressing the announced withdrawal of U.S. combat forces, the JACF media office declared that "…we will never quit fighting until the departure of the last foreign soldier from our soil." In a 2006 video message from the Amir (leader) of the Brigades to the Iraqi nation, the Amir proclaimed that the "American oppressor and tyrant has violated every place where humanity dwells and reserved his strong resentment and hatred for Islam and Muslims, destroying civilization of mankind and dragging behind every

5

individual who echoes his barking." The Amir declared that "jihad today is a compulsory duty upon all of us." In 2009, the secretary general of the JACF announced that: "We are factions of a jihadist resistance. Our first enemy is the infidel U.S. occupation, those who came with it, those who facilitated the occupation, supported it, and paved the way of its plan, and those who joined its rank against the resistance and jihad project."

### C. Targeting of U.S. Nationals by the Brigades/JACF

12)    From its inception to present day, the Brigades'/JACF's objective of resisting what they view as the "U.S. occupation" has translated into a campaign of violent hit-and-run attacks against U.S. forces by the Brigades and attempts to sway public opinion against the U.S. through negative media reports generated by the Brigades'/JACF's media wings.

13)    A review of press statements published by the Brigades and JACF that were posted to websites dedicated to news on jihad and Iraqi insurgent groups revealed that from 2005 to 2010 the Brigades claimed responsibility for the killing and wounding of U.S. military personnel in premeditated attacks against U.S. military vehicles, bases, foot patrols, and aircraft. Press statements published by the Brigades reflect the group's use of Improvised Explosive Devices (IEDs) to target U.S. military vehicles and dismounted foot patrols; the use of mortars, rockets, and missiles to shell U.S. military bases and positions; and the use of snipers to shoot U.S. military personnel.

14)    According to its media wing, the Brigades claimed responsibility for approximately 230 IED attacks, 156 shelling attacks, 82 sniper and small arms attacks, and 45 non-specific

6

attacks targeting U.S. military personnel from 2005 to 2010. In some instances these press statements were accompanied by video footage documenting the attacks. In a 2006 interview with the Al-Jazirah Satellite Channel, a Brigades spokesman affirmed that "we also have many operations that are videotaped." Many of these videos show dramatic attacks on U.S. military vehicles which likely resulted in casualties to U.S. military personnel.

15) A review of press statements published by the Brigades from 2005 to 2010 finds that the Brigades also claimed responsibility for killing approximately 94 U.S. military personnel and wounding nine others. The Brigades also claimed responsibility for U.S. military personnel deaths and injuries in 92 separate attacks. While no specific numbers of deaths or injuries were cited in these 92 attacks, the press statements used phrases similar to "the Hummer was destroyed and all of those in it were killed or injured" or "sniped an American soldier" in their descriptions of the underlying events.

16) The following confirmed attacks on U.S. forces illustrates the Brigades' violent tactics. On July 20 and 22, 2006, two U.S. mounted combat patrols in Ramadi, Iraq, were attacked by IED strikes against "M1114 High Mobility Multipurpose Wheeled Vehicles" (a/k/a Hummers). A total of seven U.S. military personnel were wounded in both attacks and two Hummers were damaged. In an official press statement dated July 22, 2006, and posted to a website that carried statements issued by Iraqi insurgent groups, the 1920 Revolution Brigades stated that they had "destroyed two Hummers belonging to the occupying American forces in the western area of Al-Ramadi." A link to two videos of the operations

7

accompanied the statements. The videos, containing the Brigades' logo, showed two Hummers sustaining direct hits from IED detonations.

## II.    Improvised Explosive Devices (IEDs)

17)    Designed to destroy and incapacitate its target, an Improvised Explosive Device (IED) is a weapon placed or fabricated in an improvised manner incorporating destructive, lethal, noxious, pyrotechnic, or incendiary chemicals. It may incorporate military weaponry, but is normally devised from non-military components. Generally speaking, an IED can be broken down into five main components – a power source, a switch, an initiator, the main charge, and a container. The IED power source stores or releases energy, either mechanical or electrical, to initiate the IED. The IED switch controls the flow of energy from the power source to the initiator and can be the most complex component of the system. There are three main categories of IED switches: command, time, and victim-operated.

18)    A radio-controlled IED ("RCIED") provides a wireless method of IED initiation through the use of a transmitter and a matched receiver. RCIEDs recovered from the battlefield in Iraq include the following configurations: a mobile phone used as the receiver connected to a homemade dual-tone multi-frequency (DTMF)[2] circuit board to decode the incoming signals including Long Range Cordless Telephones (LRCTs); a personal mobile

---

[2] Dual Tone Multi-Frequency signaling, which is commonly referred to as touch-tone dialing, sends information over a phone or audio connection. In many Improvised Explosive Devices (IEDs) that incorporate DTMF technology, the user calls a mobile phone attached to a custom circuit and explosive train. Using the phone's keypad the user sends a sequence of digits to detonate the IED. By using unique DTMF sequences or codes for their IEDs, terrorists are able to effectively control complex operations or prevent accidental predetonation. DTMF signaling is commonly used in IEDs because the technology is widely accessible, inexpensive, and simple to implement.

U.S. v. AIA 000257

radio (PMR) connected to a DTMF circuit board; a PMR connected to a transistor controlled relay (TCR); appliance controllers; wireless doorbells; keyless entry systems; and automobile alarms.

### III.    The "Omar Cache"

#### A.    Inventory of Components/Tools/Boards/Chemicals

19)    On August 30, 2006, Coalition Forces discovered at 50 Omar Street, Baghdad, Iraq, one of the largest IED caches found in Iraq ("Omar Cache"). The military personnel found numerous IED-related construction materials, test equipment, schematics, and other items related to IED construction – including an IED initiator, hundreds of components for various types of RCIEDs, and extensive bomb-making training aids. Also found were internet printouts bearing Al-Ahmad's name which featured diagrams and instructions on the process of wiring and controlling a fixed or cellular telephone and documents with electrical and electronics equipment diagrams featuring transistor connections. Computer-related material recovered from the site contained a collection of print-outs from extremist Islamic web sites. Al-Ahmad, while not present at the time of the discovery, was later linked to the Omar Cache by various evidence found there.

20)    The investigation has revealed that an analysis of the items seized from the Omar Cache indicates that the location was essentially an IED factory. The cache included all of the necessary tools and materials for manufacturing Dual-Tone Multi-Frequency (DTMF) decoder custom circuits and also included documents with apparent design plans. The

U.S. v. AIA 000258

materials found at the Omar Cache could also have been used for modifying commercial electronics to function as low-power RCIEDs and for manufacturing the DTMF-11[3] type of custom circuits which are commonly used as initiators in RCIEDs.

21) Some of the key items that indicated the cache likely served as an IED factory are listed below:

a. Assorted documents, including a DTMF-11 circuit board layout, parts list, and datasheets – these documents are likely design notes for the manufacturing of IED electronics;

b. Several sheets of blank, copper-clad boards – the boards are sent through a chemical etching process to produce custom circuit boards;

c. Hydrochloric (muriatic) acid, hydrogen peroxide, and acetone – the hydrochloric acid and hydrogen peroxide form an etching solution, and the acetone is used as a cleaning agent in the process of producing custom circuit boards;

d. Angle grinder and electric drill – these tools cut finished circuit boards from the sheet and make holes in the boards for mounting electronic components;

e. Unpopulated, etched circuit boards – these boards represent the finished product of the etching and cutting process. Multiple types of unpopulated DTMF decoder custom circuits were recovered;

f. Electronic components – all of the components needed to build DTMF-11

_____

[3] The number "11" refers to a specific DTMF circuit design.

10

circuits were recovered in large quantities;

g.     Soldering irons and solder – these items are used to mount electronic components to the circuit boards;

h.     Completed DTMF-11 circuits – there were at least six complete DTMF-11 circuits from the cache, which represented the finished product of the board manufacturing process;

i.     Mobile phones and Personal Mobile Radios (PMRs) – DTMF-11 circuits are commonly combined with these wireless devices to operate as receivers in RCIEDs.

22)     The items listed above were sufficient to produce approximately 60 DTMF-11 custom circuits. Notably, the cache included design documents, intermediate products (unpopulated circuit boards), and tools required for the manufacturing process. Such a collection indicates that the cache was not simply a storage site for IED-related materials, but that it was likely intended to build electronic IED switches (i.e., an IED electronics factory).

23)     In addition, the cache included circuitry for use in other types of RCIEDs, including many completed devices. The JDQ-6A radio controlled switches, YK1000, and YK1500 transmitters discovered at the cache are commonly used in low-power RCIEDs. The Remote Controlled (RC) toy car transmitter and receiver and Al Khateeb key fob transmitters found at the cache have low-power RCIED applications as well. The cache also included a DTMF-9 type of custom circuit and multiple Microchip PIC microcontrollers (key component for the DTMF-9 custom circuits). The cache could have been used to exploit

11

commercial devices for use in low-power RCIEDs or to manufacture DTMF custom circuits. Numerous documents clearly indicated that the individual(s) involved with the Omar Cache were interested in improving the functionality of the IED designs through incorporation of innovative technologies and advanced electronic components. For instance:

a. Technical specifications for the TRW-400-5 transceiver – while this specific device has not been found in IEDs, similar devices operating at the same frequency have been employed in IED circuits in Iraq since June 2005. Emails belonging to Al-Ahmad in August 2005 discussed this component.

b. Technical notes on dual-tone multiple-frequency (DTMF) technology used in touch-tone telephones – this technology was introduced in Iraqi IEDs in November 2005.

c. Schematics and technical notes on IED design incorporating the DTMF decoder chip. This design is typical of many IED circuits employed in Iraq. Microchip PIC16F84A is manufactured by Microchip Technology Inc., which is headquartered in Chandler, AZ, and is a leading provider of micro controller and analog semiconductors.

d. Technical specifications of the Princeton Technologies PT2262 and PT2272 remote control devices. These components, like the Microchip PIC16F84A, have been used in RCIEDs in Iraq.

## B. Al-Ahmad's Association with the Omar Cache

24) Copies of known fingerprints belonging to Al-Ahmad were sent to the FBI Laboratory in Quantico, Virginia, to conduct a comparative analysis with prints found at the Omar

12

Cache. To date, the FBI Lab has found 114 matches to various items found at the Omar Cache. For example, Al-Ahmad's prints were identified on the following types of materials: documents and book pages; a voltage control oscillators in original packaging; a lid to a power meter; an unknown electronics device in light blue metal case; and a piece of white electrical tape (the electrical tape was wrapped around an IED switch and a matching transmitter was also recovered with this device).

25) In addition, a collection of documents were seized from the Omar Cache which included the following: various photos of Ahmad Ibrahim Ahmad;[4] a handwritten document in Arabic with a translated title of "Explosives," comprising 19 chapters covering the classification and effects of various explosives, accessories used with explosives, detonation circuits, handling of explosives, demolition of buildings, bridges, airports, roads, etc., and timing devices; a voltage tester that is labeled "Al-Ahmad Manufacturing for Electronic Products" (it appeared that a small number of voltage testers were also being constructed at the Omar Cache); electronic circuit board designs and diagrams on micro-fiche slides which included a sticker for Al-Ahmadi electronics production warranty and an envelope with "Ahmad Al-Ahmadi" written on it containing an order of "neon board;" a notebook that had the name "Ahmad Al-Ahmad" written on the front from the Mustansriyyah University Nuclear lab; a second notebook that had the name "Ahmad Al-Ahmad" written on the front containing drawings of electrical circuits, circuit board designs, and formulas from the

---

[4] It should be noted that some documents belonging to other persons were also found at the Omar Cache.

13

"Al-Rafidayn" school. There was also a letter from 'Abd-al-Karim 'Amur to Ahmad Ibrahim Al-Ahmad; documents containing technical notes and lessons (on an "Al-Ahmad Electronics Industries" notebook) detailing electrical and electronic circuits, automotive sensors and wiring, batteries, frequencies, math calculations, current and voltage, and various electronic components; documents also included emails, sales receipts, letters, and personal statements; an electronics booklet describing how to employ remote control technology to command a mobile phone, wireless device, and land-line phone to detonate explosives.

26)    The Omar Cache contained business documents linked to Al-Ahmad: a mix of papers including a letter between Ahmad Al-Ahmadi and another individual, diagrams, electronic calculations, time sheets, accounts, school confirmation for "Ahmad Ibrahim Al-Ahmad," cash receipts, electrical receipt, and a tax receipt. Documents included a cash receipt and order form for a neon sign for Ahmad Al-Ahmadi and a property sticker in the name of Ahmad Al-Ahmad. There were documents linking Al-Ahmad to the Beirut, Lebanon, company SES Lebanon (a/k/a Serpico Sarl). One undated letter to "Ahmad" from a principal of SES Lebanon, stated that the principal was arranging a shipment from an unidentified company in Hong Kong "by your account to Baghdad direct, signed [the principal]." A second undated letter from SES Lebanon to Wenshing Electronics in Taipei, Taiwan, concerning Wenshing model TRW-400 transmitter/receiver indicated Al-Ahmad, through SES Lebanon, was seeking samples of the item which had a range of more than one kilometer. Based on consultation with others who are subject matter experts in explosives,

14

your affiant knows that this type of transmitter/receiver could be used in an IED.

27)     As part of the investigation, an analysis determined that materials of the kind seized at the Omar Cache were associated with IED attacks where U.S. Forces incurred casualties. For example, two attacks which were caused by RCIED initiators using a DTMF-11 custom circuit and a mobile phone are linked to the materials found in the Omar Cache.  One incident used an initiator circuit that matched circuits recovered from the Omar Cache. The other incident used a circuit that is very similar to those found in the Omar Cache.  On April 6, 2007, in the outskirts of southern Baghdad, near Baghdad International Airport, three U.S. soldiers were killed in action by a cellular-phone initiated IED.  The IED initiator used in this incident includes a DTMF-11 custom circuit that matched three circuits recovered in the Omar Cache.  The circuits all have nearly identical traces, share a common set of electrical components, and function identically.  Furthermore, the circuits were likely manufactured using the same processes.  On May 14, 2007, in northern Baghdad, approximately one-half mile from the Omar Street facility, one U.S. soldier was killed in action and four wounded in action by a cellular phone initiated IED. The IED electronic switch used in this incident included a DTMF-11 custom circuit that was very similar to three custom circuits recovered in the Omar Cache. The custom circuits had subtle differences in their trace layouts, but otherwise used a common set of components and functioned identically.

//

//

15

U.S. v. AIA 000264

## IV.  Al-Ahmad's Involvement with the 1920 Revolution Brigades

### A.  Detainee Information

#### i.    W-1

28)    During a custodial interview, W-1, who is currently facing trial for terrorism-related charges in Iraq, provided the following information about Al-Ahmad.[5]  W-1 was shown a photograph of Al-Ahmad, whom he identified as "Ahmad." W-1 indicated he met Al-Ahmad approximately six times, always in Baghdad, even though Al-Ahmad was originally from Syria.  W-1 first met Al-Ahmad in either 2005 or 2006.  W-1 stated that in 2007, Al-Ahmad relocated to China, via Syria, with his wife and child.[6]

29)    W-1 stated that while in China, Al-Ahmad designed DTMF boards to remotely detonate IEDs and commissioned a Chinese factory to manufacture them.  Al-Ahmad told W-1 that he had designed the DTMF boards, and that he was selling them solely to the 1920 Revolution Brigades to assist in the resistance against American Forces.  W-1 acknowledged that Al-Ahmad was aware the DTMF boards were being used in IEDs against Americans. Al-Ahmad told Ways he "would do anything against Americans." W-1 explained the DTMF boards shipped by Al-Ahmad did not have any other purpose, or commercial value, other

---

[5]  W-1 was interviewed on a number of occasions between July and August 2010.

[6]  When initially questioned about Al-Ahmad, W-1 stated that Al-Ahmad was a Lieutenant for the Iraq Customs (IC).  W-1 claimed that he last saw Al-Ahmad in approximately 2006 at the Baghdad Custom Building and never telephonically or electronically contacted Al-Ahmad.  When he was re-interviewed, W-1 advised he wanted to correct information provided in prior interviews.  W-1 stated he specifically wanted to provide information regarding Al-Ahmad, residing in China, and Dual Tone Multi Frequency (DTMF) boards.  W-1 clarified Al-Ahmad was never a Lieutenant for the Iraqi Customs, but rather a member of the 1920 Revolution Brigades.  W-1 further clarified that W-1 had additional contacts with Al-Ahmad and asked that this information be considered so that W-1 and a family member might be released from custody.

U.S. v. AIA 000265

than being used to detonate IEDs.

30) W-1 advised he had seen a DTMF board early in 2007, when Al-Ahmad showed one to 1920 Revolution Brigades' members. Upon being released from a prior detention in Iraq in 2009, W-1 attempted to learn the design and programming of DTMF boards to profit from its sales to Brigades' members. Al-Ahmad provided W-1 with online instructions on how the boards functioned and how they could be rendered inoperable. W-1 found the programming to be too complicated and abandoned his efforts to make the boards.

31) W-1 and Al-Ahmad interacted via email chat communications. W-1 also stated that he received an email containing scanned copies of Al-Ahmad's documents which he was supposed to use to expedite Ahmad's passport request. W-1 explained that, during his communications with Al-Ahmad, he learned about the frequency used by Al-Ahmad in his DTMF boards. W-1 stated that Al-Ahmad, approximately one and a half years ago, was troubled by a lack of payments from the Brigades for the DTMF boards. Al-Ahmad decided he would become strictly business oriented and he would provide the boards only upon full up-front payment. W-1 claimed he last communicated online with Al-Ahmad approximately seven to twenty days prior to W-1's July 24, 2010, date of capture.

32) Al-Ahmad told W-1 that the shipments of electronics to Iraq could be received via container, taking two months, or via air within one week. Al-Ahmad knew people at an unidentified Chinese airport who would facilitate the air shipment of illicit merchandise, but that the recipient of the shipment also required facilitation at the receiving airport.

17

U.S. v. AIA 000266

33)     W-1 acknowledged that C-6, described hereafter, was a member of the 1920 Revolution Brigades.

34)     W-1 indicated that, prior to W-1's July 2010 capture, Al-Ahmad inquired if C-6, of the 1920 Revolution Brigades, had been detained by Coalition Forces and what the underlying charges were. When C-6 was subsequently released, he tasked W-1 with contacting Al-Ahmad and alerting him that Coalition Forces were aware of Al-Ahmad's activities. W-1 stated that he relayed the message to Al-Ahmad via an internet communication.

35)     On March 17, 2011, W-1 was re-interviewed by the FBI in an Iraqi prison. During the interview, Ways reaffirmed his earlier statements against Al-Ahmad concerning the use of DTMF boards in IEDs and the targeting of Coalition Forces in Iraq.

36)     Between December 31, 2009 and April 21, 2010, FBI Phoenix obtained a 2703(d) court order for three of Al-Ahmad's email accounts: john_john2008812@yahoo.com, ahmsah1977@yahoo.com and sozan_sozan1981@yahoo.com. Additionally, on February 3, 2010, FBI Phoenix obtained a 2703(d) court order for Al-Ahmad's assistant, C-1's, email address beverlygong@yahoo.com. Also, on September 9, 2010, FBI Phoenix obtained a search warrant for these same email accounts. Based on a review of these accounts and other evidence collected in this investigation, FBI Phoenix found contacts between Al-Ahmad and individuals who were members or associates of the 1920 Revolution Brigades.

//

18

U.S. v. AIA 000267

### ii. C-1

37) Al-Ahmad, after leaving Iraq, initially fled to Syria, and then in approximately 2007, moved to China. Al-Ahmad established various companies in China, with the support of a Chinese assistant, C-1. These companies appeared to function as exporters, whereby Al-Ahmad received orders for products that could be obtained in China for his associates located primarily in Iraq, Syria, Sudan, and Yemen. Al-Ahmad received the orders, normally via the internet, and arranged the purchase and shipment of these orders. Your affiant discovered that Al-Ahmad utilized many email addresses to conduct business and/or communicate with his associates worldwide. Moreover, C-1 also established email accounts, which were also used to facilitate Al-Ahmad's business. As described below, a review of the evidence revealed contacts between Al-Ahmad and other individuals who were members or associates of the 1920 Revolution Brigades.

### iii. C-2

38) C-2 allegedly served as the political director and media emir for the 1920 Revolution Brigades as well as the Jihad & Change Front, and it is believed that he continues to serve in a leadership role. Based on my review of evidence gathered in this investigation, C-2 had the authority to oversee and approve the press releases that were publicly distributed on behalf of these groups. For example, C-2 was sent a Brigades' magazine for review and approval, and C-2 interacted with members of the media on behalf of the Brigades. As such, C-2 provided updates on the groups goals and activities. C-2 also received operational

19

updates from other members of the Brigades regarding attacks against U.S. forces in Iraq.

39)     Through a review of the available evidence, the investigation revealed that Al-Ahmad supplied C-2 with components that could be used in the construction and operation of IEDs. For example, on October 12, 2008, Al-Ahmad and C-2 corresponded concerning an order for mobile phones – three of the five types of mobile phone models listed in the message had been recovered in IED caches/events in Iraq. On August 20, 2007, C-2 requested an address to send the first half of the payment of $26,000 for 2,000 receivers. C-2 asked that another 100 hand units continue to be worked on. Based on training and experience and results of the investigation, your affiant believes that the receivers and hand held devices mentioned above were intended for use as part of the remote initiating systems for IEDs. In short, the investigation discovered that C-2, a senior leader with the Brigades, was ordering IED components from Al-Ahmad and transferring funds to his bank account in China as payment.

40)     The investigation has revealed that the email account haneed.jabar@gmail.com was utilized by Al-Ahmad as part of the conspiracy to provide IED components to the 1920 Revolution Brigades.

a.     On August 23, 2007, C-2 received an email from account haneen.jabar@gmail.com that included the sender's account number at the Bank of China; namely, the bank account number for "AhamedHFarhan" at the Bank of China in Shenzhen. (Farhan is an alias used by Al-Ahmad which your affiant learned through a copy of a passport containing Al-Ahmad's photograph and the name "Ahmed Hassan Farhan.") Your

20

affiant believes, based on training and experience, that Al-Ahmad established a bank account in China using his "Ahmed H. Farhan" alias and utilized the account haneen.jabar@gmail.com to communicate with C-2 regarding the purchase and shipment of items.

b.    On August 20, 2007, C-2 sent an email to an account used by Al-Ahmad (haneen.jabar@gmail.com) in which C-2 requested an address to send the first half of the payment of $26,000 for 2,000 receivers referenced above. C-2 asked that the other 100 hand units continue to be worked on. Your affiant believes, based on consultation with subject matter experts, that the receivers and hand units refer to receivers and transmitters used to initiate IEDs.

c.    On August 22, 2007, C-2 received an email from haneen.jabar@gmail.com stating, "I want to ask you the 45 old receiver you want me send or not send it to you with 50 holy Quraan together?" C-2 replied the same day with an email stating that "1. Don't send the 45 items with the holy Quran 2. Western Union refused to transfer the whole amount. they can only transfer up to 7,000 dollars. the best way is to give me the bank account number to send them. Regarding to the master card charging, they want your name in the master card because the said that this number is not available."

d.    On August 23, 2007, Al-Ahmad replied to C-2 by sending his credit card information as well as promising to inquire into the bank account transfer. Al-Ahmad then sent a second email that included the bank account information in China that was under the

U.S. v. AIA 000270

name "Ahamed H. Farhan," an alias that Al-Ahmad has used in the past.

e.     On September 10, 2007, C-2 received an email from haneen.jabar@gmail.com account that stated that the sender (Al-Ahmad) was able to find a hand-held device that met their technical specifications for $350 dollars and that 100 "pieces" would be manufactured. The email discussed that the hand-held device could be programmed in a manner where a speed dial could be inserted inside the handle. Al-Ahmad closed the email by giving an update regarding the 2,000 pieces [receivers referenced in email dated August 20, 2007 referenced above]: "Things are going good. I will receive the final model in few days."

f.     Based on information obtained pursuant to Orders from this Court, the undersigned learned that on January 1, 2010, Al-Ahmad sent an email from his john_john2008812@yahoo.com email account to the email account haneen.jabar@gmail.com.

41)     Based on training and experience, your affiant believes that C-2, the political director and media emir of the 1920 Revolution Brigades, was ordering IED components from Al-Ahmad and transferring funds to Al-Ahmad's bank account in China as payment.

iv.     C-3

42)     C-3 allegedly is a mid-level leader with the 1920 Revolution Brigades. C-3 received operational updates from Brigades' forces in Iraq and had the authority to request and procure supplies and funding for them. C-3 also routinely received expense reports from other members of the Brigades for review and remittance. On or about November 11, 2008,

22

Al-Ahmad shared information with C-3 regarding how to use a mobile phone as a surveillance tool. On November 11, 2008, Al-Ahmad sent C-3 another message which included the phrases, "Receiving unit: 100 pieces," and "Transmitting unit: 10 pieces." Based on training and experience, your affiant believes that these phrases refer to receivers and transmitters that are part of the initiation systems of RCIEDs. On December 19, 2008, Al-Ahmad sent C-3 a message containing a list of four magnets with their dimensions. A quantity of 150 was listed for each magnet. Based on the dimensions included in the message, two of the magnets listed by al-Ahmad are similar to magnets recovered from IED attacks in Iraq. Iraqi insurgents are known to glue magnets to IED initiation systems, which makes it possible to attach those devices to U.S. vehicles.

## V.    C-4

43)    C-4 allegedly served as a mid-level leader within the 1920 Revolution Brigades who kept track of the group's operational expenses. C-4 communicated with other Brigades' leaders regarding funding issues and specific updates on losses sustained during operations in Iraq, along with requests for guidance. C-4 communicated with Al-Ahmad, on or about February 2, 2009, regarding a "Shipment List" that included a wireless transmitting unit, wireless receiving unit, and electronic boards. These items found in the list were consistent with components used in IEDs. On May 5, 2009, C-4 received information from Al-Ahmad regarding a DHL shipment containing two external car antennas, two range extending systems (25 watts), one transmission frequency measuring system, electric cables, metal

U.S. v. AIA 000272

conductors and accessories. Based on C-4's leadership role in the Brigades, your affiant believes that the components being shipped from Al-Ahmad in China to C-4 in Iraq are likely being used in IEDs against U.S. military forces.

44) C-5 allegedly is an IED distributor who operated out of the Baghdad area and who was connected to members of the 1920 Revolution Brigades. On or about April 9, 2009, C-5 shared an article with C-2, a senior leader of the Brigades, which discussed the different operations taken by the resistance to prevent the needed supplies of equipment to reach the American army in Kirkuk and Mosul. The article concluded that the supplies were destroyed and that they did not reach their destination. On January 12, 2008, C-5 sent a report to Al-Ahmad. The report was translated from Arabic to English and was titled, "A report about military operations in different parts of Iraq." The first paragraph discussed the decrease in activities of the resistance groups. The second paragraph discussed the activities of the Islamic Army, which was declared a jihadi front and not a resistance group. The third topic discussed Al-Kata'ib in Karkuk, advising that groups were suffering from the inability to develop new tactics of attack and that explosive systems were not efficient anymore.

45) On August 9, 2009, C-5, using an alias, sent Al-Ahmad a request for POSITIV20 aerosol spray cans. C-5 asked Al-Ahmad to order the spray and "send it with the other stuff." Your affiant knows based on training and experience that this spray is used with custom circuit boards after production to prevent oxidation or other degradation of the circuits. On August 16, 2009, Al-Ahmad sent C-5 his bank account information for two accounts in

24

China. Shortly thereafter, C-1 sent C-5 an invoice for electronics equipment and separately the technical user manuals of the Shenzhen KYL RF modules listed on the invoice.

### vi. C-6

46) C-6 was allegedly a major distributor of IED initiators in Iraq and a leader within the Brigades. Your affiant learned that C-6 corresponded directly with Al-Ahmad on at least one occasion and also through other individuals. On June 17, 2009, C-6 described himself as an "engineer" to Al-Ahmad. Your affiant knows, based on this investigation that the term "engineer" is commonly used to describe individuals in insurgent groups involved in constructing explosive devices.

### vii. C-7

47) On or about September 2, 2008, C-7 sent Al-Ahmad a list of components that consisted of 1,000 Microchip 16F630 integrated circuits (IC), 1,000 Microchip 16F628 integrated circuits (IC), 2000 MT8870 dual tone multi-frequency decoder circuits, 2,000 crystal oscillators that operated at 3.579545 MHZ, 2000 680 transistors, 2000 681 transistors, 4000 9v battery clips, 4000 4.7 muq (no further information), and an unspecified amount of finger magnets. Your affiant has learned that six of these nine components are commonly used in IED circuits employed by insurgents in Iraq. Based on the quantities of various components requested, the purchaser could construct 2,000 IED circuits (1,000 each of two different circuits). The component list also included "finger magnets" which are consistent with magnets that are used to attach IEDs to U.S. vehicles in Iraq.

25

48)     On May 10, 2011, in Case No. 11-7234 M, the United States District Court for the

District of Arizona issued an arrest warrant for Al-Ahmad based on a criminal complaint and

affidavit which alleges that Al-Ahmad from in or about January 2005 until on or about July

2010 conspired to kill a national of the United States, which such national was outside the

United States, in violation of 18 U.S.C. § 2332(b)(2), and conspired to provide material

support or resources to be used in preparation for and in carrying out a violation of Section

2332(b)(2), in violation of 18 U.S.C. § 2339A.  Pursuant to an Interpol notice, based on this

Court's arrest warrant, Al-Ahmad was arrested on May 18, 2011 by law enforcement

authorities of the Government of Turkey while Al-Ahmad was transiting through Turkey.

Al-Ahmad is currently detained pending extradition.

## TECHNICAL BACKGROUND

49)     In my training and experience, I have learned that Google Gmail provides a variety

of on-line services, including electronic mail ("e-mail") access, to the general public.  Google

Gmail allows subscribers to obtain e-mail accounts at the domain name yahoo.com, like the

e-mail accounts listed in Attachment A.  Subscribers obtain an account by registering with

Google Gmail.  During the registration process, Google Gmail asks subscribers to provide

basic personal information.  Therefore, the computers of Google Gmail are likely to contain

stored electronic communications (including retrieved and unretrieved e-mail for Google

Gmail subscribers) and information concerning subscribers and their use of Google Gmail

services, such as account access information, e-mail transaction information, and account

26

U.S. v. AIA 000275

application information.

50) In general, an e-mail that is sent to a Google Gmail subscriber is stored in the subscriber's "mail box" on Google Gmail servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on Google Gmail servers indefinitely.

51) When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to Google Gmail's servers, and then transmitted to its end destination. Google Gmail often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google Gmail server, the e-mail can remain on the system indefinitely.

52) A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by Google Gmail but may not include all of these categories of data. A Google Gmail subscriber can also communicate via instant messaging on the web messenger communications system.

53) A Google Gmail subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by Google Gmail.

54) Subscribers to Google Gmail might not store on their home computers copies of the

27

e-mails stored in their Google Gmail account. This is particularly true when they access their Google Gmail account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

55) In general, e-mail providers like Google Gmail ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

56) Google Gmail typically retains certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google Gmail's website), and other log files that reflect usage of the account. In addition, e-mail Google Gmails often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

57) In some cases, e-mail account users will communicate directly with an e-mail service

28

Google Gmail about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Google Gmail typically retains records about such communications, including records of contacts between the user and the Google Gmail's support services, as well records of any actions taken by the Google Gmail or user as a result of the communications.

58) In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

59) In my training and experience, is it likely that individuals involved in financial or business transactions would maintain their e-mails on the system as a record of those transactions.

60) In my training and experience, it is likely that individuals involved in criminal activity related to terrorism would maintain multiple e-mail accounts, letting some email accounts lie dormant for periods of time and then returning to them at a later date, in an effort to avoid detection from law enforcement.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

61) I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google Gmail to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of

U.S. v. AIA 000278

Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

62)    Al-Ahmad has demonstrated that he utilized email accounts to communicate with others about the procurement, sale and distribution of items which have commonly been used as component parts for IED's in Iraq targeting American nationals. Based on information from W-1 , Al-Ahmad has used internet communications in furtherance of the crimes listed in the application, namely supplying DTMF boards and other component parts for use in IEDs to kill U.S. personnel.

63)    Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(I).

64)    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

65)    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and

U.S. v. AIA 000279

search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into Al-Ahmad and others known and unknown. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

66) These materials constitute evidence of a Conspiracy to Commit Extraterritorial Murder, in violation of 18 U.S.C. § 2332(b)(2).

Respectfully submitted,

DINA L. MCCARTHY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on June 9th, 2011:

_____
HONORABLE EDWARD C. VOSS
United States Magistrate Judge

31

U.S. v. AIA 000280