# EXHIBIT 40
# (Pages 1-87)

offenses considered as extraditable offenses within the meaning of Article 2 of the extradition treaty between the United States and Turkey, which entered into force on January 1, 1981.

**List of Exhibits**

20.     The following are attached as exhibits to this affidavit:

| | |
|---|---|
| Exhibit A | Complaint in case number 11-7234 M |
| Exhibit B | Arrest Warrant in case number 11-7234 M |
| Exhibit C | Text of Relevant statutes of the offenses charged |
| Exhibit D | Affidavit of FBI Special Agent Dina McCarthy |
| Exhibit E | Text of the Statute of Limitations |

21.     I believe that this affidavit and the attached exhibits establish proof of Ahmad Ibrahim Al-Ahmad's criminal activity in violation of the laws of the United States of America as alleged in the formal charges contained in the complaint. This affidavit is sworn to in the presence of a United States Magistrate Judge in the District of Arizona, United States of America, who is authorized to administer oaths.

DAVID A. PIMSNER
Assistant United States Attorney

I hereby certify that this is the original affidavit subscribed and sworn to before me on this ___ day of May, 2011.

HONORABLE MICHELLE H. BURNS
U.S. Magistrate Judge
U.S. District Court for the District of Arizona

9

Filter Review 8ffca2c9c1cc93b0000414

# EXHIBIT A

Filter Review00000415

AO 91 (Rev. 02/09)  Criminal Complaint

FILED _____ LODGED
_____ RECEIVED _____ COPY

MAY 1 0 2011

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

District of Arizona

United States of America

v.

Case No. *11 - 7234 M*

Ahmad Ibrahim Al-Ahmad

*Defendant*

(Filed Under Seal)

## CRIMINAL COMPLAINT

I, Dina L. McCarthy, the complainant, state that the following is true to the best of my knowledge and belief.

On or about the date of January, 2005 and continuing to on or about July, 2010 in the County of Maricopa in the District of Arizona and elsewhere, the defendant committed the following violations:

### COUNT 1

Beginning in or about January, 2005 and continuing to on or about July, 2010, in the District of Arizona and elsewhere, defendant, Ahmad Ibrahim Al-Ahmad, and others both known and unknown, did knowingly combine, conspire, confederate, and agree together and with other persons to kill a national of the United States, while such national was outside the United States, with malice aforethought, in violation of 18 U.S.C. Section 2332(b)(2).

### COUNT 2

Beginning in or about January, 2005 and continuing to on or about July, 2010, in the District of Arizona and elsewhere, defendant, Ahmad Ibrahim Al-Ahmad, provided material support or resources knowing and intending that the support was to be used in preparation for and in carrying out a violation of 18 U.S.C. Section 2332(b)(2)(conspiracy to kill a United States national), all in violation of 18 U.S.C. Section 2339A.

This criminal complaint is based on these facts:

(See attached Statement of Probable Cause, which is incorporated herein.)

APPROVED BY    AUSA Michael T. Morrissey

*Complainant's signature*

Dina L. McCarthy, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    May 10, 2011

*Judge's signature*

Honorable James F. Metcalf
United States Magistrate Judge
*Printed name and title*

Phoenix, Arizona

hereby attest and certify on _____
at the foregoing document is a full, true and correct
copy of the original on file in my office ...

Filter Review00000416

# EXHIBIT B

Filter Review00000417

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT

RECEIVED
MARSHALS SERVICE
DIST-AZ PHOENIX

2011 MAY 10  PM 4:27

for the

_____ District of Arizona _____

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 11-7234 M |
| | ) | SEALED |
| Ahmad Ibrahim Al-Ahmad | ) | |
| | ) | |

*Defendant*

## ARREST WARRANT

: Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   Ahmad Ibrahim Al-Ahmad   ,

who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment        ☐ Superseding Indictment        ☐ Information        ☐ Superseding Information        **X Complaint**

☐ Probation Violation Petition        ☐ Supervised Release Violation Petition        ☐ Violation Notice        ☐ Order of the Court

This offense is briefly described as follows:
18:U.S.C. Section 2332(b)(2), Count 1
18:U.S.C., Section 2332(b)(2) (conspiracy to kill a United States national), all in violation of 18 U.S.C. Section 2339A., Count 2.

| norable James F. Metcalf | United States Magistrate Judge |
|---|---|
| Name of Issuing Officer | Title of Issuing Officer |
| | May 10, 2011,  PHOENIX, ARIZONA |
| | Date                        City/State |

| Return |
|---|

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____

at *(city and state)* _____.

Date: **CERTIFIED TO BE A TRUE COPY**
       **DATED:** _5-11-11_

**RICHARD H. WEARE, CLERK**
**U. S. DISTRICT COURT**

BY: _____
       **DEPUTY CLERK**

| _____ |
| *Arresting officer's signature* |
| _____ |
| *Printed name and title* |

Filter Review00000418

# EXHIBIT C

**Conspiracy to Commit Extraterritorial Murder of a United States National**
18 U.S.C. § 2332

. . . .

(b) Attempt or conspiracy with respect to homicide.--Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall--

(1) in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and

(2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

. . . .

**Murder**
18 U.S.C. § 1111

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

**Providing Material Support to Terrorists**
18 U.S.C. § 2339A

(a) Offense.--Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . .2332, . . . . . or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal

1

judicial district as provided by law.

(b) Definitions.--As used in this section--

    (1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

    (2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

    (3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

2

Filter Review00000421

# EXHIBIT D

Filter Review00000422

## STATEMENT OF PROBABLE CAUSE

I, Dina L. McCarthy, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1)      I make this affidavit in support of an application for a criminal complaint against Ahmad Ibrahim Al-Ahmad (hereinafter "Al-Ahmad") for Conspiracy to Commit Extraterritorial Murder of a United States National, in violation of 18 U.S.C. § 2332(b)(2), and for Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A.

2)      I am a Special Agent with the Federal Bureau of Investigation (FBI) Phoenix Division. I have been employed in this capacity since approximately March 11, 2001. Prior to my employment with the FBI, I was a Military Intelligence Officer with the United States Army for approximately 10 years. I have been assigned to a counterterrorism (CT) squad for approximately 8 years.

3)      I am a criminal investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 1515(4). In the course of my duties as a Special Agent with the FBI, I have investigated Federal crimes perpetrated by individuals against the U.S. Government. As a result of my training and experience, I have become familiar with the Federal laws relating to the Conspiracy to Commit Extraterritorial Murder, in violation of 18 U.S.C. § 2332(b)(2) and Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A.

4)      The facts in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation (including other

1

law enforcement officers, analysts, Arabic language specialists, subject matter experts, and U.S. Department of Defense personnel); my training and experience; and a review of public, commercial, law enforcement and U.S. Department of Defense records and reports. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint for violations of 18 U.S.C. § 2332(b)(2), and § 2339A, my recitation of facts in support of a probable cause determination does not include each and every fact known to me concerning this investigation. Where statements of others are set forth in this affidavit, they are set forth in substance and in part.

5)     I am participating in the investigation of Al-Ahmad who your affiant submits supplied component parts to members and associates of the 1920 Revolution Brigades, an Iraqi insurgent group.  These parts were then used in improvised explosive devices (IEDs) that were employed against United States soldiers in Iraq.  Further, your affiant believes that Al-Ahmad was involved in the research and development of new technologies and methods for the manufacture of IEDs which were also used against United States soldiers.  Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that, beginning in or about 2005 and continuing to in or about July 2010, Al-Ahmad and others known and unknown, committed violations of 18 U.S.C. § 2332(b)(2), Conspiracy to Commit Extraterritorial Murder, and Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A.

2

Filter Review00000424

## LAW

### Conspiracy to Commit Extraterritorial Murder

### (18 U.S.C. § 2332(b)(2))

6)      Section 2332(b)(2) of Title 18 of the United States Code provides, in relevant part, that

> Whoever outside the United States . . . engages in a conspiracy to kill a
> national of the United States . . . that is a murder as defined in section §1111(a)
> of this title, if one or more of such persons do any overt act to effect the object
> of the conspiracy,

is guilty of a crime.

### Proving Material Support to Terrorists

### (18 U.S.C. § 2339A)

In addition, section 2339A of Title 18 of the United States Code provides, in relevant part, that

> Whoever provides material support or resources or conceals or disguises the nature,
> location, source or ownership of material support or resources, knowing or intending
> that they are to be used in preparation for, or in carrying out, a violation of [one or
> more listed federal offenses, including 18 U.S.C. §2332(b)]

is guilty of a crime.

3

### Elements of the Offenses

7)     The Government must establish each of the following elements regarding the two

foregoing offenses:

      a.     <u>18 U.S.C. § 2332(b)(2)</u>

<u>First</u>, that two or more persons entered into a conspiracy, the object of which was to

murder a national of the United States;

    <u>Second</u>, that the defendant knowingly and voluntarily became a member of the

conspiracy, with the intent to further its unlawful purpose;

    <u>Third</u>, that the defendant engaged in the conspiracy while outside the United States;

    <u>Fourth</u>, that one or more of the conspirators knowingly committed an overt act to

effect the object of the conspiracy.

      b.     <u>18 U.S.C. § 2339A</u>

<u>First</u>, the defendant provided material support or resources, or concealed or disguised

the nature, location, source, or ownership of the material support or resources; and

    <u>Second</u>, the defendant provided this material support or resources knowing or

intending that they were to be used in preparation for, or in carrying out, a violation of [one

or more listed federal offenses, including 18 U.S.C. §2332(b)].

8)     A "national of the United States" is a citizen of the United States or a person owing

permanent allegiance to the United States.[1]  The term "material support or resources" means

---

[1] 8 U.S.C. § 1101(a)(22).

4

Filter Review00000426

"any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."[2]

PROBABLE CAUSE

I.    **The 1920 Revolution Brigades**

    A.    **Origins**

9)    The 1920 Revolution Brigades (Kataib Thawrat al-Ishreen) ("the Brigades") is an armed Iraqi resistance group that opposes foreign presence in Iraq. During the height of the group's operational activities from approximately 2003 to 2007, the Brigades was among the more prominent jihadist groups in Iraq. According to a Brigades' publication, "Al-Kata'ib," the group's name dates back to the 1920 revolution when Iraqis revolted against the British occupation. The name was selected to remind Iraqis of their history of resistance against so-called occupation forces.

10)    On September 6, 2007, the Brigades announced that they joined eight other like-minded Iraqi armed factions in forming a unified front against the U.S.-led coalition under the name of "Jihad and Change Front (JACF)." In its first public statement, the JACF announced that it rejected the occupation and its consequences, including the political

---

[2] 18 U.S.C. §2339A(b)(1).

Filter Review00000427

process, government, constitution, parties, and agreements. In a 2007 interview with the Al-Jazirah Satellite Channel, a spokesman for JACF and a representative of the Brigades noted that, among the reasons for forming the JACF, the resistance must fight as one rank and contended that the "coming stage" required a political council that represented all factions of the Iraqi resistance. The "coming stage" was likely a reference to the "post-occupation" stage following an expected draw down of U.S. forces.

**B.   Goals**

11)     Communiqués published independently by the Brigades media office and jointly with the JACF media office from July 2003 to date, reflect that the goal of the Brigades and the JACF is to defeat all consequences of the U.S. presence, including the current political regime and process as it is viewed as an "occupation government." For example, in 2010, in a statement addressing the announced withdrawal of U.S. combat forces, the JACF media office declared that "...we will never quit fighting until the departure of the last foreign soldier from our soil." In a 2006 video message from the Amir (leader) of the Brigades to the Iraqi nation, the Amir proclaimed that the "American oppressor and tyrant has violated every place where humanity dwells and reserved his strong resentment and hatred for Islam and Muslims, destroying civilization of mankind and dragging behind every individual who echoes his barking." The Amir declared that "jihad today is a compulsory duty upon all of us." In 2009, the secretary general of the JACF announced that: "We are factions of a jihadist resistance. Our first enemy is the infidel U.S. occupation, those who came with it,

6

those who facilitated the occupation, supported it, and paved the way of its plan, and those who joined its rank against the resistance and jihad project."

### C.  Targeting of U.S. Nationals by the Brigades/JACF

12)     From its inception to present day, the Brigades'/JACF's objective of resisting what they view as the "U.S. occupation" has translated into a campaign of violent hit-and-run attacks against U.S. forces by the Brigades and attempts to sway public opinion against the U.S. through negative media reports generated by the Brigades'/JACF's media wings.

13)     A review of press statements published by the Brigades and JACF that were posted to websites dedicated to news on jihad and Iraqi insurgent groups revealed that, from 2005 to 2010, the Brigades claimed responsibility for the killing and wounding of U.S. military personnel in premeditated attacks against U.S. military vehicles, bases, foot patrols, and aircraft.  Press statements published by the Brigades reflect the group's use of Improvised Explosive Devices (IEDs) to target U.S. military vehicles and dismounted foot patrols; the use of mortars, rockets, and missiles to shell U.S. military bases and positions; and the use of snipers to shoot U.S. military personnel.

14)     According to its media wing, the Brigades claimed responsibility for approximately 230 IED attacks, 156 shelling attacks, 82 sniper and small arms attacks, and 45 non-specific attacks targeting U.S. military personnel from 2005 to 2010.  In some instances these press statements were accompanied by video footage documenting the attacks.  In a 2006 interview with the Al-Jazirah Satellite Channel, a Brigades spokesman affirmed that "we also have

7

many operations that are videotaped." Many of these videos show dramatic attacks on U.S. military vehicles which likely resulted in casualties to U.S. military personnel.

15)     A review of press statements published by the Brigades from 2005 to 2010 finds that the Brigades also claimed responsibility for killing approximately 94 U.S. military personnel and wounding nine others.  The Brigades also claimed responsibility for U.S. military personnel deaths and injuries in 92 separate attacks.  While no specific numbers of deaths or injuries were cited in these 92 attacks, the press statements used phrases similar to "the Hummer was destroyed and all of those in it were killed or injured" or "sniped an American soldier" in their descriptions of the underlying events.

16)     The following confirmed attacks on U.S. forces illustrates the Brigades' violent tactics.  On July 20 and 22, 2006, two U.S. mounted combat patrols in Ramadi, Iraq, were attacked by IED strikes against "M1114 High Mobility Multipurpose Wheeled Vehicles" (a/k/a Hummers). A total of seven U.S. military personnel were wounded in both attacks and two Hummers were damaged.  In an official press statement dated July 22, 2006, and posted to a website that carried statements issued by Iraqi insurgent groups, the 1920 Revolution Brigades stated that they had "destroyed two Hummers belonging to the occupying American forces in the western area of Al-Ramadi."  A link to two videos of the operations accompanied the statements.  The videos, containing the Brigades' logo, showed two Hummers sustaining direct hits from IED detonations.

Filter Review00000430

## II.   Improvised Explosive Devices (IEDs)

17)   Designed to destroy and incapacitate its target, an Improvised Explosive Device (IED) is a weapon placed or fabricated in an improvised manner incorporating destructive, lethal, noxious, pyrotechnic, or incendiary chemicals. It may incorporate military weaponry, but is normally devised from non-military components. Generally speaking, an IED can be broken down into five main components – a power source, a switch, an initiator, the main charge, and a container. The IED power source stores or releases energy, either mechanical or electrical, to initiate the IED. The IED switch controls the flow of energy from the power source to the initiator and can be the most complex component of the system. There are three main categories of IED switches: command, time, and victim-operated.

18)   A radio-controlled IED ("RCIED") provides a wireless method of IED initiation through the use of a transmitter and a matched receiver. RCIEDs recovered from the battlefield in Iraq include the following configurations: a mobile phone used as the receiver connected to a custom dual-tone multi-frequency (DTMF) circuit board to decode the incoming signals including Long Range Cordless Telephones (LRCTs);[3] a personal mobile radio (PMR) connected to a DTMF circuit board; a PMR connected to a transistor controlled relay (TCR); appliance controllers; wireless doorbells; keyless entry systems; and automobile

---

[3]   Dual Tone Multi-Frequency signaling, which is commonly referred to as touch-tone dialing, sends information over a phone or audio connection. In many Improvised Explosive Devices (IEDs) that incorporate DTMF technology, the user calls a mobile phone attached to a custom circuit and explosive train. Using the phone's keypad the user sends a sequence of digits to detonate the IED. By using unique DTMF sequences or codes for their IEDs, terrorists are able to effectively control complex operations or prevent accidental predetonation. DTMF signaling is commonly used in IEDs because the technology is widely accessible, inexpensive, and simple to implement.

9

Filter Review00000431

alarms.

### III.   The "Omar Cache"

#### A.   Inventory of Components/Tools/Boards/Chemicals

19)   On August 30, 2006, Coalition Forces discovered at 50 Omar Street, Baghdad, Iraq, one of the largest IED caches found in Iraq ("Omar Cache").  The military personnel found numerous IED-related construction materials, test equipment, schematics, and other items related to IED construction – including an IED initiator, hundreds of components for various types of RCIEDs, and extensive bomb-making training aids.  Also found were internet printouts bearing Al-Ahmad's name which featured diagrams and instructions on the process of wiring and controlling a fixed or cellular telephone and documents with electrical and electronics equipment diagrams featuring transistor connections.  Computer-related material recovered from the site contained a collection of print-outs from extremist Islamic web sites. Al-Ahmad, while not present at the time of the discovery, was later linked to the Omar Cache by various evidence found there

20)   An analysis of the items seized from the Omar Cache indicates that the location was essentially an IED factory.  The cache included all of the necessary tools and materials for manufacturing Dual-Tone Multi-Frequency (DTMF) decoder custom circuits and also included documents with apparent design plans.  The materials found at the Omar Cache could also have been used for modifying commercial electronics to function as low-power

10

RCIEDs and for manufacturing the DTMF-11[4] type of custom circuits which are commonly used as initiators in RCIEDs.

21)    Some of the key items that indicated the cache likely served as an IED factory are listed below:

a.    Assorted documents, including a DTMF-11 circuit board layout, parts list, and datasheets – these documents are likely design notes for the manufacturing of IED electronics;

b.    Several sheets of blank, copper-clad boards – the boards are sent through a chemical etching process to produce custom circuit boards;

c.    Hydrochloric (muriatic) acid, hydrogen peroxide, and acetone – the hydrochloric acid and hydrogen peroxide form an etching solution, and the acetone is used as a cleaning agent in the process of producing custom circuit boards;

d.    Angle grinder and electric drill – these tools cut finished circuit boards from the sheet and make holes in the boards for mounting electronic components;

e.    Unpopulated, etched circuit boards – these boards represent the finished product of the etching and cutting process.  Multiple types of unpopulated DTMF decoder custom circuits were recovered;

f.    Electronic components – all of the components needed to build DTMF-11 circuits were recovered in large quantities;

_____

[4]   The number "11" refers to a specific DTMF circuit design.

11

g.      Soldering irons and solder – these items are used to mount electronic components to the circuit boards;

h.      Completed DTMF-11 circuits – there were at least six complete DTMF-11 circuits from the cache, which represented the finished product of the board manufacturing process;

I.      Mobile phones and Personal Mobile Radios (PMRs) – DTMF-11 circuits are commonly combined with these wireless devices to operate as receivers in RCIEDs.

22)    The items listed above were sufficient to produce approximately 60 DTMF-11 custom circuits. Notably, the cache included design documents, intermediate products (unpopulated circuit boards), and tools required for the manufacturing process. Such a collection indicates that the cache was not simply a storage site for IED-related materials, but that it was likely intended to build electronic IED switches (i.e., an IED electronics factory).

23)    In addition, the cache included circuitry for use in other types of RCIEDs, including many completed devices. The JDQ-6A radio controlled switches, YK1000, and YK1500 transmitters discovered at the cache are commonly used in low-power RCIEDs. The Remote Controlled (RC) toy car transmitter and receiver and Al Khateeb key fob transmitters found at the cache have low-power RCIED applications as well. The cache also included a DTMF-9 type of custom circuit and multiple Microchip PIC microcontrollers (key component for the DTMF-9 custom circuits). The cache could have been used to exploit commercial devices for use in low-power RCIEDs or to manufacture DTMF custom circuits.

Filter Review00000434

Numerous documents clearly indicated that the individual(s) involved with the Omar Cache were interested in improving the functionality of the IED designs through incorporation of innovative technologies and advanced electronic components. For instance:

a.      Technical specifications for the TRW-400-5 transceiver – while this specific device has not been found in IEDs, similar devices operating at the same frequency have been employed in IED circuits in Iraq since June 2005. Al-Ahmad discussed this component since at least August 2005.

b.      Technical notes on dual-tone multiple-frequency (DTMF) technology used in touch-tone telephones – this technology was introduced in Iraqi IEDs in November 2005.

c.      Schematics and technical notes on IED design incorporating the Microchip PIC16F84A and a DTMF decoder chip. This design is typical of many IED circuits employed in Iraq. Microchip PIC16F84A is manufactured by Microchip Technology Inc., which is headquartered in Chandler, AZ, and is a leading provider of micro controller and analog semiconductors.

d.      Technical specifications of the Princeton Technologies PT2262 and PT2272 remote control devices. These components, like the Microchip PICI6F84A, have been used in RCIEDs in Iraq.

**B.      Al-Ahmad's Association with the Omar Cache**

24)      Copies of known fingerprints belonging to Al-Ahmad were sent to the FBI Laboratory in Quantico, Virginia, to conduct a comparative analysis with prints found at the Omar

Filter Review00000435

Cache. To date, the FBI Lab has found 114 matches to various items found at the Omar Cache. For example, Al-Ahmad's prints were identified on the following types of materials: documents and book pages; voltage control oscillators in original packaging; a lid to a power meter; an unknown electronics device in a light blue metal case; and a piece of white electrical tape (the electrical tape was wrapped around an IED switch and a matching transmitter was also recovered with this device).

25)      In addition, a collection of documents were seized from the Omar Cache which included the following: various photos of Ahmad Ibrahim Ahmad;[5] a handwritten document in Arabic with a translated title of "Explosives," comprising 19 chapters covering the classification and effects of various explosives, accessories used with explosives, detonation circuits, handling of explosives, demolition of buildings, bridges, airports, roads, etc., and timing devices; a voltage tester that is labeled "Al-Ahmad Manufacturing for Electronic Products" (it appeared that a small number of voltage testers were also being constructed at the Omar Cache); electronic circuit board designs and diagrams on micro-fiche slides which included a sticker for Al-Ahmadi electronics production warranty and an envelope with "Ahmad Al-Ahmadi" written on it containing an order of "neon board;" a notebook that had the name "Ahmad Al-Ahmad" written on the front from the Mustansriyyah University Nuclear lab; a second notebook that had the name "Ahmad Al-Ahmad" written on the front containing drawings of electrical circuits, circuit board designs, and formulas from the

---

[5]  It should be noted that some documents apparently belonging to other persons were also found at the Omar Cache.

14

"Al-Rafidayn" school. There was also a letter from 'Abd-al-Karim 'Amur to Ahmad Ibrahim Al-Ahmad; documents containing technical notes and lessons (in an "Al-Ahmad Electronics Industries" notebook) detailing electrical and electronic circuits, automotive sensors and wiring, batteries, frequencies, math calculations, current and voltage, and various electronic components; documents also included emails, sales receipts, letters, and personal statements; an electronics booklet describing how to employ remote control technology to command a mobile phone, wireless device, and land-line phone to detonate explosives.

26)     The Omar Cache contained business documents linked to Al-Ahmad: a mix of papers including a letter between Ahmad Al-Ahmadi and another individual, diagrams, electronic calculations, time sheets, accounts, school confirmation for "Ahmad Ibrahim Al-Ahmad," cash receipts, electrical receipt, and a tax receipt. Documents included a cash receipt and order form for a neon sign for Ahmad Al-Ahmadi and a property sticker in the name of Ahmad Al-Ahmad. There were documents linking Al-Ahmad to the Beirut, Lebanon, company SES Lebanon (a/k/a Serpico Sarl). One undated letter to "Ahmad" from a principal of SES Lebanon, stated that the principal was arranging a shipment from an unidentified company in Hong Kong "by your account to Baghdad direct, signed [the principal]." A second undated letter from SES Lebanon to Wenshing Electronics in Taipei, Taiwan, concerning Wenshing model TRW-400 transmitter/receiver indicated Al-Ahmad, through SES Lebanon, was seeking samples of the item which had a range of more than one kilometer. Based on consultation with others who are subject matter experts in explosives,

15

Filter Review00000437

your affiant knows that this type of transmitter/receiver could be used in an IED.

27)    As part of the investigation, an analysis determined that materials of the kind seized at the Omar Cache were associated with IED attacks in which U.S. Forces incurred casualties.  For example, two attacks which were caused by RCIED initiators using a DTMF-11 custom circuit and a mobile phone are linked to the materials found in the Omar Cache.  One incident used an initiator circuit that matched circuits recovered from the Omar Cache.  The other incident used a circuit that is very similar to those found in the Omar Cache.  On April 6, 2007, in the outskirts of southern Baghdad, near Baghdad International Airport, three U.S. soldiers were killed in action by a cellular-phone initiated IED.  The IED initiator used in this incident includes a DTMF-11 custom circuit that matched three circuits recovered in the Omar Cache.  The circuits all have nearly identical traces, share a common set of electrical components, and function identically.  Furthermore, the circuits were likely manufactured using the same processes.  On May 14, 2007, in northern Baghdad, approximately one-half mile from the Omar Street facility, one U.S. soldier was killed in action and four wounded in action by a cellular phone initiated IED. The IED electronic switch used in this incident included a DTMF-11 custom circuit that was very similar to three custom circuits recovered in the Omar Cache. The custom circuits had subtle differences in their trace layouts, but otherwise used a common set of components and functioned identically.

IV.    Al-Ahmad's Involvement with the 1920 Revolution Brigades

16

28)     During a custodial interview, W-1, who is currently facing trial for terrorism-related

charges in Iraq, provided the following information about Al-Ahmad.[6] W-1 was shown a

photograph of Al-Ahmad, whom he identified as "Ahmad." W-1 indicated he met Al-Ahmad

approximately six times, always in Baghdad, even though Al-Ahmad was originally from

Syria. W-1 first met Al-Ahmad in either 2005 or 2006. W-1 stated that in 2007, Al-Ahmad

relocated to China, via Syria, with his wife and child.[7]

29)     W-1 stated that while in China. Al-Ahmad designed DTMF boards to remotely

detonate IEDs and commissioned a Chinese factory to manufacture them. Al-Ahmad told

W-1 that he had designed the DTMF boards, and that he was selling them solely to the 1920

Revolution Brigades to assist in the resistance against American Forces. W-1 acknowledged

that Al-Ahmad was aware the DTMF boards were being used in IEDs against Americans.

Al-Ahmad told W-1 he "would do anything against Americans." W-1 explained the DTMF

boards shipped by Al-Ahmad did not have any other purpose, or commercial value, other

than being used to detonate IEDs.

30)     W-1 advised he had seen a DTMF board early in 2007, when Al-Ahmad showed one

to 1920 Revolution Brigades' members. Upon being released from a prior detention in Iraq

---

[6] W-1 was interviewed on a number of occasions between July and August 2010.

[7] When initially questioned about Al-Ahmad, W-1 stated that Al-Ahmad was a Lieutenant for the Iraq
Customs (IC). W-1 claimed that he last saw Al-Ahmad in approximately 2006 at the Baghdad Custom Building and
never telephonically or electronically contacted Al-Ahmad. When he was re-interviewed, W-1 advised he wanted to
correct information provided in prior interviews. W-1 stated he specifically wanted to provide information regarding
Al-Ahmad, residing in China, and Dual Tone Multi Frequency (DTMF) boards. W-1 clarified Al-Ahmad was never a
Lieutenant for the Iraqi Customs, but rather a member of the 1920 Revolution Brigades. W-1 further clarified that
W-1 had additional contacts with Al-Ahmad and asked that this information be considered so that W-1 and a family
member might be released from custody.

17

in 2009, W-1 attempted to learn the design and programming of DTMF boards to profit from its sales to Brigades' members. Al-Ahmad provided W-1 with online instructions on how the boards functioned and how they could be rendered inoperable. W-1 found the programming to be too complicated and abandoned his efforts to make the boards.

31) W-1 and Al-Ahmad interacted via email communications. W-1 stated that he received an email containing scanned copies of Al-Ahmad's documents which he was supposed to use to expedite Ahmad's passport request. W-1 explained that, during his communications with Al-Ahmad, he learned about the frequency used by Al-Ahmad in his DTMF boards. W-1 stated that Al-Ahmad, approximately one and a half years ago, was troubled by a lack of payments from the Brigades for the DTMF boards. Al-Ahmad decided he would become strictly business oriented and he would provide the boards only upon full up-front payment.

32) Al-Ahmad told W-1 that the shipments of electronics to Iraq could be received via container, taking two months, or via air within one week. Al-Ahmad knew people at an unidentified Chinese airport who would facilitate the air shipment of illicit merchandise, but that the recipient of the shipment also required facilitation at the receiving airport.

33) W-1 acknowledged that C-6, described hereafter, was a member of the 1920 Revolution Brigades.

34) W-1 indicated that prior to W-1's July 2010 capture, Al-Ahmad inquired if C-6, of the 1920 Revolution Brigades, had been detained by Coalition Forces and what the underlying charges were. When C-6 was subsequently released, he tasked W-1 with contacting Al-

18

Filter Review00000440

Ahmad and alerting him that Coalition Forces were aware of Al-Ahmad's activities. W-1 stated that he relayed the message to Al-Ahmad.

35)     On March 17, 2011, W-1 was re-interviewed by the FBI in an Iraqi prison. During the interview, W-1 reaffirmed his earlier statements against Al-Ahmad concerning the use of DTMF boards in IEDs and the targeting of Coalition Forces in Iraq. W-1 agreed to testify and to continue cooperating with the United States government.

36)     Al-Ahmad, after leaving Iraq, initially fled to Syria, and then in approximately 2007, moved to China. Al-Ahmad established various companies in China, with the support of a Chinese assistant, C-1. These companies appeared to function as exporters, whereby Al-Ahmad received orders for products that could be obtained in China for his associates located primarily in Iraq, Syria, Sudan, and Yemen. Al-Ahmad received the orders and arranged the purchase and shipment of these orders. Your affiant discovered that Al-Ahmad utilized many email addresses to conduct business and/or communicate with his associates worldwide. Moreover, C-1 also established email accounts, which were also used to facilitate Al-Ahmad's business. As described below, Al-Ahmad had contact with several individuals who were members or associates of the 1920 Revolution Brigades.

37)     C-2 allegedly served as the political director and media emir for the 1920 Revolution Brigades as well as the Jihad & Change Front, and it is believed that he continues to serve in a leadership role. Based on my review of evidence gathered in this investigation, C-2 had the authority to oversee and approve the press releases that were publicly distributed on

Filter Review00000441

behalf of these groups.  For example, C-2 was sent a Brigades' magazine for review and approval, and C-2 interacted with members of the media on behalf of the Brigades.  As such, C-2 provided updates on the groups goals and activities.  C-2 also received operational updates from other members of the Brigades regarding attacks against U.S. forces in Iraq.

38)     Through a review of the available evidence, the investigation revealed that Al-Ahmad supplied C-2 with components that could be used in the construction and operation of IEDs. For example, on October 12, 2008, Al-Ahmad and C-2 corresponded concerning an order for mobile phones – three of the five types of mobile phone models listed in the message had been recovered in IED caches/events in Iraq.  On August 20, 2007, C-2 requested an address to send the first half of the payment of $26,000 for 2,000 receivers. C-2  asked that another 100 hand units continue to be worked on.  Based on training and experience and results of the investigation, your affiant believes that the receivers and hand held devices mentioned above were intended for use as part of the remote initiating systems for IEDs.  In short, the investigation discovered that C-2, a senior leader with the Brigades, was ordering IED components from Al-Ahmad and transferring funds to his bank account in China as payment.

39)     C-3 allegedly is a mid-level leader with the 1920 Revolution Brigades.  C-3 received operational updates from Brigades' forces in Iraq and had the authority to request and procure supplies and funding for them.  C-3 also routinely received expense reports from other members of the Brigades for review and remittance.  On or about November 11, 2008, Al-Ahmad shared information with C-3 regarding how to use a mobile phone as a

Filter Review00000442

surveillance tool.  On November 11, 2008, Al-Ahmad sent C-3 another message which included the phrases, "Receiving unit: 100 pieces," and "Transmitting unit: 10 pieces." Based on training and experience, your affiant believes that these phrases refer to receivers and transmitters that are part of the initiation systems of RCIEDs.  On December 19, 2008, Al-Ahmad sent C-3 a message containing a list of four magnets with their dimensions.  A quantity of 150 was listed for each magnet.  Based on the dimensions included in the message, two of the magnets listed by al-Ahmad are similar to magnets recovered from IED attacks in Iraq.  Iraqi insurgents are known to glue magnets to IED initiation systems, which makes it possible to attach those devices to U.S. vehicles.

40)    C-4 allegedly served as a mid-level leader within the 1920 Revolution Brigades who kept track of the group's operational expenses.  C-4 communicated with other Brigades' leaders regarding funding issues and specific updates on losses sustained during operations in Iraq, along with requests for guidance.  C-4 communicated with Al-Ahmad, on or about February 2, 2009, regarding a "Shipment List" that included a wireless transmitting unit, wireless receiving unit, and electronic boards.  These items found in the list were consistent with components used in IEDs.  On May 5, 2009, C-4 received information from Al-Ahmad regarding a DHL shipment containing two external car antennas, two range extending systems (25 watts), one transmission frequency measuring system, electric cables, metal conductors and accessories.  Based on C-4's leadership role in the Brigades, your affiant believes that the components being shipped from Al-Ahmad in China to C-4 in Iraq are likely

21

being used in IEDs against U.S. military forces.

41)     C-5 allegedly is an IED distributor who operated out of the Baghdad area and who was connected to members of the 1920 Revolution Brigades. On or about April 9, 2009, C-5 shared an article with C-2, a senior leader of the Brigades, which discussed the different operations taken by the resistance to prevent the needed supplies of equipment to reach the American army in Kirkuk and Mosul. The article concluded that the supplies were destroyed and that they did not reach their destination. On January 12, 2008, C-5 sent a report to Al-Ahmad. The report was translated from Arabic to English and was titled, "A report about military operations in different parts of Iraq." The first paragraph discussed the decrease in activities of the resistance groups. The second paragraph discussed the activities of the Islamic Army, which was declared a jihadi front and not a resistance group. The third topic discussed Al-Kata'ib in Karkuk, advising that groups were suffering from the inability to develop new tactics of attack and that explosive systems were not efficient anymore.

42)     On August 9, 2009, C-5, using an alias, sent Al-Ahmad a request for POSITIV20 aerosol spray cans. C-5 asked Al-Ahmad to order the spray and "send it with the other stuff." Your affiant knows based on training and experience that this spray is used with custom circuit boards after production to prevent oxidation or other degradation of the circuits. On August 16, 2009, Al-Ahmad sent C-5 his bank account information for two accounts in China. Shortly thereafter, C-1 sent C-5 an invoice for electronics equipment and separately the technical user manuals of the Shenzhen KYL RF modules listed on the invoice.

Filter Review00000444

43)    C-6 was allegedly a major distributor of IED initiators in Iraq and a leader within the Brigades. Your affiant learned that C-6 corresponded directly with Al-Ahmad on at least one occasion and also through other individuals. On June 17, 2009, C-6 described himself as an "engineer" to Al-Ahmad.  Your affiant knows, based on this investigation that the term "engineer" is commonly used to describe individuals in insurgent groups involved in constructing explosive devices.

44)    On or about September 2, 2008, C-7 sent Al-Ahmad a list of components that consisted of 1,000 Microchip 16F630 integrated circuits (IC), 1,000 Microchip 16F628 integrated circuits (IC), 2000 MT8870 dual tone multi-frequency decoder circuits, 2,000 crystal oscillators that operated at 3.579545 MHZ, 2000 680 transistors, 2000 681 transistors, 4000 9v battery clips, 4000 4.7 muq (no further information), and an unspecified amount of finger magnets.  Your affiant has learned that six of these nine components are commonly used in IED circuits employed by insurgents in Iraq.  Based on the quantities of various components requested, the purchaser could construct 2,000 IED circuits (1,000 each of two different circuits). The component list also included "finger magnets" which are consistent with magnets that are used to attach IEDs to U.S. vehicles in Iraq.

## CONCLUSION

45)    Based on the foregoing, there is probable cause to believe that, beginning in or about 2005 and continuing to in or about July 2010,  Ahmad Ibrahim Al-Ahmad and others known and unknown committed the offenses of Conspiracy to Commit Extraterritorial Murder, in

23

violation of 18 U.S.C. § 2332(b)(2) and Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A.

## REQUEST FOR SEALING

46)    It is respectfully requested that this Court order this Complaint and Statement of Probable Cause sealed, until further order of the Court.  Your affiant submits that sealing is necessary because disclosure would adversely and seriously jeopardize the ongoing investigation. Premature disclosure could give Al-Ahmad an opportunity to destroy evidence, notify confederates, and flee from prosecution.

Respectfully submitted,

DINA L. MCCARTHY
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me
on May _10_, 2011:

HONORABLE James F. Metcalf
United States Magistrate Judge

24

Filter Review00000446

DENNIS K. BURKE
United States Attorney
District of Arizona

DAVID A. PIMSNER
Assistant U.S. Attorney
Arizona State Bar No. 007480
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
david.pimsner@usdoj.gov

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| United States of America, | Case No. 11-7234 M |
|---|---|
| Plaintiff, | **AFFIDAVIT OF DINA L.** |
| v. | **MCCARTHY, SPECIAL AGENT,** |
| | **FEDERAL BUREAU OF** |
| Ahmad Ibrahim Al-Ahmad, | **INVESTIGATION, IN SUPPORT OF** |
| | **REQUEST FOR EXTRADITION OF** |
| Defendant. | **AHMAD IBRAHIM AL-AHMAD** |

**AFFIDAVIT OF DINA L. MCCARTHY**

I, Dina L. McCarthy, being duly sworn, depose and state:

1.     I am a citizen of the United States of America, and residing in the State of Arizona.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since March 2001.  This affidavit is being submitted in support of the United States of America's request for the extradition of Ahmad Ibrahim Al-Ahmad ("Al-Ahmad") from Turkey to the United States.

**Factual Summary**

3.     During November 2009, the FBI began an investigation regarding the activities of Al-Ahmad.

4.     The investigation to date has revealed the following facts:

a.     Al-Ahmad supplied component parts to members and associates of the 1920 Revolution Brigades, an Iraqi insurgent group.  These parts were then used in improvised explosive devices (IEDs) that were employed against United States military personnel in Iraq.

1   Further, Al-Ahmad was involved in the research and development of new technologies and

2   methods for the manufacture of IEDs which were also used against United States military

3   personnel.

4       b. Beginning in or about 2005 and continuing to in or about July 2010, Al-Ahmad and

5   others known and unknown, committed a violation of 18 U.S.C. § 2332(b)(2), Conspiracy to

6   Commit Extraterritorial Murder and 18 U.S.C. § 2339A, Providing Material Support to

7   Terrorists.

8   5.    On August 30, 2006, Coalition Forces discovered at 50 Omar Street, Baghdad, Iraq, one

9   of the largest IED caches found in Iraq ("Omar Cache"). Al-Ahmad, while not present at the

10   time of the discovery, was later linked to the Omar Cache by various evidence found there,

11   detailed more fully below. The military personnel found numerous IED related construction

12   materials, test equipment, schematics, and other items related to IED construction – including

13   an IED initiator, hundreds of components for various types of Radio Controlled IEDs[1]

14   (RCIEDs), and extensive bomb making training aids. Also found were internet printouts bearing

15   Al-Ahmad's name which featured diagrams and instructions on the process of wiring and

16   controlling a fixed or cellular telephone and documents with electrical and electronics equipment

17   diagrams featuring transistor connections.

18   6.    The investigation revealed that an analysis of the items seized from the Omar Cache

19   indicated that the location was essentially an IED factory. The cache included all of the

20   necessary tools and materials for manufacturing Dual Tone Multi Frequency (DTMF) decoder

21   custom circuits and also included documents with apparent design plans. The materials found

22   at the Omar Cache could also have been used for modifying commercial electronics to function

23

24

25

---

26       [1] A radio-controlled IED ("RCIED") provides a wireless method of IED initiation through the use of a transmitter and a matched receiver. RCIEDs recovered from the battlefield in Iraq include a mobile phone used

27   as the receiver connected to a homemade dual-tone multi-frequency (DTMF) circuit board to decode the incoming signals.

28                                2

Filter Review00000448

1 as low power RCIEDs and for manufacturing the DTMF 11[2] type of custom circuits which are

2 commonly used as initiators in RCIEDs.  Photographs of the cache are attached to this affidavit

3 as Attachment 4.

4 7.    Some of the key items that indicated the cache likely served as an IED factory are listed

5 below:

6    a.   Assorted documents, including a DTMF-11 circuit board layout, parts list, and

7 datasheets – these documents are likely design notes for the manufacturing of IED electronics;

8    b.   Several sheets of blank, copper-clad boards – the boards are sent through a chemical

9 etching process to produce custom circuit boards;

10    c.   Hydrochloric (muriatic) acid, hydrogen peroxide, and acetone – the hydrochloric acid

11 and hydrogen peroxide form an etching solution, and the acetone is used as a cleaning agent in

12 the process of producing custom circuit boards;

13    d.   Angle grinder and electric drill – these tools cut finished circuit boards from the sheet

14 and make holes in the boards for mounting electronic components;

15    e.   Unpopulated, etched circuit boards – these boards represent the finished product of

16 the etching and cutting process.  Multiple types of unpopulated DTMF decoder custom circuits

17 were recovered;

18    f.   Electronic components – all of the components needed to build DTMF-11 circuits

19 were recovered in large quantities;

20    g.   Soldering irons and solder – these items are used to mount electronic components to

21 the circuit boards;

22    h.   Completed DTMF-11 circuits – there were at least six complete DTMF-11 circuits

23 from the cache, which represented the finished product of the board manufacturing process;

24    i.   Mobile phones and Personal Mobile Radios (PMRs) – DTMF-11 circuits are

25 commonly combined with these wireless devices to operate as receivers in RCIEDs.

26

27    [2]  The number "11" refers to a specific DTMF circuit design.

28    3

8.      The items found at the Omar Cache were sufficient to produce approximately 60 DTMF 11 custom circuits.  Notably, the cache included design documents, intermediate products (unpopulated circuit boards), and tools required for the manufacturing process.  Such a collection indicates that the cache was not simply a storage site for IED-related materials, but that it was likely intended to build electronic IED switches (i.e., an IED electronics factory).

9.      In addition, the cache included circuitry for use in other types of RCIEDs, including many completed devices.  The JDQ-6A radio controlled switches, YK1000, and YK1500 transmitters discovered at the cache are commonly used in low-power RCIEDs.  The Remote Controlled (RC) toy car transmitter and receiver and Al Khateeb key fob transmitters found at the cache have low-power RCIED applications as well.  The cache also included a DTMF-9 type of custom circuit and multiple Microchip PIC microcontrollers (key component for the DTMF-9 custom circuits).  The cache could have been used to exploit commercial devices for use in low-power RCIEDs or to manufacture DTMF custom circuits.  Numerous documents clearly indicated that the individual(s) involved with the Omar Cache were interested in improving the functionality of the IED designs through incorporation of innovative technologies and advanced electronic components.  For instance:

        a.  Technical specifications for the TRW-400-5 transceiver – while this specific device has not been found in IEDs, similar devices operating at the same frequency have been employed in IED circuits in Iraq since June 2005.  Emails belonging to Al-Ahmad in August 2005 discussed this component.

        b.  Technical notes on dual-tone multiple-frequency (DTMF) technology used in touch-tone telephones – this technology was introduced in Iraqi IEDs in November 2005.

        c.  Schematics and technical notes on IED design incorporating the Microchip PIC16F84A and a DTMF decoder chip. This design is typical of many IED circuits employed in Iraq.

        d.  Technical specifications of the Princeton Technologies PT2262 and PT2272 remote control devices. These components were used in IEDs prior to the Microchip PICI6F84A.

4

10. After examining the IED components recovered from the Omar Cache, it was discovered that certain components were originally manufactured by a company headquartered in the United States, in the State of Arizona.

11. Copies of known fingerprints belonging to Al-Ahmad were sent to the FBI Laboratory in Quantico, Virginia, to conduct a comparative analysis with prints found at the Omar Cache. Those fingerprints are attached to this affidavit as Attachment 2. To date, the FBI Lab has found 114 matches to various items found at the Omar Cache. For example, Al-Ahmad's prints were identified on the following types of materials: documents and book pages; a voltage control oscillators in original packaging; a lid to a power meter; an unknown electronics device in light blue metal case; and a piece of white electrical tape (the electrical tape was wrapped around an IED switch and a matching transmitter was also recovered with this device).

12. In addition, a collection of documents were seized from the Omar Cache which included the following: various photos of Ahmad Ibrahim Ahmad; a handwritten document in Arabic with a translated title of "Explosives," comprising 19 chapters covering the classification and effects of various explosives, accessories used with explosives, detonation circuits, handling of explosives, demolition of buildings, bridges, airports, roads, etc., and timing devices; a voltage tester that is labeled "Al Ahmad Manufacturing for Electronic Products" (it appeared that a small number of voltage testers were also being constructed at the Omar Cache); electronic circuit board designs and diagrams on micro fiche slides which included a sticker for Al Ahmadi electronics production warranty and an envelope with "Ahmad Al Ahmadi" written on it containing an order of "neon board;" a notebook that had the name "Ahmad Al Ahmad" written on the front from the Mustansriyyah University Nuclear lab; a second notebook that had the name "Ahmad Al Ahmad" written on the front containing drawings of electrical circuits, circuit board designs, and formulas from the "Al Rafidayn" school. There was also a letter from 'Abd al Karim 'Amur to Ahmad Ibrahim Al Ahmad; documents containing technical notes and lessons (on an "Al Ahmad Electronics Industries" notebook) detailing electrical and electronic circuits, automotive sensors and wiring, batteries, frequencies, math calculations, current and voltage,

5

1    and various electronic components; documents also included emails, sales receipts, letters, and

2    personal statements; an electronics booklet describing how to employ remote control technology

3    to command a mobile phone, wireless device, and land line phone to detonate explosives.

4    13.    As part of the investigation, an analysis determined that materials of the kind seized at

5    the Omar Cache were associated with IED attacks where U.S. Forces incurred casualties.  For

6    example, two attacks which were caused by RCIED initiators using a DTMF 11 custom circuit

7    and a mobile phone are linked to the materials found in the Omar Cache.  One incident used an

8    initiator circuit that matched circuits recovered from the Omar Cache. The other incident used

9    a circuit that is very similar to those found in the Omar Cache.  On April 6, 2007, in the outskirts

10   of southern Baghdad, near Baghdad International Airport, three U.S. soldiers were killed in

11   action by a cellular phone initiated IED.  The IED initiator used in this incident includes a

12   DTMF 11 custom circuit that matched three circuits recovered in the Omar Cache.  The circuits

13   all have nearly identical traces, share a common set of electrical components, and function

14   identically.  Furthermore, the circuits were likely manufactured using the same processes.  On

15   May 14, 2007, in northern Baghdad, approximately one-half mile from the Omar Street facility,

16   one U.S. soldier was killed in action and four wounded in action by a cellular phone initiated

17   IED. The IED electronic switch used in this incident included a DTMF 11 custom circuit that

18   was very similar to three custom circuits recovered in the Omar Cache. The custom circuits had

19   subtle differences in their trace layouts, but otherwise used a common set of components and

20   functioned identically.

21   14.    During a custodial interview, W-1, a cooperating witness who has agreed to testify,

22   provided the following information about Al-Ahmad.  W-1 was shown a photograph of

23   Al-Ahmad, whom he identified as "Ahmad."  W-1 indicated he met Al-Ahmad approximately

24   six times, always in Baghdad, even though Al-Ahmad was originally from Syria.  W-1 stated that

25   in 2007, Al-Ahmad relocated to China, via Syria, with his wife and child.  W-1 stated that while

26   in China, Al-Ahmad designed DTMF boards to remotely detonate IEDs and commissioned a

27   Chinese factory to manufacture them.  Al-Ahmad told W-1 that he had designed the DTMF

28                                            6

1  boards, and that he was selling them solely to the 1920 Revolution Brigades to assist in the

2  resistance against American Forces. W-1 acknowledged that Al-Ahmad was aware the DTMF

3  boards were being used in IEDs against Americans. Al-Ahmad told W-1 he "would do anything

4  against Americans." W-1 explained the DTMF boards shipped by Al-Ahmad did not have any

5  other purpose, or commercial value, other than being used to detonate IEDs. W-1 advised he had

6  seen a DTMF board early in 2007, when Al-Ahmad showed one to 1920 Revolution Brigades'

7  members.

8  15.    The 1920 Revolution Brigades (Kataib Thawrat al Ishreen) ("the Brigades") is an armed

9  Iraqi resistance group that opposes foreign occupation in Iraq. During the height of the group's

10  operational activities from approximately 2003 to 2007, the Brigades was among one of the most

11  prominent jihadist groups in Iraq.

12  16.    On September 6, 2007, the Brigades announced that they joined eight other like minded

13  Iraqi armed factions in forming a unified front against the U.S. led coalition under the name of

14  "Jihad and Change Front (JACF)." From its inception to present day, the Brigades'/JACF's

15  objective of resisting what they view as the "U.S. occupation" has translated into a campaign of

16  violent hit and run attacks against U.S. forces by the Brigades and attempts to sway public

17  opinion against the U.S. through negative media reports generated by the Brigades'/JACF's

18  media wings. Press statements published by the Brigades reflect the group's use of Improvised

19  Explosive Devices (IEDs) to target U.S. military vehicles and dismounted foot patrols; the use

20  of mortars, rockets, and missiles to shell U.S. military bases and positions; and the use of snipers

21  to shoot U.S. military personnel.

22  17.    According to its media wing, the Brigades claimed responsibility for approximately 230

23  IED attacks, 156 shelling attacks, 82 sniper and small arms attacks, and 45 non-specific attacks

24  targeting U.S. military personnel from 2005 to 2010. In some instances these press statements

25  were accompanied by video footage documenting the attacks. Many of these videos show

26  dramatic attacks on U.S. military vehicles which likely resulted in casualties to U.S. military

27  personnel.

28

7

18.     Additionally, the investigation found contacts between Al-Ahmad and other individuals who were members or associates of the 1920 Revolution Brigades primarily located in Iraq and Syria.  Many of the contacts involved Al-Ahmad supplying these individuals with components that could be used in the construction and operation of IEDs.

**Location and Identification Information**

19.     Al-Ahmad has several passports (Syrian passport No. 004365665  Iraqi passport No. G2143019, issued on 15 July 2008).  Those passports are attached to this affidavit as Attachment 1.  Additionally, Al-Ahmad has a number of aliases and dates of birth to include:

    a.  ALAHMEDALABDALOKLAH, f/n Ahmed;

    b.  FARHAN, f/n Ahmed Hassan;

    c.  IBRAHIM, f/n Ahmad;

    d.  EBRAHIM, f/n Ahmad;

    e.  FARHAN, f/n Ahmed Hassan (born 7 April 1975);

    f.  ALAHMEDALABDALOKLAH,  f/n  Ahmed  (born  1  January  1977);  and

    g.  ALAHMEDALABDALOKLAH, f/n Ahmed (born 10 January 1977).

20.     A photograph of Al-Ahmad is attached as Attachment 3 to this affidavit.  Through my investigation, I am aware of Al-Ahmad's appearance and can attest that the photograph attached as Attachment 3 is a photograph of Al-Ahmad.

21.     Al-Ahmad arrived in Istanbul, Turkey on May 17, 2011 on flight EK 121.  He was, thereafter, arrested and is currently in the custody of Turkish authorities.

**List of Attachments**

22.     The following attachments are incorporated into this affidavit by reference:

    Attachment 1 - Copies of Al-Ahmad's Syrian and Iraqi passports;

    Attachment 2 - Known thumb prints of Al-Ahmad;

8

Filter Review00000454

1    Attachment 3 - Photograph of Al-Ahmad; and

2    Attachment 4 - Photographs of Omar Cache

3

4

5                                   DINA L. MCCARTHY

6                                   Federal Bureau of Investigation, Special Agent

7        I hereby certify that this is the original affidavit subscribed and sworn to before me on this

8    _26_ day of May, 2011.

9

10

11                                  HONORABLE MICHELLE H. BURNS
                                    U.S. Magistrate Judge
12                                  U.S. District Court for the District of Arizona

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                        9

Filter Review00000455

# ATTACHMENT 1

Filter Review00000456



رقم الجواز | Passport No. | N 00435665
Passeport N°

وزارة الداخلية – إدارة الهجرة والجوازات
MINISTRY OF INTERIOR - DEPARTMENT OF IMMIGRATION AND PASSPORTS
MINISTÈRE DE L'INTÉRIEUR – DÉPARTEMENT DE L'IMMIGRATION ET DES PASSEPORTS

Officials of this Syrian Arab Republic Government and representatives abroad and any other competent authorities are kindly requested to let this passport holder pass freely without hindrance and to afford him all assistance and protection he may need.

Les fonctionnaires du Gouvernement de la République Arabe Syrienne et les représentants à l'Étranger et toute autorité compétente sont priés de laisser librement passer le titulaire de ce passeport et de lui accorder toute aide et protection dont il peut avoir besoin.

Director of Department
of Immigration and
Passports
or the General Consul

Directeur du Département
de l'Immigration et des
Passeports
ou le Consul Général

---

PASSPORT
PASSEPORT

جواز سفر

SYRIAN ARAB REPUBLIC
RÉPUBLIQUE ARABE SYRIENNE

الجمهورية العربية السورية

Type / نوع | Country code / Country code
P | SYR

Issue no. N délivrance: | 001.08.0009969 | رقم الإصدار



| Given Name·Prénom: | AHMED | الاسم: احمد |
| Surname·Nom: | ALAHMEDALABDALOKLAH | اللقب: الاحمد العبد العكله |
| Father Name·Nom du père: | EBRAHIM | اسم الأب: ابراهيم |
| Mother Name·Nom de la mère: | SUBHEH | اسم الأم: صبحة |
| Birth Date·Date de naissance: | 01/10/1977 | تاريخ الولادة: |
| Birth Place·Lieu de naissance: | DEIR AZZOR | مكان الولادة: دير الزور |
| Sex·Sexe: | M | الجنس: |

---

P N S Y R A L A H M E D A L A B D A L O K L A H < < A H M E D < < < < < < < < < < 7 <

Filter Review 08000457



**REPUBLIC OF IRAQ**     جمهورية العراق

| | | |
|---|---|---|
| PASSPORT   جواز سفر | TYPE   P | COUNTRY CODE   IRQ |

PASSPORT NO.   G2143019

GIVEN NAMES
**AHMED HASSAN FARHAN**

SURNAME
**FARHAN**    فرحان

PLACE OF BIRTH
**BAGHDAD – IRQ**    العراق - بغداد

| DATE OF BIRTH | NATIONALITY | SEX | |
|---|---|---|---|
| 1975-04-07 | IRAQI | M | 1975 04 07 |

MOTHER NAME
**SANAA FADHIL**    سناء فاضل

| DATE OF EXPIRY | DATE OF ISSUE |
|---|---|
| 2016-07-14 | 2008-07-15 |

ISSUING AUTHORITY
**BAGHDAD**    بغداد

```
P<IRQFARHAN<<AHMED<HASSAN<FARHAN<<<<<<<<<<<<
G2143019<0IRQ7504079M1607141<<<<<<<<<<<<<<04
```

Filter Review00000458

# ATTACHMENT 2

Filter Review00000459



Filter Review00000460

# ATTACHMENT 3





Filter Review00000462

# ATTACHMENT 4

Filter Review00000463











Filter Review00000466





Filter Review00000467

**Extension of Statute of Limitation for Certain Terrorism Offenses**
18 U.S.C. § 3286

. . . . .

(b)  No limitation.--Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a forseeable risk of, death or serious bodily injury to another person.


18 U.S.C. § 2332b(g)(5)(B)

. . . . .

(g) Definitions.--As used in this section--

    (5) the term "Federal crime of terrorism" means an offense that--

. . . . .

        (B) is a violation of--

            (i) . . . . 2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States) . . . . 2339A (relating to providing material support to terrorists) . . . . of this title.

Filter Review00000468

# EXHIBIT E

Filter Review00000469

# TREATY[1] ON EXTRADITION AND MUTUAL ASSISTANCE IN CRIMINAL MATTERS BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF TURKEY

The United States of America and the Republic of Turkey, desiring to co-operate more effectively in the repression of crime by newly regulating extradition of offenders and by providing for mutual assistance in criminal matters, have decided to conclude a Treaty on extradition and mutual assistance in criminal matters and, to that end, have appointed as their Plenipotentiaries:

Ronald I. Spiers, Ambassador of the United States of America, by the President of the United States of America,

İldeniz Divanlıoğlu, Director General of the Consular Affairs of the Ministry of Foreign Affairs, by the President of the Republic of Turkey,

who, having communicated to each other their respective full powers, which were found in good and due form, have agreed as follows:

## CHAPTER I.   EXTRADITION

### Section I.   GENERAL PROVISIONS

#### *Article 1.*   OBLIGATION TO EXTRADITE

(1)   The Contracting Parties undertake to surrender to each other, in accord-ance with the provisions and conditions laid down in this Treaty, all persons who are found within the territory of the Requested Party and who are being pros-ecuted for or have been charged with an offense, or convicted of an offense, or are sought by the other Party for the enforcement of a judicially pronounced penalty for an offense committed within the territory of the Requesting Party.

(2)   When the offense has been committed outside the territory of the Requesting Party, the Requested Party shall grant extradition subject to the provi-sions described in this Treaty if either:

(a) The laws of the Requested Party provide for the punishment of such an offense committed in similar circumstances, or

(b) The offense has been committed by a national of the Requesting Party, and that Party has jurisdiction, according to its laws, to try that person.

#### *Article 2.*   EXTRADITABLE OFFENSES

(1)   Extraditable offenses, pursuant to the provisions of this Treaty, are:

(a) Offenses, regardless of whether listed in the appendix to this Treaty or not, which are punishable under both the federal laws of the United States and the laws of Turkey by deprivation of liberty at least for a period exceeding one year or by a more severe penalty;

(b) Offenses listed in the appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty.

---

[1] Came into force on 1 January 1981, i.e., 30 days after the exchange of the instruments of ratification, which took place at Washington on 2 December 1980, in accordance with article 44 (2).

Filter Review00000470

For purposes of extradition, it shall not matter whether the laws of the Contracting Parties place the offense within the same category of offenses or describe an offense by the same terminology.

(2) Extradition shall be granted in respect of an extraditable offense for the enforcement of a penalty or prison sentence, if the duration of the penalty or prison sentence still to be served amounts to at least six months.

(3) Subject to the conditions set out in paragraph (1), extradition shall also be granted:

(a) For attempts to commit, or participation as principal, accomplice or accessory in any extraditable offense;

(b) For the offense of association to commit a crime under the laws of Turkey and for conspiracy under the laws of the United States when the facts establish an offense under the laws of both Contracting Parties;

(c) For any extraditable offense when, only for the purpose of granting jurisdiction to the United States Government, transportation, transmission of persons or property, the use of mails or other means of communication or use of other means of carrying out interstate or foreign commerce constitutes an element of the specific offense.

(4) When a request for extradition comprises several separate offenses and extradition has been granted for one of the extraditable offenses, it shall also be granted for other extraditable offenses which could not otherwise fulfill the requirements of paragraphs (1) and (2) above as related to the deprivation of liberty to be served or duration of the penalty to be enforced in the Requesting Party.

## Article 3. CONDITIONS OF REFUSAL

(1) Extradition shall not be granted:

(a) If the offense for which extradition is requested is regarded by the Requested Party to be of a political character or an offense connected with such an offense; or if the Requested Party concludes that the request for extradition has, in fact, been made to prosecute or punish the person sought for an offense of a political character or on account of his political opinions.

However, any offense committed or attempted against a Head of State or a Head of Government or against a member of their families shall not be deemed to be an offense of a political character.

The provisions of this paragraph shall not affect any obligation of the Contracting Parties which has already been undertaken or may subsequently be undertaken by them under any multilateral international agreement;

(b) If the offense for which extradition is requested constitutes a purely military offense which is not an offense under ordinary criminal law;

(c) If the person whose surrender is sought has, under the laws of either the Requesting or the Requested Party, become immune by reason of lapse of time from prosecution or punishment for the offense for which extradition is requested;

(d) If the person whose surrender is sought has been tried and acquitted or punished with final and binding effect in the Requested Party for the offense for which extradition is requested;

(e) If the offense for which extradition is requested has, according to the laws of the Requested Party, been committed in its territory and has been or will be submitted to its appropriate judicial authorities for prosecution; or

(f) If the offense for which extradition is requested has been or is subject to amnesty or pardon by either of the Parties.

(2) Extradition may be refused in any of the following circumstances:

(a) If the person whose surrender is sought is being prosecuted in the Requested Party for the same offense;

(b) If the Requested Party has decided either not to prosecute or to terminate prosecution for the same offense; or

(c) If the person whose surrender is sought has been tried and acquitted or punished in the territory of a third State for the same offense.

### Article 4. NATIONALS

(1) Neither of the Contracting Parties shall be bound to extradite its own nationals. The competent executive authority of the United States, however, shall have the power to grant the extradition of its own nationals, if, in its discretion, this is deemed proper to do.

(2) If the Requested Party does not extradite its own national, it shall, at the request of the Requesting Party, submit the case to its competent authorities in order that proceedings may be taken if its law so provides. If the Requested Party requires additional documents or evidence, such documents or evidence shall be submitted without charge to that Party. The Requesting Party shall be informed of the results of its request.

(3) Requests for the surrender of persons sought for offenses committed prior to the entry into force of the present Treaty shall not be granted by the Requested Party for nationals of that Party.

### Article 5. DETERMINATION

The right to determine the nature of the offense which entails the refusal of extradition as enumerated in article 3 rests solely within the authority of the Requested Party.

### Article 6. CHANNELS AND LANGUAGE OF COMMUNICATION

(1) The request for extradition shall be made in writing through diplomatic channels.

(2) The request for extradition is to be written in the language of the Requesting Party.

However, such a request and its supporting documents shall be accompanied by certified translations in the language of the Requested Party.

### Section II. REQUESTS

### Article 7. CONTENTS OF THE REQUEST

(1) A request relating to a person being prosecuted or who is charged with an offense, and who has yet to be convicted, shall be accompanied by the following:

(a) A warrant of arrest issued by a judge or other competent judicial officer;

(b) A statement of the facts of the case;

(c) Such evidence as, according to the laws of the Requested Party, would justify arrest and committal for trial of the person sought if the offense had been committed in the territory of the Requested Party;

(d) Evidence proving that the person sought is the person to whom the warrant of arrest refers, including information, if available, on nationality; and

(e) The text of the applicable laws of the Requesting Party, including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of legal proceedings or the enforcement of the penalty for the offense.

(2)   A request relating to a person who has been convicted but against whom there is no final judgment or sentence, shall be accompanied by the following:

(a) The record of the judgment or conviction;

(b) A statement of the facts of the case;

(c) A warrant of arrest issued by a judge or other competent judicial officer;

(d) Evidence proving that the person sought is the person to whom the judgment or conviction refers, including information, if available, on nationality; and

(e) The text of the applicable laws of the Requesting Party, including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of legal proceedings or the enforcement of the penalty for the offense.

(3)   A request relating to a person against whom there is a final judgment or sentence shall be accompanied by the following:

(a) The record of the judgment or sentence;

(b) A statement of the facts of the case;

(c) A warrant of arrest or detention order issued by a judge or other competent judicial officer;

(d) A statement showing how much of the sentence has been served;

(e) Evidence proving that the person sought is the person to whom the judgment or conviction refers, including information, if available, on nationality; and

(f) The text of the applicable laws of the Requesting Party, including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation of legal proceedings or the enforcement of the penalty for the offense.

(4)   A request relating to a person who has been convicted in his absence or in coutumacy shall be accompanied by the following:

(a) The record of the judgment or conviction;

(b) A statement of the facts of the case;

(c) A warrant of arrest or detention order issued by a judge or other competent judicial officer;

(d) Such evidence as, according to the laws of the Requested Party, would justify arrest and committal for trial of the person sought if the offense had been committed in the territory of the Requested Party;

(e) Evidence proving that the person sought is the person to whom the judgment or conviction refers, including information, if available, on nationality; and

(f) The text of the applicable laws of the Requesting Party, including the law defining the offense, the law prescribing the punishment for the offense, and the law relating to the limitation and legal proceedings or the enforcement of the penalty for the offense.

Such convictions may be treated as final convictions if the law of the Requesting Party so provides.

### Article 8.   ADDITIONAL EVIDENCE AND INFORMATION

(1)  If the Requested Party considers that the evidence and information submitted in support of the request for the extradition of a person is not sufficient to fulfill the requirements of this Treaty, that Party shall request necessary additional evidence and information. That Party may fix a time limit for the submission of such evidence and information and, upon the Requesting Party's application, for which reasons shall be given, may grant a reasonable extension of the time limit.

(2)  If the person sought is under arrest and the additional evidence and information submitted is not sufficient, or if such evidence or information is not received within the period specified by the Requested Party, the person sought shall be discharged from custody. However, such discharge shall not prevent a subsequent request for extradition for the same offense. In this connection it shall be sufficient if reference is made in the subsequent request to the supporting documents already submitted.

### Article 9.   MEASURES TO BE TAKEN

The Contracting Parties shall take all necessary measures after the information and documents related to the request for extradition have been received, including a search for the person sought. When located, the person sought shall be detained until the competent authorities of the Requested Party reach their decision. If the request for extradition is granted, the detention shall be continued until surrender.

### Article 10.   PROVISIONAL ARREST OR DETENTION

(1)  In cases of urgency, either Contracting Party may apply for the provisional arrest or detention of the person sought before the request for extradition has been submitted to the Requested Party through diplomatic channels. The request for provisional arrest or detention may be made either through diplomatic channels or directly between the Department of Justice of the United States and the Ministry of Justice of Turkey.

(2)  The application for provisional arrest or detention shall state that a warrant of arrest or a judgment exists and that it is intended to make a request for extradition. It shall also state the offense for which extradition will be requested and when and where such offense was committed and shall give all available information concerning the description of the person sought and nationality. The application shall also contain such further information, if any, necessary to justify the issuance of a warrant of arrest in the Requested Party had the offense been committed, or the person sought convicted, in that Party.

(3) The Requested Party shall make the necessary arrangements for the provisional arrest or detention and shall notify the other Party when the person sought has been arrested or detained specifying that the person sought will be released if the documents mentioned in article 7 are not submitted within a period of 60 days from the date of arrest or detention.

(4) If the documents for extradition are submitted to the executive authority of the Requested Party within the 60 day time limit, the arrest or detention shall continue until a decision on the request for extradition has been reached by the competent authorities of the Requested Party. If the request for extradition is granted, the arrest or detention may be extended to the extent permitted by the laws of the Requested Party.

(5) If the person sought is released from arrest or detention because the extradition documents have not been received by the executive authority of the Requested Party within the 60 day time limit, the Requesting Party may make a new request for extradition when the documents are subsequently received.

## Section III. Decisions

### Article 11. Decision on Extradition and Surrender

(1) The Requested Party shall promptly communicate to the Requesting Party the decision on the request for extradition. The Requested Party shall give the reasons for any complete or partial rejection of the request for extradition.

(2) If the request for extradition is granted, the competent authorities of the Contracting Parties shall agree on the time and place of surrender of the person sought. Surrender shall take place within such time as may be prescribed by the laws of the Requested Party.

(3) If the person sought is not removed from the territory of the Requested Party within the time required under paragraph (2), that person may be set at liberty. The Requested Party may subsequently refuse to extradite that person for the same offense.

(4) If circumstances beyond its control prevent a Contracting Party within the time required under paragraph (2) from surrendering or taking delivery of the person to be extradited, it shall notify the other Contracting Party before the expiration of the specified time. In such a case the competent authorities of the Contracting Parties may agree on a new time for the surrender.

(5) If the person sought flees prior to surrender, a new request for extradition need not be accompanied by the documents specified in article 7 when that person is located.

### Article 12. Concurrent Requests

(1) If extradition is requested by more than one State, either for the same offense or different offenses, the Requested Party shall freely decide on these requests, taking into consideration all the circumstances and especially the nationality of the person sought, the place where the offense or offenses were committed, the seriousness of the offense or offenses and the respective dates of the requests for extradition.

(2)  The Requested Party, while granting extradition in such a case, may authorize the Requesting Party to surrender subsequently the person sought to a third State which also requested extradition.

### Article 13.  DEFERRED SURRENDER

When the person whose surrender is sought is being prosecuted or is serving a sentence in the territory of the Requested Party for an offense other than that for which extradition has been requested, surrender of this person may be deferred by the Requested Party until the conclusion of the prosecution and the full execution of any punishment that may be or may have been awarded. In this case, the Requested Party shall inform the Requesting Party accordingly.

### Article 14.  INFORMATION ON THE RESULTS OF PROCEEDINGS

(1)  The Contracting Party to which the person sought has been surrendered shall inform the other Party of the results of the criminal proceedings initiated against this person.

(2)  In case of conviction, a certified copy of the final judgment shall be transmitted to the other Contracting Party.

### Article 15.  DELIVERY OF PROPERTY AND VALUABLES

(1)  Upon the request of the Requesting Party, the Requested Party, subject to its laws and the interests of third parties, shall seize and deliver the following property and valuables:

(a) Property which has been used in committing the crime or which may be required as evidence;

(b) Property and valuables which have been acquired as a result of the offense and were found in the possession of the person sought at the time of arrest or detention, or which are discovered subsequently;

(c) Articles subsequently acquired from the property and valuables connected with the offense.

(2)  If possible, the property specified in paragraph (1) shall be delivered to the Requesting Party at the same time as the surrender of the person extradited. Property and valuables seized under paragraph (1) shall be delivered even if extradition already granted cannot be carried out owing to the death or escape of the person sought.

(3)  The said property and valuables can be temporarily retained for proceedings pending in the territory of the Requested Party or they can be delivered under the condition of restitution.

(4)  However, the rights of the Requested Party or a third State concerning the said property and valuables are reserved. Where there are such rights, the property and valuables shall be returned to the Requested Party free of charge and as soon as possible after the proceedings.

### Section IV.  SPECIAL PROVISIONS

### Article 16.  RULE OF SPECIALITY

(1)  A person who has been extradited in accordance with the present Treaty shall not be prosecuted, punished or detained for the enforcement of a

sentence or subjected to any other restriction on personal freedom or delivered to a third State for any offense committed prior to surrender from the territory of the Requested Party other than that for which extradition was granted, except in the following cases:

(a) If the person extradited, having had for a period of 60 days from the date of final release an opportunity to leave the territory of the Party to which the person has been surrendered, still remains in the territory of that Party. This period does not include the time during which the released person could not voluntarily leave the territory of that Party;

(b) If, after having left, the person has returned voluntarily to the territory of the Party to which surrender was granted; or

(c) If there is an express consent of the Requested Party.

(2) When the consent of the Requested Party is requested for the purposes of prosecution or for the execution of a sentence concerning an offense committed prior to the surrender other than that for which extradition was granted, the Requesting Party shall comply with the procedure provided in article 7 of the present Treaty, and provide a record established by a judge or competent officer of the statement made by the extradited person in respect of the request for consent.

#### Article 17. RE-EXTRADITION TO A THIRD STATE

(1) Except as provided in article 16, paragraph (1), the Requesting Party shall not, without the consent of the Requested Party, re-extradite to a third State a person extradited to the Requesting Party and sought by the third State for an offense committed prior to surrender.

(2) A request for consent to re-extradition to a third State shall be accompanied by the documents supporting the request for extradition made by the third State, if the Requested Party requires these documents for its decision. These documents shall conform to the documents mentioned in article 7 of this Treaty.

#### Article 18. TRANSIT

(1) The transit of a person who is the subject of extradition from a third State through the territory of one Contracting Party to the territory of the other Contracting Party shall be granted upon submission of a request, provided the offense involved is an extraditable offense under article 2 and that the Contracting Party requested to permit transit does not consider the offense to be one covered by article 3.

The request for transit shall be accompanied by a copy of a warrant of arrest, final judgment or detention order. In addition, the request shall contain a statement as mentioned in article 7.

(2) The Requested Party shall not be bound to permit the transit of its nationals, nor persons who may be prosecuted or required to serve a sentence in its territory.

(3) If air transport is to be used, the following provisions shall apply:

(a) When no intermediate stop is scheduled, the Contracting Party shall notify the other Contracting Party that transit will occur, certify that a warrant of

Filter Review00000477

arrest, final judgment or detention order exists and state the name and nationality of the person in transit.

(b) When an unscheduled landing occurs, notification as provided in (a) shall have the effect of a request for provisional arrest as provided in article 10. Thereafter, a request for transit as provided in paragraph (1) shall be made.

(c) When an intermediate stop is required, the Contracting Party requesting transit shall submit a request as provided in paragraph (1).

(4) If the circumstances require detention pending transit, the Contracting Party requesting transit may be required to follow the provisions of article 10.

### Article 19.   ADMINISTRATIVE MATTERS

(1) Expenses in the territory of the Requested Party for processing the extradition request for the person sought shall be borne by that Party until surrender. The expenses after surrender shall be borne by the Requesting Party.

(2) The expenses incurred by reason of transit shall be borne by the Requesting Party.

(3) Documents submitted as required by article 7 shall be admitted into evidence by the courts of the Requested Party provided they are sealed with the official seal of the Department of State of the United States or the Ministry of Justice of Turkey and are otherwise in compliance with the laws of the respective Parties.

(4) The appropriate legal officers of the Requested Party shall, by legal means provided under its laws, assist the Requesting Party before its respective judicial authorities.

## CHAPTER II.   MUTUAL ASSISTANCE IN CRIMINAL MATTERS

### Section I.   GENERAL PROVISIONS

### Article 20.   MUTUAL ASSISTANCE

The Contracting Parties undertake to afford each other, in accordance with the provisions of chapter II of this Treaty, mutual assistance in criminal matters.

### Article 21.   SCOPE OF ASSISTANCE

(1) Each of the Contracting Parties may submit to the other Party requests for assistance in criminal matters.

(2) Criminal matters for which mutual assistance shall be afforded include investigations and criminal proceedings in respect of offenses, the punishment of which falls or would fall within the jurisdiction of the judicial authorities of the Requesting Party under its law.

(3) Mutual assistance shall include:

(a) Execution of requests related to criminal matters;

(b) Effecting the taking of testimony or statements of persons;

(c) Effecting the production, preservation and authentication of documents, records, or articles of evidence;

(d) Effecting the return to the Requesting Party of any objects, articles or other property or assets belonging to it or obtained through such offenses;

(e) Service of all judicial documents, writs, summonses, records of judicial verdicts and court judgments or decisions;

(f) Effecting the appearance of a witness or expert before a court of the Requesting Party;

(g) Location of persons; and

(h) Providing judicial records, evidence and information.

(4)   For the purposes of chapter II of this Treaty, punishment of an offense is within the jurisdiction of the judicial authorities of the Requesting Party if the offense is deemed by its laws to have been committed in the territory of that Party, or, if committed outside the territory, the laws of the Requesting Party provide for prosecution of the offense.

#### Article 22.   REFUSAL OF MUTUAL ASSISTANCE

(1)   Judicial assistance may be refused:

(a) If the investigation or proceedings concerns:

   (i) An offense which the Requested Party considers to be a political offense or an offense connected with a political offense; or

   (ii) A purely military offense which does not constitute an offense under ordinary criminal law.

(b) If the Requested Party considers that execution of the request is likely to prejudice its sovereignty, security, or similar essential interests.

(2)   For the purposes of chapter II of this Treaty, the following offenses shall not be considered political offenses or offenses connected with a political offense:

(a) Offenses for which investigations and proceedings are obligatory for the Contracting Parties under multilateral international agreements; and

(b) Offenses against a Head of State or a Head of Government or members of their families.

#### Article 23.   SCOPE OF USE

(1)   Use of any testimony, statements, documents, records or articles of evidence obtained by the Requesting Party under chapter II, section I, is limited to the purposes of investigations or criminal proceedings and adjudications of claims for damages connected with the offense which is the subject of the investigation or proceedings in the Requesting Party.

(2)   Furthermore, the material mentioned in paragraph (1) above may also be used in an investigation or prosecution relating to an offense other than the offense for which assistance was granted, provided the purpose falls within the scope of chapter II, section I.

### Section II.   REQUESTS

#### Article 24.   CONTENTS OF REQUESTS

(1)   A request for the taking of testimony or statements of persons, or for effecting the production, preservation and authentication of documents, records,

or articles of evidence shall specify the name of the authority conducting the investigation or proceedings to which the request relates and, insofar as possible, shall also indicate:

(a) The subject matter and nature of the investigation or proceeding;

(b) The principal need for the evidence or information sought;

(c) The full name, place and date of birth, address and any other available information, such as nationality, which may aid in the identification of the person or persons who are the subjects of the investigation or proceeding;

(d) The name, address and nationality of the person whose testimony or statement is sought, or from whom documents, records or articles of evidence are requested; and

(e) A description of the documents, records or articles of evidence to be produced or preserved, and of the manner in which they should be reproduced and authenticated.

(2)   The requests, insofar as possible and to the extent necessary, shall also include:

(a) A description of the particular procedure to be followed, if any;

(b) A statement as to whether sworn or affirmed testimony or statements are required; and

(c) A description of the information, statement or testimony sought.

### Article 25.   EXECUTION OF REQUESTS

(1)   Except as otherwise provided in this chapter, requests shall be executed in accordance with the usual procedure under the laws of the Requested Party.

(2)   The Requested Party may consent to a request to apply the procedure of the Requesting Party, to the extent that such procedures are not incompatible with the laws of the Requested Party.

(3)   A person in the Requested Party from whom evidence is sought shall be bound to testify and produce documents, records, or articles of evidence in the same manner and to the same extent as in criminal investigations or proceedings in the Requested Party, unless such person has a right to refuse to do so under the laws of that Party.

(4)   The appropriate judicial officers and other officials of the Requested Party shall use all means within their power under the laws of the Requested Party to execute requests. When the execution of a request requires judicial actions, the officials of the Requested Party shall present the requests to the appropriate court at no expense to the Requesting Party.

(5)   On the express request of the Requesting Party, the Requested Party shall state the date and place of execution of the request. Under the requirements and provisions of the laws of either Party, appropriate officers of the Requesting Party, or other interested persons, may be present at the execution of the requests.

### Article 26.   RECORDS AND DOCUMENTS IN POSSESSION OF CONTRACTING PARTIES

Upon request, the Requested Party shall provide to the Requesting Party, on the same conditions and to the same extent as they would be available to author-

FBI Review00000480

ities performing comparable functions in the Requested Party, the original or certified copies of:

(*a*) Judgments and decisions of courts; and

(*b*) Documents, records, and articles of evidence, including transcripts and official summaries of testimony, contained in the files of a court or investigative authority, if the Requested Party determines it is appropriate.

*Article 27.* SEARCHES AND SEIZURES OF PROPERTY AND ARTICLES

When the request seeks the handing over of any property or articles to be used in a criminal investigation or proceeding, and when this requires the execution of a search warrant, a search and seizure shall be made only in accordance with the laws of the Requested Party.

*Article 28.* DELIVERY AND RETURN OF DOCUMENTS, RECORDS, OR ARTICLES OF EVIDENCE

(1)  The Requested Party may postpone the delivery of original documents or records, or articles of evidence requested if they are needed in connection with pending proceedings by the Requested Party.

(2)  Any original documents, records or articles of evidence delivered in execution of requests shall be returned by the Requesting Party to the other Party as soon as possible unless the Requested Party waives their return.

(3)  However, the competent authority of the Requesting Party shall be entitled to retain articles for disposition in accordance with its laws if such articles belong to persons in that Party and no title or other secured rights are claimed by a person in the Requested Party.

## Section III.   SERVICE OF DOCUMENTS

*Article 29.* REQUESTS FOR SERVICE OF DOCUMENTS

(1)  A request for the service of documents, including court judgments, records of verdicts, writs, summonses or other documents which are transmitted to the Requested Party, shall include:

(*a*) The name of the authority requesting service;

(*b*) The name, address, and, if known, nationality of the person to be served; and

(*c*) The approximate allowances, travel and subsistence expenses payable to the witness or expert whose appearance is sought in the Requesting Party.

(2)  If the Requesting Party specifies in its request of service a date for any personal appearance, it should take into consideration, when setting the date for the appearance and forwarding the request, that the request must be received by the Requested Party at least 30 days before that date.

*Article 30.* EXECUTIONS OF REQUESTS FOR SERVICE OF DOCUMENTS

(1)  The Competent Authority of the Requested Party shall effect service of any document, which is transmitted for this purpose by the Competent Authority of the Requesting Party, in the manner provided by its own laws and procedure for the service of similar procedural documents.

(2)   Proof of service shall be made by means of a receipt, dated and signed by the person served or by means of a declaration specifying the form and date of service and signed by the person effecting it.

(3)   The Requested Party shall promptly transmit to the Requesting Party the receipt of service or the declaration.

(4)   If service cannot be effected, the reasons shall be communicated to the Requesting Party with the documents sought to be served.

(5)   Service of a document under this Article on a person other than a national of the Requesting Party does not confer jurisdiction in the Requesting Party.

(6)   Each Contracting Party shall retain the right to serve documents on its own nationals in the Requested Party through its diplomatic or consular officials.

### *Article 31.*   APPEARANCE OF WITNESSES AND EXPERTS IN THE REQUESTING PARTY

(1)   If the Requesting Party considers the personal appearance of a witness or expert before its judicial authorities especially necessary, that Party shall so indicate in its request for service of a summons. The Requested Party shall invite the witness or expert served to appear before the relevant judicial authority of the Requesting Party and ask whether the person agrees to the appearance.

The Requested Party shall promptly notify the Requesting Party of the reply of the witness or expert.

(2)   A witness or expert who fails to answer a summons to appear before a judicial authority of the Requesting Party shall not, even if the summons contains a notice of penalty, be subjected to any civil or criminal forfeiture, measure of restraint or legal sanction unless subsequently the person enters the territory of the Requesting Party and is there again duly summoned.

### *Article 32.*   TRANSFER AND APPEARANCE OF DETAINED PERSONS

(1)   If the appearance of a person held in custody is needed and requested by the Requesting Party as a witness or for purposes of confrontation before a judicial authority of that Party, the person in custody may temporarily be transferred to the territory of that Party if:

(a)  The person in custody consents thereto;

(b)  The transfer shall not prolong the custody; and

(c)  The Requested Party determines that there are no other important reasons against the transfer.

(2)   Execution of the request for the transfer of the person in custody may be postponed as long as the presence of the person is necessary for an investigation or proceeding in the Requested Party.

(3)   The Requesting Party shall have the authority and obligation to keep the person in custody unless the other Party authorizes release. When no longer needed, the person in custody shall be returned as soon as circumstances permit.

(4)   The Requested Party shall not decline to return a transferred person solely because he is a national of that Party.

### Article 33.   Transfer of an Accused Person

(1)   When, in connection with a request for assistance under this chapter, the Requesting Party requires the transfer to the other Party of an accused person for purposes of confrontation, the request shall so state. Upon transfer, the Requested Party shall hold him in custody as long as necessary and shall return him immediately thereafter.

(2)   If the law of the Requested Party requires proof that the Requesting Party has the accused in custody, the Requesting Party shall attach to its request any judicial orders or other documents the Requested Party requires.

(3)   On receipt of the request, the Competent Authority of the Requested Party will promptly seek from the appropriate authorities any legal process necessary to keep the accused in custody. The Requested Party will notify the Requesting Party that custody is authorized before the transfer takes place.

### Article 34.   Safe Conduct

(1)   A witness or expert, whatever his nationality, appearing before a judicial authority in the Requesting Party pursuant to a request made under this Treaty, shall not be prosecuted or, except as provided in paragraph (3) of article 32 or paragraph (1) of article 33, be detained or subjected to any other restriction of personal liberty in the territory of that Party with respect to any act or conviction which preceded his departure from the territory of the Requested Party.

(2)   A person, whatever his nationality, summoned before a judicial authority in the Requesting Party to answer for acts forming the subject of proceedings against him, shall not be prosecuted or detained or subjected to any other restriction of his personal liberty for acts or convictions which preceded his departure from the territory of the Requested Party and which are not specified in the request.

(3)   The safe conduct provided in this Article shall cease if 10 days after the person receives official notification that his presence is no longer required, the person, being free to leave the territory of the Requesting Party, has not done so, or after having left, has voluntarily returned.

### Section IV.   Information

### Article 35.   Exchange of Information

(1)   With a view to furthering the purposes of this Treaty, the authorities of either Party are authorized to furnish any information, documents, records or evidence which may be of interest to the other in pertinent matters including investigations or proceedings in either Party, to the extent permitted by their laws and under such conditions as are appropriate.

(2)   Where appropriate, the Parties will provide each other relevant information relating to their laws, regulations, statutes and international practices in criminal matters.

### Article 36.   Records

(1)   To the maximum extent possible, the appropriate authorities of the Contracting Parties shall inform each other of criminal convictions and subsequent measures concerning nationals of the other Party.

(2)   On request, the Parties shall provide copies of judicial records relating to criminal proceedings against a national of the Requesting Party to the same extent as those records are available to judicial authorities in the Requested Party.

### Article 37.   LOCATION OF PERSONS

If the Requesting Party requests information as to the location of persons who are believed to be within the Requested Party, the Requested Party shall make every effort to ascertain the whereabouts and addresses of such persons in its territory. Such requests shall include all available information on identity and location.

### Section V.   PROCEDURE

### Article 38.   COMPETENT AUTHORITIES

(1)   The Competent Authorities under chapter II of this Treaty shall be the Department of Justice of the United States of America and the Ministry of Justice of the Republic of Turkey.

(2)   Requests under this chapter shall be made only by the Competent Authorities and may be transmitted directly between them or through diplomatic channels.

(3)   The Competent Authority of the Requested Party shall promptly transmit requests to the appropriate authorities for execution.

### Article 39.   ACTION ON THE REQUEST

(1)   If the Requested Party determines that the request for assistance is not consistent with the provisions of this chapter or that it cannot be executed, that Party shall immediately inform the Requesting Party and specify the reasons.

(2)   Upon completion of a request for assistance, the Requested Party shall return the original request to the Requesting Party together with all the documents, information and evidence obtained.

### Article 40.   LANGUAGE

(1)   Requests for mutual assistance and all supporting documents shall be prepared in the language of the Requesting Party.

(2)   These requests and their supporting documents shall be accompanied by true and complete translations in the language of the Requested Party.

(3)   Translation of all transcripts,   statements, or documents or records obtained through a request shall be incumbent upon the Requesting Party.

### Article 41.   EXPENSES

Requests under this chapter shall be executed by the Requested Party without any expense to the Requesting Party, except for the following:

(a) Allowances, including subsistence and travel expenses, for a witness or expert invited to appear in the Requesting Party under article 31. These allowances and expenses shall be calculated as from the place of residence in the Requested Party and shall be at rates equal to those provided in the schedules and rules in force in the Requesting Party;

(b) Expenses involved in the transfer and return of detained persons transferred under article 32 or article 33; and

(c) Fees of private experts specified by name in the request.

### CHAPTER III.   FINAL PROVISIONS

#### *Article 42.*   TERRITORIAL APPLICATION

(1)   A reference in this Treaty to the territory of either Contracting Party is a reference to all territory under its jurisdiction.

(2)   This Treaty shall not affect obligations which the Contracting Parties have undertaken or will undertake under any multilateral international agreement.

#### *Article 43.*   SCOPE OF EFFECT

This Treaty shall apply to offenses encompassed by article 2 committed before and after the date this Treaty enters into force. Extradition shall not be granted, however, for an offense committed before this Treaty enters into force which was not an extraditable offense under previous agreements.

#### *Article 44.*   ENTRY INTO FORCE AND DENUNCIATION

(1)   The present Treaty shall be subject to ratification and the exchange of the instruments of ratification shall take place in Washington.

(2)   The present Treaty shall enter into force 30 days after the exchange of the instruments of ratification and shall remain in force indefinitely.

(3)   Upon entry into force of this Treaty, the Treaty of Extradition between the United States and Turkey signed at Lausanne, Switzerland, on August 6, 1923,[1] shall cease to have effect, except that requests presented prior to entry into force of the present Treaty shall be processed according to the provisions of the Treaty of 1923.

(4)   Either Contracting Party may denounce and terminate this Treaty by giving prior written notice to the other Party. Such denunciation shall take effect six months after the receipt of the notice.

IN WITNESS WHEREOF the respective Plenipotentiaries of the Contracting Parties have signed the present Treaty and have affixed hereunto their seals.

DONE at Ankara in duplicate, this seventh day of June 1979, in the English and Turkish languages, both texts being equally authentic.

*[Signed — Signé]*[2]

For the Government
of the United States of America

*[Signed — Signé]*[3]

For the Government
of the Republic of Turkey

---

[1] League of Nations, *Treaty Series*, vol. CLIII, p. 71.
[2] Signed by Ronald I. Spiers — Signé par Ronald I. Spiers.
[3] Signed by I. Divanlıoğlu — Signé par I. Divanlıoğlu.

## APPENDIX

1. Murder.

2. Manslaughter.

3. Aggravated wounding, injury, or assault, even when loss of life results; wounding or injuring with intent to cause grievous bodily harm.

4. Illegal abortion.

5. Kidnapping; abduction; false imprisonment; child-stealing.

6. Rape; indecent assault; incest; bigamy.

7. Unlawful sexual acts with or upon children under the age specified by the laws both of the Requesting and Requested Parties.

8. Procuration.

9. Libel.

10. Willful non-support or willful abandonment of a minor or other dependent person when by reason of such non-support or abandonment the life of that minor or other dependent person is or is likely to be endangered.

11. Robbery; larceny; burglary; embezzlement; extortion.

12. Malicious damage to property.

13. Fraud, including breach of trust and offenses against the laws relating to the unlawful obtaining of money, property or securities.

14. Offenses against the laws relating to forgery, including the making of forged documents or records, whether official or private, or the uttering or fraudulent use of documents or records.

15. Receiving, possessing, or transporting for personal benefit any money, valuable securities, or other property, knowing the same to have been unlawfully obtained.

16. Offenses relating to counterfeiting.

17. Perjury, including subornation of perjury; false swearing; false statements, either written or oral, made to a judicial authority or to a government agency or office.

18. Arson.

19. Unlawful obstruction of judicial proceedings or proceedings before governmental bodies or interference with an investigation of a violation of a criminal statute, by influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator.

20. *a.* Unlawful abuse of official authority which results in bodily injury or deprivation of life, liberty or property of any person.

    *b.* Unlawful injury or intimidation in connection with, or interference with, voting or candidacy for public office, jury service, government employment, or the receipt of enjoyment of benefits provided by government agencies.

21. Facilitating or permitting the escape of a person from custody; prison mutiny.

22. Offenses against the laws relating to bribery.

23. Offenses against the laws relating to civil disorders.

24. Offenses against the laws relating to organized criminal enterprises or associations.

25. Any act willfully jeopardizing the safety of any person traveling upon a railway or in any aircraft or vessel or other means of transportation.

26. Piracy, by statute or by the law of nations; mutiny or revolt aboard an aircraft or vessel against the authority of the captain or commander of such aircraft or vessel; any seizure or exercise of control, by force or violence, or threat of force or violence, of an aircraft or vessel.

27. *a.* Offenses against the laws relating to importation, exportation or transit of goods, articles, or merchandise, including smuggling.

    *b.* Offenses relating to willful evasion of taxes and duties.

    *c.* Offenses against the laws relating to international transfers of funds.

28. Offenses against the bankruptcy laws.

29. Offenses against the laws relating to narcotic drugs, *Cannabis sativa L.*, hallucinogenic drugs, cocaine and its derivatives, and other dangerous drugs and chemicals.

30. Offenses against the laws relating to the illicit manufacture of or traffic in poisonous chemicals or substances injurious to health.

31. Offenses against the laws relating to firearms, ammunition, explosives, incendiary devices or nuclear materials.

32. Offenses against the laws relating to the sale or transportation or purchase of securities or commodities.

33. Any other act for which extradition may be granted in accordance with the laws of both Contracting Parties.

**20 Kasım 1980**
**Sayı: 17166**

**2312 Sayılı Kanunla Onaylanması Uygun Bulunan, Hükûmetimiz ile Amerika
Birleşik Devletleri Hükûmeti Arasında Suçluların Geri Verilmesi ve Ceza
İşlerinde Karşılıklı Yardım Anlaşmasının Onaylanmasına
Dair Bakanlar Kurulu Kararı**

**5 Kasım 1980 — No : 8/1843**
**[Resmî Gazete'de yayımı : 20 Kasım 1980 — Sayı : 17166]**

2312 sayılı Kanunla onaylanması uygun bulunan ekli «Türkiye Cumhuriyeti ile
Amerika Birleşik Devletleri Arasında Suçluların Geri Verilmesi ve Ceza İşlerinde
Karşılıklı Yardım Anlaşması»nın onay belgelerinin teatisinden otuz gün sonra yürür-
lüğe girmek üzere onaylanması; Dışişleri Bakanlığı'nın 15/10/1980 tarihli ve KOGM/
KOSD/ABD/SÖZL - 1605 sayılı yazısı üzerine, 31/5/1963 tarihli ve 244 sayılı Kanu-
nun 3 üncü maddesine göre, Bakanlar Kurulu'nca 5/11/1980 tarihinde kararlaştırıl-
mıştır.

DEVLET BAŞKANI
KENAN EVREN
ORGENERAL

BAŞBAKAN
B. ULUSU

| | | | |
|---|---|---|---|
| Devlet Bak. - Başbakan Yrd.<br>Z. BAYKARA | Devlet Bak. - Başbakan Yrd.<br>T. ÖZAL | Devlet Bakanı<br>Prof. Dr. İ. ÖZTRAK | Devlet Bakanı<br>M. ÖZGÜNEŞ |
| Devlet Bakanı<br>Prof. Dr. M. N. ÖZDAŞ | Adalet Bakanı<br>C. MENTEŞ | Millî Savunma Bakanı<br>Ü. H. BAYÜLKEN | İçişleri Bakanı<br>Ş. ÇETİNER |
| Dışişleri Bakanı<br>İ. TÜRKMEN | Maliye Bakanı<br>K. ERDEM | Millî Eğitim Bakanı<br>H. SAĞLAM | Bayındırlık Bakanı<br>Dr. T. ÖNALP |
| Ticaret Bakanı<br>K. CANTÜRK | Sağ. ve Sos. Yardım Bakanı<br>Prof. Dr. N. AYANOĞLU | Gümrük ve Tekel Bakanı<br>R. BATURALP | Ulaştırma Bakanı<br>N. ÖFGÜR |
| Tarım ve Orman Bakanı<br>Prof. Dr. S. ÖZBEK | Çalışma Bakanı<br>Prof. Dr. T. ESENER | Sanayi ve Teknoloji Bakanı<br>Ş. KOCATOPÇU | Enerji ve Tabii Kay. Bakanı<br>S. BİNGÖL |
| Turizm ve Tanıtma Bakanı<br>İ. EVLİYAOĞLU | İmar ve İskân Bakanı<br>Dr. Ş. TÜTEN | Köy İşleri ve Koop. Bakanı<br>M. R. GÜNEY | Gençlik ve Spor Bakanı<br>V. ÖZGÜL |
| | Sosyal Güvenlik Bakanı<br>S. ŞİDE | Kültür Bakanı<br>C. BABAN | |

Filter Review00000488

S. ÖZDOĞAN

## AMERİKA BİRLEŞİK DEVLETLERİ İLE TÜRKİYE CUMHU-RİYETİ ARASINDA SUÇLULARIN GERİ VERİLMESİ VE CEZA İŞLERİNDE KARSILIKLI YARDIM ANLASMASI

Amerika Birleşik Devletleri ve Türkiye Cumhuriyeti, suçluların geri veril-mesinin yeniden düzenlenmesi ve ceza işlerinde karşılıklı yardım ilkelerinin saptanması yolu ile suçların önlenmesinde daha etkin bir işbirliği sağlamak isteği ile aralarında bir "Suçluların Geri Verilmesi ve Ceza İşlerinde Karşılıklı Yardım Anlaşması" bağıtlamayı kararlaştırmışlar ve bu amaçla Yetkili Temsil-cileri olarak:

Amerika Birleşik Devletleri Başkanı: Amerika Birleşik Devletleri Büyükelçisi, Ronald I. Spiers'i,

Türkiye Cumhuriyeti Cumhurbaşkanı: Dışişleri Bakanlığı Konsolosluk Genel Müdürü Bay İldeniz Divanlıoğlu'nu,

atamışlardır.

Bu Temsilciler, usulüne uygun ve geçerli yetki belgelerinin karşılıklı değişiminden sonra, aşağıdaki maddeler üzerinde anlaşmışlardır:

### BÖLÜM I. SUÇLULARIN GERİ VERİLMESİ

#### Kesim I. GENEL HÜKÜMLER

##### *Madde 1* SUÇLULARI GERİ VERME YÜKÜMLÜLÜĞÜ

(1) Sözleşen Taraflar, İstenilen Taraf ülkesi içinde bulunup da bir suçtan ötürü hakkında kovuşturma yapılan veya bir suçla itham edilmiş veya bir suçtan hüküm giymiş olan, veya İsteyen Taraf ülkesinde işlenmiş bir suç nedeniyle adli yargı organlarınca verilmiş bir cezanın yerine getirilmesi amacıyla diğer Taraf'ça istenen tüm kişileri, bu Anlaşma'da yer alan hüküm ve koşullara uygun olarak, birbirlerine teslim etmeyi üstlenirler.

(2) Suç, İsteyen Taraf ülkesi dışında işlenmiş olduğu takdirde, İstenilen Taraf:

(a) Kendi yasaları, benzer koşullarda işlenmiş böyle bir suçun cezalandırılmasını öngörüyorsa, veya

(b) Suç, İsteyen Taraf'ın bir uyruğu tarafından işlenmiş olup da, anılan Taraf'ın kendi yasalarına göre bu kişiyi yargılama yetkisi varsa,

bu Anlaşma'da belirtilen hükümlere bağlı olarak, suçlunun geri verilmesini kabul edecektir.

##### *Madde 2.* GERİ VERME KONUSU OLABİLECEK SUÇLAR

(1) Geri verme konusu olabilecek suçlar, bu Anlaşma hükümlerine uygun olmak üzere, şunlardır:

(a) Bu Anlaşma'ya Ek Liste'de yazılı olsun olmasın, hem Birleşik Devletler federal yasalarına, hem de Türkiye yasalarına göre, tasgari haddi bir yılı aşan süre ile hürriyeti bağlayıcı bir cezayı veya daha ağır bir cezayı gerektiren suçlar.

Filter Review00000489

(*b*) Bu Anlaşma'ya Ek Liste'de yazılı olup hem İsteyen Taraf, hem de İstenilen Taraf yasalarına göre, asgari haddi bir yılı aşan bir süre veya daha ağır bir cezayı gerektiren suçlar.

Geri verme amaçları bakımından, Sözleşen Taraflar'ın yasalarının, suça aynı suçlar kategorisi içinde yer verip vermemesi veya bir suçu aynı deyimlerle niteleyip nitelememesi önemli olmayacaktır.

(2) Geri verme konusu olabilecek bir suçla ilgili cezanın veya hürriyeti bağlayıcı mahkûmiyet hükmünün yerine getirilmesi amacıyla yapılan geri verme istemi, bakiye cezanın veya infaz edilecek mahkûmiyetin süresi en az altı ay olduğu takdirde kabul edilecektir.

(3) (1)nci fıkrada belirtilen koşullara bağlı olmak üzere, geri verme şu suçlar için de kabul edilecektir:

(*a*) Geri vermeye konu olabilecek herhangi bir suçun işlenmesine teşebbüs, veya böyle bir suça aslî, müşterek veya feri fail olarak katılma;

(*b*) Sözleşen Taraflar'ın her ikisinin yasalarına göre de suç teşkil etmesi kaydıyla, Türkiye yasalarına göre suç işlemek için cemiyet teşkili ve Birleşik Devletler yasalarına göre iki veya daha çok kişinin kanunsuz bir eylem için anlaşması;

(*c*) Yalnız Birleşik Devletler yargı yetkisinin uygulanması amacıyla; kişi veya malların nakledilmesinin, iletilmesinin veya dış veya eyaletlerarası ticaretin yapılmasında posta veya öteki haberleşme yollarının veya başkaca araçların kullanılmasının, belli bir suçun unsurunu meydana getirmesi halinde, Anlaşma'ya göre geri vermeye konu olabilecek böyle bir suç.

(4) Geri verme istemi, birbirinden ayrı çeşitli suçları kapsadığı ve geri vermeye konu olabilecek suçlardan biri için kabul edildiği takdirde, yukarıda (1) ve (2)nci fıkralar gereklerini, İsteyen Taraf'ta çekilecek hürriyeti bağlayıcı ceza veya ceza yerine getirilecek ceza mahkûmiyetinin süresi bakımından yalnız başına karşılayamayacak olan ve nitelik yönünden geri verme konusu olabilecek öteki suçlar için de, geri verme kabul edilecektir.

### *Madde 3.* REDDETME KOŞULLARI

(1) Geri verme aşağıdaki hallerde kabul edilmeyecektir:

(*a*) Geri verme istemine konu olan suç, İstenilen Taraf'ça, siyasi nitelikte veya böyle bir suçla murtabıt bir suç sayılır ise; veya geri verme isteminin, gerçekte, istenen kişiyi, siyasi görüşleri nedeniyle kovuşturmak veya cezalandırmak için yapılmış olduğuna İstenilen Taraf'ça kanaat getirilir ise.

Bununla birlikte, bir Devlet Başkanına veya Hükümet Başkanına veya aileleri üyelerinden birine karşı işlenmiş veya işlenmeye teşebbüs edilmiş bir suç, siyasi nitelikte bir suç sayılmayacaktır.

Bu fıkra hükümleri, Sözleşen Taraflar'ın, çoktaraflı uluslararası bir anlaşma ile, halen üstlenmiş oldukları veya sonradan üstlenebilecekleri bir yükümlülüğü etkilemez;

(*b*) Geri verme istemine konu olan suç, adli ceza yasalarına göre suç olmayan sırf askeri nitelikte bir suç ise;

(*c*) Teslimi istenen kişi, İsteyen veya İstenilen Taraflar'dan birinin yasalarına göre, geri verme istemine konu olan suçtan ötürü kovuşturulmaktan veya cezalandırılmaktan, zamanaşımı nedeniyle, bağışık ise;

(d) Teslimi istenen kişi, geri verme istemine konu olan suçtan ötürü İstenilen Devlet'te yargılanarak kesin ve bağlayıcı bir hükümle beraat etmiş veya mahkûm olmuş ise;

(e) Geri verme istemine konu olan suç, İstenilen Taraf'ın yasalarına göre, bu Taraf ülkesinde işlenmiş olup da, kovuşturma için İstenilen Taraf adli makamlarına intikal ettirilmiş veya intikal ettirilecek ise; veya

(f) Geri verme istemine konu olan suç, Taraflar'dan birinde çıkarılan genel veya özel affa konu olmuş veya olmakta ise.

(2)  Geri verme, aşağıdaki hallerden birinde reddedilebilir:

(a) Teslimi istenen kişi, aynı suçtan ötürü İstenilen Taraf'ta kovuşturulmakta ise;

(b) İstenilen Taraf, aynı suçtan ötürü kovuşturmamak yeya kovuşturmayı durdurmak kararı almış ise; veya

(c) Teslimi istenen kişi, aynı suçtan ötürü bir üçüncü Devlet ülkesinde yargılanarak beraat etmiş veya mahkûm olmuş ise.

### Madde 4.  UYRUKLAR

(1)  Sözleşen Taraflar'dan hiç biri, kendi uyruklarını geri vermek zorunda olmayacaktır. Ancak, Birleşik Devletler'in yetkili yürütme makamı, kendi seçimine göre, yerinde gördüğü takdirde, kendi uyruklarının geri verilmesini kabul etmeye yetkili olacaktır.

(2)  İstenilen Taraf kendi uyruğunu geri vermediği takdirde, yasasında öngörülmek kaydıyla kovuşturma işleminin yapılabilmesi için, İsteyen Taraf'ın istemi üzerine, durumu yetkili makamlarına iletecektir. İstenilen Taraf ek belge veya kanıtlara gerek görür ise, bu gibi belge veya kanıtlar bu Taraf'a masrafsız sağlanacaktır. İsteyen Taraf'a isteminin sonuçlarından bilgi verilecektir.

(3)  Bu Anlaşma'nın yürürlüğe girmesinden önce işlenmiş suçlardan ötürü aranmakta olan kişilerin teslimine ilişkin istemler, İstenilen Taraf'ça, bu Taraf'ın uyrukları için kabul edilmeyecektir.

### Madde 5.  BELİRLEME YETKİSİ

Suçun, 3.üncü Maddede sayılan nedenlerle geri vermenin reddolunmasını gerektirecek niteliğini belirleme hakkı, yalnız İstenilen Taraf'ın yetkisinde bulunacaktır.

### Madde 6.  HABERLEŞME YOLLARI VE DİLİ

(1)  Geri verme istemi, diplomatik yollardan yazılı biçimde yapılacaktır.

(2)  Geri verme istemi, İsteyen Taraf'ın dilinde yazılacaktır.

Bununla birlikte, geri verme istemine ve dayanağı belgelere, İstenilen Taraf dilinde onaylı çevirileri eklenecektir.

### Kesim II.  İSTEMLER

### Madde 7.  İSTEMİN İÇERİĞİ

(1)  Hakkında kovuşturma yapılan veya bir suçla itham edilen ve henüz hüküm giymemiş olan bir kişi ile ilgili isteme aşağıdaki belgeler eklenecektir:

(a) Bir yargıç veya başka yetkili adli bir görevli tarafından çıkarılmış tutuklama müzekkeresi;

(b) Olayın maddi unsurlarına ilişkin bir açıklama;

(c) Suç, İstenilen Taraf ülkesinde işlenmiş olsa idi, İstenilen Taraf'ın yasalarına göre, istenen kişinin tutuklanmasını ve mahkemeye sevkini haklı gösterebilecek olan kanıtlar;

(d) İstenen kişinin, tutuklama müzekkeresinde belirtilen kişi olduğunu gösteren ve varsa, uyrukluğuna ilişkin bilgileri de içeren kanıtlar; ve

(e) İsteyen Taraf'ın; suçu tanımlayan, bu suç için öngörülen cezayı belirleyen ve dava veya ceza zamanaşımlarına ilişkin yasaları da dahil olmak üzere, suça uygulanabilecek yasalarının madde metinleri.

(2) Hüküm giymiş olmakla birlikte hakkındaki ceza yargısı veya kararı kesinleşmemiş olan kişi ile ilgili isteme, aşağıdaki belgeler eklenecektir:

(a) Ceza yargısı veya mahkûmiyet kararının onaylı örneği;

(b) Dava konusu olayın maddi unsurlarına ilişkin bir açıklama;

(c) Bir yargıç veya başka yetkili adli bir görevli tarafından çıkarılmış tutuklama müzekkeresi;

(d) İstenen kişinin ceza yargısı veya mahkûmiyet kararında belirtilen kimse olduğunu gösteren ve varsa, uyrukluğuna ilişkin bilgileri de içeren kanıtlar; ve

(e) İsteyen Taraf'ın; suçu tanımlayan, bu suç için öngörülen cezayi belirleyen ve dava veya ceza zamanaşımlarına ilişkin yasaları da dahil olmak üzere, suça uygulanan yasalarının madde metinleri.

(3) Hakkında kesin bir ceza yargısı veya kararı bulunan bir kişiye ilişkin isteme, aşağıdaki belgeler eklenecektir:

(a) Kesin ceza yargısı veya mahkûmiyet hükmünün onaylı örneği;

(b) Dava konusu olayın maddi unsurlarına ilişkin bir açıklama;

(c) Bir yargıç veya başka yetkili adli bir görevli tarafından çıkarılmış tutuklama müzekkeresi veya tutukluluk emri;

(d) Hapis cezasının ne kadarının çekilmiş olduğunu gösteren bir belge;

(e) İstenen kişinin kesin ceza yargısı veya mahkûmiyet hükmünde belirtilen kişi olduğunu gösteren ve, varsa, uyrukluğuna ilişkin bilgileri de içeren kanıtlar; ve

(f) İsteyen Taraf'ın; suçu tanımlayan, bu suç için öngörülen cezayı belirleyen ve dava veya ceza zamanaşımlarına ilişkin yasaları da dahil olmak üzere, suça uygulanan yasalarının madde metinleri.

(4) Duruşmada hazır bulunmaksızın veya gıyabında hüküm giyen bir kişi ile ilgili isteme, şu belgeler eklenecektir:

(a) Ceza yargısı veya mahkûmiyet kararının onaylı örneği;

(b) Dava konusu olayın maddi unsurlarına ilişkin bir açıklama;

(c) Bir yargıç veya başka yetkili adli bir görevli tarafından çıkarılmış tutuklama müzekkeresi veya tutukluluk emri;

(d) Suç, İstenilen Taraf ülkesinde işlenmiş olsa idi, İstenilen Taraf'ın yasalarına göre, istenen kişinin tutuklanmasını ve mahkemeye sevkini haklı gösterebilecek olan kanıtlar;

(e) İstenen kişinin ceza yargısı veya mahkümiyet kararında belirtilen kişi olduğunu gösteren ve, varsa, uyrukluğuna ilişkin bilgileri de içeren kanıtlar; ve

(f) İsteyen Taraf'ın; suçu tanımlayan, bu suç için öngörülen cezayı belirleyen ve dava veya ceza zamanaşımlarına ilişkin yasaları da dahil olmak üzere, suça uygulanan yasalarının madde metinleri.

Bu gibi mahkümiyet kararları, İsteyen Taraf'ın yasasında öyle öngörülmekte ise, kesin hüküm gibi işleme tabi tutulabilecektir.

### Madde 8.  EK KANIT VE BİLGİLER

(1)  İstenilen Taraf, bir kişinin geri verilmesi için yapılan istemin dayanağı olarak verilen kanıt ve bilgilerin, bu Anlaşma gereklerinin yerine getirilmesi için yeterli olmadığı görüşünde ise, anılan Taraf, gerekli ek kanıt ve bilgileri isteyecektir. Anılan Taraf, bu kanıt ve bilgilerin verilmesi için bir süre saptayabilir ve, İsteyen Taraf'ın nedenlerini de göstereceği başvurusu üzerinde, sürenin, makul bir zaman için uzatılmasını kabul edebilir.

(2)  İstenen kişi, tutuklu ise ve verilmiş olan ek kanıt ve bilgiler yeterli değilse, veya bu kanıt ve bilgiler İstenilen Taraf'ça belirtilen süre içinde alınmamış ise, serbest bırakılacaktır. Ancak, böyle bir serbest bırakma, aynı suçtan ötürü daha sonra geri verme için istemde bulunulmasını önlemeyecektir. Bu takdirde, sonraki istemde, daha önce verilmiş olan dayanak belgelere atıfta bulunulması yeterli olacaktır.

### Madde 9.  ALINACAK ÖNLEMLER

Sözleşen Taraflar, geri verme istemine ilişkin bilgi ve belgelerin alınmasından sonra, istenen kişinin aranması da dahil olmak üzere, gerekli tüm önlemleri alacaklardır. Aranan kişi, bulunduğunda, İstenilen Taraf yetkili makamları karara varıncaya kadar, tutukluluk altında bulundurulacaktır. Geri verme istemi kabul edildiği takdirde, tutukluluk hali teslime deyin sürdürülecektir.

### Madde 10.  GEÇİCİ TUTUKLAMA

(1)  İvedi hallerde, Sözleşen Taraflar'dan her biri, geri verme isteminin diplomatik yollardan İstenilen Taraf'a verilmesinden önce, aranan kişinin geçici tutuklanması veya tutukluluk altına alınması için başvuruda bulunabilir. Geçici tutuklama veya tutukluluk altına alma istemi, diplomatik yollardan veya Birleşik Devletler Adalet Bakanlığı ile Türkiye Adalet Bakanlığı arasında doğrudan doğruya yapılacaktır.

(2)  Geçici tutuklama veya tutukluluk başvurusunda, bir tutuklama müzekkeresi veya mahkeme kararının var olduğu ve geri verme isteminde bulunulması niyetinde olunduğu belirtilecektir. Başvuruda, geri verme istemine konu olan suç ile, bu suçun nerede ve ne zaman işlendiği belirtilecek ve istenen kişinin eşkâli ve uyrukluğu ile ilgili eldeki tüm bilgiler verilecektir. Başvuruda, ayrıca, eğer suç İstenilen Taraf'ta işlenmiş veya istenen kişi bu Taraf'ta hüküm giymiş olsa idi, İstenilen Taraf'ta bir tutuklama müzekkeresi çıkarılmasını haklı göstermek için gerekli olabilecek ek bilgiler de, varsa, gösterilecektir.

(3) İstenilen Taraf, geçici tutuklama veya tutukluluk için gerekli düzenlemeleri yapacak ve, istenen kişinin, 7.nci Maddede yazılı belgelerin tutuklama veya tutukluluk tarihinden itibaren 60 günlük bir süre içinde verilmemesi halinbe, serbest bırakılacağını belirterek, bu kişinin tutuklandığı veya tutukluluk altına alındığı tarihi diğer Taraf'a bildirecektir.

(4) Geri verme belgeleri, İstenilen Taraf'ın yürütme makamına 60 günlük zaman süresi içinde verildiği takdirde, tutuklama veya tutukluluk hali, İstenilen Taraf yetkili makamlarınca geri verme istemi konusunda bir karara varılıncaya kadar sürecektir. Geri verme istemi kabul edildiği takdirde, tutuklama veya tutukluluk hali, İstenilen Taraf yasalarının izin verdiği ölçüde uzatılabilir.

(5) İstenen kişi, geri verme belgeleri İstenilen Taraf yürütme makamınca 60 günlük zaman süresi içinde alınmamış olduğu için tutukluluk haline son verilip serbest bırakıldığı takdirde, İsteyen Taraf, belgelerin İstenilen Taraf'ça daha sonra alınması üzerine, geri verme için yeni bir istemde bulunabilir.

## Kesim III.  KARARLAR

### *Madde 11.*  GERİ VERME VE TESLİM KARARI

(1) İstenilen Taraf, geri verme istemi üzerine aldığı kararı İsteyen Taraf'a hemen bildirecektir. İstenilen Taraf, geri verme isteminin tamamen veya kısmen reddi halinde, bunun nadenlerini belirtecektir.

(2) Geri verme istemi kabul edildiği takdirde, Sözleşen Tarafların yetkili makamları, istenen kişinin teslim edileceği zaman ve yer konusunda anlaşmaya varacaklardır. Teslim, İstenilen Taraf'ın yasaları ile belirlenmiş olabilecek zaman için gerçekleştirilecektir.

(3) İstenen kişi, (2)nci fıkraya göre gerekli zaman içinde İstenilen Taraf ülkesinden teslim alınmadığı takdirde, serbest bırakılabilir. İstenilen Taraf, sonradan, bu kişiyi aynı suçtan ötürü geri vermeyi reddedebilir.

(4) Sözleşen Taraflar'dan birinin kontrolü dışındaki koşullar, geri verilecek kişinin, (2)nci fıkraya göre gerekli zaman içinde teslimine veya alınmasına engel olduğu takdirde, bu Taraf belirlenen zamanın bitiminden önce diğer Sözleşen Taraf'a bildirimde bulunacaktır. Bu gibi bir durumda, Sözleşen Taraflar'ın yetkili makamları, teslim için yeni bir zaman üzerinde anlaşmaya varabilirler.

(5) İstenen kişi teslimden önce kaçtığı daha sonra bulunduğu takdirde, geri verme için yapılacak yeni isteme, 7.nci Maddede belirtilen belgelerin eklenmesi gerekmez.

### *Madde 12.*  İSTEMLERİN ÇAKIŞMASI

(1) Aynı veya değişik suçlardan ötürü birden fazla Devlet tarafından geri verme isteminde bulunulduğu takdirde, İstenilen Taraf, tüm koşulları ve özellikle istenen kişinin uyrukluğunu, suçun veya suçların işlendiği yeri, suçun veya suçların ağırlığını, ve geri verme istemlerinin sırasıyla tarihlerini gözönüne alarak, bu istemler üzerinde serbestçekkarar verecektir.

(2) İstenilen Taraf, böyle bir durumda geri vermeyi kabul ederken, ayrıca geri verme isteminde bulunmuş olan bir üçüncü Devlet'e istenen kişiyi sonradan teslim etmek yetkisini, İsteyen Taraf'a verebilir.

### *Madde 13.*   TESLİMİN ERTELENMESİ

Teslimi istenen kişi, İstenilen Taraf ülkesinde, geri verme isteminde bulunulmuş olan suçtan başka bir suç nedeniyle kovuşturulmakta veya bir hapis cezasını çekmekte ise, bu kişinin teslimi, kovuşturmanın sonuçlandırılmasına ve verilmiş veya verilebilecek bir cezanın tamamen yerine getirilmesine kadar İstenilen Taraf'ça ertelenebilir. Bu takdirde, İstenilen Taraf, durumdan, İsteyen Taraf'a bilgi verecektir.

### *Madde 14.*   KOVUŞTURMA SONUÇLARINDAN BİLGİ VERİLMESİ

(1)  İstenen kişinin teslim edilmiş olduğu Sözleşen Taraf, bu kişi hakkında açılan cezai kovuşturma sonucundan diğer Taraf'a bilgi verecektir.

(2)  Mahkûmiyet halinde, kesin ceza yargısının onaylı bir örneği diğer Sözleşen Taraf'a iletilecektir.

### *Madde 15.*   EŞYA VE DEĞERLERİN TESLİMİ

(1)  İsteyen Taraf'ın istemi üzerine, İstenilen Taraf, kendi yasalarına ve üçüncü tarafların haklarına bağlı olarak, aşağıdaki eşya ve değerlere elkoyup bunları teslim edecektir:

(*a*)  Suçun işlenmesinde kullanılmış veya kanıt olarak gerekli olabilecek eşya;

(*b*)  Suçun bir sonucu olarak elde edilmiş olup da yakalama veya tutuklama sırasında istenen kişinin zilyetliğinde bulunmuş olan, veya sonradan ortaya çıkarılan eşya ve değerler;

(*c*)  Suçla ilgili olan eşya ve değerlerden, sonradan elde edilmiş maddeler.

(2)  (1)inci fıkrada belirtilen eşyanın İsteyen Taraf'a teslimi, mümkünse, geri verilen kişinin teslimi ile aynı zamanda yapılacaktır. (1)inci fıkra uyarınca elkoyulan eşya ve değerler, geri verme kabul edildiği halde istenen kişinin ölümü veya kaçması nedeniyle yerine getirilemeyecek bile olsa, yine teslim edilecektir.

(3)  Anılan eşya ve değerler, İstenilen Taraf ülkesinde yapılmak üzere olan kovuşturmalar için geçici olarak alıkonulabilir veya geri verilmesi koşulu ile teslim edilebilir.

(4)  Ancak, İstenilen Taraf'ın veya bir üçüncü Devlet'in anılan eşya ve değerler ile ilgili hakları saklıdır. Bu hakların var olduğu hallerde, eşya ve değerler, İstenilen Taraf'a masrafsız olarak ve kovuşturmalardan sonra mümkün olan en kısa sürede geri gönderilecektir.

### Kesim IV.   ÖZEL HÜKÜMLER

### *Madde 16.*   HUSUSİLİK KURALI

(1)  İşbu Anlaşma'ya uygun olarak geri verilmiş olan kişi, aşağıdaki haller dışında, İstenilen Taraf ülkesinden tesliminden önce işlenmiş olup da geri vermenin kabul edilmiş olduğu suçtan başka herhangi bir suçtan ötürü kovuşturulamaz, cezalandırılamaz, veya bir cezanın yerine getirilmesi için tutuklanamaz veya kişisel hürriyetinin başka herhangi bir biçimde kısıtlanmasına tabi tutulamaz veya bir üçüncü Devlet'e teslim edilemez:

(*a*)  Geri verilen kişi, teslim edilmiş olduğu Taraf'ın ülkesini, kesin serbest bırakıldığı tarihten itibaren 60 günlük bir süre içinde terketmek fırsatına

sahip olduğu halde, yine bu Taraf ülkesinde kalmış ise. Bu süre, serbest bırakılan kişinin, irade dışı nedenlerle bu Taraf ülkesini terketmemiş olduğu zamanı içermez;

(b) Bu kişi, terkettikten sonra, teslim edildiği Taraf ülkesine kendi isteği ile dönmüş ise; veya

(c) İstenilen Taraf'ın açık rızası var ise.

(2) Teslimden önce işlenmiş olup da geri vermenin kabul edilmiş olduğu suçtan başka bir suç ile ilgili olarak kovuşturma yapılması veya bir hapis cezasının yerine getirilmesi amacı ile İstenilen Taraf'ın rızası istendiğinde, İsteyen Taraf, işbu Anlaşma'nın 7.nci Maddesinde öngörülen usullere uyacak ve rıza istemi ile ilgili olarak geri verilmiş kişi tarafından yapılmış beyanın bir yargıç veya yetkili memur tarafından düzenlenen tutanağını İstenilen Taraf'a sağlayacaktır.

### Madde 17.   ÜÇÜNCÜ BİR DEVLETE YENİDEN GERİ VERME

(1) 16.ncı Maddenin (1)nci fıkrası hükmü saklı kalmak üzere, İsteyen Taraf'a geri verilmiş olup teslimden önce işlenmiş bir suçtan ötürü üçüncü bir Devlet tarafından istenen kişi, İstenilen Taraf'ın rızası olmadıkça, İsteyen Taraf'ça üçüncü bir Devlete yeniden geri verilemez.

(2) Üçüncü bir Devlete yeniden geri vermeye ilişkin rıza istemine, İstenilen Taraf'ça kendi kararına esas olmak üzere gerek görüldüğü takdirde, üçüncü bir Devlet tarafından yapılmış geri verme isteminin dayanağı olan belgeler eklenecektir. Bu belgeler, Anlaşma'nın 7.nci Maddesinde yazılı belgelere uygun olacaktır.

### Madde 18.   TRANSİT GEÇİŞ

(1) Geri vermeye konu olan kişinin üçüncü bir Devlet'ten alınıp Sözleşen Taraflar'dan birisinin ülkesi üzerinden diğer Sözleşen Taraf ülkesine transit geçişine izin verilebilmesi için, suçun 2.nci Madde uyarınca geri vermeye elverişli bir suç olması ve transit geçişe izin vermesi isteminde bulunulan Taraf'ın bu suçu 3.ncü Madde kapsamında görmemesi gerekir.

Transit geçiş istemine, tutuklama müzekkeresinin, kesin ceza yargısının veya tutukluluk emrinin bir örneği eklenecektir. Ayrıca, istem, 7.nci Maddede belirtilen biçimde bir açıklamayı de içerecektir.

(2) İstenilen taraf, ne kendi uyruklarının transit geçişlerine, ne de kendi ülkesinde kovuşturulabilecek veya bir hapis cezasını çekmesi gerekebilecek kişilerin transit geçişlerine izin vermek zorunda olmayacaktır.

(3) Hava ulaşımı kullanıldığı takdirde, aşağıdaki hükümler uygulanacaktır:

(a) Herhangi bir duraklama öngörülmüyor ise, Sözleşen Taraf diğer Sözleşen Taraf'a transit geçişin yapılacağını bildirerek, tutuklama müzekkeresinin, kesin ceza yargısının veya tutukluluk emrinin var olduğunu belgelendirecek ve transite konu olan kişinin adını ve uyrukluğunu bildirecektir.

(b) Önceden öngörülmeyen bir iniş halinde, (a) bendine göre yapılacak bildirim, 10.ncu Maddede hükme bağlandığı gibi geçici tutuklama için yapılmış bir istem hükmünde olacaktır. Bundan sonra (1)nci fıkra hükmüne göre transit geçiş isteminde bulunulacaktır.

(c) Duraklama gerekli olduğu takdirde, transit geçiş isteyen Sözleşen Taraf, (1)nci fıkra hükmüne göre istemde bulunacaktır.

(4) Transit geçişi sağlamak üzere koşullar tutukluluk halini gerektirdiği takdirde, transit geçiş isteminde bulunan Sözleşen Taraf'ın 10.ncu Madde hükümlerine uyması istenebilecektir.

### Madde 19.   İDARİ KONULAR

(1) İstenilen Taraf ülkesinde istenen kişinin geri verilmesi isteminin işleme konulması ile ilgili giderler, teslime kadar bu Taraf'ça karşılanacaktır. Teslimden sonraki giderler İsteyen Taraf'a ait olacaktır.

(2) Transit geçiş nedeniyle yapılan giderler İsteyen Taraf'a ait olacaktır.

(3) 7.nci Madde gereği olarak verilen belgeler, Birleşik Devletler Dışişleri Bakanlığı veya Türkiye Adalet Bakanlığı mühürüyle mühürlenmiş olmak ve diğer yönleriyle ilgili Taraf'ların yasalarına uygun bulunmak kaydıyla, İstenilen Taraf mahkemelerince kanıt olarak kabul edilecektir.

(4) İstenilen Taraf'ın ilgili adli memurları, kendi yasalarında öngörülen hukuki olanaklar çerçevesinde, İsteyen Taraf'a, kendi ilgili adli makamları önünde yardımda bulunacaklardır.

### BÖLÜM II.   CEZA İŞLERİNDE KARŞILIKLI YARDIM

### Kesim I.   GENEL HÜKÜMLER

### Madde 20.   KARŞILIKLI YARDIM

Sözleşen Taraflar, bu Anlaşma'nın II.nci Bölümündeki hükümlere uygun olarak, birbirlerine ceza işlerinde karşılıklı yardımba bulunmayı üstlenirler.

### Madde 21.   YARDIMIN KAPSAMI

(1) Sözleşen Taraflar'dan her biri, diğer Taraf'tan cezai konularda yardım istemlerinde bulunabilir.

(2) Karşılıklı yardımda bulunulacak cezai konular, İsteyen Taraf'ın kendi yasaları gereğince cezalandırılması adli makamlarının yargı yetkisinde bulunan suçlarla ilgili soruşturmaları ve ceza kovuşturmalarını kapsar.

(3) Karşılıklı yardım şunları kapsayacaktır:

(a) Ceza işlerine ilişkin istemlerin yerine getirilmesi;

(b) Kişilerin ifade veya beyanlarının alınmasının sağlanması;

(c) Belgelerin, kayıtların veya maddi kanıtların verilmesi, korunması ve doğrulanmasının sağlanması;

(d) İsteyen Taraf'a ait olan veya sözkonusu suçların işlenmesinden elde edilen şeyler, maddeler veya başkaca eşya veya değerlerin İsteyen Taraf'a geri verilmesinin sağlanması;

(e) Her türlü adli belgelerin, davetiyelerin, mahkeme celpnamelerinin, adli kararların ve mahkeme hüküm veya kararlarının onaylanmış örneklerinin tebliğ edilmesi;

(f) Bir tanık veya bilirkişinin İsteyen Taraf'ın mahkemesi önünde hazır bulunmasının sağlanması;

(g) Kişilerin adreslerinin saptanması;

(h) Adli kayıtların, kanıtların ve bilgilerin sağlanması.

(4)  Bu Anlaşma'nın II.nci Bölümünün amaçları bakımından, suç, İsteyen Taraf'ın yasaları ile bu Taraf ülkesinde işlenmiş kabul edildiği veya ülkesi dışında işlenmiş olup da İsteyen Taraf yasaları ile suçun kovuşturulması öngörüldüğü takdirde, suçun cezalandırılması, İsteyen Taraf adli makamlarının yargı yetkisi içinde sayılır.

## Madde 22.   KARŞILIKLI YARDIMIN REDDOLUNMASI

(1)  Adli yardım aşağıdaki hallerde reddedilebilir:

(a) Soruşturma veya kovuşturma:

  (i) İstenilen Taraf'ça siyasi bir suç veya siyasi bir suça murtabıt bir suç olarak görülen bir suç ile; veya

  (ii) Adli ceza yasalarına göre bir suç oluşturmayan sırf askeri bir suç ile,

  ilgili ise.

(b) İstenilen Taraf, istemin yerine getirilmesini, kendi egemenliğine, güvenliğine veya benzer temel çıkarlarına zarar verebilecek nitelikte görmekte ise.

(2)  Bu Anlaşma'nın II.nci Bölümünün amaçları bakımından, aşağıdaki suçlar, siyasi veya siyasi bir suça murtabıt suçlardan sayılmayacaktır:

(a) Çoktaraflı uluslararası anlaşmalar gereğince Sözleşen Taraflar için soruşturma veya kovuşturma zorunluluğu bulunan suçlar; ve

(b) Bir Devlet Başkanı veya bir Hükümet Başkanı veya aileleri üyelerine karşı işlenen suçlar.

## Madde 23.   KULLANMA AMACI

(1)  II.nci Bölümün I.nci Kesimi hükümleri gereğince, İsteyen Taraf'ça elde edilen tanık ifadeleri, beyan, belge, kayıt veya maddi kanıtlar, bu Taraf'ta yalnız soruşturma veya cezai kovuşturmalar amaçları ile ve soruşturma veya kovuşturma konusu olan suçla ilgili tazminat istemlerinin karşılanması için kullanılacaktır.

(2)  Ayrıca, yukarıda (1)nci fıkrada belirtilen malzeme, kullanma amacı II.nci Bölüm I.nci Kesim kapsamı içinde kalmak kaydıyla, yardımın kabul edilmiş olduğu suçtan başka bir suç ile ilgili olan bir soruşturma veya kovuşturma için de kullanılabilecektir.

## Kesim II.   İSTEMLER

### Madde 24.   İSTEMLERİN İÇERİĞİ

(1)  Kişilerin ifade veya beyanlarının alınması, veya belgelerin, kayıtların veya maddi kanıtların verilmesi, korunması ve doğrulanmasının sağlanması konusundaki bir istemde, istemin ilgili olduğu soruşturma veya kovuşturmayı yöneten makamın adı belirtilecek ve, olanaklı olduğu ölçüde, aşağıdaki hususlar da gösterilecektir:

(a) Soruşturma veya kovuşturmanın konusu ve niteliği;

(b) İstenen kanıt veya bilgilere başlıca ihtiyaç nedeni;

Filter Review00000498

(c) Soruşturma veya kovuşturma konusu olan kişi veya kişilerin adı-soyadı, doğum yeri ve tarihi ve adresi ile uyrukluk gibi kimliklerinin saptanmasına yarayabilecek eldeki öteki bilgiler;

(d) İfade veya beyanının alınması veya kendisinden belge, kayıt veya maddi kanıtlar istenilen kişinin adı, adresi ve uyrukluğu; ve

(e) Verilecek veya korunacak belgelerin, kayıtların veya maddi kanıtların tanımı ve hangi biçimde çıkarılması ve doğrulanması gerektiği.

(2) İstemler, olanağı olduğu kadar ve gerektiği ölçüde, şunları de içerecektir:

(a) İzlenecek özel bir usul varsa bunun tanımı;

(b) Tanık ifadeleri veya beyanların yeminli veya onaylı olması gerekip gerekmediği;

(c) İstenilen bilgi, beyan veya tanık ifadelerinin tanımı.

## Madde 25.   İSTEMLERİN YERİNE GETİRİLMESİ

(1) Bu Bölümde başka türlü hükme bağlanmış olmadıkça, istemler, İstenilen Taraf yasalarına göre mutad olan usullere uygun olarak yerine getirilecektir.

(2) İstenilen Taraf, İsteyen Taraf'ın kendi usullerinin uygulanmasına ilişkin bir istemine, bu usuller İstenilen Taraf'ın yasaları ile bağdaşmaz nitelikte olmadığı ölçüde, rıza gösterebilir.

(3) İstenilen Taraf'ta kendisinden kanıt istenilen kişi, bu Taraf yasaları gereğince reddetme hakkına sahip olmadıkça, İstenilen Taraf'ta ceza soruşturma veya kovuşturmalarındaki aynı usul ve kapsam çerçevesinde tanıklık yapmak, belgeleri kayıtları veya maddi kanıtlari vermekle yükümlü olacaktır.

(4) İstenilen Taraf'ın ilgili adli görevlileri ve öteki memurları, istemleri yerine getirmek için, İstenilen Taraf yasaları gereğince haiz oldukları bütün yetkileri kullanacaklardır. Bir istemin yerine getirilmesi adli işlemleri gerektirdiği takdirde, İstenilen Taraf'ın görevlileri, İsteyen Taraf'a herhangi bir masraf yüklemeksizin, istemi ilgili mahkemeye sunacaklardır.

(5) İsteyen Taraf'ın açık istemi üzerine, İstenilen Taraf, istemin yerine getirileceği tarihi ve yeri bildirecektir. Her iki Taraf'ın yasalarının gereklerine ve hükümlerine göre, İsteyen Taraf'ın ilgili memurları veya başka ilgili kişiler, istemlerin yerine getirilmesinde hazır bulunabilirler.

## Madde 26.   SÖZLEŞEN TARAFLAR'DAKİ KAYITLAR VE BELGELER

İstem üzerine, İstenilen Taraf, kendi ülkesinde benzer görevleri yerine getiren ilgili makamlarına sağlanabilecek aynı koşullar altında ve ölçüde olmak üzere:

(a) Mahkemelerin hüküm ve kararlarının, ve

(b) İstenilen Taraf'ça uygun bulunması halinde, ifade tutanakları ve resmi özetleri de dahil olmak üzere mahkeme veya soruşturma makamının dosyalarında bulunan belgelerin, kayıtların ve maddi kanıtların,

asıllarını veya onaylanmış örneklerini, İsteyen Taraf'a sağlayacaktır.

*Madde 27.* EŞYA VE MADDELERİN ARANMASI VE ELKOYMA

İstem, herhangi bir eşya veya maddenin bir ceza soruşturma veya kovuşturmasında kullanılmak üzere teslimine ilişkin olduğu ve bu bir arama emrinin yerine getirilmesini gerektirdiği takdirde, arama ve elkoyma, ancak, İstenilen Taraf yasalarına uygun olarak yapılacaktır.

*Madde 28.* BELGELERİN, KAYITLARIN VEYA MADDİ KANITLARIN TESLİMİ VE GERİ VERİLMESİ

(1)  İstenilen Taraf, kendi ülkesinde yapılacak kovuşturmalarla ilgili olarak gerekli olması halinde, istenilen belge veya kayıtların asıllarının veya maddi kanıtların teslimini erteleyebilir.

(2)  İstemlerin yerine getirilmesi suretiyle teslim edilen belgelerin, kayıtların asılları veya maddi kanıtlar, İstenilen Taraf bunların geri verilmesinden vazgeçmedikçe, İsteyen Taraf'ça mümkün olan en kısa zamanda öteki Taraf'a geri verilecektir.

(3)  Ancak, maddelerin İsteyen Taraf'daki kişilere ait olması ve İstenilen Taraf'ta bulunan bir kişi tarafından üzerinde hiçbir istihkak veya başkaca kazanılmış talebinde bulunulmaması halinde, İsteyen Taraf'ın yetkili makamı, bu maddeleri, kendi yasalarına uygun olarak işlem yapmak üzere, alıkoymak yetkisine sahip olacaktır.

Kesim III.  BELGELERİN TEBLİĞİ

*Madde 29.* BELGELERİN TEBLİĞİNE İLİŞKİN İSTEMLER

(1)  Mahkeme kararları, adli kararlar, davetiyeler, celpnameler veya İstenilen Taraf'a gönderilen başka belgeler de dahil olmak üzere, belgelerin tebliği için yapılacak istem, aşağıdaki hususları içerecektir:

(*a*)  Tebliği isteyen makamın adı;

(*b*)  Tebligat yapılacak kişinin adı, adresi ve eğer belli ise uyrukluğu; ve

(*c*)  İsteyen Taraf'ta adli makam önüne çıkması istenilen tanık veya bilirkişiye ödenebilecek olan yaklaşık tazminat, yol ve oturma giderleri miktarı.

(2)  İsteyen Taraf, tebliğ isteminde, herhangi bir kişinin adli makam önüne çıkması için bir tarih belirttiği takdirde, duruşma için tarih saptarken ve istemi iletirken, istemin bu tarihten en az (30) gün önce İstenilen Taraf'ça alınması gerektiğini gözönünde bulundurmak zorundadır.

*Madde 30.* BELGELERİN TEBLİĞİ İSTEMLERİNİN YERİNE GETİRİLMESİ

(1)  İstenilen Taraf'ın Yetkili Makamı, İsteyen Taraf Yetkili Makamınca tebliğ edilmek üzere gönderilen belgeleri, kendi yasa ve usullerinin öngördüğü biçimde tebliğ edecektir.

(2)  Tebliğin yapıldığı, tebligat yapılan kişinin imzasını ve tebliğ tarihini taşıyan bir alındı ile veya tebligatın biçim ve tarihi ile tebliği yapan kişinin imzasını taşıyan bir bildirimle belgelendirilecektir.

(3)  İstenilen Taraf, tebligat alındısını veya bildirimini, İsteyen Taraf'a gecikmeksizin iletecektir.

(4)  Tebligat yapılamadığı takdirde, bunun nedenleri, tebliği istenen belgeler ile birlikte, İsteyen Taraf'a a bildirilececektir.

Filter Review00000500