ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona
DAVID A. PIMSNER
MELISSA KARLEN
BILL SOLOMON
Assistant U.S. Attorneys
Arizona State Bar No. 007480
California State Bar No. 218101
Arizona State Bar No. 0020012
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona  85004
Telephone:  602-514-7500
David.Pimsner@usdoj.gov
Melissa.Karlen@usdoj.gov
William.Solomon@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-12-01263-PHX-NVW |
|---|---|
| Plaintiff, | |
| vs. | **JOINT TRIAL OUTLINES** |
| Ahmed Alahmedalabdaloklah, | |
| Defendant. | |

Pursuant to the "Revised Case Management Schedule" (Doc. 341) and the Court's Order of February 24, 2017 (Doc. 156), the United States and defense respectfully submits these outlines of their case in chief for trial.  Based on the evidentiary presentation summarized below, the outstanding stipulations, and a reasonable estimate of the aggregate cross-examinations, the United States requests that the Court allocate a total of twenty to twenty-four (20-24) trial days for completion of the Government's case in chief.  For each sub-part below, the United States estimates the number of trial days and identifies the points of proof addressed by the lay and expert witnesses.    Based on the evidentiary presentation summarized below, the outstanding stipulations, and a reasonable estimate of the aggregate cross-examinations, the defense requests that the Court allocate a total of five

to seven (5-7) trial days for completion of the defense's case in chief.  For each witness the defense anticipates at least two (2) hours to half a day for cross-examination.

## I.   GOVERNMENT'S INTRODUCTION

As set forth in the superseding indictment, the United States alleges, *inter alia*, that Ahmed Alahmedalabdaloklah, also known as "Ahmed Hassan Farhan", (herein "the Defendant") conspired to murder United States nationals in violation of Title 18, United States Code, Section 2332(b)(2); conspired to use a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a; conspired to maliciously damage or destroy U.S. Government Property by means of an explosive, in violation of Title 18, United States Code, Section 844(f)(1), (d), (n); aided and abetted the possession of a destructive device during a crime of violence, in violation of Title 18, United States Code, Sections 924(c) and 2; provided material support to terrorists, in violation of Title 18, United States Code, Section 2339A; and conspired to possess a destructive device during a crime of violence, in violation of Title 18, United States Code, Section 924(o).

As set forth in more detail below, beginning in or about January 2005 until on or about July 2010, the United States will prove at trial that the Defendant conspired with others to procure component parts and manufacture custom circuit boards to be used in radio-controlled improvised explosive devices ("RCIEDs") which targeted U.S. military personnel in Iraq.  In particular, the Defendant supported members of an Iraqi terrorist group known as the 1920 Revolution Brigades ("the Brigades").  Upon leaving Iraq, the Defendant eventually opened a business in China.  While in China, the Defendant maintained contact with members and associates of the Brigades.  After being expelled from China in May 2011, the Defendant was transiting through Turkey when he was arrested pursuant to an arrest warrant issued by this Court.  After contesting his extradition from Turkey for several years, the Defendant ultimately was extradited to the United States on August 27, 2014.   The estimated length of the Government's case in chief is commensurate with the duration and complexity of the alleged transnational conspiracy and the technical nature of the physical evidence at the heart of the conspiracy.

## II.   OUTLINE OF GOVERNMENT'S CASE IN CHIEF

### A. The Iraq Insurgency and the 1920 Revolution Brigades

**[4 Witnesses; 2-3 trial days]**

The United States expects to prove that during the mid-2000s in Iraq, after the regime of Sadaam Hussein had fallen, a violent insurgency developed.   One of the prominent jihadist groups in Iraq was the Brigades.   The overarching goal of the Brigades was to compel American and Coalition military forces to leave Iraq through a campaign of violent attacks.   Among various methods of attack, the group targeted American military vehicles and patrols with Improvised Explosive Devices ("IEDs") of various kinds.   In particular, the Brigades deployed RCIEDs.   The basic configuration involved a mobile phone modified to act as a receiver to detonate explosive material after receiving a wireless signal.

The United States expects to present lay and expert testimony about the origins, organization, tactics, and propaganda of the Brigades. This testimony is critical to provide the jury a background and context to understand the principal evidence of the case.   The Defendant allegedly became involved in a conspiracy with members of the Brigades – a group that targeted U.S. military personnel and equipment in Iraq.   Although general information about casualties and conditions were available to the public via television, newspapers, and the Internet, the details regarding policies, procedures, trends, patterns and reactions of the U.S. military were not.   The witnesses listed below will provide this information, allowing the jury to understand the conditions during which the alleged conspiracy arose, and the effect such conditions had on evidence in this case, to include its collection, the chain of custody procedures, and its transfer and exploitation.   In addition, the experts will provide information on the organization at the heart of this conspiracy, the Brigades.   It is essential for the jury to understand this organization's role, motivations, and objectives in attacking U.S. military personnel and equipment.   An understanding of the group's history, as well as its contemporaneous actions, media postings, and involvement in the war is needed to fully appreciate the significance of Defendant being involved, communicating with, and assisting so many known associates of this group.   In preparing

the testimony of these witnesses, the United States will be cognizant of the Court's concerns that this portion of the case be present in a tailored, streamlined, and non-cumulative manner.

### 1. David Kilcullen, Retired Australian Military Officer, Senior Counterinsurgency Advisor for the Iraq War

The United States intends to introduce factual and expert testimony from Dr. David Kilcullen, a retired Australian military officer who served in the Iraq War.  During the relevant timeframe of the indictment, Dr. Kilcullen was Chief Strategist in the U.S. Department of State Counterterrorism Bureau, Senior Counterinsurgency Advisor to General David Petraeus, and then Senior Advisor for Counterinsurgency to Secretary of State Condoleezza Rice.

From the perspective of a counterinsurgency soldier and expert, Dr. Kilcullen will testify about the historical evolution of the Iraqi insurgency, including his experience with insurgent groups in Iraq and the challenges and security issues faced by coalition forces (including the evolution, strategy, and tactical use of IEDs by insurgent groups).  In addition, he will describe insurgent groups that targeted the area(s) around where he was stationed.  He will outline the common tactics, patterns, and weapons these insurgent groups used and any counter efforts made by coalition forces to combat these attacks.  He will testify briefly about the specific insurgent groups they dealt with, including the 1920 Revolution Brigades.

Dr. Kilcullen will further introduce the formation of the Combined Explosive Exploitation Cell ("CEXC")[1] facility located in Iraq and the protocol and efforts made by military personnel to recover insurgent devices at caches/storage areas or implanted in the field for forensic review.  Dr. Kilcullen will note the significance of recovering these devices and analyzing them forensically to assist in identifying trends and patterns used by

---

[1] CEXC-Iraq was a multi-national organization responsible for neutralizing the IED threat in Iraq through collection and exploitation of IED evidence and related intelligence.

insurgent groups to assist Coalition Forces in creating counter measures (to include the development of Weapons Technical Intelligence measures and procedures).  He will also describe to the patterns and trends to include the quantity, quality, evolution, and sophistication of IED's through 2006 to 2008.  Later witnesses will provide the detailed explanation regarding CEXC's operations and procedures.

Rather than re-litigating the necessity of the Iraq War, this testimony will help provide a context for the jury on the history of insurgent groups in Iraq during the war and the challenges and security issues faced by Coalition Forces.  His testimony is based on his education, training and personal experience in the Iraq War.  His perspective provides an incredibly useful and unique blend of theory and reality both from a broad overview of how the war was conducted to the details he encountered while stationed there.  This testimony is outside the general knowledge of most, if not all, of the jurors.  This testimony is necessary for jurors to understand the alleged conspiracy, including: the evolution, strategy, and tactical use of IED by insurgent groups to include the Brigades; the counter measures used by U.S. and coalition military, the priorities of the U.S. and Coalition forces regarding the collection and exploitation of IED devices and caches and why the physical evidence in this case was considered so important to the Department of Defense; the U.S. and coalition plans and strategies for counter insurgency.  This testimony goes specifically to several of the overt acts alleged in the conspiracy and are needed to meet the Government's burden.[2]  His important testimony will be succinct and focused.

## 2. Evan Kohlmann, Chief of Research and Development at Flashpoint Global Partners

The United States intends to introduce expert testimony from Mr. Evan Kohlmann.  He will provide background information on Sunni militia groups in Iraq, to include the Brigades, and the Jihad and Change Front and their relationship with other insurgency

---

[2] These descriptions will assist in proving the overt acts listed in several counts of the Indictment, including the use of IEDs by the 1920 RB against US military personnel and US military vehicles in Iraq.

groups in Iraq including Al Qaida in Iraq (AQI).  Mr. Kohlmann will explain the process by which individuals originating from other countries become involved in militia/insurgent groups.  Mr. Kohlmann will further describe the Brigades activities in Iraq, to include: their ideology; their insignia and its meaning; the group's name and its historical significance/meaning; their mission; their hierarchy and inner workings and components (media and others).

Mr. Kohlmann will testify about the nature of their online postings, press statements, including claims of responsibility for IED attacks against U.S forces, and the video footage of these attacks.  Mr. Kohlmann will testify to the nature and extent of attacks the Brigades claimed responsibility for, to include IED attacks, which targeted U.S. military personnel in Iraq.  Mr. Kohlmann will further testify regarding the 1920 RB's publication, "Al-Kata'ib" and related postings.

This testimony will provide a detailed, but succinct, history of the organization and insight into the structure of the group during the timeframe relevant to the conspiracy charged in this case.  Mr. Kohlmann will describe the propaganda (including press releases, interviews and articles about these interviews and videos produced by the group) created, disseminated and heralded by the Brigades, again during the relevant timeframe.  This testimony will provide context for the jury into the 1920 Revolution Brigades, their objectives, mission, and actions.  Such information is crucial to the jury understanding the communications, agreements, and actions of the Defendant and the known associates of this group.

### 3. Mark Wickham, Retired British Military Officer, Senior Counter-Improvised Explosive Device Adviser for the Iraq War

The United States intends to introduce factual and expert testimony from Mr. Wickham, a retired British military officer.  Mr. Wickham was the Senior Counter- IED Adviser/ High Threat Improvised Explosive Device Ammunition Technical Officer in Iraq in 2004–2005.  In that position, Mr. Wickham established the first Corps Counter-IED working group, which served as the doctrinal model for the Department of Defense.  Mr. Wickham created the policy, doctrine, tactics, training and procedures for the conduct of

Counter-IED operations throughout Iraq.  Mr. Wickham also advised senior leaders with Counter-IED and Weapons Technical Intelligence advice.  He further laid the foundations for United States (US) Joint Counter-IED capabilities, and assisted in developing the Corps Counter-IED maker (cell) targeting process and the Combined Explosives Exploitation Cell (CEXC).

After his time in Iraq, Mr. Wickham then worked with the Joint Improvised Explosive Devices Defeat Organization (JIEDDO) in Washington D.C.  In that role he advised the U.S. Military on all matters of high-threat IEDs, targeting insurgents, and influenced changes to policy and operations, critical to U.S. Military Counter-IED initiatives and training.

Mr. Wickham will testify about the use of IEDs and the necessity of recovering and documenting technical and forensic information contained on/in IED devices and parts. He will also explain the realities and protocol implemented to collect these IED parts or devices in highly dangerous conditions.  Mr. Wickham will testify about the formation of the CEXC facility located in Iraq and the protocol and efforts made by military personnel to recover insurgent devices at caches/storage areas, or implanted in the field, for technical and forensic review.  Mr. Wickham will further testify to the significance of recovering these devices and analyzing them technically and forensically to assist in identifying trends and patterns used by insurgent groups to assist Coalition Forces in creating counter measures (to include the development of Weapons Technical Intelligence measures and procedures) and also to identify those who created, manufactured, implanted and used these devices.  Mr. Wickham will also discuss the principles governing the analysis and review of IEDs, specifically, force-protection, targeting, sourcing, and forensics to support prosecution.  He will discuss the chain of custody and forensic collection protocols established by CEXC, the forensic review conducted in Iraq, and the policies and procedures for shipping the items back to the United States for further analysis.

This testimony provides specific and relevant information about IEDs, the U.S. military policies and procedures, their inception and evolution, and the collection of IEDs as evidence of a crime.  The information is relevant to the charged conspiracy which alleges

Defendant assisted with the design and manufacture of IEDs used against military forces. The testimony will directly bear on the underlying policies followed by military personnel in the collection of items of evidence at the two IED events in this case as well as at the Caches.  The tailored testimony will present information that is outside the knowledge of the jurors.

**4.  Colonel Kurt J. Pinkerton, United States Army**

The United States intends to introduce factual and expert testimony from Colonel Pinkerton.  Col. Pinkerton served as a Battalion Commander around the Abu Ghraib area, which is close in proximity to the events alleged in the conspiracy, the April 6, 2007, and May 14, 2007, IED attacks, and the two caches described in greater detail below (Section III(E)). Based upon his firsthand knowledge and experience as a Battalion Commander, he will testify to the general conditions in Iraq between 2006 and 2009, both for civilian and military populations.  He will also describe the approximate location of Coalition Forces including general base locations and the most common routes/roads used by coalition convoys and vehicles during this timeframe.  Col. Pinkerton may briefly testify about insurgent groups that targeted the area(s) he was stationed in or near including the Brigades. He will summarily describe the common tactics, patterns, and weapons these insurgent groups used and any counter efforts made by coalition forces to combat these attacks. This would include testimony on the reasons behind the U.S. Army seeking out, seizing, and searching caches.

As previously stated, rather than re-litigating the necessity and/or merits of the Iraq War, this testimony will help provide a context for the jury of the conditions that existed in Iraq during the time of the alleged conspiracy for both military and civilian populations. This is information that is outside the general knowledge of most, if not all of the jurors. This context is necessary for jurors to understand the process for collecting the evidence in wartime conditions, the need to locate and exploit IED caches, and in understanding the process of other military personnel who collected evidence.  Col. Pinkerton is also able to identify the location of U.S. military routes and bases, which is critical when assessing the motivation and targets for the location of IEDs.  His invaluable testimony will be succinct

and focused.

**B.  The "Omar Street Cache"**

**[15-20 Witnesses; 12-13 trial days]**

On August 30, 2006, a U.S. military patrol entered an apartment on Omar Street, in Baghdad, Iraq, and discovered, what at the time was, one of the largest caches for making custom circuit boards for use RCIEDs.  The soldiers seized, *inter alia*, (1) IED-related instructional documents; (2) testing equipment; (3) DTMF decoder custom circuit boards that were nearly identical to DTMF circuit boards recovered in RCIEDs in Iraq, and hundreds of components for circuit boards; (4) other items related to IED construction – including an IED initiator; (5) design documents for custom circuits; (6) manufacturing tools to make circuit boards (7) various transmitting devices; and (8) numerous mobile phones and personal mobile radios.  Analysis of the items seized from the Omar Cache indicates that the location was essentially an IED electronics factory.

At the time of the raid of Omar Street, the military patrol found no insurgents present within the cache.  However, there were numerous items of evidence linking the Defendant to the Cache: (1) a laboratory notebook with the Defendant's name; (2) photo identification cards of the Defendant; (3) equipment and materials with the label "Al Ahmad Manufacturing"; and (4) emails and letter from the Defendant.  Ultimately, over 1,000 latent fingerprints located on materials in the Cache were matched to the Defendant's known fingerprints -- including latent fingerprints on a document (Q140) describing how to employ remote control technology to command a mobile phone, wireless device, and land-line phone to detonate explosives.

The United States intends to introduce the factual testimony from several soldiers who discovered the Omar Cache and/or were involved in the collection and transport of the evidence. This list would include: Col. John Norris, Richard Low, Captain Derrick Draper, Major William Huff, Geoffrey Mullin, and other soldiers as needed.  Their testimony will assist in laying the foundation, where needed, for multiple items of evidence recovered from the Omar Cache.

**1.  Daniel Lien, Physical Scientist/Forensic Examiner, Terrorist Explosive Device Analytical Center (TEDAC)/FBI Laboratory, Quantico, Virginia**

As for the fingerprint analysis and identification, the United States intends to introduce factual and expert testimony from TEDAC/FBI Physical Scientist/Forensic Examiner, Daniel Lien, regarding the fingerprint examinations conducted in this case.  As stated in the original expert notice **[Doc. 97]**, the United States intends to primarily introduce testimony though Mr. Lien, regarding friction ridge print examinations (manual and computer assisted) conducted on documents, boards, switches, (IED) components, and other evidence involved in this case.  His testimony will focus on the viability and persistence of latent prints on items of evidence.  He will also testify regarding the number of latent prints developed from the documents and other physical evidence in this case, the methods used to lift the latent prints (including, visual examination, Ninhydrin (NIN), laser and UV lights, reflective ultraviolet imaging system (RUVIS), (cyanoacrylate) super glue fuming (SGF), alternative black powder (ABP), and a chemical composition of fluorescent dyes called RAM (Rhodimine 6G, Ardrox and MBD) visualized with three wave lengths of light (Laser, UV, and 455)), and the suitability of those prints for the purposes of comparison against known fingerprint exemplars, including those taken from the defendant, co-conspirators and others.

Based upon his experience and training, he will opine that fingerprints recovered from evidence at the Omar Street Cache (including on an IED initiator) matched known fingerprint exemplars of the Defendant.  He will identify these exact pieces of evidence, and opine to the number of Defendant's fingerprints identified at the Omar Street Cache.  His opinion and testimony is based upon and consistent with the reports and lab notes previously provided in discovery to defense.  The various laboratory technicians previously identified will testify about the processing of the evidence and will not offer expert opinions concerning the comparative analysis of the Defendant's known prints and the latent prints recovered from Omar Street.  Depending on stipulations reached concerning the chain of custody, several of these technicians may need to be called.

Apart from fingerprint analysis, the materials seized at the Omar Street Cache were

also analyzed for technical import.  First, electrical engineers posted with the CEXC in Baghdad inventoried the material from the cache and analyzed it.  Then it was sent to the FBI-led Terrorist Explosive Device Analytical Center ("TEDAC") in Quantico, VA, which serves as the U.S. Government's single interagency organization to receive, fully analyze, and exploit all terrorist IEDs, of interest to the United States.  TEDAC found that the cache included all of the materials necessary to manufacture and completely assemble custom switching circuits used in IEDs.  In particular, the materials in the cache were for the construction of DTMF-11[3] custom decoder circuits, which were commonly used as initiators in RCIEDs.  However, components for other types of RCIED initiators were also present.

## 2.  CEXC Technicians/Engineers/Staff

The United States intends to introduce the factual testimony from numerous members of the Staff at CEXC, located in Iraq. This list would include: Tamiko Bogad, SABT Sam Mum, SABT John Holland, Robert Aleman, Marie Edwards, James Betts, Kevin Zibari, SABT Rose, Richard Dula, Kim Sartorius, Tomas Garrason, Alan Housel, Jim Altobell, Gregory Moore, SABT Gaston, Erik Berg, Clydell Morgan, Rodolfo Zamora, Capalia, SABT LaMonde, and as needed, other fingerprint technicians stationed at the CEXC laboratory in Iraq.  This laboratory was the initial repository of evidence recovered in Iraq, including those collected in caches and IED/RCIED incidents.  In this facility, the evidence was initially processed and analyzed for forensic, biometric and counter-insurgency intelligence.   While the Government will unlikely need to call all of the witnesses listed above, several of them at a minimum will need to lay the foundation for multiple items of evidence recovered from the Omar Cache.

---

[3] The designator "DTMF-11" refers to a specific DTMF circuit design as determined by CEXC.

### 3.  **Christopher Graham & Steve Luhowy, Combined Explosive Exploitation Cell (CEXC) Forensic Engineers**

The United States intends to introduce factual and expert testimony from Christopher Graham and Steve Luhowy, electrical engineers stationed at the CEXC facility in Iraq.  Their testimony will be focused on their analysis associated with IEDs recovered in Iraq specifically between the years 2006 and 2009.

In addition to the previously noticed testimony, and based upon their scientific, and technical knowledge Messrs. Graham and Luhowy will testify to the lexicon used in the forensic analysis of IEDs in the field.  They will further testify about, and demonstrate, the process of creating a circuit board.  Mssrs. Graham and Luhowy will provide opinions about specific items located at the Omar Street Cache that were significant to them based on their scientific and technical knowledge, training and experience.  They will opine that the materials found in the Omar Street Cache, taken as a whole, are consistent with an IED design/manufacture shop. E.g., drills, soldering irons, etching solutions, blank copper boards, etched circuit boards, design notes, large numbers of components, mobile phones, and completed DTMF-11 circuits. They will further testify to their observations and opinions about the patterns and types of items, parts, ordinances, and circuit boards that were found together in other caches, labs or sites.

The testimony of Messrs. Graham and Luhowy will be consistent with the reports provided in discovery and in reliance on their training an experience as electrical engineers regarding the design and functionality of printed circuit boards.  Their testimony will be based on their review of various TEDAC and CEXC reports as well as their review of evidence recovered in Iraq.

### 4.  **Steve Malloy, TEDAC/FBI Laboratory Engineer**

The United States intends to introduce factual and expert testimony from TEDAC/FBI electrical engineer Steve Malloy.  Mr. Malloy will testify about the circuit analysis associated with IEDs, to include schematics, actual circuit boards, as well as components and associated pieces.  His testimony will cover general uses and functions of electronic components, parts and boards.   In addition, he will testify about the

examinations, analyses, opinions, and observations related to specific items of evidence sent to TEDAC.   Mr. Malloy will also testify about comparisons (similarities and differences) between various electronic devices, schematics and circuit boards provided to TEDAC from locations throughout Iraq.

Based upon his experience and training, Mr. Malloy will opine that schematics and parts lists in the Defendant's email accounts were consistent with IED submissions analyzed by TEDAC.  Mr. Malloy will also opine about the use and function of schematics recovered in the content of Defendant's email messages.  Mr. Malloy will also opine that electronic components referenced in Defendant's emails were consistent with components that were used to manufacture IED initiators.  Mr. Malloy will also provide his expert opinion on certain documents recovered in the Omar Street Cache, specifically but not limited to Q140.  Specifically, he will opine that Q140 contains instructions on how to use remote control via mobile/wireless telephones for detonating explosives.  Mr. Malloy will also provide his expert opinion to other items of evidence recovered at Omar Street Cache and their use in IED's, to include but not limited to trace layouts found in Q22.  Mr. Malloy will further opine that boards and schematics recovered at the Rabie Street Cache are consistent with schematics recovered in email accounts attributed to the Defendant.  He will also opine on the similarities between circuit boards recovered at the Omar Street Cache –in terms of design, components, and functionality – and boards recovered from other IED events.   He will further opine on the use and purpose of the IED initiator recovered at the Omar Street Cache (Q38) and the DTMF decoder custom circuit recovered at the Amiriyiah Cache[4] (Q88), both of which had Defendant's fingerprint on it.[5]

Mr. Malloy's testimony will be based upon, and consistent with, the TEDAC reports provided in discovery and in reliance on his training and experience as an electrical

---

[4] This particular cache is referred to as the "Amiriyah Cache" due to its location inside the Amiriyah neighborhood of Baghdad.

[5] The fingerprints identifications were located on pieces of tape on Q38 and the top-inside of a project box on Q88.

engineer regarding the design and functionality of printed circuit boards.  His testimony will be based upon his review of various TEDAC reports as well as his review of evidence recovered in Iraq.

### C. Witnesses Linking the Defendant to the 1920 Revolution Brigades
### [2 Witnesses; 2-3 trial days]

In the course of the investigation, the United States has identified two cooperating witnesses, Muhammad Husayn Ali al Zawbai and Jamal Abdul Wahab Khamees al-Dhari, who have testified in foreign depositions that the Defendant used his technical expertise to help the Brigades detonate IEDs through remote control and continued to supply component parts to Brigades members after the Defendant relocated to China.

### 1.   Muhammad Husayn Ali al Zawbai (hereinafter Ali)

Ali has lived in Abu Ghraib, Iraq.  He was familiar with the Brigades because they had a strong presence in the area.  Additionally, Ali was a member of the al Zawbai tribe which also supported the Brigades.  Ali was familiar with the Brigades' goal of throwing out American out of Iraq through political and military resistance.  The military resistance included bombings.  Ali would see the Brigades public announcements on television and online showing videos of bombing U.S. forces.

Ali was approximately 20 years old when he first met the Defendant.  He first saw the Defendant in 2007 when the Defendant came to the area of western Radwaniah, where Talib Hamdan, aka Abu Ghassan,[6] resided.  The Defendant asked about Talib Hamdan, who at the time, had been detained by U.S. forces having been accused of being a Brigades member.   The Defendant wanted to know who was replacing Talib Hamdan and was referred to Hamdan Ibrahim Hamdan, Talib Hamdan's brother who was living nearby.

Ali next saw the Defendant approximately 20 days later at Hamdan Hamdan's home.  Defendant had in his possession a grey electronic box the Defendant said could be used for many purposes including causing explosions.  Ali saw the Defendant, who he

---

[6] Talib Hamdan was Ali's father in law.

knew as Engineer Diya, on a number of occasions in Iraq and spoke with him on the phone. He also communicated with the Defendant from 2007 to 2010 using Yahoo Chat.  Through these communications he knew the Defendant had moved to China and had supplied 1,000 electronic boards to the Brigades.

Ali acknowledged that he was detained by U.S. forces in 2008 and 2010 and accused of being a member of the Brigades.  At the time of his 2008 detention, Ali identified as his a silver laptop and paperwork he had in his possession at the time of his 2008 detention. Ali admitted that the notebook contained his own handwriting and acknowledged that his notes made reference to transmitters and receivers.  Ali also identified pictures on his laptop and a Yahoo chat he had on his computer.  The chat was between Mohammed Hosen, which Ali confirmed was his name, and sozan_sozan1981[7].  The chat session mirrored the handwritten notes in Ali's notebook about ordering transmitters and receivers for Abu Ghassan.

Ali acknowledged sending messages from Abu Ghassan to the Defendant and recalled he passed on one message wherein Abu Ghassan warned the Defendant to be careful.  Ali admitted that in 2010, the Defendant wanted Ali to pick up three walkie talkie radios he had sent to Abu Ghassan in Iraq.

An additional source of information is content recovered from Ali's hard drive during 2008 interactions with U.S. forces.  The United States intends to introduce the factual testimony from the individuals involved in the raid wherein Ali was arrested and the original hard drive was located and seized.  Those individuals include: Joseph Loar, Glen Alvin Demarcus III, and Eric Stachowski.  The United States also intends to elicit the factual and expert testimony from the FBI CART examiner who processed the imaged hard drive, Joseph Shramovich, III, and Hilda Graulau.

---

[7] The government will introduce at trial evidence that sozan_sozan1981 was an account utilized by the Defendant.

## 2. **Jamal Abdul Wahab Khamees al-Dhari (hereinafter Jamal)**

Jamal testified in a foreign deposition. Jamal described himself as a member of the al-Dhari family who are leaders of the al Zawbai tribe in Iraq. Jamal testified that the Brigades was formed by an Iraqi resistance that took place in 1920 seeking independence from British Colonial rule. Jamal's great grandfather was one of the leaders of the rebellion. Jamal supported the Brigades and would offer assistance to anyone in need, including Brigade members. Jamal knew that the Brigades was involved with military resistance including using improvised explosive devices against U.S. forces.

Jamal's cousin, Harith al-Dhari, was a military commander for the Brigades and was killed in Iraq in 2007. Jamal knew the Defendant through Harith. Harith advised Jamal that the Defendant was using his technical expertise to help the Brigades detonate IEDs through remote control. Jamal knew the Defendant as Muhktar. Harith told Jamal that Mukhtar was someone who would assist the Brigades in resisting the U.S. occupation of Iraq. Jamal describes the Defendant as an engineer whose specialty was how to detonate an IED wirelessly from a distance. Jamal agreed that the Defendant continued to support the Brigades after he moved to China. During this time, Jamal communicated with the defendant in part via email. Jamal identified john_john2008812@yahoo.com as the Defendant's email address. Jamal was able to authenticate emails between himself and the Defendant as well as other Brigade members. For example there was an email between the Defendant and Jamal which listed 10 transmitters and 100 receivers. Jamal stated they were technical devices from China to assist in Iraq and that they were needed to complete their work and mission. Jamal explained they were used with bombs to explode with remote control to receive and send. Jamal further explained that more receivers were needed than transmitters because the receivers would often be damaged during detonation. Jamal assisted the Defendant in obtaining reservations for a hotel in Lebanon. The Defendant emailed a copy of his passport to Jamal. The passport bore the name Ahmed Hasan Farhan.

Jamal also identified Talib Abu Ghassan as a belonging to al Zawbai tribe and a member of the Brigades with knowledge and experience in explosive devices and rockets.

Jamal admitted to making payments to Abu Ghassan.  Jamal identified Dr. Mehdi al Kubaisi as someone who helped the Brigades with political matters.

**D. Email Evidence Showing the Defendant's Involvement with the Brigades [7-10 Witnesses; 5-6 trial days]**

Throughout the course of this investigation, the contents of numerous email accounts were obtained based on various court orders.  In accordance with these court orders, the information/content of these email accounts was provided to the Federal Bureau of Investigation for preservation and processing.  Contained within these disclosures, and provided in discovery, are a large number of emails sent and received by Defendant, his co-conspirators, other members of the Brigades, and others working with and for the Defendant.

The United States intends to introduce many of these emails into evidence at trial.  Some of the emails will be authenticated through a trial witness who personally sent or received the email in question.  No foundational questions should arise in those circumstances. *See* Fed. R. Evid. 901(b)(1)(one acceptable method of authentication is testimony by a "witness with knowledge" that "an item is what it claims to be.").In other instances, circumstantial evidence will establish that the emails were exchanged between the Defendant, his co-conspirators, other members of the Brigades, and those in his employ. *See* Fed. R. Evid. 901(b)(4) (authentication based on "the appearance, contents, substance, internal patterns, or other distinctive  characteristics of the item, taken together will all the circumstances.").

The list of emails the United States intends to introduce at trial include, but are not limited to[8]:

- August 20, 2007, email in which Defendant is asked to provide his address for the first half of the payment ($26,000) for 2,000 receivers.  The sender also requests Defendant to continue to work on another 100 units.  It is believed that the sender of the email was a senior leader with the Brigades, and ordered IED components

---

[8]  As the court is aware, trial preparation is an on-going, fluid process.  As such, the United States requests the right to alter or supplement this list as needed.

from Defendant Al-Ahmad and transferring funds to his bank account in China as payment.

- October 12, 2008, in which Defendant discuss an order for mobile phones. The email chain also contains a discussion of pricing. Three of the five types of mobile phones discussed had been recovered in IED caches/events in Iraq.

- October 18, 2008, email in which Defendant is sent four images of circuit trace layouts[9] depicting two DTMF custom circuits, one transistor controlled relay custom circuit, and one timer custom circuit. The two DTMF trace layouts were nearly identical to DTMF-18D/E[10] trace layouts and circuit boards found at the Rabie Cache. The transistor controlled relay was nearly identical to custom switching circuits found at the Rabie Cache and the timer custom circuit was similar to custom switching circuit boards found in the Rabie Cache.

- November 9, 2008, an email where Defendant sent his assistant Beverly Gong an image of a DTMF decoder custom circuit trace layout and then an email shortly after where Beverly Gong forwarded the same DTMF decoder custom circuit layout to hengtaipcb@21cn.com, a commercial vendor in China involved in the fabrication of printed circuit boards. The DTMF decoder custom circuit in the Defendant's email account is identical to an image of a DTMF trace layout found in the Rabie Cache and nearly all of the components match and the electrical traces and component pads are in similar location as DTMF-18D/E[11] circuit boards found in the Rabie Cache.

- November 11, 2008, email from Defendant Al-Ahmad in which he shares information on how to use a mobile phone as a surveillance tool.

- November 11, 2008, email from Defendant which included the phrases, "receiving unit: 100 pieces," and "transmitting unit: 10 pieces." It is believed that these phrase references receivers and transmitters that are part of the initiation systems of Remote Controlled Improvised Explosive Devices (RCIEDs).

- December 19, 2008, email in Defendant sent a message containing a list of four magnets with their dimensions. A quantity of 150 was listed for each magnet. Two

---

[9] A circuit trace layout is a diagram that shows the electrical pads and traces. The pads indicate where the holes will be drilled in the printed circuit board (PCB) to accommodate and solder electrical components or wiring. The electrical traces are used to provide electrical connections to the pads and the components or wires connected to them.

[10] The designator "DTMF-18D/E" refers to a specific DTMF circuit design as determined by CEXC.

[11] The designator "DTMF-18D/E" refers to a specific DTMF circuit design as determined by CEXC.

of the magnets listed by Defendant are similar to magnets recovered from IED attacks in Iraq.  Iraqi insurgents are known to glue magnets to IED initiation systems, which makes it possible to attach those devise to U.S. vehicles.

- September 2, 2008, email to Defendant with an attachment containing a list of parts with the majority of components to make 2,000 DTMF-18D/E circuit boards.
- February 2, 2009, email to Defendant about a "shipment list" that included a wireless transmitting unit, wireless receiving unit, and electronic boards.  These items were consistent with components used in IEDs.
- May 5, 2009, email from Defendant about a DHL shipment containing two external car antennas, two range extending systems (25 watts), one transmission frequency measuring system, electric cables, metal conductors and accessories.
- January 12, 2008, email to Defendant which contained a report.  The report was about the military operations in different parts of Iraq.  The first paragraph discussed the decreases in activities of the resistance groups.  The second paragraph discussed the activities of the Islamic Army, which was declared a jihadi front and not a resistance group.  The third topic discussed Al-Kata'ib in Karkuk, advising that groups were suffering from the inability to develop new tactics of attack and that explosive systems were not efficient anymore.
- August 9, 2009, email from Defendant requesting POSITIV20 aerosol spray cans.  The recipient of the email responded to Defendant and requested that he order the spray and "send it with the other stuff."  This type of spray is used with custom circuit boards after production to prevent oxidation or other degradation of the circuits.
- August 16, 2009, email from Defendant providing bank account information on two accounts in china.
- August 26, 2009, email from the Defendant containing an invoice to purchase 14 different types of Radio Frequency (RF) modules[12] and a variety of computer related items.  TEDAC found that 10 of the 14 RF module model types listed in the Defendant's email were also found in the Rabie Cache and a potential Victim Operated, Radio Controlled IED, also found at the Rabie Cache, contained an RF module that was similar to the RF modules listed in the invoice emailed by the Defendant.

These emails were sent and received by the Defendant, his co-conspirators, other members of the Brigades, and others working with and for the Defendant.  Some of the

---

[12] An RF Module is a small electronic circuit which is used to receive, transmit or transceive radio waves on one of a number of carrier frequencies.

emails directly establish a connection between known associates of the Brigades and the Defendant.  There are emails, as evident from the list included above, that demonstrate the individual and the group's purpose and plan to further this conspiracy, and their role and involvement in the attacks against U.S. forces.   Other emails include identifying information, which identify which email account belonged to each person/associate.

The United States intends to introduce this evidence by laying the proper foundation that may include, depending on stipulations, testimony from the following witnesses:  the custodians of records for the respective email companies; cooperating witnesses who can describepecific emails and accounts used by themselves and other individuals including Defendant, Jamal Abdul Wahab Khamees al-Dhari, Muhammad Husayn Ali-Ways al Zawbaim, and Dr. Mahdi Ibrahim Thamir; FBI personnel (agentsand CART examiners (Jeffrey Evans, Robert Meshinsky, Joseph Shramovich III, Hilda Graulau), and analysts (Gregory Neville, Tami Laskowki); and EvanKohlmann.   These emails are critically important to corroborate the Defendant's knowledge of, and support for, the group's objectives.

 Finally, the United States intends to introduce the factual and expert testimony of various translators who translated writings in various languages found in/on numerous documents, schematics, notes, letters, books and emails that will be introduced as evidence in this case.  Significant portions of the contents of these emails are either in the Arabic or Chinese language.  These noticed linguists will verify the accuracy of their translations and the content/translations of these emails in the English language.   This technical and specialized knowledge and skill will assist the trier of fact to understand the content of the evidence in this case.

Depending on the stipulations reached, the United States may call FBI Linguists Manhal Ayyoub (Arabic), Georges Nasr (Arabic), Saliba Shahin (Arabic), Sabah Zori (Arabic), Sami Khoury (Arabic), Lilian Baryman (Chinese), Benjamin Polus (Arabic), and Rimon Dahdal (Arabic).   In addition, the United States intends to call Conduit Transcriptions Linguists Louay Abdulla (Arabic), Shirley Chen (Chinese), and Alex Tuey (Chinese).

E. Physical Evidence from IED Attacks and Other IED Caches
[7-10 Witnesses; 5-6 trial days]

The United States also intends to introduce limited evidence regarding relevant IED events and other IED caches.  This information is related to the charged conspiracy and relevant to establish the players' and organizations' motive, role, and involvement in IED attacks against what they view as the "U.S. occupation."  First, the United States intends to introduce the factual testimony of another 1920 RB member, Waad Alwan.  This individual implanted RCIEDs and IEDs for the 1920 RB.  He will describe the manner in which the devices were implanted in the ground, and the mission and goal behind such implantation, to expel coalition forces out of Iraq by use of IEDs.

Second, the United States will offer evidence concerning two IED events.  The first IED event occurred near Al-Radwaniyah on April 6, 2007, in the outskirts of southern Baghdad, near Baghdad International Airport.  Three U.S. soldiers were killed, and one M1114 "Humvee" was destroyed, by a cellular phone initiated IED. The next event occurred in the Adhamiyah neighborhood in north Baghdad on May 14, 2007, approximately one-half mile from the Omar Street facility.  One U.S. soldier was killed in action, four soldiers were severely wounded, and one M1151 "Humvee" was destroyed by a cellular phone initiated IED.

During both of these attacks, U.S. soldiers were injured and killed and U.S. military equipment was destroyed.  At trial, the United States will call some of these percipient military witnesses to testify to the events of those days, their recollection of the attacks, and their roles in the collection of the IED evidence and the documentation of what occurred.[13]  For both of these attacks, witnesses will testify to the process by which the items of evidence and/or photographs of the evidence and IED attack sites were collected, examined, and ultimately forwarded to the TEDAC laboratory located in Quantico,

---

[13] The percipient military witnesses include: James Beller, Jamie Mattice, Jr., Aaron Rasmussen, Patrick Mange, Matthew Martinez, Jarrod Taylor, Octavio Nunez, Omar Avila, Andrew Catterton, Travis Guthmiller, Clay Sigler, and others as needed.

Virginia.  In addition, for the April 6, 2007 event, the TEDAC engineers examined the images of the device that was forwarded by CEXC and opined that the IED initiator used in this incident includes a dual tone multi frequency custom circuit (DTMF-11)[14] that matches three circuits recovered in the Omar Cache.  The circuits all have nearly identical traces[15], share a common set of electrical components, and function identically. Furthermore, the circuits were likely manufactured using the same processes.  As for the May 14, 2007 event, the TEDAC engineers opined that the IED electronic "initiator" used in this incident included a DTMF-11[16] custom circuit that was very similar to three custom circuits recovered in the Omar Cache.  The custom circuits had subtle differences in their trace layouts, but otherwise used a common set of components and functioned identically.

Finally, in addition to the evidence about the two IED attacks listed above, the United States intends to introduce evidence related to two other caches.  At the first cache (the "Amiriyah Cache")[17], United States military recovered a DTMF-11 custom circuit board with five outputs, a hands-free headset, a project box, spade connectors, tape and wire.  Defendant's latent prints were on the project box.  According to former CEXC and TEDAC engineers, this is a very unique DTMF-11 circuit board because it has five outputs rather than the typical one output.  Significantly, TEDAC engineers have opined that this unique custom circuit board is a match to DTMF decoder custom circuit boards recovered in the Omar Cache (Q124).

Depending on stipulations reached with the defense, the United States will call the military personnel who were present at the caches upon their discovery, the recovery of

---

[14] The designator "DTMF-11" refers to a specific DTMF circuit design as determined by CEXC.

[15] A circuit trace layout is a diagram that shows the electrical pads and traces.  The pads indicate where the holes will be drilled in the printed circuit board (PCB) to accommodate and solder electrical components or wiring.  The electrical traces are used to provide electrical connections to the pads and the components or wires connected to them.

[16] The designator "DTMF-11" refers to a specific DTMF circuit design as determined by CEXC.

[17] This particular cache is referred to as the "Amiriyah Cache" due to its location inside the Amiriyah neighborhood of Baghdad.

evidence, the subsequent chain of custody witnesses who will testify about their involvement, and the process as items made their way to CEXC in Iraq and ultimately to the TEDAC lab in Quantico, Virginia.[18]

At the second cache (the "Rabie Cache")[19], documents were recovered that contained information about building, programming, and operating a DTMF custom circuit using a cell phone or any transmitting or receiving device. It is believed that the purpose of this document was to promulgate an advanced (relative to 2009) IED initiation system design to assist bomb makers in building IED initiators for use against U.S. Forces in Iraq. The circuit includes a small infrared motion detector sensor, which according to the translated document, can be "…programmed by the number of targets needed to pass before it's activated." The translated document adds that "in case more than one target is selected the timing is set with the target speed whether it's in or out of cities…" As used in IEDs against U.S. Forces in Iraq, passive infrared sensors detect movement of a heat source, such as a vehicle. When the ambient temperature is detected, the sensor acts as a trigger to initiate the IED.

The document also contained two DTMF decoder custom circuit trace layouts[20] and an associated parts list. We note that TEDAC engineers compared the two DTMF custom circuit layouts from the document found in the Rabie Cache to DTMF custom circuit layouts found in email attachments in email accounts attributed to the Defendant and concluded that they were nearly identical. Further, the DTMF custom circuit layouts found in the email accounts attributed to the Defendant were found to be nearly identical to DTMF-18D/E[21] decoder custom circuit boards (printed circuit boards both populated and

---

[18] The military witnesses here would include: Thomas Hickey, Andrew Tarasar, and the personnel responsible for transferring the evidence from CEXC to TEDAC.

[19] This particular cache is referred to as the "Rabie Cache" due to its location on Rabie Street in Baghdad.

[20] A circuit trace layout is a diagram that shows the electrical pads and traces. The pads indicate where the holes will be drilled in the printed circuit board (PCB) to accommodate and solder electrical components or wiring. The electrical traces are used to provide electrical connections to the pads and the components or wires connected to them.

[21] The designator "DTMF-18D/E" refers to a specific DTMF circuit design as determined by CEXC.

unpopulated with electronic components) found at the Rabie Cache. Additionally, the parts list contained in the document found in the Rabie Cache (Q184) contains the majority of the components found in a parts list that was emailed to an email account attributed to the Defendant. TEDAC assessed that the parts list in the Defendant's email account appeared to be a shopping list, or an order form, to purchase relatively large amount of components with the goal to create 2,000 DTMF circuits or devices.

Again, depending on stipulations reached with the defense, the United States will call the military personnel who were present at the caches upon their discovery, the recovery of evidence, the subsequent chain of custody witnesses needed to testify to their role in handling the evidence as the items made their way to CEXC in Iraq, and ultimately to the TEDAC lab in Quantico, Virginia.[22] The TEDAC engineers will lay the foundation for their opinions regarding the similarities of the schematics and purpose behind the documents. The United States will move to admit the emails through the proper foundation that may include, again depending on stipulations reached, testimony from the custodian of records for the respective email companies to establish that these emails are what they purport to be are and accurate; testimony by potential government witnesses, including cooperating witnesses, about specific emails and the email accounts used by individuals associated with the 1920 Revolution Brigades and the Defendant (to establish that the accounts belong to the defendant); testimony about information that identifies the user of each relevant email account (including identifying information/names contained in the content of specific emails) and admission of the contents of the email to establish the Defendant was the recipient of the emails/user of the email account that contained attachments of DTMF custom circuit layouts that were found to be nearly identical to DTMF-18D/E[23] decoder custom circuit boards (physical circuit boards with some populated with electronic components) found at the Rabie Cache (referenced above) and

---

[22] The military witnesses include: Matthew Godfrey, SA David Nunez, and others as needed.

[23] The designator "DTMF-18D/E" refers to a specific DTMF circuit design as determined by CEXC.

the parts list emailed to an account attributed to the Defendant (again referenced above).

**F.  Defendant's Transfer to U.S. Custody**

**[3 Witnesses; 1 trial day]**

On May 10, 2011, a complaint was filed against the defendant in the United States District Court, District of Arizona. The complaint alleged violations of 18 U.S.C. § 2332(b)(2), Conspiracy to Commit Extraterritorial Murder, and 18 U.S.C. § 2339A, Providing Material Support to Terrorists.  An arrest warrant was subsequently issued.

On May 17, 2011, defendant was detained pursuant to a red notice based upon the complaint and warrant in The Republic of Turkey.  Thereafter, the United States sought the extradition of the Defendant from the Turkish government.  On May 26, 2011, the undersigned submitted an affidavit and related attachments in support of extradition to the Honorable United States Magistrate Judge Michelle H. Burns, who authorized the application on that day.  On or about June 16, 2011, the formal request for extradition was provided to the Turkish authorities.

On June 28, 2012, a Federal grand jury in the District of Arizona returned an indictment against the Defendant.  The Defendant was charged with conspiracy to use a weapon of mass destruction in violation of Title 18, United State Code, Section 2332a; conspiracy to maliciously damage or destroy U.S. Government Property by means of an explosive in violation of Title 18, United State Code, Section 844(f)(1), (2), (n); aiding and abetting the possession of a destructive device during a crime of violence in violation of Title 18, United States Code, Sections 924(c) and 2;and conspiring to possess a destructive device during a crime of violence in violation of Title 18, United States Code, Section 924(o).  That same day, the Court issued a warrant for the arrest of the Defendant for the offenses charged in the indictment.

Thereafter, the United States sought the extradition of the Defendant from the Turkish government.  On July 16, 2011, the undersigned submitted an affidavit and related attachments in support of extradition to the Honorable United States Magistrate Judge David K. Duncan, who authorized the application on that day.  On June 21, 2011, the formal request for extradition was provided to the Turkish authorities.  On August 12, 2014,

a Federal grand jury in the District of Arizona returned a superseding indictment against the Defendant combining the charges contained in the complaint with the charges in the Indictment.   The Defendant was transferred, in FBI custody, to the United States and arraigned on August 27, 2014.

The United States intends to introduce the factual testimony of Special Agents Dina McCarthy, Clint Hemberg, and Stewart Whitson, describing the process of obtaining the full set of fingerprints from the defendant at arrest,[24] and the location where Defendant initially arrived to the United States, Phoenix, Arizona.   The United States will also introduce the factual testimony of Mitch Little, an employee authorized to testify about the location of his company's headquarters in Tempe, Arizona and identify one of the chips located in this case as one his company sold.

## III.  OUTLINE OF DEFENSE'S CASE IN CHIEF

After reviewing the current status of the case from the defense perspective, we anticipate that the Defendant's affirmative case may require between 5-7 days to complete. This includes the foreign language deposition of a defense witness from Hong Kong.

Next, the defense is unaware of the actual number of witnesses that the government intends to present at trial. However, it is nevertheless reasonable to assume that on average, at least two hours to half a day will be required for cross-examination by the defense of each government witness.

Finally, depending upon the nature of the testimony presented by the government, the Defendant may call rebuttal witnesses. Anticipating cross-examination of those

//

//

//

---

[24] Additional witnesses may be needed to establish/testify to all sources of fingerprints from the defendant throughout the investigation/prosecution.

witnesses by the government and possible re-direct, we believe the presentation of defense rebuttal witnesses with cross-examination and re-direct can reasonably take an additional 2-3 days to complete.

Respectfully submitted this 28th day of July, 2017.

ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

*s/ David Pimsner*
*s/ Melissa Karlen*
*s/ Bill Solomon*
DAVID A. PIMSNER
MELISSA KARLEN
BILL SOLOMON
Assistant U.S. Attorneys

1

## CERTIFICATE OF SERVICE

2

3

I hereby certify that on July 28, 2017, I electronically transmitted the attached documents to the Clerk's Office using the CM/ECF system for filing sealed documents and sent a copy of the foregoing sealed motion to:

4

5

Molly A. Karlin
Jon M Sands

6

Gregory Bartolomei

7

Jami Johnson
Counsel for Defendant Ahmed Alahmedalabdaloklah

8

9

s/ *Theresa A. Hanson*

10

Legal Assistant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28