ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona
DAVID A. PIMSNER
MELISSA KARLEN
BILL C. SOLOMON
Assistant U.S. Attorneys
Arizona State Bar No. 007480
California State Bar No. 218101
Arizona State Bar No. 020012
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona  85004
Telephone:  602-514-7500
David.Pimsner@usdoj.gov
Melissa.Karlen@usdoj.gov
William.Solomon@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-12-01263-PHX-NVW |
| Plaintiff, | |
| vs. | **UNITED STATES OF AMERICA'S RESPONSE TO DEFENDANT'S OBJECTIONS TO THE EXPERT TESTIMONY OF EVAN KOHLMANN** |
| Ahmed Alahmedalabdaloklah, | |
| Defendant. | |

## **Introduction**

Given that a terrorist group's organization, history, and ideology present unfamiliar topics for most jurors, district courts routinely permit expert testimony on these subjects in national security trials.  Using a methodology widely accepted in the field of international terrorism studies, the United States' expert in this case, Mr. Evan Kohlmann, will assist the jury by adducing these subjects as they relate to the 1920 Revolution Brigades – the terrorist group the Defendant is accused of conspiring with and supporting.  Kohlmann's proposed testimony would provide reliable and critical information to the jury as it assesses the principal evidence in the case.  Therefore, the Court should overrule the Defendant's objections and permit Kohlmann to testify as an expert witness.

# Argument

**Because the Proposed Expert Testimony Stems From a Reliable Methodology and Would Assist the Jury in Understanding Other Evidence Central to the Charges in the Indictment, the Testimony is Admissible Under the Federal Rules of Evidence.**

Under the Federal Rules of Evidence, an application of the general principles governing the admissibility of expert testimony to the opinions set forth in Kohlmann's report establishes why his proposed testimony should be admitted.

### A. The Standard for Admitting Expert Testimony

The admissibility of expert testimony in federal courts is governed by Federal Rule of Evidence 702, along with the Supreme Court's teachings in *Daubert v. Merrill Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and its progeny.[1]  *See Estate of Barabin v. Astenjohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc).  As the Ninth Circuit has instructed, a district court should evaluate the admissibility of expert testimony according to the following determinations:

(1) Whether the opinions are based on scientific, technical, or other specialized knowledge;

(2) Whether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue;

(3) Whether the expert has appropriate qualifications (i.e., some special knowledge, skill, experience, training or education on that subject matter);

---

[1] *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997).

(4) Whether the testimony is relevant and reliable;

(5) Whether the methodology or technique the expert uses "fits" the conclusions (the expert's credibility is for the jury);

(6) Whether the probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time.

*See United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In general, the Federal Rules of Evidence "provide a liberal standard for the admissibility of expert testimony," *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003) *(citing Daubert*, 509 U.S. at 588), as "[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

The Ninth Circuit has explained that Rule 702 requires that expert testimony be both relevant and reliable. *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001). Moreover, "[r]elevancy simply requires that the evidence logically advance a material aspect of the party's case." *Estate of Barabin*, 740 F.3d at 463 (*quoting Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (internal quotations omitted)). As to reliability, the issue essentially is whether an expert's testimony has "a reliable basis in the knowledge and experience of the relevant discipline." *Kuhmo Tire*, 526 U.S. at 149. A court may consider several indicia of reliability enumerated in *Daubert*:

> (1) "Whether a theory or technique has been or can be tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the technique's known or potential rate of error . . ."; and

>   (4) "whether a particular technique or theory has gained general acceptance in the relevant scientific community."

*United States v. Williams*, 506 F. 3d, 151, 160 (2d Cir. 2007) (*quoting Daubert*, 509 U.S. at 593-94).  However, "[t]he test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.,* 526 U.S. at 141.  Courts have "considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable." *Id*. at 152.  The objective is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*.

### B. As a Qualified Terrorism Expert, Kohlmann Utilized a Widely-Accepted Social Science Methodology to Form His Opinions About The 1920 Revolution Brigades.

As explained in his expert report, Kohlmann employs a social science methodology known as "comparative analysis."  ("Expert Report I: U.S. v. Ahmad Ibrahim al-Ahmad" at 3-4, June 2017) ("Exp. Rep.")  To that end, in describing features of a given terrorist group, international terrorism researchers analyze a variety of sources.  *Id*.  Given the reliance by modern terrorist groups on the internet, researchers not surprisingly seek out and then study, *inter alia*, publications by these groups' media wings and video-recorded speeches by their leaders.  *Id*.  To form accurate opinions about a group's organization, history, ideology, and tactics, researchers such as Kohlmann then analytically compare primary, secondary, and tertiary sources to create a coherent and reliable narrative.  *Id*.  In

the present case, Kohlmann has confirmed that he utilized this methodology in forming his opinions about the 1920 Revolution Brigades. *Id*. at 3.

### 1. *Kohlmann's Methodology is Reliable.*

Numerous courts have concluded that the methodology employed by Kohlmann satisfies the standard for admissibility of expert testimony. *See United States v. Kaziu*, 559 Fed. Appx. 32 (2d Cir. 2014) (upholding admission of expert testimony by Kohlmann about "how al-Shabaab and al-Qaeda distribute their propaganda through 'media wings'"); *United States v. Hassan*, 724 F. 3d 104, 131-32 (4th Cir. 2014) (structure of Islamic extremist groups and methods of recruitment); *United States v. Amawi*, 695 F. 3d 457, 478-79 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 1474 (2013) (testimony about how terrorists use the internet to recruit and train jihadists); *United States v. Mustafa*, 406 Fed. App'x. 526, 528-29 (2d. Cir. 2011) (affirming trial court's decision to allow Kohlmann to testify as a "terrorism expert" regarding al-Qaeda); *United States v. Farhane*, 634 F. 3d 127, 158-60 (2d Cir. 2011) (expert testimony regarding "al-Qaeda and Azzam Publications, the publisher of a jihadist videotape"); *United States v. Aref*, 285 Fed. Appx 784, 792 (2d Cir. 2008) (expert testimony regarding Pakistani and Kurdish terrorist groups); *United States v. Paracha*, 313 Fed. Appx. 347, 351 (2d Cir. 2008) (expert testimony regarding the "organization and structure of al-Qaeda"). Other researchers, using the same or similar methodology, have also been approved to provide expert testimony about terrorist groups. *See United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (tactics used by Palestinian

Islamic Jihad); *United States v. Hammoud*, 381 F.3d 316, 336 (4th Cir. 2004) (structure and leadership of Hizballah).

In *Paracha*, for example, the trial court conducted a daylong *Daubert* hearing and concluded that Kohlmann's methodology was reliable and similarly utilized by other researchers in his field. In particular, the *Paracha* Court determined that:

> [Kohlmann's] methodology consists of gathering multiple sources of information, including original and secondary sources, cross checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain consonant with the most reliable sources. . . . His methodology is similar to that employed by his peers in his field; indeed, he explained that he works collaboratively with his peers, gathering additional information and seeking out and receiving comments on his own work.

*Paracha*, 2006 WL 12768, at *20. The *Paracha* Court further found that Kohlmann's expert opinions "regarding al-Qaeda's origins, leaders and certain tradecraft are generally accepted within the relevant community" and that he employed "sufficiently reliable methodology to meet the requirements of" Rule 702. *Id.* Most recently, District Judge Brian M. Cogan held that the comparative analysis methodology used by Kolhmann was a type of "qualitative social science and historical research" that is widely accepted. *See United States v. Harun*, 12 Cr. 0134, Slip. Op. at 5 (E.D.N.Y. February 20, 2017) (Attachment A).

Seeking to circumvent this overwhelming case law, the defense essentially claims that Kohlmann has *misapplied* the methodology of comparative analysis when he formed his opinions in the present case. ("Defendant's Objections to Proposed Government Expert

- 6 -

Evan Kohlmann" ("Def. Obj.") at 9-14.) This objection is unavailing for several reasons. First, as the Ninth Circuit has observed, the courts "are concerned not with the correctness of the expert's conclusions but the soundness of his methodology." *Estate of Barabin*, 740 F.3d at 463 (*quoting Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)) (internal quotations omitted). Insofar as the defense contends that Kohlmann's analysis was incomplete and thus resulted in erroneous conclusions, those contentions are at most a topic for cross-examination or testimony from a defense expert, not preclusion of the Kohlmann testimony as a whole. The Defendant forgets that "*Daubert* makes the district court a gate-keeper, not a fact finder." *See United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006).

Second, while objecting to Kohlmann's reliance on internet videos and statements published by the 1920 Revolution Brigades as hearsay (Def. Obj. 4-7), the defense overlooks that these types of materials are routinely relied upon by terrorist researchers. In *Damrah*, for example, the defendant similarly contended that it was improper for the government's terrorism expert to rely upon books about a terrorist group, its press releases, newspaper articles, and government publications. *Damrah*, 412 F.3d at 625 n. 4. In affirming the ruling to admit the expert testimony, the Sixth Circuit approvingly quoted the district court: "Given the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon." *Id*. at 625. Indeed, this methodology constitutes "the gold standard in the field of international terrorism." *Id*.

Experts, of course, in general may rely on hearsay in formulating their opinions where experts in that field reasonably rely on such evidence. *See United States v. Zarate-Morales*, 377 Fed. Appx. 696, 698 (9th Cir. 2010); Fed. R. Evd. 703.  And, as a corollary, a party must not use an expert to simply introduce otherwise inadmissible hearsay. *See United States v. Vera,* 770 F.3d 1232, 1237-1240 (9th Cir. 2014) (gang expert permitted to rely upon hearsay because he synthesized the various source materials and applied his experience and methodology); *United States v. Escobar*, 462 Fed. Appx. 58, 62 (2d Cir. 2012) (rejecting Confrontation Clause challenge to expert testimony because "there is no evidence [the expert] communicated any out-of-court testimony statements to the jury."). But here, the defense erroneously conflates the *bases* for Kolhmann's testimony as delineated in his report with the *opinions* themselves.  The United States is not seeking to offer into evidence the numerous statements imbedded in the documents Kohlmann relied upon, but rather his expert opinions based on his analysis of those documents, his understanding of how terrorist groups are organized and utilize the internet, and his experience as terrorism researcher for twenty years.  As such, Kohlmann's expert testimony is entirely appropriate. *See Zarate-Morales*, 377 Fed. Appx. at 698 ("law enforcement agents testifying as experts may rely on inadmissible hearsay in describing the structure and operations of a criminal organization."); *Vera*, 770 F.3d at 1238-39; *Hankey*, 203 F.3d at 1169.

Finally, the defense claims that Kohlmann's report does not recite sufficient facts or data to supports its conclusions.  (Def. Obj. at 13-14.)  The defense, however,

conspicuously fails to contradict any of Kohlmann's ultimate conclusions regarding the origins, leadership, ideology, and tactics used by the 1920 Revolution Brigades or the authenticity of the websites he relied upon.[2] *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) (lack of any contradictory evidence supported reliability and admissibility of expert opinion).  Grounded in a reliable methodology, the non-controversial substance of these opinions should come as no surprise.  For example, the recent deposition of Jamal al Dhari, a leader within the 1920s Revolution Brigades, corroborated Kohlmann's conclusion that the Brigades sought to expel American forces through violent attacks.  Al-Dhari's description of his relatives' roles in the leadership of the group is also consistent with Kohlmann's.  The group's history traces back to a movement that sought independence from British rule during the 1920-22 revolution.  As reflected in their internet claims of responsibility, which Kolhmann contemporaneously followed and studied back in the mid-2000s – years before this prosecution was commenced – the group's strategy and objectives are not fairly in dispute.[3]  (Exp. Rep. at

---

[2] In his filing, the Defendant does not request a hearing, nor is one required for the Court to fulfill its gate-keeping function under *Daubert*.  *See United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007); *United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007).  Where an expert's methodology have been subject to previous *Daubert* hearings, moreover, a district court may consider such prior testimony under Fed. R. Evd. 104(a).  *See, e.g., United States v. Ghayth*, 2014 WL 978629, at *1 (S.D.N.Y. Feb. 28, 2014).  At the Court's request, the United States will provide a copy of the transcript from the *Daubert* hearing in *Harun* (cited above), the most recent case where Kohlmann explained his methodology.

[3] The defense's passing criticism of Kolhmann for considering some limited email evidence revealed by the FBI's investigation in this case is misplaced. (Def. Obj. at 6.)  Experts on gangs and criminal organizations routinely base their opinions on the underlying evidence in a case.  *See Zarate-Morales*, 377 Fed. Appx. at 697 (expert relied upon statements from informants); *Hankey*, 203 F.3d at 1169 (expert knew co-defendant gang members).

- 9 -

7-18.) Yet, in proving the core conspiracy and its objectives, this evidence is critical for the jury's understanding.

The defense's contention that Kolhmann's opinions lack a sufficient factual basis and are "unsubstantiated" (Def. Obj. at 10-14) is belied by Kolhmann's meticulous sourcing in his report. In arriving at his opinions, Kolhmann relied in part on a personal interview he conducted in May 2008 with a former official of the 1920 Revolution Brigades. (Exp. Rep. at 6.) Prior to this case, moreover, Kolhmann had collected and studied communiques and statements from the group, as well its official Arabic-language, online magazine – one issue of which included an instructional guide on the use of IEDs. (Exp. Rep. at 17.) Apart from a handful of emails emanating from this case, the lion's share of Kolhmann's supporting evidence derived from his independent research into Iraqi terrorist groups. Despite accusing Kolhmann of being "uncritical" with his supporting materials, the defense utterly fails to identify <u>any</u> salient primary, secondary, or tertiary sources related to the 1920 Revolution Brigades which it claims Kolhmann overlooked.

What the defense misconstrues as "contradictory" claims in the report, e.g., regarding the Brigades' dealings with AQI (Def. Obj. at 11), merely are aspects of an evolving and complicated relationship between two jihadist groups. In any event, if the defense at trial attempts to challenge some of Kohlmann's conclusions, the weighing of the expert testimony is for the jury to determine. *See Kennedy*, 161 F.3d at 1230 (if an expert's reasoning is sound and opinions will assist the jury, "it is a matter for the finder of fact to decide what weight to accord the expert's testimony."). In criticizing Kolhmann's report

as incomplete, the defense misperceives that Kohlmann's twenty-five (25) page report was not intended to serve as the definitive, all-encompassing treatise on the 1920 Revolution Brigades. Rather, under Rule 16, the report more than amply provides the defense with a written summary of his anticipated testimony, and the bases thereof.

### 2. Kohlmann's Education and Extensive Experience Qualify Him as a Terrorist Expert.

The defense also contends that Kohlmann is not qualified to render opinions about the 1920 Revolution Brigades because he has not "traveled to Iraq, and he does not speak Arabic." (Def. Obj. at 7-9.) The courts (*see supra*) which have held that Kohlmann's methodology satisfied Rule 702 and *Daubert* have likewise concluded that Kohlmann possesses the necessary education, experience, and training to provide expert testimony about terrorist groups. In *Farhane*, for example, the Second Circuit affirmed the trial court's ruling that Kolhmann was qualified to provide expert testimony about terrorist groups such as al Qaeda:

> Kohlmann's proposed expert testimony had a considerable factual basis: (1) his graduate studies at Georgetown University's School of Foreign Service and Center for Contemporary Arab Studies and at the University of Pennsylvania Law School; (2) his full time employment at two organizations focusing on terrorism and al-Qaeda, "Globalterroralert.com" and the Investigative Project; (3) his authorship of various academic papers and a book on al-Qaeda; (4) his provision of consulting services on terrorism and al-Qaeda to various federal agencies; and (5) his ongoing efforts to collect, analyze, and catalogue written, audio, and visual materials relevant to terrorism generally and al-Qaeda in particular, including the records of guilty pleas and confessions from admitted al-Qaeda operatives.

*Farhane*, 634 F.3d at 158-59.  The *Farhane* court also noted that "Kohlmann's work had undergone various forms of peer review, that his opinions were generally accepted within the relevant community, and that his methodology was similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations." *Id*. at 159 (internal quotation marks omitted).  Despite not speaking Arabic fluently himself (he employs such speakers where necessary), Kohlmann has previously testified as an expert witness on similar matters in over thirty (30) federal criminal trials in the United States.[4]  (Exp. Rep. at 1-3.)  He has likewise testified twice in the military commission trials held in Guantanamo Bay, Cuba, and in various different foreign courts and tribunals as an expert witness on terrorism issues.  *Id*. The defense offers no examples of how a lack of Iraqi trips critically undermines Kolhmann's methodology or his conclusions.  In short, the Defendant proffers no colorable basis to challenge Kolhmann's qualifications as a terrorism expert.

### C. As a Qualified Terrorism Expert, Kohlmann's Proposed Testimony Would be Relevant and Helpful to the Jury.

Apart from his challenges under Rule 702, the Defendant also argues that Kohlmann's testimony should be precluded under Federal Rules of Evidence 401 and 403.

---

[4] The defense cavils that while Kohlmann has testified about other terrorist groups, he has not previously testified about the 1920 Revolution Brigades. (Def. Obj. at 7.)  This criticism is meritless for two basic reasons: the present case appears to be the first federal trial where this group's organization and tactics have played a central role.  Moreover, Kolhmann's ability to provide expert testimony stems from the fact that he has been studying this group (and other Iraqi insurgent groups) and its publications since the mid-2000s (*see supra*).

(Def. Obj. 14-17). When placed in context with other evidence in the case, the relevance of Kohlmann's testimony is manifest.

### *1. Kohlmann's Testimony Will Assist the Jury to Understand the Terrorist Organization with which the Defendant Conspired.*

At trial, the jury will see evidence and hear testimony about how the Defendant conspired with members of an Iraqi insurgent group known as "The 1920 Revolution Brigades." The United States will prove that the Defendant directly interacted with members of that group and supported their goal to force American military forces to leave Iraq by conducting a campaign of violent attacks. The Defendant's alleged role was to design and produce custom-designed, circuit boards for use in remote-controlled, improvised explosive devices ("RCIEDs"). The jury will also hear testimony about the location and activities of the 1920 Revolution Brigades during the mid-2000s, including through the testimony of U.S. military personnel who faced their violent attacks.

In order to place that testimony and evidence in context, the United States intends to elicit expert testimony from Kohlmann on the formation, structure, leadership, and tactics of the 1920 Revolution Brigades. (Exp. Rep. at 5-25.) Certain witnesses (e.g., Col. Pinkerton, Dr. Kilcullen, and Jamal al Dhari) will describe their personal experiences with the 1920 Revolution Brigades. But to apprehend the import of this testimony, the jury needs to learn from Kohlmann such information as the significance of the historical referent to the group's name; how its ideology fueled its conspiratorial objective to kill Americans; and how the leadership employed violent tactics (which other evidence will show the Defendant supported through his technical expertise). Without such testimony, the jury

would not be able to fully understand, let alone assess, the significance the Defendant's role vis-à-vis the Brigades.  *See* Fed. R. Evid. 702(a).  As the defense concedes (Def. Obj. at 2-3), few – if any – jurors will have even heard of the 1920 Revolution Brigades (especially given the passage of time since the Iraq insurgency occurred) or understand the significance of the Defendant's conspiratorial conduct in supporting its members.

In drug and gang cases, the Ninth Circuit has repeatedly approved of experts to provide historical context, tactics, and structural information regarding such criminal enterprises.  *See United States v. Ogedengbe*, 187 Fed. Appx. 175 (9th Cir. 2006) (testimony about the structure and practices of complex international drug smuggling organizations) (citing cases) and *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (testimony about gang's "code of silence" and retaliations).  Other circuits are in accord.  *See, e.g., United States v. Abu Jihaad*, 553 F. Supp. 2d 121, 124 (D. Conn.), *aff'd* 630 F.3d 102 (2d Cir. 2010) (citing cases); *United States v. Amuso*, 21 F.3d 1251, 1263-64 (2d Cir. 1994). The Second Circuit, for example, has long held that expert testimony is appropriate regarding the nature, structure, and methods of organized crime (including the meaning of certain code words and roles played by specific individuals).  *See United States v. Lombardozzi*, 491 F.3d 61, 77 (2d Cir. 2007); *United States v. Locascio*, 6 F.3d 924, 936-38 (2d Cir. 1993); *United States v. Gotti*, No. 02-743, 2004 WL 2423799, at *1-2 (S.D.N.Y. Oct. 29, 2004) (permitting the government's organized crime expert to "identify specific members of organized crime families, other than the defendants, by name and rank").  In light of the numerous insurgent groups then active in Iraq, the explanatory nature of

Kohlmann's expert testimony regarding the 1920 Revolution Brigades similarly will assist the jury in understanding the criminal scheme in which the Defendant participated.

### 2. *Kohlmann's Testimony is not Unfairly Prejudicial.*

Given the nature of the charges and the other evidence in this case, the defense also misses the mark in arguing that the probative value of the proffered testimony is *substantially* outweighed by unfair prejudice to the Defendant. *See* Fed. R. Evid. 403 ("[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice" to the defendant).

As the Court is aware, the Defendant is charged with several extremely serious, terrorism-related crimes, stemming from his involvement in a conspiracy to kill U.S. military personnel in Iraq. At this stage of the litigation, the defense's protestations that they are unaware of the probative value of the evidence linking the Defendant to the 1920 Revolution Brigades is truly mystifying. (Def. Obj. at 14-16.) As far back as the original complaint, the United States spelled out in the detail that the Defendant is charged with conspiring with members of an Iraqi terrorist group called the 1920 Revolution Brigades. Through violent attacks against American military personnel (many using RCIEDs), this group sought to end the U.S. "occupation" of Iraq. The evidence at trial will show that the Defendant joined this conspiracy and assisted in the design and production of the electronic circuitry for these weapons. Similarly, email evidence will show that an account belonging to the Defendant (john_john2008812@yahoo.com) and a co-conspirator (m4d4_m4d4@yahoo.com) were in contact with social networking forums for jihadist

groups. The import of emails such as these will be lost to the jury without expert testimony explaining the nature of such forums. (Exp. Rep. at 23-25.)

In light of those charges and that record, it is hard to see how Kohlmann's proffered testimony could be considered unduly prejudicial in any way. Lay witnesses and documentary evidence link the Defendant to the 1920s Revolution Brigades. The group publicly admitted to killing Americans through a campaign of violent attacks. As weapons, RCIEDs provided a lethality and element of surprise by which the Defendant's co-conspirators inflicted significant casualties. In his report, Kolhmann's passing references to Al Qaeda in Iraq ("AQI"), Hamas, and jihad are necessary to accurately describe the history of the Brigades and its activities. The 1920 Revolution Brigades did not exist in a vacuum. In cases like this one, such evidence about a violent organization may be "prejudicial" to a defendant who conspired with that organization to kill but certainly is not *unfairly* so. *See Hankey,* 203 F.3d at 1172; *United States v. Benkahla*, 530 F.3d 300, 310 (4th Cir. 2008) (affirming admission of expert testimony about a terrorist group because, in part, "Rule 403 is not an injunction to exclude prejudicial evidence…."). As the D.C. Circuit observed, Federal Rule of Evidence 403 "does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone. It does not bar powerful, or even "prejudicial" evidence. Instead, the Rule focuses on the "danger of unfair prejudice," and give the court discretion to exclude

- 16 -

evidence only if that danger "substantially outweighs" the evidence's probative value." *See United States v. Gartmon*, 146 F.3d 101, 1021 (D.C. Cir. 1998) (Garland, J.).  To understand the nature of this group (the Defendant's alleged co-conspirators) and why it was targeting American personnel (as opposed to other insurgent or sectarian groups operating in Iraq), the jury needs the assistance of expert testimony from Kohlmann as it seeks to arrive at a just verdict.

## Conclusion

The opinions developed by Kolhmann are grounded in years of research pre-dating this litigation and based on a widely-accepted methodology used in the social sciences. Without the assistance of Kohlmann's testimony, the jury will not adequately understand the evidence showing the Defendant's involvement in a conspiracy with that group. Consequently, the Court should overrule the Defendant's objections and allow Kolhmann to testify at trial.

Respectfully submitted this 7th day of August, 2017.

ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona

*s/ David A. Pimsner*

DAVID A. PIMSNER
MELISSA KARLEN
BILL C. SOLOMON
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

Copy of the foregoing served electronically via the ECF system this 7th day of August, 2017 to:

Jon Sands
Gregory A. Bartolomei
Jami Johnson
Molly A. Karlin

Counsel for Ahmed Alahmedalabdaloklah


*s/ Norma Hernandez*
U.S. Attorney's Office