DECLARATION

I, Hualing Fu, do hereby swear and affirm:

1. My name is Hualing Fu.

2. I am a Professor of Law in the Faculty of Law at the University of Hong Kong in Pokfulam, Hong Kong, China. From 2008 to 2011, I served as the head of the Department of Law at the University of Hong Kong. In addition to my appointment at the University of Hong Kong, I have also taught at the City University of Hong Kong, the University of Washington School of Law, New York University School of Law and the University of Pennsylvania School of Law.

3. I hold a Bachelor's Degree in Law from Southwest University of Politics and Law in Chongqing, China, a master's degree in criminology from the University of Toronto, and a juris doctor degree from Osgoode Hall Law School in Toronto, Canada.

4. I am the author of over 30 articles and scholarly papers. I have published extensively in the areas of human rights and corruption in China and have also published on issues related to national security law and terrorism in Hong Kong and China. My research interests include constitutional law and human rights, with a special focus on the criminal justice system in China. I teach in the areas of corruption, human rights in China, and the legal relations between Hong Kong and mainland China.

5. A true and correct copy of my cv is attached hereto as Exhibit 1.

6. I have been contacted by the Office of the Federal Public Defender for the District of Arizona, who I understand to be counsel for the defendant, Ahmed Alahmedalabdaloklah ("Mr. Alahmedalabdaloklah"), in the case of *United States v. Alahmedalabdaloklah*, Case No. CR-12-1263-PHX-NVW (D. Ariz.). I have agreed to provide this expert opinion on a *pro bono* basis for use in that case.

7. I have never met Mr. Alahmedalabdaloklah, and I have no personal knowledge of any of the facts of this case. In preparing this affidavit, I have relied on an August 11, 2017 letter from David A. Pimsner to counsel for Mr. Alahmedalabdaloklah (the "August 11 letter"), which was provided to me by counsel for Mr. Alahmedalabdaloklah, and which is attached hereto as Exhibit 2. I have also relied on certain facts provided to me by counsel for Mr. Alahmedalabdaloklah, which are summarized below.

1

8. I have been informed that Mr. Alahmedalabdaloklah is a Syrian national who has been accused by the United States government of various terrorism-related offenses, including, *inter alia*, conspiracy to use a weapon of mass destruction, conspiracy to commit extraterritorial murder of a United States national, and provision of material support to terrorists. It is my understanding that the charged events are alleged to have occurred between approximately January 2005 and July 2010.

9. I understand that at least some of the illegal activity alleged in this case is alleged to have occurred in China. Specifically, I understand that the United States government has alleged that Mr. Alahmedalabdaloklah began residing in China beginning in or around 2007 and that it has alleged that while he was residing in China, Mr. Alahmedalabdaloklah, with the assistance of a Chinese national, established an export company that received orders from and arranged shipments to individuals located in Iraq and the Middle East. I further understand the United States has alleged that Mr. Alahmedalabdaloklah arranged some of these shipments with the intent that the materials contained in the shipments be used to commit illegal acts of terrorism against United States citizens.

10. I have been informed that beginning in or around March of 2010 and continuing until just before his arrest on the present charges in May 2011, Mr. Alahmedalabdaloklah's business in China employed a Chinese national (the "Chinese witness"), who currently resides in Guangzhou, China.

11. I understand that beginning in or around April 2016 and continuing through July 2017, Mr. Alahmedalabdaloklah's defense team was in contact with the Chinese witness, who had indicated that she was willing to assist in Mr. Alahmedalabdaloklah's defense by traveling from Guangzhou to Hong Kong to participate in a deposition for use in Mr. Alahmedalabdaloklah's criminal case. I understand that a deposition was ultimately scheduled in Hong Kong for late July 2017 and that the Chinese witness had agreed to attend.

12. I understand that the Chinese witness was expected to testify at the deposition that while she worked for him, Mr. Alahmedalabdaloklah ran a legitimate business and that she was not aware of any criminal activity.

13. I understand that on or around July 28, 2017, less than one week before the deposition was scheduled to take place, the Chinese witness contacted the defense team via text message and told them she had been contacted by the "government" of China and that she could not go to Hong Kong for an "international case." She stated that the Chinese government had informed her that if she left China for Mr. Alahmedalabdaloklah's case she would need to "report to" the government of

China. I also understand that she told defense counsel that the government of China knew more about Mr. Alahmedalabdaloklah's case than she did and that the government of China would contact defense counsel if defense counsel needed help with Mr. Alahmedalabdaloklah's case. I understand that communications from the defense team requesting clarification of and additional information about the text messages of July 28, 2017 have gone unanswered.

14. I have been informed that over the course of her communication with the defense team between April 2016 and June 2017, the Chinese witness had told the defense team that she had been interviewed by Chinese police around the time of Mr. Alahmedalabdaloklah's arrest in 2011 but that she had not been contacted by anyone other than the defense team about Mr. Alahmedalabdaloklah or his case since that time. I have been further informed that as late as June 2017, the Chinese witness had confirmed to the defense team that no one other than Mr. Alahmedalabdaloklah's defense team had ever contacted her about this case.

15. I understand that in response to the abrupt termination of cooperation by the Chinese witness, the United States Court ordered the government of the United States to provide to defense counsel all information it had regarding the withdrawal of the Chinese witness and that this order resulted in the sending of the August 11 letter, which I have reviewed.

16. The letter indicates that on or around July 5–6, 2017, Assistant United States Attorney Melissa Karlen, the prosecutor who intended to travel to the then-scheduled deposition in Hong Kong, authorized the United States Department of Justice's Office of International Affairs ("OIA") to share with the Hong Kong Department of Justice ("HKDOJ") certain information regarding Ms. Karlen's anticipated travel. This information appears to have included, *inter alia*, the name of the case, a description of the charges, the name of the Chinese witness, and a statement that the case was "sensitive."

17. The August 11 letter also indicates that on July 7, 2017, Ms. Karlen authorized OIA to release to HKDOJ the information that the Chinese witness was an employee of the defendant during a portion of the time relevant to the indictment and that the Chinese witness was expected to testify that during the time she worked for him the defendant ran a legitimate business.

18. The August 11 letter does not include the full correspondence between OIA and HKDOJ, but it suggests that at some point correspondence from OIA to HKDOJ was forwarded to the Hong Kong Police such that by no later than July 13, 2017, the Hong Kong police became aware of the proposed deposition.

19. Hong Kong is a Special Administrative Region (SAR) in China.  Under the Basic Law, which is the constitution for Hong Kong, Hong Kong maintains a separate legal system that is independent of that in other parts of China.

20. Under Article 95 of the Basic Law, Hong Kong and China may agree to cooperate on mutual legal assistance.

21. In general, there has been strong and effective cooperation on civil and commercial matters, such as the delivery of judicial documents and recognition and enforcement of arbitral award and court judgments.

22. Police cooperation between Hong Kong and China is effective, although there is not an overarching legal framework.  Police cooperation is particularly strong in the area of intelligence exchange.

23. Police cooperation has been institutionalized since the return of Hong Kong to China.  There is a unit within Hong Kong Police Force that is in charge of cooperation with Chinese police, the Ministry of Public Security.  The Ministry of Public Security has also set up a representative office in Hong Kong that is headed by a senior police officer from the Ministry of Public security.

24. Police cooperation between Hong Kong and China takes various forms.  There are regular high-level meetings and workshops to discuss general and specific issues relating to criminal investigation; there are regular and *ad hoc* mutual visits for intelligence gathering and investigation purposes; and there is a standing cooperation mechanism for intelligence exchange to allow seamless cooperation.

25. Police cooperation can be reactive.  When a party requests the other side for assistance, the requested party is required to gather information and offer other assistance according to the relevant legal requirement of hosting jurisdiction.  Each year more than 1,000 requests are made through the police cooperation mechanism.  Police cooperation can be proactive in the sense that police offer important intelligence relating to crime to the other side without a request.

26. Any information relating to suspected terrorism would be regarded as highly sensitive and given the most serious attention.  It is certain that, upon receiving such information, the receiving party will immediately alert the other party.  In the case at hand, the Hong Kong police will inform the Chinese police of that terrorism-related information that they have received.

27. China is a country under the leadership of the Communist Party. The Party monopolizes all political powers and permits little political participation and input in the political process.  The Party also exerts tight and rigid control over the

society and restricts any contact Chinese citizens may have with foreign countries, organizations and individuals on sensitive matters.

28. A terrorism case that has happened, in part at least, in China but is being prosecuted elsewhere is a politically sensitive issue.  It is highly likely that the police will look into the matter closely and it is highly unlikely that the Chinese government would allow its citizens to give evidence overseas in such a terrorism case.  There is an agreement of mutual legal assistance on criminal matters between China and the US; the Chinese government will insist on using the official channel in offering legal assistance, if at all.

29. While Chinese law does not prevent Chinese citizens from traveling overseas to give evidence or offering assistance on legal matters, the government can use other extra-legal measures to persuade them not to do so in sensitive matters.  It is highly probable that the Chinese police, upon being informed of the alleged terrorism prosecution, have intervened to dissuade related party from participating.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  November 30, 2017

_____
HUALING FU

# EXHIBIT  1

# CURRICULUM VITAE

## Fu Hualing
### (dob: 25 December 1962)

**Current post**          Professor
                          Department of Law
                          The University of Hong Kong
                          Tel. 2859-7043, Fax: 2559-3543
                          E-mail: hlfu@hku.hk

**Education**

| | | |
|---|---|---|
| 1983 | LLB | Southwestern University of Political Science and Law, Chongqing, China |
| 1988 | MA | University of Toronto, Toronto, Canada |
| 1993 | Doctor of Jurisprudence | Osgoode Hall Law School York University, Toronto, Canada |

**Work Experiences**

| | |
|---|---|
| 1983-1986 | Southwestern University of Political Science and Law, Assistant Professor |
| 1993-1997 | City University of Hong Kong, Assistant Professor |
| 1997-1998 | The University of Hong Kong, Research Fellow |
| 1998-1999 | The University of Hong Kong, Assistant Professor |
| 2000-2008 | The University of Hong Kong, Associate Professor |
| 2006 | Visiting Professor, University of Washington School of Law, USA |
| 2008- | The University of Hong Kong, Professor |
| 2012 | Hauser Global Visiting Professor (invited) |
| 2013 | Distinguished Visiting Professor, University of Pennsylvania School of Law |

**Prizes and Awards**

"Re-education through Labour in Historical Perspective" (2005) 184 *The China Quarterly* 811-830

- 2005 Gordon White Award from *The China Quarterly*
- 2005 Research Output Prize from The University of Hong Kong

**Other Professional Services**

| | |
|---|---|
| Members: | Mainland Affairs Committee, the Law Society of Hong Kong (2003-2005) |
| | Hong Kong University Press Committee (2012-2013) |
| Co-Editor: | Hong Kong Law Journal (Chinese Law) (2003-) |
| Director: | Centre for Comparative and Public Law (2004-2006) |
| Head: | Department of Law, Faculty of Law, The University of Hong Kong (2008-2010) |
| Associate Dean: | Faculty of Law (China Affairs, 2014-2018) |

*Manuscript review for:*

Asian Journal of Comparative Law, Asian Journal of Comparative Politics, Asian Journal of Criminology, Asian Journal of Law and Society, Asian Survey, Australian Journal of Asian Law, Australian Journal of Human Rights, Brill, Business and Politics; China Information; Current Chinese Affairs, Journal of Comparative Law, Journal of Comparative Criminal Justice, Cambridge University Press, China Perspectives, China Review, Critical Criminology, Gofs Research Paper Series, Police Studies, The China Quarterly, The China Journal, Australian Journal of International Law, Global Constitutionalism; Hong Kong Law Journal, Hong Kong University Press, Human Rights Watch, Human Rights in China, Journal of Criminal Justice, Law and Social Inquiry, Modern China，Law & Society Review, South African Journal of Criminal Justice, Studies of Post-Communism, Journal of Law and Social Inquires, Yale Law Journal, International Journal of Offender Therapy and Comparative Criminology

*Consultancy:*

The Asian Foundation (evaluating the Foundation's legal aid projects in China, 2005)
Danish Centre for Human Rights (advising on its criminal justice research project 2005)
The UK Secretary for Foreign and Commonwealth Office (evaluating six of its rule of law projects in the mainland and Hong Kong, 2007)
Raoul Wallenberg Institute (advising on its police and prosecution cooperation project, 2005 and 2007)
UNICEF (legal and policy review of AIDS testing in China, 2007)
American Bar Association (evaluating ABA rule of law projects in China, 2008)
Access to Justice in Rural China (managing a donor project in three Chinese provinces, 2008-2010)
The Rights Practice (TRP) (evaluating TRP's duty lawyers and on-site procurators project in Hubei Province, 2013)

**Publications in English**

*Books:*

Bryan Bachner and Fu Hualing (eds.) *Commercial Law in the PRC* (Butterworths, 1995)

H L Fu and Richard Cullen *Media Law in the PRC* (Asia Law and Practice, Hong Kong, 1996)

Johannes Chan, H L Fu and Yash Ghai (eds.) *Constitutional Debate on the Right of Abode: Conflict on the Approach to Interpretation* (Hong Kong University Press, 2000, English and Chinese)

Fu Hualing, Carole Peterson and Simon Young (eds.) *National Security and Fundamental Freedoms: Hong Kong's Article 23 Under Scrutiny* (Hong Kong University Press, 2005)

Fu Hualing, Lison Harris and Simon Young (eds.) *The Struggle for Coherence: Constitutional Interpretation in Hong Kong* (Palgrave Macmillan, 2008).

Fu Hualing and Zhu Guobin, Constitutional Rights and Constitutionalism: Research on Contemporary Chinese Constitutional Problems (Hong Kong University Press, 2011, in Chinese).

Jean Philippe Beja, Fu Hualing and Eva Pils, Liu Xiaobo, Charter 08 and the Limits of China's Political Reform (Hong Kong University Press, 2012).

Fu Hualing and John Gillespie (eds.) Resolving Land Disputes in East Asia: Exploring the Limit of Law (Cambridge University Press, 2014).

*Journal Articles:*

Fu Hualing, "Police Reform and Its Implication for Chinese Social Control" (1990) 14(1) *International Journal of Comparative and Applied Criminal Justice* 247-256.

Fu Hualing, "Patrol Police: A Recent Development in the People's Republic of China" (1990) 13 *Police Studies* 111-117.

Fu Hualing, "Police Accountability: The PRC Case." *Police Studies* (Vol. 14, No. 3, Fall 1991, pp 140-151)

Fu Hualing, "Juvenile Delinquency in Post-Mao China" (1992) 16 *International Journal of Comparative and Applied Criminal Justice* 263-272.

Fu Hualing, "Police Accountability: The PRC Case." *Police Studies* (Vol. 14, No. 3, Fall 1991, pp 140-151)

Fu Hualing, "The Judicial Assistant System in Rural China." *Issues and Studies* (Vol. 28, No. 4, 1992, pp.23-45)

Fu Hualing, "Understanding People's Mediation in Post Mao China." *Journal of Chinese Law* (Vol. 16, No. 2, Fall, 1992, pp. 211-246)

Fu Hualing "China's Security Service Company." *Journal of Security Administration*  (Vol 16, No. 2, December 1993, pp. 35-44)

H L Fu "A Bird in the Cage: Police and Political Leadership in PRC." *Policing and Society* (Vol. 4, 1994, pp. 277-291)

H L Fu, "A Case for Abolishing Shelter for Examination: Judicial Review and Police Powers in China." *Police Studies* (Vol. 17, No. 4, pp. 41-60)

H L Fu and Richard Cullen, "China's National Security Law" (1996) 34 *Columbia Journal of Transnational Law* pp. 449-486)

H L Fu "Sedition and Political Dissidence: Towards Legitimate Dissent in China?" (1996) *Hong*

3

*Kong Law Journal* pp. 210-233.

Richard Cullen and H L Fu "Fiscal Reform in China: Implication for Hong Kong" (1997) 19 *Loyola International and Comparative Law Journal* 389-412.

H L Fu "Sedition in Common Law: Lesson for China and Lessons for the West", *Law Year Book 1995-1996* (City University of Hong Kong Law Department Society), 16-25.

H L Fu and Richard Cullen, "A Market Place of Centrally Planned Ideas" (1996) 18 *Delhi Law Review*, reprinted in Parman and Singh (eds) *Legal Dimensions of Free Market Economy*.

H L Fu and Richard Cullen, "Regulating the Established Press in China" (1996) 5 *Hong Kong Journal of Public Administration* 121-152.

H L Fu "The Relevance of Chinese Criminal Law to Hong Kong and its Residents" (1997) 27 *Hong Kong Law Journal* 229-246.

Richard Cullen and H L Fu, "Seeking Theory from Experience: Media Regulation in China", (1998) 5 *Democratization* 155-178.

H L Fu "Criminal Defence in China: The Possible Impact of the 1996 Criminal Procedural Law Reform", (1998) 153 *The China Quarterly* 31-48.

H L Fu and Richard Cullen, "The Law of Defamation in China", (1998) 11 *Transnational Lawyers* 1-22.

Richard Cullen and H L Fu, "Some Limitations in the Basic Law Exposed." (1999) 22 *China Perspectives* 54.

H L Fu and Pinky Choy "Unlawful Detention in the Mainland and the concerns of Hong Kong," (2000) 30 *Hong Kong Law Journal* pp. 290-303.

H L Fu, Richard Cullen and Pinky Choy, *"*Curbing the Enemies of the State: What does Article 23 Require?" (2001-2002) "5 *Journal of Chinese and Comparative Law* pp. 45-72.

H L Fu and Richard Cullen, "National Security Law in Hong Kong: Quo Vadis: A study of Article 23 of the Basic Law of Hong Kong," (2002) 19 *UCLA Pacific Basin Law Journal* pp. 185-230.

H L Fu and Richard Cullen, "Political Policing in Hong Kong," (2003) 33 *Hong Kong Law Journal* pp. 199-230.

H L Fu, "The Politics of Mediation in a Chinese County: The Case of Luo Lianxi," (2003) 5 *Australian Journal of Asian Law* (107-227).

Fu Hualing and D W Choy, "From Mediation to Adjudication: Settling Labor Disputes in China," (September 2004) 3 *China Rights Forum* 17-22.

Fu Hualing, "Re-education through in Historical Perspective" (2005) 184 *The China Quarterly* 811-830.

Fu Hualing, "Zhou Yongkang and Recent Police Reform in China," (2005) *Australian and New Zealand Journal of Criminology* 241-253.

Fu Hualing and Richard Cullen, "Two Views of Hong Kong's Basic Law: But Hong Kong Should Seek A Better Way…" *Hong Kong Journal* (2006) http://www.hkjournal.org/archive/2006_spring/fu.html

Fu Hualing, 'Commentary on "Transforming Family Law in Post-Deng China,"' (2007) 191 *The China Quarterly* 696-698.

Fu Hualing, "When Lawyers are prosecuted…The Struggle of a Profession in Transition" (2007) 2 *Journal of Comparative Law* 95-133.

Fu Hualing and Richard Cullen, "Weiquan (Rights Protection) Lawyering in an Authoritarian State: Building a Culture of Public Interest Lawyering" (2008) 59 *The China Journal* 111-127.

Fu Hualing and Richard Cullen, "Climbing the Weiquan Ladder: A Radicalizing Process for Rights-Protection Lawyers," (2011) *The China Quarterly* 40-59.

Fu Hualing, "Challenging Authoritarianism through Law: Potential and limit" (2011) 6 *National*

4

*Taiwan University Law Review* 339-365.

Fu Hualing 2012, "Embedded Socio-Legal Activism in China: The Case of Yirenping," 42 Hong Kong Law Journal, vol. 42 pp 531-560.

Fu Hualing, "Away from Grass-roots? The Irony of the Chinese Rural Legal Service" (2015) 60 (3-4) *Diogenes* 116-132.

Fu Hualing, "Building Judicial Integrity in China," (2016) (39:1) *Hastings International and Comparative Law Review* 167-181

*Book Chapters:*

Fu Hualing, "Theft and Related Offenses", in D. Roebuck (ed) *The Criminal Law of Hong Kong: A Descriptive Text* (Beijing, Beijing University Press, 1995).

Fu Hualing, "Criminal Investigation", in D. Roebuck (ed) *The Criminal Procedure in Kong Kong: A Descriptive Text* (Beijing, Beijing University Press, 1996), pp. 46-87.

Fu Hualing, "Present and Future of Criminal Defence in China", In G.G. Wang (ed), *Recent Development in Chinese Law* (Hong Kong: Sweet & Maxwell, 1996).

Fu Hualing, "Criminal Procedure Law," in Wang Chengguang and Zhang Xianchu (eds.) *Introduction to Chinese Law* (Hong Kong, Sweet and Maxwell, 1997).

Fu Hualing, "The Right to Fair Trial in China" in Andrew Byrnes (ed) *The Right to Fair Trial in International & Comparative Perspective* (Centre for Comparative and Public Law, The University of Hong Kong, 1996).

Mark Gaylord and Fu Hualing, "Economic Reform and `Black Society': The Re-emergence of Organized Crime In Post-Mao China," in *Organized Crime*, Massimo Buscema and Stanley Eistein (eds.), (Office of International Criminal Justice, Chicago, 1999).

H L Fu, "The Form and Substance of Legal Interaction Between Hong Kong and Mainland China: Towards Hong Kong's New Legal Sovereignty", Raymond Wacks (ed.). *The New Legal Order in Hong Kong* (University of Hong Kong Press, 1999), pp 95-132.

R Cullen and H L Fu, "Chinese Constitutionalism: Will Politics always Trump Law?" in A. J. de Roo and R. W. Jagtenberg (eds.) *Yearbook of Law and Legal Practice in East Asia* 1999 Vol. 4 (Kluwer Law International).

H L Fu, "National Security in a Free Society: Understanding Article 23 of the Basic Law" in Steve Tsang (ed.) *Judicial Independence and the Law of Rule in Hong Kong* (University of Hong Kong Press, 2001), pp 73-98. A longer version of the police was published in (2000) 182 *Nagoya University Journal of Law and Politics*, pp. 35-76.

H L Fu, "Criminal Law" in Freshfields (ed.) *Doing Business in China* (New York: Juris, 2001, loose-leaf).

H L Fu, "Procuratorate" in Freshfields (ed.) *Doing Business in China* (New York: Juris, 2001, loose-leaf).

H L Fu, "People's Republic of China" *Encyclopedia of Crime and Justice* (2002).

H L Fu, "Supremacy of a Different Kind: The Constitution, the NPC and the Hong Kong SAR", in Johannes Chan, H L Fu and Yash Ghai (eds.) *The Constitutional Conflict: The Interpretation of the Basic Law* (University of Hong Kong Press, 2000, pp.97-112).

H L Fu, "Legal Relations between Kong Hong Kong and Mainland China" in Rubin Porter (ed.) *One Country, Two Systems in Transition*, (Routledge, 2002).

H L Fu, "After Dictatorship: The Nature and Function of the Police in Post-Mao China" in M. Amir and S Einstein, *Policing, Security and Democracy: Theory and Practice*, (Office of International Criminal Justice, USA, 2001) pp. 259-284.

5

Hualing Fu, "Shifting Landscape of Dispute Resolution in Rural China," in Jianfu Chen, Yuwen Li an dJan Michiel Otto (eds.) *Implementation of Law in the People's Republic of China* (Kluwer Law International, 2002).

Fu Hualing "Putting China's Judiciary into Perspective: Is it Independent, Competent and fair?" Erik Jensen & Tom Heller, (eds.) *Beyond Common Knowledge: Empirical Approaches to the Rule of Law* (Stanford University Press: 2003), pp. 193-219.

H L Fu and Pinky Choy, "Policing for Profit: Fiscal Crisis and Institutionalized Corruption of Chinese Police," in Stanley Einstein (ed.) *Policing, Security and Corruption* (Office of International Criminal Justice, USA, 2004).

Fu Hualing, "Punishing for Profit: Rehabilitation and Punishment in Chinese Laojiao Institution," Neil Diamond, Stanley Lubman, and Kevin O'Brien (eds.) *Engaging the Law in China: State, Society and Possibilities for Justice* (Stanford University Press, 2005).

Fu Hualing, "Counter-revolutionaries, Subversives, and Terrorists: China's Evolving National Security Law," in Fu Hualing, Carole Peterson and Simon Young (eds.) *National Security and Fundamental Freedoms: Hong Kong's Article 23 Under Scrutiny* (Hong Kong University Press, forthcoming 2005).

Fu Hualing, "Past and Future Offences of Sedition in Hong Kong" in Fu Hualing, Carole Peterson and Simon Young (eds.) *National Security and Fundamental Freedoms: Hong Kong's Article 23 Under Scrutiny* (Hong Kong University Press, 2005).

Fu Hualing and D W Choy, "Of Iron and Rubber? People's Deputies of Hong Kong to the National People's Congress," in Fu Hualing, Lison Harris and Simon Young (eds.) *The Struggle for Coherence: Constitutional Interpretation in Hong Kong* (Palgrave Macmillan, forthcoming 2007).

D W Choy and Fu Hualing, "Cross-border Relations in Criminal Matters", in Mark S. Gaylord, Danny Gittings and Harold Traver (eds.), *Introduction to Crime, Law and Justice in Hong Kong* (Hong Kong: Hong Kong University Press, 2009).

Fu Hualing, "Developing Rule of Law through Public Interest Litigation", in Stacy Mosher and Patrick Poon (eds.), *A Sword and a Shield: China's Human Rights Lawyers* (Hong Kong: China Human Rights Lawyers Concern Group, 2009), 129-140.

Fu Hualing (2009), "Access to Justice and Constitutionalism in China," in Stephanie Balme and Michael W. Dowdle, (eds.) Building Constitutionalism in China (New York: Palgrave Macmillan).

Fu Hualing, "Access to Justice in China: Potentials, Limits, and Alternatives", in John Gillespie and Albert Chen (eds.), *Legal Reforms in China and Vietnam: A Comparison of Asian Communist Regimes* (Routledge, 2010), Chapter 7.

Fu Hualing, "Institutionalizing Criminal Process in China," in Guanghua Yu (ed.) The Development of the Chinese Legal System: Change and Challenge (Routledge), 26-48.

Fu Hualing and Richard Cullen, "The Development of Public Interest Litigation in China" in Po Jen and Holning Lau (eds.) *Public Interest Litigation in Asia* (Routledge, 2011) 9-34.

Fu Hualing and Richard Cullen, "From Mediatory to Adjudicatory Justice: The Limits of Civil Justice Reform in China," in Margaret Y K Woo and Mary E Gallagher (eds.) Chinese Justice: Civil Dispute Resolution in Contemporary China (Cambridge, 2012), 25-58.

Fu Hualing, "Responses to Terrorism in China," in Victor V Ramraj, Michael Hor, Kent Roach and George Williams (eds.) Global Anti-Terrorism Law and Policy (2nd Edition) (Cambridge, 2012), 334-256.

"Autonomy, Courts and the Political-Legal Order in Contemporary China," in Cao Liqun, Ivan Sun and Bill Hebeton (eds.) Handbook of Chinese Criminology (Routledge, 2013), 76-88.

"Politicized challenges, de-politicized responses: political monitoring in China's transitions" in Fergal Davis,Nicola McGarrity and George Williams (eds.) *Surveillance, Counter-Terrorism and Comparative Constitutionalism* (Routledge, 2014), 296-312.

"The upward and downward spirals in China's anti-corruption enforcement," in Mike McConville and Eva Pils, (eds.) *Comparative Perspectives on Criminal Justice in China* (Edward Elgar, 2013), 390-410.

"Stability and Anticorruption Initiatives: Is There a Chinese Model?" in Susan Trevaskes, Elisa Nesossi, Sarah Biddulph and Flora Sapio (eds.) *The Politics of Law and Stability in China* (Edward Elgar, 2014).

"Mediation and the Rule of Law: The Chinese Landscape," in Joachim Zekoll, Moritz Balz, and Iwo Amelung (eds) *Formalization and Flexibilisation in Dispute Resolution*, (Brill, 2014).

"Wielding the sword: President Xi's new anti-corruption campaign," in Susan Rose-Ackerman and Paul Lagunes (eds.) Greed, Corruption, and the Modern State: Essays in political Economy, (EE Elgar, 2016), 134-160.


*Book Reviews:*

Fu Hualing, review of *Constitutional Law in China* by Lin Feng, (2001) 31 *Hong Kong Law Journal* 544-546.

Fu Hualing, review of *Bridging the Global Divide on Human Rights: A Canada-China Dialogue* edited by Eror P. Mendes and Anik Lalonde-Roussy (Aldershot: Ashgate, 2003) *Hong Kong Law Journal* 244-246.

Fu Hualing, review of China's Long March toward the Rule of Law by Randall Peerenboom, (Cambridge University Press, 2002) (2004) 34(1) *Hong Kong Law Journal* 205-208).

Fu Hualing, review of Borge Bakken. *Crime, Punishment, and Policing in China*. (2006) 186 *China Quarterly* 470-472.

Fu Hualing, review of *Rightful Resistance in Rural China* by Kelvin O'Brien and Lianjiang Li (Cambridge University Press, 2006), (2006) 16(12) *Law and Politics Book Review* 948-950 http://www.bsos.umd.edu/gvpt/lpbr/subpages/reviews/o'brien-li1206.htm.

Fu Hualing, review of *China's Death Penalty: History, Law and Contemporary Practices* by Hong Lu and Terance D. Miethe (2007) 192 *The China Quarterly* 1028-1030.

Fu Hualing, review of *Economic Analysis of Law in China* by Thomas Eger, Michael Faure and Zhang Naigen (eds.) (Cheltenham: Edward Elgar, 2007), (2008) 60 *The China Journal* 174-176.

Fu Hualing, review of China's Legal Soul: The Modern Chinese Legal Identity in Historical Context by John W. Head (Durham, North Carolina: Carolina Academic Press, 2009) (2009) 39 (2) *Hong Kong Law Journal* 561-563.

Fu Hualing, review of The Politics of Cross-Border Crime in Greater China: Case Studies of Mainland China, Hong Kong and Macao by Sonny Shiu-Hing Lo (Armonk, NY, and London: ME Sharpe, 2009) (2010) 201 *The CQ* 213-214.

Fu Hualing, review of Chinese Immigration Law by Guofu Liu (Farnham, UK, and Burlington, VT: Ashgate, 2011) (2012) 210 The China Quarterly.

*Reports:*

Fu Hualing, *Creating a Support Structure for Rights: Legal Aid and the Rule of Law in China* (A Report Prepared for the Asia Foundation, December 2005) http://www.asiafoundation.org/pdf/CH_legalaid.pdf.

David Geer and Fu Hualing, *Evaluation of Rule of Law Project in China* (A Report prepared for the British Foreign and Commonwealth Office, 2007).

Fu Hualing, *Multi-Country Review of Laws and Policies on HIV Testing and Counseling in East Asia and the Pacific, A Country Report : People's Republic of China* (A Report prepared for UNICEF EAPRO, June 2007).

Fu Hualing, *The Potential of Rights Advocacy in China: An Evaluation of the ABA Rule of Law Initiative in China* (June 2008).

Fu Hualing, Developing a Culture of Neutrality: Detention Centres as an Entry Point to Criminal Justice Reform in China (January, 2014).

**EXHIBIT  2**



**U.S. Department of Justice**

United States Attorney
District of Arizona

---

*Two Renaissance Square*          *Main:*  *(602) 514-7500*
*40 North Central Avenue, Suite 1200*   *FAX:*  *(602) 514-7650*
*Phoenix, Arizona   85004-4408*

August 11, 2017

Jon Sands
Gregory A. Bartolomei
Jami Johnson
Molly A. Karlin
Federal Public Defenders Office
850 W Adams St., Ste 201
Phoenix, AZ 85007

RE:   *United States v. Ahmed Alahmedalabdaloklah*
      CR-12-01263-PHX-NVW

Dear Counsel:

Pursuant to the order dated August 4, 2017, we are providing you with all information we have regarding the withdrawal of the Hong Kong witness.   In short, we have no information about why the Hong Kong witness decided to withdraw from the deposition.   We were surprised to learn from your pleadings that the deposition had been canceled because the Hong Kong witness had been contacted by the "government" and no longer wanted to participate.   To be abundantly clear, we did not direct, request, or suggest to anyone, that the Hong Kong witness should be contacted by any government.   It has always been our intent that you have the ability to depose your witness for the defense case and we are committed to finding a way to allow you to get her statements into trial.

We provide you with the following information to be transparent about the process we followed while making arrangements for the deposition:

On May 22, 2017, Melissa contacted the Executive Office for United States Attorneys (USAEO), the office in charge of official foreign travel, to seek assistance in obtaining permission to travel for the deposition.   Melissa learned that the requirements for travel included having to obtain/possess an official passport, having to fill out and submit a travel questionnaire, having to obtain a country clearance, and having to obtain concurrence from DOJ's Office of International Affairs (OIA).

1

On July 5, 2017, Melissa submitted to USAEO her request for an official passport and the Questionnaire for Official Foreign Travel (see Attachment A), as well as her request to OIA for approval/concurrence for official government travel.   (See Attachment B.)

On July 5-6, 2017, Frances Chang, the OIA attorney assigned to Hong Kong matters, advised Melissa that she felt OIA should notify the Hong Kong Department of Justice (HKDOJ) of the trip and intended activity because U.S. government personnel would be involved in the deposition.   Ms. Chang asked if she could share with HKDOJ the information in the questionnaire/application.   Melissa advised that the information could be shared with HKDOJ.

On July 7, 2017, Ms. Chang informed Melissa by email that HKDOJ had sent the following response regarding the deposition:

> The case below has raised a very interesting scenario and thank you for alerting us to it.   Given an AUSA and a FBI agent are going to come over to take deposition in a criminal matter, may I know whether any Hong Kong law enforcement authorities have been notified in case they want to be present in the process?   If not, would FBI consider notifying the Hong Kong Police. Although the US-HK MLAA is not engaged in this case, I would expect the Hong Kong Police would want to be informed if any foreign law enforcement authority is coming over in connection with the obtaining of evidence for a criminal matter.    Is it fine for you to provide us with a gist of the case and what the defence evidence is about?   If the details of the deposition taking arrangement is available, it would be nice to let us know.

Ms. Chang asked if there was additional information she could provide to HKDOJ.   She also asked whether the FBI Legal Attaché in Hong Kong should speak with Hong Kong law enforcement.   On July 7, 2017, the FBI Legal Attaché advised that he deferred communications with Hong Kong to Ms. Chang.   Thus, the FBI Legal Attaché did not contact the Hong Kong police or authorities.

On July 7, 2017, Melissa authorized Ms. Chang to release the following information to HKDOJ:

> The defense has arranged the deposition of a trial witness in Hong Kong.   She was an employee of the charged defendant during part of the timeframe relevant to the criminal charges.   We anticipate that she will testify that while she worked for the defendant he ran a legitimate business.   Her role is limited, and she is not charged in the case.   She has voluntarily agreed to the deposition.

Ms. Chang forwarded that information to HKDOJ, and on that same date Melissa received OIA concurrence that she could travel for the deposition.   The approval was forwarded to USAEO to support the application for a country clearance.

2

On July 12, 2017, Melissa asked Ms. Chang in an email whether she had heard back from Hong Kong, and asked for guidance on what should be conveyed if she was stopped when entering Hong Kong.  Ms. Chang responded that she had received no further inquiries from HKDOJ, so she assumed all was fine.  Ms. Chang informed Melissa that if stopped or asked, she should state the Mutual Legal Assistance at the International Law Division in the Hong Kong Department of Justice was aware of the visit.

On July 13, 2017, Ms. Chang forwarded to Melissa the following email she received overnight from HKDOJ:

> I have forwarded your email below to Hong Kong Police for
> consideration.    The police take issue with the taking of
> deposition, even though it is initiated by the defence, and consider
> that the intended process has gone beyond the scope of informal
> assistance at the law enforcement level.   The police object to the
> presence of foreign law enforcement officials in Hong Kong for
> the purposes of a foreign criminal matter.   In light of the
> comments, the US is required to either send Hong Kong a mutual
> assistance request to arrange taking of deposition or change the
> venue for obtaining deposition to a place outside Hong Kong.

On July 18, 2017, Melissa informed defense counsel that neither she nor her agent were permitted to travel to Hong Kong.  Melissa advised she would seek permission to participate in the deposition via VTC link in Phoenix (with the deposition still occurring in Hong Kong).  Jami indicated during a telephone call later that day that she still intended to travel to Hong Kong if the United States could participate in the deposition via VTC.

On the same date, Melissa and Bill spoke with OIA attorneys Frances Chang and Rosemary Yu, who agreed to seek clarification on whether the United States was permitted to participate via VTC.  On July 19, 2017, OIA advised Melissa that the prosecution could not participate in the deposition, even by VTC.  That same day, OIA attorney Rosemary Yu began reaching out to Thailand and Australia to see if the deposition might be taken in one of those countries.

On July 21, 2017, Bill sent defense counsel an email advising that if the defense proceeded with the deposition as planned, the United States was willing to forego opposing the admissibility of the deposition based on our inability to participate, although we reserved the right to make any standard evidentiary objections based on the questions asked and answers provided.  The United States also agreed to transport the defendant to the United States Attorney's Office (as with the other depositions), and to allow the defense to use the U.S. Attorney's office and facilities for the deposition.

On July 22, 2017, Bill sent a follow-up email advising defense counsel that the FBI was scheduled to transport the defendant to the U.S. Attorney's Office as originally planned.  He also requested IT information to establish the VTC connection between Hong Kong and the U.S. Attorney's Office.  That same day, Jami sent us an email advising that flights, hotel rooms, and conference rooms for the deposition had already been canceled.

3

Subsequently, we filed a joint request with the Court for an extension of time to complete the deposition and an order for transport of the defendant on August 1, 2017. We then began coordinating the facilities, transportation, and personnel needed to ensure that our office would be available for the deposition.   More specifically, we sent the new transport order to the FBI, provided Jami our IT contact officer's name to assist in establishing the VTC connection, and at your request, even provided the name and contact information for the videographer we had used for the other two depositions.   These coordinated efforts and communications extended throughout the weekend.

The first we knew of an issue with the deposition was on Monday, July 31, 2017, the day before the deposition, when we received Greg's email informing us that the deposition was not going forward and that he intended to file a motion to vacate the transport of the defendant.   To this date, the only information we have regarding the witness's withdrawal is the information set forth in the Motion to Vacate the Transport of the Defendant and the Supplement to Defendant's Motion to Continue Trial and to Reset Remaining Schedule Deadlines (Dkt. 363 and 373).

On August 7, 2017, Melissa asked OIA attorney Rosemary Yu what specifically OIA had conveyed to HKDOJ, and the reasoning behind the disclosure of such information.   In response, Ms. Yu provided the following in an email:

> When U.S. law enforcement officials travel abroad for official purposes, we respect the sovereignty of the foreign jurisdiction and notify them of the details regarding the purpose and reason for our anticipated presence, and seek their concurrence.   The United States expects the same of foreign law enforcement operating within U.S. soil.   Under U.S. law, the failure of "an agent of a foreign government" to provide prior notification to the Attorney General before acting in the United States in such a capacity is a criminal offense under 18 U.S.C. § 951, punishable by up to ten years' imprisonment.   Other foreign jurisdictions may have similar prohibitions.   In this instance, as part of a query regarding potential travel by a U.S. prosecutor on a defense request, OIA provided the name of the case, the name of the witness, name of the prosecutor who intended to travel, dates of proposed travel, and trial date. Although we typically provide a proposed location, it was still to be determined.   OIA, as the Central Authority of the United States on criminal legal assistance matters, communicated only with counterparts within the Central Authority of Hong Kong's Department of Justice.

Our office never provided OIA information regarding the timing of the second deposition.   On August 10, 2017, Ms. Yu confirmed that OIA never provided HKDOJ with the second deposition date.   She also confirmed that OIA's last communication with HKDOJ was on July 24, 2017, which predated the scheduling of the second deposition.

To be clear, we followed the required protocol and procedure for foreign travel, which included providing basic information about the case as shown in the attached questionnaires and

4

emails.   While we were required to provide the witness's name to USAEO and OIA as part of the foreign travel protocol, we did not provide any other contact information or identifying information of the witness.   Furthermore, we did not direct, request, or suggest in any way, that any Hong Kong or Chinese official approach or contact the witness.

      Please feel free to call us should you have any questions.

                    Sincerely yours,

                    ELIZABETH A. STRANGE
                    Acting United States Attorney
                    District of Arizona

                    *David A. Pimsner*

                    DAVID A. PIMSNER
                    Assistant United States Attorney

# Attachment A

## Karlen, Melissa (USAAZ)

| | |
|---|---|
| **From:** | Karlen, Melissa (USAAZ) |
| **Sent:** | Wednesday, July 5, 2017 12:27 PM |
| **To:** | USAEO-Foreign Travel |
| **Cc:** | Flores, Andrea (USAAZ) |
| **Subject:** | RE: Foreign Travel - Steps to Securing Official International Travel.docx.doc |
| **Attachments:** | Hong Kong Itinerary.pdf; Attachment 2 Questionnaire for Official Foreign Travel Fillable.pdf |

Katherine,
Thank you for all the information!

1.) I've attached the updated questionnaire for official foreign travel. No apologies needed, my fault for using an old form.
2.) I have a letter verifying my Acting US Attorney's approval for the travel.
3.) I've emailed OIA for approval and am awaiting a response.
4.) Attached as well, is my flight itinerary.

Please let me know if you need additional information, and/or if you wish me to send you the OIA approval email once received, and my Acting US Attorney's approval.

Melissa

**From:** USAEO-Foreign Travel
**Sent:** Wednesday, July 5, 2017 12:13 PM
**To:** Karlen, Melissa (USAAZ) ·                     ·; USAEO-Foreign Travel ·
**Cc:** Flores, Andrea (USAAZ) ·
**Subject:** RE: Foreign Travel - Steps to Securing Official International Travel.docx.doc

Hello Melissa,

Attached you'll find the up-to-date version of the questionnaire. Unfortunately the version that you sent stopped circulating back in May 2016. Please fill that out and send it back – apologies for the double work on that.

There is no visa required for Hong Kong so you're good on that front.

In addition to the questionnaire, you'll need ECC, OIA, and USA approval in addition to an approved flight itinerary. Please send me your flight itinerary asap so I can request ECC. When booking (if not done already), please make sure, whenever possible, that you are booked on a US based carrier as AUSAs (and all government employees) must adhere to the Fly America Act. If you have any questions on that please let me know.

If you need any other information in the meantime please let me know.

Best,
Katherine

**Katherine Bauer**
Contractor - Foreign Travel Analyst
Phone - +1
Executive Office for U.S. Attorneys

Washington DC, 20530

**From:** Karlen, Melissa (USAAZ)
**Sent:** Wednesday, July 05, 2017 2:01 PM
**To:** USAEO-Foreign Travel <
**Cc:** Flores, Andrea (USAAZ)
**Subject:** Foreign Travel - Steps to Securing Official International Travel.docx.doc

Good morning,
Please find attached my completed questionnaire for travel abroad on judicial assistance matters.  I need to travel to Hong Kong to conduct a deposition of a defense trial witness.  My intended dates of travel are July 25, 2017 to July 28, 2017.   I believe my next step in the process is this—obtaining OIA's approval to travel.

Please contact me at your earliest convenience so we can discuss any additional requirements before travel that might be time-sensitive (such as required shots, visas, etc.).  Apologies for the questions but this is my first time travelling internationally on official business.

Thank-you,
Melissa Karlen
                    (cell)
602-            (office)

**MELISSA B. KARLEN | Assistant U.S. Attorney**
**National and Border Security Division**
United States Attorney's Office
40 N. Central Ave., Ste. 1200, Phoenix, AZ  85004
Tel: 602-5          ax: 602-         Email:r

**PLEASE NOTE: The Department of Justice retains all email messages, and may be required to turn messages over to the defense if they contain case-related information the defendant is entitled to receive**

2

# Questionnaire for Official Foreign Travel

**United States Attorneys' Offices and the Executive Office for United States Attorneys**
**Last Revised: April 28, 2016**
A separate questionnaire is required for each EOUSA/USAO employee who is traveling.

| Part I. Traveler Information and Scope of Travel | | | |
|---|---|---|---|
| Full Name | | Office (e.g., EOUSA, USAO-ALN, etc.) | |
| Melissa Karlen | | USAO-AZ | |
| Position Title | | E-mail Address | |
| AUSA | | @usdoj.gov | |
| Telephone Number | | Departure Address (City and State) | |
| (602) | | Phoenix, Arizona | |
| Departure Date (from Home or Office) | | Return Date (to Home or Office) | |
| 07/25/2017 | | 07/28/2017 | |
| Country of Birth | USA | Place of Birth | |
| Foreign Locations | City | Province (if applicable) | Country |
| Destination 1 | Hong Kong | | Hong Kong |
| Destination 2 | | | |
| Destination 3 | | | |
| Destination 4 | | | |

| Question | YES | NO |
|---|---|---|
| Q1: Are you traveling to more than four destinations? If yes, attach an additional sheet listing the additional destinations. | ○ YES | ● NO |
| Q2: Have you completed your travel reservations? If yes, please attach a detailed flight itinerary, your lodging information, and any other transportation reservations. If no, please STOP and make your travel reservations before proceeding. | ● YES | ○ NO |
| Q3: Have you already obtained OIA's approval? If yes, please attach OIA's approval e-mail. If you are traveling for civil purposes, you do not need OIA's approval to travel. For others, submit a completed questionnaire to OIA to obtain approval. | ○ YES | ● NO |
| Q4: Do you have an official passport that is valid for at least six months from the date you will arrive in the foreign country? | ● YES | ○ NO |
| Q5: Have you submitted a request for an official passport to EOUSA and is the request currently pending? | ○ YES | ● NO |
| Q6: Has the Department of State granted you a waiver of the requirement for an official passport? If yes, please attach the State Department's e-mail granting a waiver. | ○ YES | ○ NO |

| Q7: Do any of your destinations require a visa for travel under an official passport? If applicable, submit the required materials to EOUSA to obtain visas prior to departure. | ◯ YES | ⦿ NO |
|---|---|---|

Q8: For the passport under which you will be traveling, please provide the following data:

| Passport Type (e.g., Tourist, Official) | Passport Issuing Country | Passport Number (note pending, if applicable) | Passport Expiration Date (note pending, if applicable) |
|---|---|---|---|
| Official | USA | | |

| Q9: Are you traveling to a high-threat area? | ◯ YES | ⦿ NO |
|---|---|---|
| Q10: Have you completed HTSOS training in the last five years?  If yes, please attach the training certificate if you are traveling to a high-threat area. | ◯ YES | ⦿ NO |
| Q11: Have you completed FACT training in the last five years? If yes, please attach the training certificate, if you are traveling to a high-threat area. | ◯ YES | ⦿ NO |
| Q12: What is your security clearance level? If you have access to TS-SCI, you must complete a DOJ-504 and provide it to your DOSM and receive a security briefing prior to departure. | ◯ Secret   ◯ Top Secret   ◯ TS-SCI   ◯ Other | |
| Q13: Do you plan to take any government-furnished equipment (including "bring your own device" equipment) out of U.S. territory?  If yes, submit a request to your IT Systems Manager. | ⦿ YES | ◯ NO |
| Q14: Will any travel expenses be paid for, or reimbursed, by a source external to the EOUSA/USAO community?  If yes, seek advance approval from GCO or RMP, as necessary. | ◯ YES | ⦿ NO |
| Q15: Do your travel arrangements include actual lodging expenses (i.e., lodging expenses in excess of OCONUS rates)? | ◯ YES | ⦿ NO |
| Q16: Do your travel arrangements include premium class travel (e.g., travel accommodations above coach class)? | ◯ YES | ⦿ NO |
| Q17: Have you already received country clearance from the State Department through the eCC system?  If yes, please attach the eCC notification that provides country clearance. | ◯ YES | ⦿ NO |
| Q18: EOUSA requests eCC country clearance for nearly all EOUSA and USAO travelers. The clearance is required prior to departure.  Shall EOUSA request eCC clearance for you? | ⦿ YES | ◯ NO |
| Q19:  If you do not have eCC authorization to travel, and you do not want EOUSA to request eCC clearance for you, what office is requesting eCC clearance on your behalf? Note that federal investigative agencies are not authorized to obtain eCC clearance on behalf of EOUSA or USAO attorneys. | | |

| Part II.  General Questions Applicable to All Foreign Travel |
|---|

**Q20:  Who is paying for the travel?**

USAO-AZ

**Q21: If foreign embassy personnel or consular or diplomatic officials have been consulted regarding travel, please provide their names, titles, organizations and contact information.**

N/A.

**Q22: If U.S. Embassy or consular personnel have been involved, please provide their names, titles, section, and contact information.**

N/A.

**Q23: If assistance from U.S. Embassy or consular personnel is required (e.g., a consular official to administer an oath) or if office space at an Embassy or consulate is required, please specify.  If the Embassy is coordinating lodging, please include your credit card information.**

N/A.

**Q24: If the assistance of a stenographer, court reporter, interpreter, or other service provider is required in the foreign country, please provide specific details about when and where services are required.  EOUSA will relay the request to the State Department in the eCC system.**

N/A.

**Q25: Please include any other comments or details that would help the Department of State ensure that difficulties do not arise.**

N/A.

**Q26:  I am traveling…**

○  Abroad to Attend a Conference or Training Event (Complete Part III)

◉  To a Country Other Than Canada on a Judicial Assistance Matter (Complete Part IV)

○  To Canada on a Judicial Assistance Matter (Complete Part V)

**Part III.  Additional Questions for Conferences and Training Events**

Q27: What is the name of the conference event or training program?

Q28: What is the purpose of the conference event or training program?

Q29: What is the specific venue name and address for the conference event or training program?

Q30: Who are the primary points of contact for the conference event or training program?  Please include contact information (e.g., organizations, telephone numbers, and email addresses).

**Part IV. Additional Questions for Travel to Countries Other Than Canada on Judicial Assistance Matters**

Q31: Please provide the names, titles, offices, districts, telephone numbers, and email addresses of the individuals traveling abroad with you for purposes of conducting investigations, interviews, depositions, inspections, etc.  Include all federal, state or local U.S. officials who intend to travel, as well as service providers who will be traveling with you (if applicable).

- Brittany Stephenson, FBI Special Agent, FBI District of Arizona, @ic.fbi.gov
- Jami Johnson, Deputy Public Defender, FPD District of Arizona, @fd.org
- Oscar Castillo, FPD Investigator, FPD District of Arizona, @fd.org

Q32: Please provide the case name, USAO number, and court docket number.

U.S. v. Alahmedalabdaloklah, CR 12-1263-PHX-NVW (ESW)

Q33: What is the nature of the case (explain briefly in lay terms)?  In what stage is the case? How sensitive is the case in your estimation?

Defendant is a Syrian national who resided in Iraq and China between 2006-2009. He is charged as being a part of a conspiracy to design/manufacture/use Improvised Explosive Devices against US military.

The case is charged and set for trial on October 3, 2017.

The case is sensitive.

**Q34:** What is the purpose of travel?  In particular, specify what will be accomplished during travel (e.g., interviewing witnesses, taking depositions, etc.).

Deposition of defense trial witness.

**Q35:** Please list the names and nationalities of persons to be interviewed or deposed, including addresses and telephone numbers if available.

Guo Xu (aka "Gogo").  She is a Chinese national who worked for the defendant when he resided in China.

**Q36:** Is the prosecution of a foreign national foreseen?  If so, provide name and nationality.

Defendant is a foreign national.  Alahmedalabdaloklah (Syrian born/ has Iraqi passport and status)

**Q37:** Is a host country government official to be deposed or interviewed?  Please provide name, title, and whether the person has been contacted and has agreed to participate.

N/A.

**Q38:** Have foreign authorities (e.g., INTERPOL, foreign police) cleared the visit and are foreign authorities prepared to cooperate?  Please explain in detail and reference the names, titles, and telephone numbers of the foreign contacts.

N/A.

| **Part V. Additional Questions for Travel to Canada on Judicial Assistance Matters** |
|---|
| Q39: Please provide the names, titles, offices, districts, telephone numbers, and email addresses of the individuals traveling abroad with you for purposes of conducting investigations, interviews, depositions, inspections, etc.  Include all federal, state or local U.S. officials who intend to travel, as well as service providers who will be traveling with you (if applicable). |
| |
| Q40: Please provide the case name, USAO number, and court docket number. |
| |
| Q41: Briefly explain the background of the case (including the nature of the case, stage of the case, special sensitivities associated with the case, and how much money is involved). |
| |
| Q42: What is the purpose of travel?  In particular, specify what will be accomplished during travel (e.g., interviewing witnesses, taking depositions, etc.).  Include the dates and times of the interviewing, investigating or other activities.  Why is travel to Canada necessary? |
| |

Q43: Names of persons to be interviewed or deposed, including dates of birth, nationality and citizenship, phone numbers, and home or business address for each witness and any other pertinent information that may assist in locating them. **If this information is unavailable, DFAIT will not grant clearance.**

Q44: Provide confirmation that the interviews or depositions are voluntary and provide the contact information for the persons who have contacted the witnesses/suspects (e.g., Royal Canadian Mounted Police).

Q45: Provide the name and contact information for any legal representative(s) who may take part in the proceedings, as well as that of their firm/organization.

Q46: If the prosecution of a foreign national is foreseen, please provide name and nationality.

Q47: If a Canadian government official is to be deposed or interviewed, provide name, title, and whether the person has been contacted and has agreed to participate.

Q48: If INTERPOL, Canadian law enforcement, or another Canadian authority has cleared the visit or if Canadian authorities are otherwise prepared to cooperate, explain in detail including names, titles, and telephone numbers of the Canadian contact(s).

The completed questionnaire and attachments (e.g., itinerary, training certificate), should be:
- Emailed to OIA to obtain OIA's approval for foreign travel (unless OIA approval has already been obtained or unless travel is for civil purposes only)
- Emailed to EOUSA (using the USAEO-Foreign Travel Mailbox)
- Included as an attachment to the foreign travel authorization in E2 Solutions.

If you have any questions about foreign travel, please contact the EOUSA RMP Travel Unit by emailing USAEO-Foreign Travel or by calling

Carlson
Wagonlit
Travel   SatoTravel.

**Your Itinerary**

---

**Trip on Jul 25, 2017**                     Locator: **JCUWXC**        Date: **Jul 05, 2017**

| | |
|---|---|
| Traveler | **MELISSA B KARLEN** |
| | DOJE2 |
| | ATTN-MELISSA KARLEN |
| | |
| | USA |
| | ALL MCO‡S MUST BE MAILED TO. |
| | STEFFANY RIVERA-SMITH |
| | EOUSA |
| | |
| | WASHINGTON, DC 20530 |
| | THIS IS AN ITINERARY ONLY |
| | AND NOT A VALID TICKET OR RECEIPT |
| Customer Number | 643SR7F |
| Agent | EB |

---

\*THIS DOCUMENT BECOMES AN INVOICE WHEN THE PASSENGER
\*NAME/INVOICE AND TICKET NUMBERS APPEAR
\*IN THE PRICING BOX
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*TICKET PURCHASE WITH CA.......

---

**Tuesday, July 25, 2017**                              Confirmation

 **Flight AMERICAN AIRLINES 2996**

DEPARTURE                                        ARRIVAL
**PHOENIX, AZ**                                  **LOS ANGELES,CA**
**5:40 AM, Jul 25, 2017**                        **7:11 AM, Jul 25, 2017**

| | |
|---|---|
| Status | Confirmed |
| Class | Coach Class - G |
| Duration | 01:31 (Non-stop) |
| Equipment | CRJ-700 Canadair Reg Jet |
| Meal Service | None |
| Notes | DEP-TERMINAL 4 |
| | \*PHX-LAX OPERATED BY SKYWEST AIRLINES AS AMERICAN EAGLE |
| | ONEWORLD |

---

**Tuesday, July 25, 2017**                              Confirmation

 **Flight AMERICAN AIRLINES 8940**

DEPARTURE                                        ARRIVAL
**LOS ANGELES,CA**                               **HONG KONG**
**9:25 AM, Jul 25, 2017**                        **3:25 PM, Jul 26, 2017**

| | |
|---|---|
| Status | Confirmed |
| Class | Coach Class - V |
| Duration | 15:00 (Non-stop) |
| Equipment | 77W |
| Meal Service | Breakfast, Dinner |
| Reserved Seats | 39A |
| Notes | DEP-TOM BRADLEY INTL TERM |
| | ARR-TERMINAL 1 |
| | \*LAX-HKG OPERATED BY CATHAY PACIFIC AIRWAYS |
| | ONEWORLD |

---

**Wednesday, July 26, 2017**                            Confirmation



**Hotel JW MARRIOTT HOTEL HONG KONG**

LOCATION
**PACIFIC PLACE 88 QUEENSWAY**
**HONG KONG CN 00000       , HK**

CONTACT
Tel 852-28-108366
Fax 852-28450737

| | |
|---|---|
| Reserved For | MELISSA B KARLEN |
| Status | Confirmed |
| Check-In | Jul 26, 2017 |
| Check-Out | Jul 28, 2017 |
| Number of Rooms | 1 |
| Rate | HKD 2,500.00/night |
| Cancellation Policy | Cancel 1 day prior |
| Directions | DIRECTION TO THE PROPERTY FROM AIRPORT HKG - TRAVEL WEST TO SOUTH RUNWAY ROAD AND TURN RIGHT. PROCEED TO SOUTH PERIMETER ROAD AND TURN LEFT. TAKE THE SECOND EXIT AT THE ROUNDABOUT ONTO CHUN WAN ROAD. AT THE CHUN WAN ROAD INTERCHANGE TAKE THE THIRD EXIT ONTO THE AIRPORT ROAD RAMP. MERGE ONTO AIRPORT ROAD/LANTAU LINK. AT THE NW TSING YI INTERCHANGE CONTINUE ONTO CHEUNG TSING HIGHWAY, TSING KWAI HIGHWAY AND WEST KOWLOON HIGHWAY. FROM WEST KOWLOON HIGHWAY TAKE EXIT A AND MERGE ONTO ROUTE 4. TRAVEL TO EXIT 10 TOWARD QUEENSWAY. TURN RIGHT AT COTTON TREE DRIVE. MAKE A SLIGHT LEFT AT QUEENSWAY AND A SLIGHT LEFT AGAIN ONTO THE RAMP. KEEP RIGHT AT THE FORK IN THE ROAD. // MTR SUBWAY - TAKE THE TURQUOISE LINE // AIRPORT EXPRESS - TAKE THE BUS TO CENTRAL HONG KONG AND CONNECT WITH THE BLUE LINE. STAY |

---

**Friday, July 28, 2017**                                                  Confirmation



**Flight AMERICAN AIRLINES 192**

DEPARTURE
**HONG KONG**
**6:45 PM, Jul 28, 2017**

ARRIVAL
**LOS ANGELES,CA**
**5:35 PM, Jul 28, 2017**

| | |
|---|---|
| Status | Confirmed |
| Class | Coach Class - V |
| Duration | 13:50 (Non-stop) |
| Equipment | 77W |
| Meal Service | Lunch, Snack |
| Reserved Seats | 40L (Window) |
| Notes | DEP-TERMINAL 1 |
| | ARR-TOM BRADLEY INTL TERM |
| | ONEWORLD |

---

**Friday, July 28, 2017**                                                  Confirmation

**Flight AMERICAN AIRLINES 613**

DEPARTURE
**LOS ANGELES,CA**
**7:25 PM, Jul 28, 2017**

ARRIVAL
**PHOENIX, AZ**
**9:00 PM, Jul 28, 2017**

| | |
|---|---|
| Status | Confirmed |
| Class | Coach Class - G |
| Duration | 01:35 (Non-stop) |
| Equipment | Airbus Jet |
| Meal Service | None |
| Reserved Seats | 32F (Window) |
| Notes | ARR-TERMINAL 4 |
| | ONEWORLD |

---

| Name | Invoice / Ticket / Date | Base | Tax 1 | Tax 2 | Tax 3 | Total |
|---|---|---|---|---|---|---|
| | | USD 1,262.00 | 36.00US | 5.50YC | 10.96XT | 1,380.86 |
| | | | | | **Total Amount** | **1,380.86** |

Form of Payment: CAXXXXXXXXXXXX9720

Attachment B

## Karlen, Melissa (USAAZ)

| | |
|---|---|
| **From:** | Karlen, Melissa (USAAZ) |
| **Sent:** | Wednesday, July 5, 2017 11:53 AM |
| **To:** | Chang, Frances (CRM); Yu, Rosemary (CRM) |
| **Subject:** | Official travel abroad to Hong Kong |

Hello,

I'm writing to obtain OIA approval to travel to Hong Kong on official business between July 25, 2017 and July 28, 2017.  I am travelling to conduct a deposition of a defense witness for trial.  The case is U.S. v. Alahmedalabdaloklah, CR 12-1263-PHX-NVW (ESW).  Our criminal trial is scheduled for October 3, 2017.

Defendant is a Syrian national who resided in Iraq and China between 2006-2009. He is charged as being a part of a conspiracy to design/manufacture/use Improvised Explosive Devices against US military.

Deposition is of a Chinese national (Guo Xu aka "Gogo"), who worked for defendant during the time frame relevant to our case.

Please let me know if there is any additional information you need.

Melissa

(cell) 602

(office) 602·

**MELISSA B. KARLEN | Assistant U.S. Attorney**
**National and Border Security Division**
United States Attorney's Office
40 N. Central Ave., Ste. 1200, Phoenix, AZ  85004
Tel: 602-· ,       Fax: 602-       · | Email:.