# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-12-01263-001-PHX-ROS |
| Plaintiff, | **ORDER** |
| v. | |
| Ahmed Alahmedalabdaloklah, | |
| Defendant. | |

The parties disagree on the admissibility of certain expert testimony. As set forth below, many of the parties' disagreements involve questions of weight, not admissibility, of that testimony. But, at present, it appears some of the government's expert witnesses are attempting to offer overly broad testimony that is also repetitive. Moreover, the government's witness regarding the origins and goals of the 1920 Revolution Brigades ("Brigades") may not have a reliable basis for the opinions he plans to offer. And finally, one of Defendant's experts does not appear qualified to offer all of the testimony Defendant has proposed. Therefore, the Court is inclined to limit the expert testimony as set forth below.

**I. General Standard**

Federal Rule of Evidence 702 allows for the admission of expert testimony "if the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; (1) it is based upon sufficient facts or data; (2) it is the product of reliable principles and methods; and (3) the expert has applied the principles and methods reliably

to the facts of the case." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In practice, however, the admissibility inquiry is much less mechanical than this framework suggests. The inquiry is "flexible" and admissibility must be evaluated under "the particular circumstances of the particular case." *Id.* "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* The ultimate goal is to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Id.*

## II. Government's Experts

According to the parties' briefing, Defendant objects to six of the government's expert witnesses. Those witnesses fall into three categories. First, there are witnesses who will testify regarding the political and military situation in Iraq at the relevant time. Second, there are engineering experts who will testify about the electronic evidence. And third, there is a witness who will testify about the Brigades' "origins, ideology, leadership, tactics and strategy, and relationship with other insurgent groups in Iraq." (Doc. 560 at 22-23). The following represents an overview of the evidence each witness plans to offer, the basis on which Defendant objects, and the Court's current view of that witness's planned testimony.

### A. Political and Military Experts

#### i. David Kilcullen

Dr. David Kilcullen is a retired Australian military officer with a doctorate degree in "political anthropology of insurgent and terrorist groups and counterinsurgency methods in Indonesia." (Doc. 560 at 6). In 2007, Dr. Kilcullen served as "Senior Counterinsurgency Advisor" to the Multi-National Force in Iraq. And in 2008, he served as "Special Advisor for Counterinsurgency to the U.S. Secretary of State." (Doc. 560-1 at 4). Dr. Kilcullen has authored five books as well as numerous articles regarding counterinsurgency tactics. The government plans on calling Dr. Kilcullen to offer opinions regarding "[c]ombat strategies of certain insurgent groups, including the 1920

Revolution Brigades," the goals and strategies of the Brigades, and the fact that "IEDs were continuously adapted to prevent the United States from developing effective countermeasures." (Doc. 560 at 7).

The government explains Dr. Kilcullen's opinions are relevant and reliable because he has first-hand experience with the conditions in Iraq. Based on that experience, as well as his education and training, the government offers Dr. Kilcullen as "an expert in the field of counterinsurgency strategy." (Doc. 560 at 8). Dr. Kilcullen will testify that "[b]asic tenets of counterinsurgency strategy and theory explain why the 1920 Revolution Brigades sought to drive a wedge between the Iraqi people and the U.S. military." (Doc. 560 at 8).

Defendant concedes Dr. Kilcullen can testify "about what he personally knows about the 1920 Revolution Brigades" but Defendant objects to any testimony beyond that. In particular, Defendant does not believe Dr. Kilcullen should be permitted to testify about "insurgent groups" in general. Moreover, Defendant claims there has never been adequate disclosure of how Dr. Kilcullen learned anything about the Brigades in particular.

At present, Dr. Kilcullen appears qualified to offer testimony regarding the Brigades such as their tactics and goals assuming he has first-hand knowledge of those topics. But his testimony will be limited to the Brigades. That is, Dr. Kilcullen will not be permitted to offer general testimony about "insurgent groups" and what "insurgent groups" were attempting to accomplish in Iraq. In addition, Dr. Kilcullen will not be permitted to offer lay testimony regarding his general experiences working with General Petraeus or the numerous groups associated with IED attacks. (Doc. 560 at 9). That testimony is not relevant to this case and, even if it were, the prejudicial impact of such testimony would outweigh its probative value. Fed. R. Evid. 403.

### ii. Colonel Kurt J. Pinkerton

Colonel Kurt J. Pinkerton is a "highly-decorated officer" with the United States Army. He served as a Battalion Commander in the Abu Ghraib area from October 2006

to October 2008 and from January 2009 to January 2010. In that position, he had daily contact "with soldiers and the situations they faced and experienced." The government plans to elicit testimony from Colonel Pinkerton that the Brigades, and other groups, were active in the Abu Ghraib area. The government will also have Colonel Pinkerton "testify about common tactics, patterns, and weapons" such groups used. Finally, Colonel Pinkerton is expected to explain the "different types of IED detonators" used, including when and where DTMF boards were used, and how detonators evolved over time.

According to the government, Colonel Pinkerton is qualified to offer this testimony based on his "military training and experience." He allegedly has "developed specialized knowledge in the field of tactics used by insurgent groups."

Defendant objects to any testimony from Colonel Pinkerton because the government allegedly has not disclosed how Colonel Pinkerton knows anything about the Brigades and its tactics. Moreover, Defendant claims the government has not disclosed how Colonel Pinkerton has any specialized knowledge regarding the different type of IEDs used.

Colonel Pinkerton's knowledge and experience may qualify him to offer some expert opinions but the opinions identified by the government appear to involve general insurgent groups, not merely the Brigades. Colonel Pinkerton likely can testify about the Brigades but likely cannot offer general opinions about various groups. To the extent Colonel Pinkerton wishes to offer testimony regarding the Brigades in particular, that testimony appears to be duplicative of Dr. Kilcullen's. Thus, expert testimony from Colonel Pinkerton, at present, appears unnecessary.

Colonel Pinkerton's proposed lay testimony also suffers from serious flaws. According to the government, Colonel Pinkerton will offer testimony about the "general conditions in Iraq," the Malaki Administration, how the Iraqi police operated, and how the Iraqi judicial process worked. None of this testimony appears relevant to the present case. The only portion of the proposed lay testimony that might be admissible is Colonel

1 Pinkerton's possible interactions with the Brigades. Assuming those interactions were first-hand, Colonel Pinkerton may be permitted to testify about them. (Doc. 560 at 13).

### B. Engineering Experts

The government plans on calling three electrical engineering experts. Defendant has six general objections to these witnesses. First, Defendant claims the government will not be able to lay an adequate foundation and chain of custody for the electronic components allegedly found in the Omar Street site. Because those components are the basis for the experts' testimony, Defendant believes all the testimony is not based on reliable information. Second, Defendant believes it is unnecessary to have three witnesses provide substantially similar testimony. Third, the experts' planned testimony that the Omar Street site was an "IED factory" is conclusory and not based on sufficient facts and data. Fourth, none of the experts had experience with the "non-nefarious electronics market in Iraq," meaning they cannot testify about the Omar Street site as consistent with nefarious or non-nefarious intentions. Fifth, the testimony rests on analyses performed by other individuals and it would violate Defendant's confrontation rights not to allow him to cross-examine the individuals who conducted the analyses. And sixth, the government did not timely disclose these opinions.

Most of these preliminary objections are insufficient, at present, to exclude the engineering experts. The government represents that it will be able to overcome foundation and chain of custody issues and, at present, the Court cannot assess whether that is true. Similarly, the proposed testimony that the Omar Street site was an "IED factory" or that it was inconsistent with non-nefarious electronics will depend on the exact contents of the experts' opinions and the basis on which those opinions are based. It appears likely the experts have sufficient familiarity with IEDs such that they will be qualified to offer opinions regarding the likely intent of the components found at the Omar Street site. Next, Defendant's confrontation rights will not be violated by expert testimony merely because the experts' opinions are based on the work of others, in compliance with Federal Rule of Evidence 703. Finally, the disclosures were sufficiently

timely. The only general objection that may have merit involves the potentially duplicative nature of the testimony.

Defendant is correct that the engineering witnesses seem likely to offer substantially similar, if not completely duplicative, testimony. The government will not be allowed to present multiple experts merely to have them offer the same opinions. The government may need to eliminate one or more of their engineering experts to avoid any duplication.

### i. Christopher Graham

Christopher Graham obtained his Bachelor's and Master's degrees in Electrical Engineering. From 2006-2010, he worked as a "forensic engineer and scientific advisor" with the Department of Defense in Iraq and Afghanistan. In 2006-2007, Mr. Graham was the "Lab Manager for the Combined Explosive Exploitation Cell" where he examined and analyzed the electronics that were being used in IEDs. Mr. Graham will offer testimony regarding how RCIEDs operate and the importance of DTMF technology. He will also explain how printed circuit boards are made. And finally, he will testify about the material found in the Omar Street apartment and that the material was "capable of being used in RCIEDs." (Doc. 560 at 15).

According to the government, Mr. Graham is qualified to offer this testimony through his "training and career investigating electrical circuits and electronics" but also through his particular experience working with the electrical portions of IEDs. Defendant agrees Mr. Graham is qualified to offer certain opinions and Defendant does not object to having Mr. Graham "explain to the jury the parts of an RCIED and how they work together." (Doc. 575 at 32). But Defendant does object to a video created by Mr. Graham allegedly explaining the operation of IEDs. Defendant claims that video is unduly prejudicial and misleading in that it depicts explosions despite there being no direct link between Defendant and explosive material. Defendant also believes some of Mr. Graham's opinions were not timely disclosed and one opinion is so imprecise as to be unintelligible. (Doc. 575 at 36).

Having reviewed Mr. Graham's training, knowledge, and experience, as well as his planned testimony, his testimony appears admissible. Mr. Graham has substantial experience working with RCIEDs and is qualified to explain to the jury how RCIEDs operate. The admissibility of his video, however, will be determined upon review of the video. And the alleged unintelligibility of Mr. Graham's opinions is a flaw for cross-examination, not exclusion.

### ii. Steven J. Luhowy

Steven Luhowy obtained Bachelor's degrees in General Science and Electrical Engineering and spent twenty-eight years in the United States Army. From January 2006 through July 2007, Mr. Luhowy worked in Iraq "as an engineer analyzing RCIEDs." (Doc. 560 at 17). He was in Iraq at other times as well, such that he has spent a total of three years "analyzing the electronics of IEDs." Mr. Luhowy will offer testimony that the "Omar Street site was an IED switch factory" and the type of devices found at that site were used in RCIEDs. In addition, Mr. Luhowy will testify a manual found at that site explained how to use "DTMF technology for detonation devices." (Doc. 560 at 17).

The government believes Mr. Luhowy is qualified to offer this testimony based on his experience analyzing IEDs in Iraq. That experience resulted in Mr. Luhowy having "specialized knowledge . . . how RCIEDs operated." (Doc. 560 at 18).

Defendant objects to Mr. Luhowy's testimony because there is an insufficient basis for Mr. Luhowy "to attribute nefarious purpose" to the objects found at the Omar Street site. (Doc. 575 at 38).

Mr. Luhowy appears qualified based on his knowledge and experience to testify about RCIEDs but it is unclear whether he is qualified to offer the opinions the government plans to elicit. Mr. Luhowy plans to testify the Omar Street site was an "IED switch factory." This appears to be based on his opinion that the type of boards found at that site "were not sold commercially in Iraq or elsewhere." (Doc. 560 at 18). The government has not clearly identified the basis for Mr. Luhowy's knowledge regarding the commercial market in Iraq. And absent some indication of such knowledge, Mr.

Luhowy's ability "to attribute nefarious purpose" to the Omar Street site may not be admissible.

### iii. Steven J. Malloy

Steven J. Malloy has a Bachelor's degree in Electrical Engineering and a Master's degree in Computer Science. Mr. Malloy has worked for the FBI for twenty-one years and currently works as the Technical Director for the FBI's Terrorist Explosive Device Analytical Center. Since 2004, Mr. Malloy has analyzed electronics from IEDs found in Iraq. He has tested "hundreds of electronic circuit boards" and he "routinely consults with explosive experts in other government agencies." Mr. Malloy will offer testimony that the "Omar Street location was an IED electronics factory." (Doc. 560 at 19). He will also testify the material found at that site includes "custom-made circuit boards" that "matched those found at two post-blast IED events." (Doc. 560 at 19). Mr. Malloy will explain a "decoder circuit" found at the Amiriyah Cache with Defendant's fingerprint on it was an IED switch. Finally, Mr. Malloy will testify that a "custom circuit decoder design" found in an email belonging to Defendant is "identical to documents and the tracings on circuit boards" found at the Rabie Cache. The Rabie Cache allegedly contained "the majority of the components found in a parts list that was emailed to an email account attributed to the Defendant." (Doc. 560 at 20).

The government believes Mr. Malloy is qualified to offer this testimony based on his years of experience analyzing "electrical circuits and electronics suspected as being involved with IEDs." (Doc. 560 at 21).

Defendant believes Mr. Malloy's testimony is inadmissible regarding the "match" between the material found at the Omar Street and the two IED explosions. Moreover, Defendant contends the government has never disclosed any basis for linking Defendant to the Rabie Cache, meaning Mr. Malloy's testimony regarding the link between Defendant and the Rabie Cache is inadmissible.

Mr. Malloy appears qualified to offer opinions regarding the electronics of IEDs but some of his planned testimony appears duplicative. Mr. Malloy plans to testify the

Omar Street site was an "IED electronics factory" which seems to be the same as Mr. Luhowy's testimony that the site was an "IED switch factory." Purely duplicative testimony will not be allowed. In addition, it is unclear what Mr. Malloy means by claiming boards found at the Omar Street site "matched" those found at two bombings. Given the government's acknowledgement that it will not seek to link Defendant to those bombings, it is difficult to determine whether testimony of a "match" should be admitted. As for Mr. Malloy's planned testimony regarding the Amiriyah Cache and Rabie Cache, that testimony appears admissible subject to the government linking Defendant to those caches

### C. 1920 Revolution Brigades Expert

The government wishes to call Evan F. Kohlmann as an expert on "terrorist and insurgent groups," including the Brigades. Mr. Kohlmann has a Bachelor's degree in International Politics as well as a J.D. Mr. Kohlmann currently works as a "private International Terrorism Consultant" and is the "Chief Innovation Officer" at a "risk-intelligence firm" in New York City. (Doc. 560 at 21). His work consists of gathering information and authoring "intelligence reports and analysis" regarding the risks clients face from "international criminal organizations." Mr. Kohlmann will offer testimony regarding the Brigades' "origins, ideology, leadership, tactics and strategy, and relationship with other insurgent groups." In addition, he will testify the Brigades' "primary goal . . . was to drive the so-called 'occupation forces' from Iraq." (Doc. 560 at 23). Mr. Kohlmann will opine the Brigades pursued this goal through IED attacks. Finally, Mr. Kohlmann will explain the Brigades' leadership structure.

The government believes Mr. Kohlmann is qualified to offer this testimony based on his experience gathering information about terrorist groups and application of "comparative analysis." That term refers to studying primary, secondary, and tertiary sources. "By comparing and analyzing" this source material, Mr. Kohlmann determines "a commonly accepted narrative that explains a terrorist group's history." (Doc. 560 at 26).

Defendant objects to Mr. Kohlmann's testimony as based on nothing more than "downloading and cataloging online terrorist postings with the assistance of a translator." (Doc. 575 at 71). This purported methodology is not, according to Defendant, a reliable basis for any of Mr. Kohlmann's opinions in this case. In particular, Defendant claims Mr. Kohlmann has no direct sources regarding the Brigades and it has never been clear how, exactly, Mr. Kohlmann knows anything about the Brigades. Defendant also contends that, to the extent the government has identified a basis for Mr. Kohlmann's testimony, it consists entirely of hearsay statements that would not be admissible. Thus, Defendant believes the government is using Mr. Kohlmann merely to introduce large amount of hearsay evidence.

Despite the government's insistence that Mr. Kohlmann is routinely qualified as an expert, it is not clear he is qualified or sufficiently knowledgeable about the issues in this case to allow him to offer expert testimony. The government claims Mr. Kohlmann conducted a "comparative analysis" to develop a "profound understanding" of the Brigades. But the "comparative analysis" performed here seems to consist entirely of downloading information from the Internet and forming opinions. The only attempt at primary source research was an alleged interview of a "former official of the 1920 Revolution Brigades." But Defendant claims the government has never identified who that individual was or how Mr. Kohlmann knew he was an "official" in the Brigades. (Doc. 581 at 24; 575 at 66). Thus, Mr. Kohlmann's "comparative analysis" in the present case may not have included any primary sources.

As for secondary sources, Mr. Kohlmann's approach may be sufficient for some groups but his opinions appear to be based on a relatively sparse number of sources. As described by Defendant, the secondary sources are a few "internet sources of seriously questionable reliability" as well as some of the emails from the present case. Such a sparse record of secondary sources casts substantial doubt on the reliability of Mr. Kohlmann's method regarding the Brigades. And finally, Kohlmann does not appear to identify any tertiary sources, *i.e.* academic papers, addressed specifically to the opinions

he plans on offering of the Brigades.

In sum, Kohlmann's method in this case appears to have consisted of extrapolating a detailed and coherent story of the Brigades' history, culture, goals, and operations from a few sources of unknown quality. That appears close to the "nonsense opinions" the Court is required to exclude. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Accordingly, to the extent the government insists on Mr. Kohlmann testifying, it must offer a substantially more compelling case that his methods and procedures have resulted in reliable opinions regarding the Brigades. The fact that Mr. Kohlmann may be knowledgeable regarding other similar groups is not enough. Defendant is not alleged to have been a member of any other group and the government will not be allowed to use Mr. Kohlmann's expertise regarding other groups as the justification for introduction of unreliable opinions regarding the Brigades.

### III. Defendant's Experts

Defendant plans on calling four expert witnesses. The government objects to all of these based on Defendant's alleged failure to provide adequate disclosures for each witness. But beyond those unconvincing objections, the government seeks exclusion of only one of the witnesses who Defendant plans to use as an expert on Iraqi culture.

Taisir El-Qoulaq was born in Palestine, grew up in Syria, but traveled to the United States for college. Mr. El-Qoulaq has lived in the United States for the past forty years. Mr. El-Qoulaq has a Bachelor's degree in Electrical Engineering and a Master's degree in Economics. From 2004 to 2009, Mr. El-Qoulaq lived in Baghdad, and from 2006 through 2009, Mr. El-Qoulaq worked as the Chief of Staff for the United States Department of the Treasury. While in Baghdad, Mr. El-Qoulaq "was frequently called upon to serve as a cultural liaison and cultural consultant to the American military." (Doc. 573 at 6). In that role, Mr. El-Qoulaq "gained familiarity with local political movements and the dynamics between and among various political, social, and cultural groups in Iraq." (Doc. 573 at 7). Mr. El-Qoulaq will offer testimony regarding the "history of Syrian refugees in Iraq" and the "profound culture of distrust among the Iraqi

people" that grew up as a result of the rule of Saddam Hussein. Based on that culture of distrust, the "Brigades tended to select members very carefully" and it is "implausible" that Defendant, a Syrian national, "would have been allowed to be a member of the [Brigades]." (Doc. 573 at 8). Moreover, individuals in Iraq often falsely identified others as members of certain groups "to settle longstanding inter-tribal, inter-familial, or inter-cultural feuds." (Doc. 573 at 8).

The government argues Mr. El-Qoulaq is not qualified to offer opinions regarding Iraqi culture. (Doc. 580 at 10). In particular, Mr. El-Qoulaq allegedly has no meaningful knowledge or experience regarding Iraqi culture before 2004 and, therefore, he cannot offer any opinions about the history of Syrian nationals in Iraq. As for the testimony regarding the "culture of distrust," the government believes Mr. El-Qoulaq has not identified the methodology he used to arrive at this opinion. Instead, this opinion appears to be a "sweeping generalization" that is not admissible as an expert opinion. (Doc. 580 at 11).

Beyond its concerns regarding the factual basis and reliability of Mr. El-Qoulaq's proposed testimony, the government also argues his testimony is inadmissible under Rule 403 because "it is so tinged with ethnic bias and stereotyping." (Doc. 580 at 12). An opinion that Iraqis, in general, made false reports regarding individuals' membership in groups allegedly implies that, as an Iraqi, Jamal Al-Dhari, must have been lying when he stated Defendant was a member of the Brigades. The government believes that testimony would "invite the jury to distrust [Mr. Al-Dhari] by invoking an ethnic, national stereotype." (Doc. 580 at 13). Finally, the government contends Mr. El-Qoulaq's testimony is inadmissible because it is nothing other than an attack on Mr. Al-Dhari's credibility.

Mr. El-Qoulaq appears qualified to offer certain testimony based on his time in Iraq. But Defendant has not identified how Mr. El-Qoulaq would be qualified to speak to Iraqi history in general or the history of Syrian refugees in particular. It appears that Mr. El-Qoulaq may have knowledge regarding the Brigades in particular, such as their

operations and the manner in which individuals could become members.  Such testimony appears relevant and, provided Mr. El-Qoulaq can proffer a basis for that testimony, it likely is admissible.  The government is correct, however, that Mr. El-Qoulaq is not entitled to invoke stereotypes of Iraqis in an attempt to undermine the credibility of government witnesses.

Dated this 21st day of December, 2017.

                                        Honorable Roslyn O. Silver
                                        Senior United States District Judge