UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-12-1263-PHX-ROS |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | January 30, 2018 |
| Ahmed Alahmedalabdaloklah, | ) | 2:16 p.m. |
| | ) | |
| Defendant. | ) | EXCERPTED TRANSCRIPT |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE

REPORTER'S *EXCERPTED* TRANSCRIPT OF PROCEEDINGS

(Jury Trial – Day 1 – Opening Statements)

Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1              A P P E A R A N C E S

2    For the Government:
                 U.S. Attorney's Office
3                By:  DAVID A. PIMSNER, ESQ.
                      WILLIAM C. SOLOMON, ESQ.
4                     MELISSA KARLEN, ESQ.
                 40 North Central Avenue, Suite 1800
5                Phoenix, AZ  85004

6                U.S. Department of Justice
                 By:  JOSEPH N. KASTER, ESQ.
7                950 Pennsylvania Avenue, NW, Suite 2649
                 Washington, DC  20530

8

9    For the Defendant:

10               Federal Public Defender's Office
                 By:  GREGORY A. BARTOLOMEI, ESQ.
11                    JAMI S. JOHNSON, ESQ.
                      MOLLY A. KARLIN, ESQ.
12                    SHISHENE JING, ESQ.
                 850 West Adams Street, Suite 201
13               Phoenix, AZ  85007

14   ALSO PRESENT:
                 STEVEN SCHEPS, USAO Intelligence Specialist
15               OSCAR CASTILLO, FPDO Investigator
                 RENEE RIVERA-THOMAS, FPDO Paralegal

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

## SUMMARY OF PROCEEDINGS

| | |
|---|---|
| Opening Statement by Mr. Kaster | 4 |
| Opening Statement by Ms. Johnson | 15 |
| Recess | 34 |
| Pretrial Matters Discussed | 34 |
| Recess | 46 |
| Jury Excused For The Evening | 47 |

UNITED STATES DISTRICT COURT

1          P R O C E E D I N G S

2          (Jury voir dire held and jury instructions given.)

3          (The defendant was assisted by the Official Court

4     Interpreter.)

5          (The following is an excerpted transcript of proceedings.)

6               THE COURT:  All right.  The government has an opening

7     statement.

8               Mr. Kaster.

9               MR. KASTER:  Yes, Your Honor.

10              THE CLERK:  Mr. Kaster, do you need the lectern pulled

11    out?

12              MR. KASTER:  Excellent.  It would be better if I did

13    that.

14              May it please the Court?

15              THE COURT:  Yes.

16              MR. KASTER:  Ladies and gentlemen of the jury, good

17    afternoon.

18              During the course of this trial, the United States

19    will prove to you, beyond all reasonable doubt, that the

20    defendant, Ahmed Alahmedalabdaloklah, conspired with others to

21    kill military personnel in Iraq using remote-controlled

22    improvised explosive devices.

23              These devices were sophisticated.  They included

24    electronics that required technical expertise to operate.  We

25    will prove to you that the defendant, over several years, used

1    his technical skills and his technical abilities to further

2    that bombing conspiracy.

3            In the summer of 2006, ladies and gentlemen, the

4    country of Iraq was enduring one of its most dangerous and

5    violent periods.  Dictator Saddam Hussein was in jail.  A new

6    government had been elected.

7            But this new government, this fledging new government

8    was failing in one of its most basic obligations to its

9    citizens.  It was unable to keep its citizens safe.

10            Alongside the average Iraqi citizen, however, U.S.

11    soldiers were trying to provide security in Baghdad and

12    elsewhere in Iraq.  But they themselves were confronting a

13    lethal threat.

14            The soldiers that were in their vehicles, the soldiers

15    that were on foot patrol were encountering on a weekly, on a

16    daily basis, roadside bombs, these improvised explosive devices

17    that without any notice would suddenly go off.

18            One of the groups that was responsible for these bombs

19    was a group known as the 1920 Revolution Brigades.  You will

20    hear evidence explaining this group's origins, who some if its

21    members were, and their overall strategy.

22            Their overall strategy matched the conspiratorial

23    objective that the defendant shared, which was this:  Through a

24    campaign of violence, primarily through these improvised

25    explosive devices, to drive a wedge between the American

1    soldiers and the Iraqi people they were trying to protect to

2    try to force the American military to abandon the Iraqi

3    citizens.

4         The evidence in this case will show that the

5    defendant, Ahmed Alahmedalabdaloklah, joined a conspiracy with

6    members of the 1920 Revolution Brigades.  We will prove to you

7    he shared their violent objectives, and he assisted them with

8    their deadly weapon of choice, these improvised explosive

9    devices.

10        You will learn how remote-controlled improvised

11   explosive devices worked in Iraq.  You will come to understand

12   from the evidence how the defendant's technical knowledge was

13   critical to making these bombs work.

14        We will prove to you through witnesses and physical

15   evidence that the defendant joined this conspiracy, that he

16   furthered it through his abilities and through providing

17   electronic components, that he embraced the overall

18   conspiratorial objective of the 1920s to force Americans to

19   leave Iraq.

20        Now, what do we anticipate this evidence specifically

21   to be?  To begin with, you will hear testimony from engineering

22   experts who will explain to you how these remote-controlled

23   improvised explosive devices worked.

24        From a bird's eye view, the operation of one of these

25   devices is the following:  There are two locations.  There's

1    the location where the bomb has been in place.  Typically, this

2    was a roadside bomb, but not always.  Then there's a separate

3    location where someone who was called the triggerman would send

4    remotely a radio frequency signal from a transmitting device to

5    a receiving device that was located with the main explosive,

6    thereby detonating it.

7         So the basic components, then, of an improvised

8    explosive device, or an IED, to use the acronym, is first, you

9    need a main explosive.  You need something that either is a

10   homemade explosive or is a military shell that's been

11   repurposed or a C-4.  And in Iraq during this time period, that

12   type of explosive was relatively easy to be found.

13        You then need some way to initiate that explosive, a

14   blasting cap or something similar to set off the main

15   explosive, what would in turn provide power to the blasting

16   cap.  This gets to the heart of the case and the evidence you

17   will hear.

18        You will hear that IED switches involved electronic

19   components that drew power from battery sources so that when

20   they received the signal, the radio frequency signal from the

21   transmitter, they would provide necessary power to the

22   initiating blasting cap, for example, to set off the main

23   charge.

24        Finally, as I mentioned, the evidence will show that

25   the triggerman needs some sort of transmitting device.  And in

**UNITED STATES DISTRICT COURT**

1    Iraq, during the mid-2000s, what happened was that the

2    individuals that were using these devices that were designing

3    them, they repurposed, they misused common, otherwise benign

4    electronics, cell phones, long-range cordless telephones,

5    personal mobile radios or walkie-talkies, devices, essentially

6    anything that could transmit a radio signal from the triggerman

7    to the place of emplacement in order to set off that bomb at

8    their time and choosing when a military patrol or a military

9    convoy was passing by.

10             The evidence will further demonstrate to you that

11   another common technology, one that you are probably all

12   familiar with, a technology that is used in touch-tone phones

13   called dual tone multifrequency technology or, to use the

14   acronym, DTMF, was used by these IED designers.  Dual tone

15   technology essentially allows for two audible sounds to be

16   combined into a signal.

17             And the IED designers figured out that by using that

18   signal, they could essentially provide a way of avoiding

19   unintentional detonations.  So they would send a signal from

20   their translating device to the receiving device using DTMF

21   technology so that only one key, the right key that they

22   pressed on the transmitting device set off that explosive.

23             Moreover, they used this technology to try to outsmart

24   the American military, which was coming up with their own

25   countermeasures to deactivate these devices.

1          As a result, the DTMF technology for these bombs

2     evolved, and the engineers that were studying them saw them.

3     They saw these circuit boards that were used in the bombs

4     change.  They changed with the components, the electronic

5     components, they changed with the circuitry, and they evolved

6     over time.

7          Now, the evidence will further demonstrate to you that

8     the 1920 Revolutionary Brigade primarily used these

9     remote-control IEDs as their weapon of choice.  As I said a

10    moment ago, you will hear testimony about the group's origins.

11    And moreover, you will hear testimony from two Iraqi witnesses,

12    who are unavailable for trial, but who have provided videotaped

13    depositions, which will you will watch and view.

14         One of those witnesses is a man named Jamal al-Dhari.

15    Jamal al-Dhari testified to many important facts in this case.

16    The evidence will show that a relative of his, a man named

17    Harith al-Dhari, was the military commander of the 1920

18    Revolution Brigades during the mid-2000s.

19         Moreover, Harith al-Dhari introduced Jamal al-Dhari to

20    that man sitting there next to his lawyer, the defendant.  And

21    he told Jamal that the defendant had a special skill, a set of

22    technical skills that could help the group in their project to

23    explode these devices and avoid the American efforts to stop

24    them from exploding.

25         Listen carefully to that man's testimony.  Jamal

1    al-Dhari, to this day, believes that his group was doing the

2    right thing, in his mind.  In his view, he saw what the

3    American forces were trying to do as being wrong.  He viewed

4    the Americans as occupiers.  And as a result, he supported

5    their violent goal back then, as did the defendant.

6          Jamal al-Dhari will tell you that he knew the

7    defendant by nickname.  The defendant was known as Mukhtar.

8    And knowing him by that nickname, the defendant and

9    Jamal al-Dhari communicated with each other.  They met in

10   person, but when the defendant left Iraq and move to China, the

11   defendant and Jamal al-Dhari maintained their conspiratorial

12   relationship through phone calls and emails.

13         Jamal al-Dhari's testimony doesn't stand alone, ladies

14   and gentlemen.  We will prove to you that his testimony should

15   be credited because of corroborative evidence.  To begin with,

16   you will see some of the emails that the defendant and Jamal

17   al-Dhari shared in furtherance of their conspiracy.

18         One illustration is an email from November of 2008,

19   where the defendant is communicating to Jamal al-Dhari

20   information regarding the shipment of 10 transmitters and 100

21   receivers for IEDs.

22         And you ask yourself, why only 10 transmitters and 100

23   receivers?  Jamal answered that question in his deposition.  He

24   said we needed more receivers because they got blown up when

25   the bombs went off, but we could reuse the transmitters.

1          We further will show you emails among the defendant

2    and other conspirators to further their overall plan.

3          Now, you will hear that there's physical evidence

4    besides the emails that corroborates the defendant's role in

5    the IED conspiracy.

6          On August 30th, 2006, military patrol in Baghdad came

7    to an apartment, the apartment on what's known as Omar Street.

8    And when they entered those apartments, what they found was

9    essentially an IED switch factory.

10         Now, there was no one present when the soldiers

11   searched those apartments, but the evidence they found, and the

12   evidence that we will bring to court today, will establish for

13   you the nature of the activity that was occurring in that

14   apartment.

15         And what was that activity?  The evidence will show

16   that the activity was very clearly an IED switch factory for

17   both making circuit boards for switches, but also the types of

18   receivers and transmitters that would be needed for an IED

19   configuration.

20         When the soldiers entered the apartment, they gathered

21   as much as they could, they put it on their trucks, and they

22   took it back to what was known as Camp Victory, which was the

23   main military base for the U.S. in Baghdad -- west Baghdad

24   during this time frame.

25         At Camp Victory there was a special group known as the

1   Combined Explosive Exploitation Cell.  Their acronym was CEXC,

2   or CEXC.  CEXC comprised, in the main, engineers who analyzed

3   components involved in IEDs, from exploded IEDs, from

4   unexploded IEDs, from caches such as Omar Street in order to

5   figure out what these IED designers and bombers were using.

6         When they initially saw the photos of Omar Street,

7   they sent the soldiers back a second day to gather even more

8   evidence, gather even more electronics to bring it back for

9   analysis.

10         You will hear how the soldiers did this.  You will

11  hear how the CEXC engineers analyzed this evidence and how they

12  then boxed it up and sent it to the FBI's laboratory in

13  Quantico, Virginia, where the FBI studied the evidence and

14  remained there until it was brought to Phoenix, Arizona, for

15  trial.

16         Now, you may hear suggestions that the soldiers who

17  collected the evidence should have done more to photograph the

18  evidence or to catalogue it, but the combination of their

19  testimony, of the photos that exist, of the evidence itself

20  will convince you beyond any question that the evidence that's

21  here in court today is the evidence that was taken from Omar

22  Street several years ago.

23         As I mentioned, we will prove to you that Omar Street

24  was an IED switch factory, that there were many different types

25  of transmitters and receivers located there.

1          Now, there were no explosives found at Omar Street.

2    And you will hear testimony that that was common to keep the

3    explosives away from the electronics when the IEDs were being

4    made.

5          You will also hear testimony that, getting back to the

6    DTMF technology, dozens of DTMF boards, the kinds of boards

7    that the engineers saw in IEDs, were seized from the Omar

8    Street apartments.

9          Some were populated with components, with the

10   necessary wires ready to be hooked up on a battery to be sent

11   out in the field.  Some were in the state of manufacture.

12         There were the raw materials to make more.  And that

13   is why we will prove to you that it was an IED switch factory,

14   because it was a place where not just one, not just two, but

15   dozens of these circuit boards for IEDs could be made.

16         As I mentioned, the evidence will show that there was

17   no one present at Omar Street when the soldiers searched those

18   apartments.  But there were documents.  And we will prove to

19   you a link between the defendant and that location because some

20   of his personal papers were left there, as well as fingerprints

21   that were matched, years later, on documents and other

22   materials to the defendant.

23         Now, there are other people there as well.  There's no

24   question.  But remember, this is a conspiracy, so there's no

25   surprise that there may have been other people working at this

1    IED switch factory.

2          And the Omar Street evidence, ladies and gentlemen,

3    along with the email evidence, along with the testimony you'll

4    hear, both from the fact witnesses as well as the expert

5    witnesses, will establish defendant's role in the charged

6    conspiracies.  That is an overview of what the case is about.

7          Two quick points about what the case is not about.

8    This is a criminal case, and it is not about the arguments for

9    or against the Iraq war in March of 2003.

10          You will hear no evidence about the reasons for the

11   war beginning, whether it was right or whether it was wrong for

12   the U.S. military to begin the war in March of 2003.  This case

13   is about the criminal acts that we will prove to you that the

14   defendant committed years later.

15          Second, as I indicated at the outset, the defendant is

16   charged, in the main, for committing conspiracies -- with

17   conspiring to commit various crimes.

18          He's not charged with the murder of a particular

19   individual on a particular day by placing a bomb on the ground.

20   That is not the charge that he is facing.

21          Given the evidence just outlined now, we anticipate at

22   the end of the case that Judge Silver will instruct you on the

23   elements of each of the crimes that are charged.

24          And as she's already outlined for you, among those

25   charges is that the defendant conspired to kill U.S. military

1    personnel, that he conspired to use weapons of mass

2    destruction, the improvised explosive devices, that he

3    conspired to destroy U.S. military property and military

4    vehicles that were hit by these roadside bombs, and that he

5    provided material support to this IED conspiracy.

6         Thank you for the time that you will devote to this

7    case.  Thank you for the careful attention that you will bring

8    to the evidence and for keeping an open mind until all of the

9    evidence is in.

10        And after all the evidence is received, and after

11   Judge Silver has instructed you on the legal principles that

12   you must follow, we are confident that you will reach a just

13   verdict.

14        You will reach a verdict dictated by the law and the

15   facts.  You will reach a verdict that will hold the defendant

16   accountable for what he did.  And you will find the defendant

17   guilty on all counts.  Thank you.

18        THE COURT:  Thank you.

19        Ms. Johnson.

20        MS. JOHNSON:  Good afternoon.  My name is Jami

21   Johnson.  And I have the privilege of representing Mr. Ahmed

22   Alahmedalabdaloklah.

23        Mr. Kaster has just told you a lot about what he

24   expects that you are going to hear over the next few weeks.

25   I'm going to talk to you about what you're not going to hear.

1          First, you're not going to hear any evidence that any

2     harm ever came to any United States citizen or any piece of

3     United States property as a result of anything that Mr. Oklah

4     did.  Not ever.

5          You're also going -- not going to hear that anything

6     that Mr. Oklah ever sold or ever touched was ever actually

7     turned into an IED, an improvised explosive device.  Nothing.

8          Lastly, you are not going to hear that Mr. Oklah has

9     ever, in his entire life, made a single anti-American

10    statement, uttered a single anti-American sentiment, voiced any

11    hatred, dislike, or disapproval of the United States, its

12    citizens, or its government.

13         Mr. Oklah has no motive to target Americans.  And the

14    government will never provide you with any motive that

15    Mr. Oklah had to target Americans.

16         Now, Mr. Oklah and the government have a lot of

17    disagreements about the evidence in this case.  But one thing

18    that both sides do agree on is that the 1920 Revolutionary

19    Brigades is an organization that takes its name from the 1920

20    Iraq Revolution.

21         The 1920 revolution in Iraq is basically to the

22    country of Iraq what the American Revolution is to the United

23    States.  It's the revolution in 1920 where the people of Iraq

24    banded together to expel the British occupiers and come

25    together as one country, the country of Iraq.

1      You will hear evidence that some of the individuals

2  who now identify with or who support the 1920 Revolution

3  Brigades do so because their grandfathers, or maybe even their

4  great-grandfathers, fought in the 1920 revolution, and they

5  have adopted that name to honor their grandfathers and their

6  grandfathers' vision of a self-governing nation of Iraq, where

7  all Iraqi people, and only Iraqi people, get to decide together

8  the future of their country.

9      You may from time to time hear someone -- witnesses

10  refer to the 1920 Revolution Brigades as an Iraqi nationalist

11  organization, and that's basically what that term means.  It's

12  an organization that supported the idea of an independent Iraq,

13  governed by and for Iraqis, all Iraqis, Sunni, Shia, Kurds,

14  Christians, Jews, anyone who was a citizen of Iraq.

15      Now, Mr. Oklah did not conspire with an Iraqi

16  nationalist organization to kill American soldiers.  He's not

17  even Iraqi.  He's Syrian.

18      And you may hear me calling him Mr. Oklah.  You may

19  hear the case being announced as the United States versus Ahmed

20  Alahmedalabdaloklah.

21      In Mr. Oklah's country, naming conventions are done a

22  little bit differently from the United States, and the reason

23  his last name is so long is because it's actually a compilation

24  of his name and his father's name and his grandfather's name.

25      But the closest thing -- the closest part of that name

1    to what would be a family name or last name in the United

2    States is Oklah, which is why we decided, for the convenience

3    of everyone, to refer him to as Mr. Oklah.

4         So you will hear testimony that Mr. Oklah was born in

5    Syria in 1977.  You will also hear testimony about how

6    Mr. Oklah's family moved from Syria to Iraq when he was a small

7    child.  So it would have been around the same time, the late

8    1970s, early 1980s, that there was a large wave of refugees

9    leaving Syria, where they were fleeing the brutal dictatorship

10   of Hafez al-Assad, who was the father of the current brutal

11   dictator of Syria, Bashar al-Assad.

12        Now, in the late '70s and early '80s, Iraq was already

13   governed by Saddam Hussein.  I'm sure you can imagine Iraq

14   under Saddam Hussein wasn't the greatest place to live, so you

15   can only imagine how bad things in Syria must have been for

16   people to decide that Iraq was better than Syria.

17        You will hear testimony that Saddam Hussein did accept

18   these refugees, there were a few thousand of them, and he let

19   them live in Iraq.  But he only gave them certain privileges,

20   and he didn't let the refugees assimilate into Iraqi culture.

21   The acceptance only went so far.

22        They were not granted citizenship.  They weren't given

23   any status.  They don't allow them to remain in Iraq

24   permanently.  And he maintained tight control over the

25   community.  He installed its leaders to make sure that he could

1    keep an eye on them.  And it was basically a way for Saddam

2    Hussein to continue to consolidate his power.

3          So Mr. Oklah grew up in this very precarious

4    environment.  But, like a lot of immigrants, he had an

5    entrepreneurial spirit and a desire to succeed.  He worked

6    hard.  You will hear that he went to college, got married, had

7    a child, and you will hear that he opened an electronic shop in

8    Baghdad.

9          I've already told you that Mr. Oklah was born in 1977.

10   That makes him 40 as he sits here in court today.  So that

11   means that when the Americans invaded Iraq in 2003, he was 25

12   years old.  He was a young husband, a young father trying to

13   make his way in the world.

14         Now, we also agree with Mr. Kaster that the parties

15   are not going to turn this trial into relitigation of the Iraq

16   war, who was right, who was wrong.  It's not relevant.  But

17   there are couple of things that you need to understand about

18   the Iraq war in order to understand the evidence in this case.

19         First, you will hear testimony that under Saddam

20   Hussein there were no cell phones permitted in Iraq, nor a lot

21   of other what we consider modern contemporary electronic

22   devices.  It didn't exist.  He didn't let them in.

23         So when the Americans invaded Iraq and Saddam's regime

24   was overthrown, a huge market suddenly opened up for cell

25   phones and others electronics.  And, you know, Iraq is a large

country; Baghdad is a big city.  Millions of people wanting to buy things they hadn't been allowed to own before.  It was a great business opportunity for a young man recently out of school.

The other thing that you need to understand about the Iraq war, unfortunately, as I'm sure many of you are -- maybe all of you are already aware, the security situation in Iraq deteriorated rapidly after the American invasion and civil war broke out.  Iraq is a multiethnic, multireligious country with lots of different people from different cultures and different backgrounds.

And very shortly after the Americans invaded, these groups began separating off, going into their own neighborhoods, going into their own corners.  And many of them started fighting each other.

Now, where did that civil war leave Mr. Oklah? 25-year-old husband and father, Syrian refugee, not an Iraqi citizen.  He's a man without a group.

You will hear testimony, you will hear expert testimony that in the culture of Iraq in the mid-2000s, this would have left Mr. Oklah in a very precarious social position.

I believe that Mr. Kaster mentioned -- and I don't think there's any dispute -- that in the mid-2000s the Iraqi government was not capable of protecting its citizens.  Even less was it capable of protecting people who weren't even

1   citizens people who technically had no legal right to be there.

2          So what did Mr. Oklah do?  We all agree.  He left and

3   went to China.

4          Now, you know, why China?  China doesn't just supply

5   the United States with cheap electronics, tennis shoes, and

6   children's toys and whatever.  It supplies the whole world with

7   those things.  And that includes the Middle East.

8          So Mr. Oklah, young dad and businessman with

9   experience in selling electronics, picks up and moves to China,

10  sets up a business.

11         Now, the government does not dispute that Mr. Oklah

12  had, in China, a legitimate business selling legitimate goods

13  made in China, including electronics but not limited to

14  electronics, and that he was selling those goods to customers

15  in the Middle East and other places in the world.

16         Now, you just heard the government allege that in

17  addition to his legitimate business, he was also providing

18  electronics that they claim he knew were being used in IEDs

19  against American soldiers.

20         What they left out, and what I want you to keep in

21  mind, is that you won't hear any evidence at all that Mr. Oklah

22  ever shipped from China a single, solitary piece of electronics

23  that could actually be turned into an IED.  Not one.  Not ever.

24         I mentioned to you earlier you weren't going to hear

25  any evidence that he ever made any anti-American statements.

 1    Mr. Kaster mentioned the government has some of Mr. Oklah's

 2    emails.  That's true.  They found some email accounts and

 3    subpoenaed the emails and got email records dating back to

 4    2006.

 5            You will hear that Mr. Oklah was arrested in 2011.

 6    And he was brought to the United States -- in Turkey.  He was

 7    arrested in 2011 in Turkey.  He was brought to the United

 8    States in 2014.

 9            So the United States has been aware of and has been

10    monitoring, or at least has access to, 12 years of email

11    communications, telephone calls, whatever else has been

12    monitored.  Twelve years, not a single anti-American statement.

13    None.

14            So how did we get here?  The evidence is going to show

15    that the answer to that question is that we're here as a result

16    of a long series of mistakes, rushes to judgment, and failures

17    to investigate.  To understand how these mistakes happened and

18    how Mr. Oklah got caught up in them, we have to go back to

19    Iraq.

20            Recall that I mentioned to you earlier that you would

21    hear testimony that after the American invasion of Iraq in

22    2003, civil war broke out.  Security situation was very bad.

23    It was bad for the American troops, and it was probably worse

24    for Iraqi citizens.

25            Violent and dangerous people were fighting each other,

1    and there was a lot of internal relocation, internal

2    displacement within the country.

3         People who were in neighborhoods where maybe they were

4    not the majority ethnic group or the not majority religious

5    group were picking up and leaving and going to other places,

6    trying to find cities or neighborhoods that were more secure or

7    maybe just cities and neighborhoods where they were in the

8    majority rather than the minority because it brought increased

9    safety for them, safety that was not being provided by the

10   Iraqi government.

11        You heard testimony from Mr. -- or excuse me.  You

12   heard Mr. Kaster assert, it's not testimony, that explosive C-4

13   were relatively easy to find in Iraq at the time.  That's true,

14   because, you will hear, it's because the Iraq Army, like a lot

15   of other people in Iraq, just dropped everything and ran, left

16   behind C-4 munitions, and people were going and scavenging.

17        And that's consistent with, I believe, all the

18   testimony you will hear from the fact witnesses and the expert

19   witnesses in this case, that Iraq is a country where people

20   were just fleeing.  They were dropping their stuff and running.

21        Now, you'll hear that one of the neighborhoods that

22   was most affected by all of this was the neighborhood called

23   Adhamiyah, which is the neighborhood of 50 Omar Street, the

24   apartments where Mr. Kaster was talking about, were located.

25        Baghdad is a big city, has millions of people.  Like

1    any other big city, it has neighborhoods and has homes and

2    shops and schools.

3          You'll hear testimony that Adhamiyah was once a really

4    thriving neighborhood, but that by 2006 it had fallen into

5    significant disrepair.  And there were a lot of shops,

6    apartments that had just been abandoned.

7          You'll hear testimony that the ground floor of 50 Omar

8    Street, not the apartments that Mr. Kaster was talking about,

9    the ground floor was an electronics shop.  And you will hear

10   testimony that on the third floor of 50 Omar Street, soldiers

11   who were going door to door looking for people, looking for

12   objects, trying to clean up the situation in the neighborhood,

13   found this third-floor apartment and they found a lot of junk,

14   including a bunch of electronics, ordinary electronics, cell

15   phones, radios, probably a dozen computers, screws, wires,

16   tape, you know, the kind of stuff you would have if you had an

17   electronics shop.

18         Now, these troops, they weren't trained police

19   officers.  I'm going to pause there for a moment because

20   Mr. Oklah and the government continue to have a lot of

21   disagreements about the evidence in the case, but one thing you

22   are not going to hear us disagreeing about is that nobody is

23   going to be blaming the United States military for anything.

24         United States military had a very difficult mission.

25   They do the best they can.  They are not police officers.  They

1    don't receive the training of police officers, and their

2    mission isn't the same as police officers.

3         I'm not going to get into it right now, a lot of

4    detail about who touched what item at what time and where it

5    went, but you will learn that there were a lot of problems with

6    the way that the evidence in this case was collected.  A lot of

7    it has been lost, with no record of what happened to it.

8         It seems like some stuff has also been added in,

9    accidentally, by persons unknown, over the course of this case.

10   There's a lot of questions about what exactly the soldiers

11   found.  There are some pictures.  There are some pictures where

12   you can kind of tell some objects were originally found at the

13   apartment, but there is a big question mark about what happened

14   to a lot of what was found at 50 Omar Street.

15        So getting back to these apartments at 50 Omar Street,

16   the soldiers find -- they find computers and cell phones and

17   radios.  And Mr. Kaster said the Army was being hit by IEDs.

18   And IEDs are -- one of the things that you will learn

19   throughout the course of this case, the I in IED stands for

20   improvised.  It means it's made by something that was not

21   originally intended to be a bomb or to make anything explode.

22        One of the things you're going to learn is that almost

23   any piece of electronics can theoretically be turned into an

24   IED.  Cell phones, ordinary cell phones, apparently relatively

25   easy to rig, somebody who knows how to do it, five to ten

1  minutes, can make it into something that would detonate a

2  charge.

3  And we agree.  There are no allegations that any

4  actual explosives were ever found at 50 Omar Street.  It's just

5  electronics.

6  So the soldiers, who aren't electrical engineers, who

7  are not police officers, they look around and they more or less

8  immediately come to the conclusion that this apartment must be

9  being used for some noninnocent purpose, just due to the sheer

10  quantity of electronics that they find.

11  They look around and they also see a bunch of

12  documents, yes, that have Mr. Oklah's name on them: school

13  report cards, family photos, math homework.

14  And they immediately assume, incorrectly as the

15  evidence will show, that Mr. Oklah must, number one, he must be

16  the current resident of the apartment and, number two, that he

17  must be using the apartment to make bombs and, number three,

18  that those bombs must be being made to target the United States

19  military.

20  The evidence will ultimately show that it was this

21  unfortunate, and ultimately incorrect, snap judgment that then

22  dictated the course of the investigation and ultimately led to

23  where we are today.

24  Mr. Kaster noted that they found a lot of fingerprints

25  of -- Mr. Oklah's fingerprints on items that were taken from

1    50 Omar Street.

2            Now, what he did not tell you, that not a single one

3    of those fingerprints was found on a piece of electronic

4    equipment that seems like it was probably intended to be used

5    in an IED.  There were IED materials found at 50 Omar Street.

6    That's not what Mr. Oklah's fingerprints were on.

7            In analyzing and weighing the evidence from 50 Omar

8    Street, we're going to be asking you, as jurors, not to think

9    about what life is like here in stable, safe United States, but

10   rather what life was like in Iraq in 2006.  Mentioned that

11   there was an enormous amount of internal dislocation, internal

12   migration going on in Iraq, where people were just abandoning

13   their homes, abandoning their neighborhoods, and fleeing.

14           I also mentioned that there was a culture of

15   scavenging going on.  The Iraqi military abandoned their C-5

16   and walked off, and other people picked it up and did whatever

17   they did with it.

18           It's not always easy to get things in wartime.  People

19   were recycling, people were borrowing, people were reusing.

20   And as I mentioned before, turns out almost any piece of

21   electronics can be turned into an explosive.  Cell phones,

22   garage door openers, the little keyless remote things that you

23   use to get into your car, any of those, very easy to convert

24   into something that would detonate a bomb.

25           And there were individuals in Iraq who specialized in

1    figuring out how to turn these ordinary legal devices into

2    something that could trigger an explosion.

3        Now, I think it's ultimately unclear whether 50 Omar

4    Street was actually an IED factory, that even taking the

5    government at its word that it was, there's no reason to

6    believe that it's Mr. Oklah's IED factory.  Because what they

7    really found was a lot of Mr. Oklah's old junk, family

8    photographs, soccer magazines from the 1980s, math homework.

9    That's the stuff that has his fingerprints on it.

10       Now, you will hear that there's a lot of good reason

11   to believe that someone was living at the 50 Omar Street

12   apartment, or occupying it.  And there's a lot of good reason

13   to believe that person was not Mr. Oklah.  So Mr. Oklah's

14   family photographs, school report cards, math homework, you

15   know, is the kind of stuff that you throw into a filing

16   cabinet, disappears, could sit there for years.

17       Although it is worth mentioning that in these filing

18   cabinets full of documents, again, not a single anti-American

19   piece of propaganda, not a single document expressing an

20   anti-American viewpoint.  None.  And also no papers mentioning

21   the 1920 Revolution Brigades.

22       Now, there was evidence collected at 50 Omar Street

23   that suggested more recent occupation.  Toothbrushes, razor

24   blades, cigarette butts, underwear, a toenail clipping, the

25   kind of stuff you'd need more immediate access to if you were

1    actually occupying that apartment, if you were sleeping there.

2           And they collected this stuff.  The soldiers collected

3    this stuff, sent it to a lab, tested it for DNA, tested it

4    against Mr. Oklah's DNA.  For most of the items they found

5    enough DNA to determine, to be able to figure out, you know, if

6    we only knew who this person was, we could match -- we could

7    get a match on this piece of evidence.

8           None of it was Mr. Oklah's DNA.  There were a few

9    items where they just didn't have enough DNA to do a comparison

10   at all.  There was no DNA from Mr. Oklah identified at this

11   apartment.  Somebody's DNA was there and it wasn't his.

12   Somebody was brushing their teeth at 50 Omar Street.  Somebody

13   was shaving, somebody was smoking cigarettes, and that person

14   was not Mr. Oklah.

15          You will hear that the majority of the DNA analysis

16   wasn't done actually until a few months ago.  By that point,

17   the government had already made up its mind that that apartment

18   was Mr. Oklah's apartment, and it was too late to change

19   course.  He was already here in the United States.

20          The evidence will show that after jumping to the

21   incorrect conclusion that 50 Omar Street was an IED factory,

22   and it was an IED factory being run by Mr. Oklah, that the

23   government proceeded to investigate by asking around in Iraq.

24          Now, you'll hear that in Iraq that a lot of what the

25   American military was doing -- or I shouldn't say a lot of what

1   they were doing, but what was being done frequently was

2   American military were going out and arresting large numbers of

3   people.  They would let them go relatively soon.  Interrogate

4   them, ask some questions, try to figure out whether they were

5   involved in any noninnocent activities, and release them if

6   they thought that they were not.

7           So they start asking around about Mr. Oklah.  And

8   Mr. Kaster mentioned that the government has two witnesses, who

9   he says are unavailable.  You will hear deposition testimony.

10  You will watch deposition testimony from two witnesses who

11  claim that they know or that they heard from a relative that

12  Mr. Oklah was somehow helping the 1920 Revolution Brigades do

13  something.

14          When you watch the testimony, I think that you will

15  understand that there's significant reason to doubt the

16  truthfulness of that testimony.

17          Mr. Kaster spoke about Mr. al-Dhari, who he says

18  emailed Mr. Oklah with an order for 10 transmitters and 100

19  receivers, and that Mr. al-Dhari heard from his cousin Harith

20  that Mr. Oklah was helping the 1920 Revolutionary Brigade.

21          Who is Mr. al-Dhari?  Mr. al-Dhari is a very wealthy

22  Iraqi citizen who lives in Latvia.  Mr. al-Dhari is a man with

23  political ambitions.  He's not in hiding.  Mr. Kaster said that

24  Mr. al-Dhari was proud of his activities with the 1920

25  Revolution Brigade, felt no need to hide it.

1         Mr. al-Dhari has not been charged with any crime. Not

2  only has Mr. al-Dhari not been charged with any crime, as late

3  as last year Mr. al-Dhari was in Washington, D.C., eating with

4  Senator Lindsey Graham, Congressman Ed Royce, to talk about his

5  vision for the future of Iraq.

6         So why are people who conspire to kill American

7  citizens being invited to the United States to talk to senators

8  and congressmen? This is sort of interesting thing about the

9  1920s Revolutionary Brigade that Mr. Kaster omitted from his

10  story about what they were doing.

11         So I mentioned earlier the 1920 Revolution Brigade is

12  an Iraqi nationalist organization, which means that they wanted

13  Iraq to be governed by Iraqis. Now, were they upset that the

14  American military had invaded Iraq and had installed a

15  provisional government? Sure. Lots of people who were not

16  killing Americans were also upset about that.

17         But the Americans were not the only foreign presence

18  in Iraq. When the Americans invaded Iraq, you will hear

19  testimony that a large number of violent groups from outside

20  Iraq came to Iraq basically to fight the Americans because

21  that's where the Americans were. And they did some horrible

22  things, from Iran and Saudi Arabia.

23         The 1920s Revolution Brigade, they opposed the

24  American presence in Iraq, but they were even more upset about

25  the violent extremists killing them and killing their families.

1          And one of the parts of the story that Mr. Kaster has

2     left out, that you are going to hear testimony that in 2007,

3     2007, which is right during the middle of the charged

4     conspiracy here in this case, in the very neighborhood where

5     Mr. Kaster is going to allege that Mr. Oklah was providing

6     explosives, that the 1920's Revolutionary Brigade actually

7     partnered up with the American military to fight these violent

8     extremist groups.

9          You will hear fact testimony from fact witnesses, from

10    American military commanders, you'll also hear testimony from

11    the government's own expert witnesses, that the American

12    military partnered up with the 1920 Revolutionary Brigade to

13    rout the violent extremist groups from the neighborhood and

14    that, after succeeding in that goal with the help of the 1920

15    Revolutionary Brigade, the American military proceeded to turn

16    security for the area over to the 1920 Revolutionary Brigade so

17    that they were running the neighborhood, and the American

18    military stopped having problems in that neighborhood.

19         Mr. Kaster would like you to believe that the 1920s

20    Revolutionary Brigade is an organization with a single-minded

21    devotion to killing American citizens, and that story is simply

22    not correct.

23         So Mr. al-Dhari, he's still coming to the United

24    States.  Mr. Kaster referred to him as unavailable.  What

25    you'll actually hear is that Mr. al-Dhari was planning on being

1    here, not to come testify at this trial.  Mr. al-Dhari had

2    plane tickets.  He was supposed to get here last Sunday to go

3    meets with congresspeople again.

4          The government asked Mr. al-Dhari -- you will hear

5    testimony, that the government asked Mr. al-Dhari if he would

6    come to trial.  He refused.  I think you will understand why

7    when you see Mr. al-Dhari's deposition testimony.

8          Mr. al-Dhari, again, who's a very rich, very powerful

9    man, who has a personal political agenda that he is more than

10   willing to promote on the back of a Syrian refugee that no one

11   cares anything about if it means that Mr. al-Dhari could

12   advance his own agenda.

13         So Mr. al-Dhari is apparently not in the United

14   States, having changed his plans once he learned that if he

15   showed up in the United States, he might have to come to court

16   and talk to you all about the things that he said this summer,

17   including things that seem like they are demonstrably untrue.

18         So wait until that deposition gets played.  Keep an

19   open mind and form your own opinions about Mr. al-Dhari and the

20   credibility of his testimony.

21         We're asking you for the next few weeks to do what the

22   government in this case has not done, which is to keep an mind,

23   to not rush to an immediate judgment about what did or did not

24   happen, because what the evidence will ultimately show is that

25   what has led us here is a long and unfortunate series of

1    mistakes.

2           I'd like you to listen to the evidence with an open

3    mind, because at the conclusion of the presentation of the

4    evidence, my colleague, Mr. Bartolomei, is going to come back

5    up to this podium, and he is going to ask you to correct the

6    mistake that the United States government and the FBI refused

7    to correct, to return a verdict of not guilty so that Mr. Oklah

8    can go home to his country and to be with his wife and

9    children.  Thank you.

10          THE COURT:  Thank you.  Ladies and gentlemen, we're

11   going to take a break.  We will see you back here about 25

12   minutes -- is that three?  No, 25 minutes to 4:00.  We are in

13   recess.

14          (The jury retired to the jury room at 3:14 p.m.)

15          THE COURT:  Let me ask government counsel.  Are you

16   ready to call your first witness?

17          MS. KARLEN:  Your Honor, may I have a moment to check

18   to see if he is here?

19          THE COURT:  Well, hold on for a second.  Let me ask

20   you another question.  First of all, who is the witness?

21          MS. KARLEN:  Colonel Pinkerton.

22          THE COURT:  Second question is, when did you give the

23   defense notice you were going to call this witness?

24          MS. KARLEN:  For today or for tomorrow.  I believe we

25   emailed --

1          THE COURT:  That you were going to call the witness

2     today as a consequence of my ruling yesterday that you must

3     give 24-hour notice, just like I require it of the defense.

4          And remember what I said.  I said to the government

5     that -- first of all, couple of things.  I was surprised that

6     they had not turned over all the 302s.  After the lengthy

7     discovery in this case, I would be very surprised to see if the

8     government was prepared when this case was scheduled for trial

9     on November 3rd.  We've come a long way from there.

10          The theory has changed, and I had resolved along the

11    way that I thought the government was complying with the orders

12    to provide notice to the defense so they could cross-examine

13    witnesses.

14          Now, I think it was yesterday Mr. Bartolomei said he

15    had not gotten an updated list.  And I said to Mr. Pimsner, why

16    is that?  Mr. Pimsner seemed to be irked at me for asking that.

17    And he had a good point.  He said, well, we've had a little

18    trouble changing the witnesses' presentation to get witnesses

19    here.  I then said, you have to give the defense 24 hours.

20          Now I heard today that there is -- there has been

21    provided to defense counsel notes of recent interview of this

22    witness you're going to call.  And you are relying, as I

23    believe you think you can, on the Jencks Act, that you can turn

24    over these notes, Jencks Act material, after the witness has

25    testified.

1          As I said, and I say again, in my career as a judge,

2     as a prosecutor, I never heard the government say that

3     because -- let me finish -- because if the defense does not

4     have the opportunity to review the latest information provided

5     by the government, I have to grant a continuance, because the

6     defendant is entitled to due process.  I don't know of a case

7     that doesn't hold that.

8          Now I am asking again.  Do you have a witness?

9          MS. KARLEN:  We do, Your Honor.  And in response, if I

10    may have a chance to respond to some of your comments?

11         We provided defense counsel on Friday at 5:51 an email

12    listing this first week's worth of witnesses, including Colonel

13    Pinkerton.  Last night after the hearing, at 9:38 p.m., we

14    provided an email documenting what we believed the Wednesday

15    witnesses were going to be.

16         As we previously explained to the Court, the

17    government was under the impression that our testimony was

18    going to start on Wednesday.  Last night, I and an FBI agent

19    did do an interview with Colonel Pinkerton.  That was in trial

20    preparation.  It was an interview preparing him for testifying

21    on Wednesday morning as we had intended.

22         Due to our constitutional obligations, our duties,

23    when there was new evidence that was provided or anything that

24    was inconsistent, we wanted to make sure we provided that to

25    defense counsel right away.  That is why they received a few

pages, and they're small pages, of notes from the agent, because that documents what happened.

And as the Court had said earlier, it's more information pertaining to what they have been noticed through the expert notices. I know he has switched to a fact witness, but that has been consistently a thread throughout all of the notices we've provided, what information he will testify to.

We are not invoking the Jencks Act to say that we're going to give them this information at the very last moment. What we are saying is that we performed interviews, preparing our witnesses for trial, and based on that, we followed through with our obligations and duties as prosecutors, that we take extremely seriously, to provide the notes to defense counsel because there was insufficient time, based on the fact the interview occurred last night, to create a 302. And we wanted to make sure that information was provided to defense counsel.

That's the information provided. We're not standing on the Jencks Act, standing before the Court saying we're turning something over at the very last minute because that's our right. We're saying we're turning over the information because that's our duty to do so when we've had an interview with a witness. And this was in final preparation for this witness's testimony.

THE COURT: Is there anything in that group of materials or -- materials that you think -- and I presume you

1  would not turn it over to the defense unless you thought it was

2  material to his testimony.  Otherwise, you would not have

3  provided it.

4          Now, let me just also say something else that I've

5  told counsel.  From the very beginning, I've said that the jury

6  would be picked by noon.  And as I mentioned a number of times,

7  because we use extensive questionnaires, I have never had a

8  jury before not chosen by noon, including the first 9/11

9  prosecution in January of 2002.

10         Opening statements were expected to be not

11 particularly long, and I see that they have not been,

12 particularly since the government was only going to give an

13 opening statement for a half an hour.

14         United States government should have been prepared for

15 your first witness and provided the information to defense

16 counsel.

17         Now, perhaps there's no harm.  I am going to ask

18 defense counsel if you have reviewed the recent information

19 that you've received from the government, and are you prepared,

20 based upon that -- Mr. Kaster, please be seated -- are you

21 prepared to cross-examine the witness.

22         MS. JOHNSON:  Your Honor, I -- regrettably, I truly am

23 not.  I received the notes, I think I was in my car on the way

24 coming to the courthouse.  I -- I appreciate that the

25 government has significantly shortened its opening.  I think in

1   the original trial schedule, it was anticipated to be an hour

2   or two hours.

3           And the email from Ms. Karlen that was sent yesterday

4   evening indicated that Mr. Pinkerton was going to testify

5   Wednesday morning.

6           I spent last night preparing my opening.  I assumed

7   that the government had allotted its time so that its opening

8   was going to fill much more time than it did, since they said

9   that they would begin with Mr. Pinkerton Wednesday morning.  I

10  have not reviewed the materials.  I feel that it would be

11  unfair to my client to proceed at this point.

12          MR. KASTER:  Your Honor, there's one piece of the

13  procedural history that I think has been unintentionally

14  overlooked.

15          The parties were before the Court for a pretrial

16  conference prior to the trial date of January 23rd.  And -- my

17  co-counsel informs me that we were before the Court on

18  January 17th.

19          And as reflected in the transcript for that hearing,

20  we tried to confirm that, even though we were under the clear

21  understanding the Court would be selecting the jury, you know,

22  within a half a day, that opening statements would be in the

23  afternoon, along with the initial instructions, but then

24  testimony would begin following day.

25          And so we had tried to confirm the testimony would

1    begin on Wednesday, the 24th.  And that's the source of our

2    confusion this week, Your Honor, is that we assumed that same

3    understanding carried over to this week.

4        As a result, we were assuming we would present our

5    first witness tomorrow.  And accordingly, Ms. Karlen provided

6    the list of witnesses last night, which was well over a day in

7    advance, for the defense to know that Colonel Pinkerton would

8    be testifying Wednesday morning, not Tuesday afternoon.

9        And the other point was that, pursuant to the Court's

10   instruction to just -- to turn over notes, you know, as soon as

11   we had them with regards to these trial prep interviews, again

12   we're not saying they are substantially verbatim to qualify for

13   Jencks.  We're just turning them over as soon as we have them.

14       And with regards to Mr. Pinkerton, having sent them to

15   the defense last night, we weren't anticipating they would be

16   needing to use them today.  We thought they would have today to

17   go over them because --

18       THE COURT:  Well, okay.  Let me stop you for a second.

19       Did I say unequivocally that testimony would begin on

20   the second day?  Or was that an understanding that that would

21   be the opening statement?  I don't know, particularly since our

22   hearing last night, that anyone could have interpreted what I

23   said to mean that the government wasn't required to call

24   witnesses immediately after opening statements.

25       But let me say this.  Let's get over this.  It sounds

1    as if the defense is not ready for your first witness.  So we

2    are going to convene tomorrow.  But I can tell you, and this

3    applies to both sides, you are to give notice of what witnesses

4    you are calling.  No late disclosures of material evidence or

5    information concerning those witnesses.  Otherwise, I am going

6    to grant a continuance.

7            And there is a substantial concern for the government

8    that if we continue this trial, that there may be a mistrial

9    because we only have one alternate left.  That's nobody's

10   fault.  It's unfortunate.  But I am telling both sides, right

11   now, it falls on the government that -- I made this clear.  I

12   certainly made it clear last week when I was surprised that you

13   were still interviewing witnesses.

14           Nonetheless, let's put that aside.  I'm going to tell

15   the jury to be here before 8:30 so we can start at 8:30.

16   Clear?

17           MR. KASTER:  Yes, Your Honor.  We're clear, Your

18   Honor.

19           MR. BARTOLOMEI:  We're clear, Your Honor.

20           THE COURT:  All right.  Now, is the list of witnesses

21   to be called by the government made clear to the defense?  And

22   let's hear now who they are, how much time it's going to take

23   on direct examination for every one of those witnesses.

24           MR. KASTER:  I will let Ms. Karlen respond to that, if

25   I may.

1      MS. KARLEN:  Your Honor, can I just have one moment

2  for the time frame?

3      THE COURT:  Yes.

4      MS. KARLEN:  I have the names, but I want the time

5  frame.

6      First witness is Colonel Kurt Pinkerton.  We

7  anticipate his direct testimony to be an hour.  The next

8  testimony that we intend to elicit is playing the al-Dhari

9  deposition.  We believe -- we believe it's either five or six

10 hours, Your Honor.  I have to verify the exact time frame after

11 the cuts were made pursuant to the Court's rulings.

12     THE COURT:  Okay.  So you expect that the first

13 witness is how much time?  I missed it.

14     MS. KARLEN:  Colonel Pinkerton is an hour.

15     THE COURT:  Okay.  Then five or six hours for

16 Mr. al-Dhari?

17     MS. KARLEN:  I apologize.  I don't have the exact

18 amount of time, but without seeing it after cuts were made,

19 that would be my estimate, between the direct and

20 cross-examination.

21     The next witness the United States intends to call is

22 Todd Wilson.  United States anticipates the direct testimony of

23 an hour.

24     THE COURT:  That would be -- so you are anticipating

25 that's going to all occur tomorrow?

1          MS. KARLEN:  Yes, Your Honor.  We certainly are going

2     to be ready and prepared.  We have made sure that we have

3     numerous witnesses here to cover both tomorrow and the next day

4     as well.

5          THE COURT:  And of course, let me just repeat, and I

6     know you understand, if there -- if you are interviewing these

7     witnesses again and there's anything they provide you that is

8     material, then you are to provide that within 24 hours of their

9     testimony.

10          MS. KARLEN:  Thank you.

11          THE COURT:  Actually, you know, if they are going to

12     testify tomorrow, they have to have it this evening.

13          MS. KARLEN:  We will scan it and email it as soon as

14     we have it.  As soon as interview is finished, we will scan and

15     email it.

16          THE COURT:  Okay.  What I am saying is, if you expect

17     to call those witnesses tomorrow, you are to provide it this

18     evening.

19          MS. KARLEN:  Thank you, Your Honor.

20          THE COURT:  All right.  So we have at least tomorrow.

21     We have that resolved.  And afterwards, you can provide notice

22     in writing to defense counsel how much time it's going to take

23     for each of the witnesses thereafter.  Tomorrow is Wednesday,

24     Thursday and Friday.

25          MS. KARLEN:  Your Honor, I'm sorry.  Just to make

1    clear, we do have a few additional witnesses in case we need

2    them tomorrow.  If you would like for the record to be clear so

3    that defense counsel is advised our order, the next witness

4    will be William Huff, and that's anticipated to be three hours.

5    And then the final witness is Jeffrey Mullin that we anticipate

6    might possibly be tomorrow.  We anticipate his direct testimony

7    will be four hours.

8            THE COURT:  All right.  Okay.  So that's quite a bit.

9    I doubt that we're going to call -- you are going to get

10   through all those witnesses tomorrow.  But at least the defense

11   knows.  And again, provide any supplemental information that

12   has not already been provided within 24 hours, that means

13   tonight, so they have it for tomorrow.

14           Now, I'm going to call -- unless there's something

15   else, I'm going to call the jury back in.

16           MR. BARTOLOMEI:  Yes, Your Honor.  Unrelated to the

17   matter dealing with the scheduling --

18           (Juror Number 1 walks into the courtroom.)

19           A JUROR:  It's not time yet?

20           THE CLERK:  You can't come in the courtroom.

21           A JUROR:  Sorry.  I was trying to put the code in, and

22   it's not opening.

23           (Juror Number 1 leaves the courtroom.)

24           THE COURT:  That juror has been a bit confused

25   throughout this process.  There's nothing in her questionnaire

1     to indicate there's a reason for it, but it's okay.  This is a

2     courthouse.  I have even been confused and couldn't find my

3     office.

4          So, Mr. Bartolomei, go ahead.

5          MR. BARTOLOMEI:  Yes, Your Honor.  I am objecting to

6     any further references by the government to my client as "that

7     man."  My client has a name.  This issue has actually been

8     discussed before the prior judge who was in charge of this

9     case, before his illness.

10          I would prefer -- and I object to my client not being

11    referred to by his name.  I think it's inappropriate.  I would

12    not be referring to "that agent" or anything like that.  I just

13    think it's not proper.

14          THE COURT:  Well, it is -- it was, Mr. Kaster,

15    argumentative.  That kind of reference perhaps would be

16    acceptable in closing argument.  But I've taken it as

17    argumentative.

18          MR. KASTER:  I apologize, Your Honor.

19          THE COURT:  All right.  Okay.  I'm going to get the

20    jury back in here.  I guess Christine is trying to have the

21    juror find her place.  I will have the jurors come back in and

22    have them here -- we will start at 8:30.  So that means you

23    need to be here earlier.  And I will tell the jurors that they

24    need to be here earlier.

25          THE CLERK:  Ready for the jury?

1          THE COURT:  Yes.

2          THE CLERK:  There's still four missing.

3          THE COURT:  We'll wait.  Okay.  We will take a break

4     also.  Christine will tell us when they are back.

5          (Recess taken at 3:33 p.m. until 3:40 p.m.)

6          (Jury enters the courtroom.)

7          THE COURT:  Please be seated.  Guess what?  You get to

8     go home early.  Yes.  I'm sure you are all happy about that.

9          We will start on time tomorrow, 8:30.  So if you

10    arrive at 8:30, you're late.  So please get here early enough.

11    I know the traffic can be a problem at that time.  Yes, I can

12    see some nodding heads.  But that's for all of us.  That's for

13    the lawyers and that's for me.  And certainly nothing can start

14    without me.  So make sure you're here on time.

15         Have a nice evening.  And remember, don't listen to

16    anything about this case.  Don't talk to anyone about it.  You

17    can say you're sitting as a juror in a Federal Court.  And you

18    could tell your family that.  You can tell your employer that.

19    But that's it.  All right?  And we are -- you are excused.

20         I know Christine has told you, she's the expert, you

21    are to put your notebooks in the room.

22         A JUROR:  What about the juror badge?

23         THE CLERK:  You want to keep those and wear those when

24    you come back tomorrow.

25         THE COURT:  A little souvenir.  All right.  Have a

1  nice evening.

2          (The jury retired to the jury room.)

3          THE COURT:  Okay.  Please be seated.  Counsel, I don't

4  think at this time that it's necessary for me to talk to the

5  one juror who seems -- has been confused quite a bit.  You

6  might have noticed when she was selected, she started to walk

7  out of the courtroom instead of coming up here.  I don't think

8  it's necessary.

9          She looks fine from her questionnaire.  But, you know,

10  we certainly can't lose a juror.  So it might be that we need

11  to bring her in the courtroom and make sure that she feels

12  comfortable about where she is to go and where she is to be.

13  But I am going to wait on that.

14          Now, I do recall from last night defense counsel wants

15  to talk to me in camera, and I've accepted that, about the

16  subpoenas.  The government is aware of it.  The government is

17  also aware that I have cited case law that I believe is

18  applicable to whether or not these individuals can be

19  subpoenaed, and I have a concern.  But I want to hear from

20  defense counsel.

21          Now, I can't recall if there's any other issues that

22  are looming, but there always are in cases like this.  Let me

23  hear from the government.

24          MR. KASTER:  We have one issue, Your Honor.

25          MR. SOLOMON:  Judge, we certainly do not want to take

1     a position on the subpoenas.  The one thing I do want to say,

2     though, is that the case law the Court cited last night, I

3     don't believe it applies to this particular instance.  The

4     reason is because that case law applied to a situation in which

5     the Secretary of Agriculture was issued a subpoena to provide a

6     deposition in a case back in the 1940s.  And I don't know -- I

7     believe --

8             THE COURT:  Yes, it was 1941, that case.

9             MR. SOLOMON:  I believe --

10            THE COURT:  Do you know if there's any case law after

11    that?  What I'm really asking is, are you allowing the

12    subpoenas to go forward or no?

13            MR. SOLOMON:  So I don't think that applies, because I

14    think the Court found that that was a quasi-judicial function

15    that the Secretary of Agriculture was exercising.  I don't

16    think that's the case here.

17            I think what would happen is if the Court were

18    inclined to issue the subpoenas, there would probably be

19    litigation initiated by those who would represent the

20    congresspeople, probably the Office of General Counsel for both

21    the House and the Senate.  We would not take a position on that

22    litigation.  That would be up to them.  We don't represent

23    them.

24            THE COURT:  Okay.  So, then, I presume the defense

25    agrees with that.  I also noted in the Eighth Circuit case,

UNITED STATES DISTRICT COURT

1    though, that the attorney general and the assistant attorney

2    general were subpoenaed, and the Eighth Circuit said that the

3    law still applies to them because there was a concern.  I know

4    that it was the secretary, but there was a concern about

5    interference with the functions of the office, which is

6    certainly applicable.

7          As you know, before Department of Justice officials

8    can be subpoenaed, there are regulations.  So I'm not sure I

9    agree with you, but perhaps the defense does.  And there's been

10   a reference in opening statement that there will be testimony

11   about Senator Graham and the congressman, so -- and there was

12   no objection to that, so I guess you expect it.

13         MR. SOLOMON:  Judge, there has already been testimony

14   in the deposition of Mr. al-Dhari.  Mr. Kaster actually asked

15   him if he had met with Mr. Graham and Mr. Royce.  So there has

16   already been testimony.

17         THE COURT:  I do think there's some reference, I read

18   that, in the visas, which are going to be admitted into

19   evidence.

20         MR. SOLOMON:  Yes.  And I think that dealt with his

21   plans to come this time.  I believe there was a letter from a

22   different congressperson inviting him to meet with her.  I

23   believe that was Congresswoman Gabbard from Hawaii.

24         THE COURT:  Now, I will say I appreciate the research

25   that you have done.  And I also agree that generally it is -- I

1    expected that if the subpoenas are issued, that there will be

2    an objection and that someone will stand in and represent the

3    senator and the representatives and oppose it.

4            But I also don't want to be in a situation where, as a

5    judge, I'm issuing a subpoena that is contrary to the law,

6    where I know in fact that it's interfering with the functions

7    of the Senate and the House of Representatives.

8            So I'm not completely sure I agree with you,

9    nonetheless.  So that's my concern from my point of view.  And

10   I -- I accept your position that perhaps that 1941 case, the

11   Morgan case, is not applicable to the Senate or the House of

12   Representatives.  I will take a close look at it.

13           MR. SOLOMON:  Judge, again, we just want to reiterate

14   we don't take a position on the subpoenas.  But I did do some

15   additional research, and I believe there was a case out of the

16   Southern District of California back in 2007.  I can give a

17   case cite for Westlaw on that.

18           THE COURT:  Will you at least give it to the Court?

19           MR. SOLOMON:  I can give it -- can I give it now?  And

20   then defense counsel would have it as well.

21           THE COURT:  Okay.  Go ahead.

22           MR. SOLOMON:  It's 2007 Westlaw 2976784.  And again,

23   that's out of the Southern District of California, United

24   States of America versus Brent R. Wilkes.  And what it is, I

25   was able to pull up a memorandum of points and authorities that

1    the Office of General Counsel had filed in that case where

2    members of Congress were subpoenaed.  So I would anticipate

3    this would be probably what would come as a result of the

4    subpoenas.

5            THE COURT:  So the judge, the Southern District of New

6    York, you said?

7            MR. SOLOMON:  Southern District of California.

8            THE COURT:  California.  Actually issued the subpoena

9    to Congress?

10           MR. SOLOMON:  Yes.  It appeared subpoenas were

11   actually issued.  A motion to quash was filed.  There was a

12   response filed.  And then it turned out, for whatever reason, I

13   couldn't figure out the reason, that the motion to quash was

14   denied because it was moot.  I couldn't find out why it was

15   moot.

16           THE COURT:  All right.  Thank you.

17           MS. MOLLY KARLIN:  Thank you, Your Honor.  We agree

18   with Mr. Solomon that it's not the -- we appreciate that they

19   are not taking a position.  We believe they don't have standing

20   to take a position on this.  A 17B subpoena is an ex parte

21   matter, and it's ex parte matter because it concerns funding.

22           THE COURT:  I'm sorry.  Concerns funding?

23           MS. MOLLY KARLIN:  It concerns funding for an indigent

24   defendant.  If --

25           THE COURT:  I'm quite aware of all of that.  It's

1   going to be ex parte, but you gave notice to the government and

2   also notice to the Court.  And so my concern is whether or not

3   I had the authority to do that.

4          Now, you and I and the rest of your counsel will talk

5   about this in camera.

6          MS. MOLLY KARLIN:  Respectfully, Your Honor, I'd just

7   like to point out we gave notice not for the purpose of somehow

8   asking if we could issue the subpoena or to let them intervene,

9   but because we are now in trial and we wanted to let them know

10  that we intend to call these people as witnesses.

11         THE COURT:  All right.  Ms. Karlin, you basically told

12  me that yesterday and now again.  You gave them notice.  They

13  basically agree with you.  So it's moot.  My concern is you

14  gave me notice.  You asked me to do this.  I want to make sure

15  I can do it as a matter of law.  So that's it.  So now we're

16  going to hold the hearing in camera.  All right?

17         MS. MOLLY KARLIN:  Thank you.

18         THE COURT:  Is there anything else from the government

19  before tomorrow?

20         MR. PIMSNER:  No, Your Honor.  Can we be excused, or

21  do you want us to wait outside?

22         THE COURT:  No.  You can be excused.  I'm sure you

23  have something to do.

24         MR. PIMSNER:  Thank you, Your Honor.

25         (Government leaves and defense remains for an ex parte

1    motion.)

2         (Sealed proceedings held.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

C E R T I F I C A T E

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7     an EXCERPTED, true, and accurate transcript of all of that

8     portion of the proceedings contained herein, had in the

9     above-entitled cause on the date specified therein, and that

10    said transcript was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 5th day of February,

12    2018.

13

14                              s/Elva Cruz-Lauer
                          Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT