1            **UNITED STATES DISTRICT COURT**

2           **FOR THE DISTRICT OF ARIZONA**

3                  _____

4

**United States of America,**        )

5                                     )    No. **CR 12-1263-PHX-ROS**

             Plaintiff,               )

6                                     )

        vs.                           )    Phoenix, Arizona

7                                     )    January 31, 2018

**Ahmed Alahmedalabdaloklah,**        )    1:13 p.m.

8                                     )

             Defendant.               )

9    _____ )

10

11      **BEFORE:   THE HONORABLE ROSLYN O. SILVER, JUDGE**

12      <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

13      *(**Jury Trial - Day 2 - P.M. Session**)*

14

15

16

17

18

19

20

Official Court Reporter:

21   Laurie A. Adams, RMR, CRR

     Sandra Day O'Connor U.S. Courthouse, Suite 312

22   401 West Washington Street, Spc 43

     Phoenix, Arizona 85003-2151

23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter

     Transcript Prepared by Computer-Aided Transcription

25

```
 1   APPEARANCES:

 2   For the Plaintiff:
             U.S. ATTORNEY'S OFFICE
 3           By:  David A. Pimsner, Esq.
             By:  Melissa B. Karlen, Esq.
 4           By:  William C. Solomon, Esq.
             40 North Central Avenue, Suite 1800
 5           Phoenix, Arizona 85004

 6           U.S. DEPARTMENT OF JUSTICE
             By:  Joseph N. Kaster, Esq.
 7           950 Pennsylvania Avenue NW, Suite 2649
             Washington, DC 20530
 8
     For the Defendant:
 9           FEDERAL PUBLIC DEFENDER'S OFFICE
             By:  Gregory A. Bartolomei, Esq.
10           By:  Jami S. Johnson, Esq.
             By:  Molly A. Karlin, Esq.
11           By:  Shishene Jing, Esq.
             850 West Adams Street, Suite 201
12           Phoenix, Arizona 85007

13   ALSO PRESENT:
             Steven Scheps, USAO Intelligence Specialist
14           Renee Rivera-Thomas, FPDO Paralegal
             Oscar Castillo, FPDO Investigator
15
```

16
## I N D E X

17
| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
18

JAMAL AL-DHARI
19 (By videotape deposition)
| By Mr. Kaster - Resumed | 3 | | 41 | |
20 | By Mr. Bartolomei | | 14 | | |

21
### INDEX OF EXHIBITS

22
| EXHIBIT | | IDENT | RECEIVED |
| 14 | Copy of e-mail dated 1-9-07 from | | |
23 | | Dhari_jamal@yahoo.com to | | |
| | Abdullah.lootah@istithmar.ae | 4 | 5 |

24

25

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Let's get the jury in.  Are you ready to

 3   roll?

 4            MR. PIMSNER:  We are, Your Honor.

 5            (Jury in at 1:14 p.m.)                          01:13PM

 6            THE COURT:  Please be seated, Ladies and Gentlemen.

 7   Thank you.  And we're ready to proceed.

 8            MR. PIMSNER:  Thank you, Your Honor.  We will begin

 9   with the third segment of the deposition.

10            (The following videotape deposition was played in open 01:14PM

11   court:)

12            THE VIDEOGRAPHER:  The time is 1:29 a.m.  We're now

13   back on record.  And the court reporter will now swear in the

14   interpreter.

15            (The interpreter was sworn by the court reporter.)   01:15PM

16                         JAMAL AL-DHARI,

17   a witness herein, having been first duly sworn by the clerk to

18   speak the truth and nothing but the truth, was examined and

19   testified as follows:

20                    DIRECT EXAMINATION-RESUMED

21   BY MR. KASTER:

22   Q.  All right.  Mr. Al-Dhari, I'm now going to show you what's

23   been marked for identification as Government's Exhibit Number

24   14 and ask if you can identify this document.

25   A.  Okay.                                              01:15PM
```

1    Q.  Let's pause for a moment and let her catch up.

2    A.  Okay.  So it's an electronic e-mail from my personal

3    e-mail.  It's from an individual who resides at the United Arab

4    Emirates, and it contains a copy of a passport sent from

5    another e-mail under tiss2007@yahoo.com.  And actually, I          01:16PM

6    forwarded this e-mail to that person.  And, again, it contains

7    a copy of a passport for an individual named Ahmed Hassan

8    Farhan.

9    Q.  And the top of the first page e-mail account there that

10   says dhari_jamal@yahoo.com, that is your e-mail account,          01:17PM

11   correct?

12   A.  So it's a Yahoo mail, yes.  It's an electronic e-mail.

13   Q.  Is that your account?

14   A.  Yes.  It's my e-mail address.

15   Q.  And on the second page, who is this a picture of in the        01:17PM

16   passport?

17   A.  And this is for our brother, Mukhtar.

18   Q.  Does Mukhtar also go by the name of Ahmed Farhan?

19   A.  Yes.  Yes, sir.  This is the copy of his passport.

20          MR. KASTER:  Government will offer into evidence            01:18PM

21   Government's Exhibit Number 14.

22          (Videotape deposition paused.)

23          MR. PIMSNER:  Your Honor, at this time I would like to

24   admit Exhibit 14 and publish it to the jury.

25          MS. JOHNSON:  We stand on prior objections.                 01:18PM

1          THE COURT:  Overruled.

2          MR. PIMSNER:  Thank you.

3          Showing the first page.  Showing the second page.

4    Thank you, Your Honor.

5          THE COURT:  Yes.                                        01:19PM

6          (Videotape deposition resumed in open court:)

7    BY MR. KASTER:

8    Q.  I will show you what's been marked for identification as

9    Government's Exhibit Number 15 and ask if you can identify

10   that.                                                         01:19PM

11   A.  Okay.  So again, it was an e-mail, and it was sent from my

12   personal e-mail in 2008 to Mr. Abas Almwsawi or Dr. Abas

13   Almwsawi, and he's the Iraqi ambassador in Moscow.  And he's a

14   friend of mine.  And, of course, he was the Iraqi ambassador in

15   Moscow until the U.S. invasion into Iraq.                     01:21PM

16         MR. KASTER:  Government would offer into evidence

17   Exhibit Number 15.

18         MR. BARTOLOMEI:  No objection.

19   BY MR. KASTER:

20   Q.  Mr. Al-Dhari, what is your understanding of the information 01:21PM

21   that are you conveying in Government's Exhibit Number 15?

22   A.  Yes.  It's clear.  So, yes, the question was clear.  I sent

23   this letter or this e-mail to Dr. Abas, and it contains a phone

24   number to Mr. Ahmed Hassan Farhan in Syria just to introduce

25   him to him.                                                   01:22PM

1   Q.   Next I will show to the witness what's been marked as

2   Government's Exhibit Number 16 and ask whether he can identify

3   this document.

4   A.   So, yes, it was an electronic e-mail coming out of my

5   personal e-mail to two individuals on August 2008 to                    01:23PM

6   jorg@yahoo.com and mustafaliraqi@yahoo.com

7   Q.   And what was the attachment to the e-mail?

8   A.   And it was a hotel reservation at the Quality Hotel in

9   Tripoli, Lebanon, for two people.  And the first -- I can see

10  on the first page there is a reservation for one person and his   01:24PM

11  wife, and he's a friend of mine.  And on the second page there

12  is another reservation for Mr. Ahmed Farhan.

13          MR. KASTER:  Government will offer into evidence

14  Exhibit Number 16.

15  BY MR. KASTER:                                                          01:25PM

16  Q.   Do you recall, Mr. Al-Dhari, sitting here today, why you

17  got a reservation confirmation for Mr. Ahmed Farhan back in

18  2008?

19  A.   I don't recall exactly why it was that reservation but let

20  me tell you this.  So let me tell you this:  It was part of our   01:25PM

21  coordination to those.  They need help and assistance in

22  reserving hotels to those people or the staff at the embassies

23  or others.

24  Q.   Did you do this coordination on behalf of the 1920

25  Revolutionary Brigades?                                                 01:26PM

1   A.  So it's not a problem, sir.  We offer assistance to all of

2   those people that are in need of it.  It does not matter if

3   they belong to the 20th Revolution Battalions or not any, any

4   people that need assistance, anyone, any person.

5   Q.  Returning to Government's Exhibit Number 14, the passport          01:27PM

6   of Ahmed Farhan, I'm giving the exhibit back to the witness and

7   asking Mr. Al-Dhari what, if anything, was he doing on behalf

8   of Mr. Farhan with Mr. Farhan's passport?

9   A.  Okay.  So that person needed a visa to visit China.  So

10  that's why he sent it to me and I forwarded it to my friend at        01:28PM

11  the United Arab Emirates trying to assist him in that matter.

12  Q.  I will now show the witness what's marked for

13  identification as Government's Exhibit Number 17 and ask you to

14  look at it and tell us if you can identify that document.

15  A.  So it was, again, another e-mail address sent from my             01:29PM

16  personal e-mail.  And it was a hotel reservation sent -- so it

17  was sent from the Quality Hotel to my e-mail address on the

18  24th of August, 2008.

19  Q.  And on the second page of the document, whose name is the

20  reservation for?                                                      01:30PM

21  A.  So it was under the name Ahmed Hassan Farhan, the Quality

22  Hotel.

23          MR. KASTER:  The government now offers into evidence

24  Government's Exhibit Number 17.

25  BY MR. KASTER:                                                        01:30PM

1  Q.  Next I'd like to show you Government's Exhibit Number 18

2  and ask you to look at it.  And can you identify this document?

3  A.  So, again, it was an electronic e-mail and under the

4  address of your friend Mukhtar and sent to John underscore --

5        MR. KASTER:  Hold on, Translator.  The witness is                01:31PM

6  correcting a point.

7        THE WITNESS:  From john_john, not to.  It was an

8  electronic e-mail under your friend Mukhtar from

9  john_john200812@yahoo.com to my e-mail address.

10 BY MR. KASTER:                                                          01:32PM

11 Q.  And what was the date of the e-mail?

12 A.  It was on November, 2008.

13 Q.  What did the e-mail concern?

14 A.  So the concern about this e-mail that Mukhtar sent it to me

15 after a greeting and explaining he was late in sending for some         01:33PM

16 health issues.  And that e-mail -- so it was an e-mail sent

17 from Mukhtar saying that he was late in sending this message,

18 or this e-mail, to me because of some bad health issues.  But

19 it contained some details and information on how to use a

20 certain phone.                                                          01:34PM

21 Q.  Who owned the john_john account?

22 A.  It belongs to the same person, Mukhtar.

23 Q.  And how do you know that?

24 A.  So the reason why, because of the e-mail address Mukhtar,

25 of your friend Mukhtar, he was known by this signature, you             01:35PM

1    know.  It's for him.  It belongs to him, your friend Mukhtar,

2    and because we communicated too many times under this e-mail

3    address.  And the most important thing that he was talking --

4    or I mean he was writing and talking some detailed information

5    about that certain phone that expected to come only from him,    01:35PM

6    not from any other person.  So that e-mail address, it belongs

7    only to Mukhtar.

8    Q.  All right.  What was the nature of the -- strike that

9    question.

10            What kind of phone was this document describing?         01:36PM

11   A.  So we were talking often about too many things, which we

12   were thinking that it might hurt us if we talked about it.  And

13   the things, the concerns we used to address, it has to do with

14   the resistance and the way we're trying to help them.  And

15   that's why we were thinking of a phone that no one can           01:37PM

16   penetrate, or learn, about that phone.  And Mukhtar advised me

17   with that.

18   Q.  I will know show you what's been marked for identification

19   as Government's Exhibit 18A and ask if you could identify that

20   document.                                                         01:38PM

21   A.  So it was the same e-mail but sent to me again a day after

22   that.  That was it.

23            MR. KASTER:  Government will offer into evidence

24   Government's Exhibit 18A.

25   BY MR. KASTER:                                                    01:39PM

1    Q.  So Mr. Al-Dhari, what does the attachment to your e-mail

2    concern?  What was it about?

3    A.  So it was an attachment, some details and information on

4    how to use that phone and some other details about the phone

5    that that phone was able to penetrate another phone and listen          01:40PM

6    to another phone.  And it was protected from spying, and it had

7    other instructions and information.

8    Q.  I will now show the witness what's been marked as

9    Government's Exhibit Number 19 and ask if you can identify

10   that, please.                                                           01:40PM

11   A.  So it was, again, another e-mail from your friend Mukhtar

12   and sent from the e-mail of john_john, underscore, I think john

13   122008, I think, and sent --

14          THE INTERPRETER:  Just for the record, the interpreter

15   is repeating the e-mail that he made, JohnJohn under 2008812 at         01:41PM

16   yahoo.com --

17          THE WITNESS:  And sent in November, 2008 to my e-mail.

18   And it was talking about receivers and about 100 pieces of

19   receivers, devices, and another 10 pieces of different kind of

20   devices.                                                                01:42PM

21          THE INTERPRETER:  And if may the interpreter ask Mr.

22   Dhari about that missing statement there.

23          MR. KASTER:  I think the question is the Number 10

24   refers to what kind of device?

25          THE INTERPRETER:  Yes, sir.                                      01:42PM

1          MR. KASTER:  Can you translate that?

2          THE INTERPRETER:  Yes, of course.

3          THE WITNESS:  So as I mentioned before, another 10

4    pieces of different kind of devices were sent from China to

5    assist the resistance in Iraq.                               01:43PM

6    BY MR. KASTER:

7    Q.  Offer Government's Exhibit Number 19.

8          So Mr. Al-Dhari, let me ask you a few questions

9    regarding this exhibit.  What is your understanding as to why

10   Mukhtar is sending you this information?                      01:43PM

11   A.  So the resistance were in need to those devices in

12   assisting them in finishing and completing their work and their

13   mission.  So there were receivers and other devices to help the

14   resistance in finishing their mission.

15   Q.  As to the 10 devices, can you describe a little more what  01:44PM

16   those devices' purpose was?  How were they to be used?

17   A.  So, once again, the resistance were in need for those

18   devices, and they used to use them with bombs and -- with bombs

19   to explode them through remote controls.  That's why they

20   needed those devices, to receive and send.                   01:46PM

21   Q.  And Mr. Al-Dhari, why were you being sent 100 receivers but

22   only 10 transmitters?

23   A.  So, actually, the reason for that because we don't need a

24   lot of those transmitters but we will need more for those

25   receivers.  And the reason why, because those receivers, they  01:47PM

 1   get damaged with the bombs very quick.  That's why we need more

 2   pieces of them.

 3   Q.  I will show you what's marked for identification as

 4   Government's Exhibit Number 20.  Can you identify this

 5   document?                                                      01:47PM

 6   A.  So it was an e-mail address under the title "Ready

 7   Materials" sent from the same e-mail that Mr. Mukhtar used

 8   under John_John on December 2008 to my e-mail address.  And he

 9   was talking about different materials ready to be shipped but

10   through the sea shipment.                                      01:49PM

11   Q.  Government will offer into evidence government's Exhibit

12   Number 20.

13          What types of materials are being described in this

14   e-mail?

15   A.  I really don't know the truth, sir, but it was some        01:49PM

16   magnetic material but my knowledge and understanding that those

17   materials were ready to be shipped.

18   Q.  Mr. Al-Dhari, did the resistance have problems detonating

19   their explosive devices because the Americans were trying to

20   jam or block the signals?                                      01:50PM

21   A.  Yes, sir.  I agree with you.  There were a lot of problems

22   and issues.

23   Q.  And did Mukhtar use his technical or technological

24   expertise to help solve those problems with the resistance?

25   A.  So it was a pride for us, sir.  We were very proud of that  01:51PM

 1    work, and it was something great to help a person and to

 2    liberate people and help them get rid of their occupation.

 3    Q.  But the question was, did Mukhtar --

 4    A.  (In English) I answered the question but she didn't

 5    translate.                                                          01:52PM

 6         (Through the translator:)  Yes.  As I mentioned before

 7    that Mukhtar used to help us in that matter.

 8    Q.  Mr. Al-Dhari, one or two more questions.  You told us

 9    previously that you spoke with Mukhtar over the phone in

10    addition to communicating via e-mail.  Is that correct?            01:53PM

11    A.  Yes, sir.

12    Q.  Did you discuss these types of shipments with Mukhtar over

13    the phone as well as through e-mail?

14    A.  We really don't talk a lot about details either via phone

15    or in e-mail, because we know that everything is ready and         01:54PM

16    everything is ready to move on and be shipped.

17         MR. KASTER:  Translator, the word ready?  Everything

18    is ready?

19         THE INTERPRETER:  May the interpreter ask Mr. Dhari to

20    repeat, sir?                                                       01:54PM

21         MR. KASTER:  Yes.

22         THE WITNESS:  So, yes, we talked via phone and e-mails

23    but we did not talk about details either via phone or e-mails.

24    We used to talk briefly, but we used to understand the purpose

25    of talking that when we had some things to ship and the           01:56PM

1    shipment will be ready, and we understand what we were talking

2    about.

3    BY MR. KASTER:

4    Q.  And why did you not go into details as to the purpose of

5    these shipments over the phone or e-mail?                          01:56PM

6    A.  And the reason why, because we were talking about concerns

7    or things that have to do with the Iraqi resistance against the

8    Americans because they might be -- they might be opposed to

9    harm.  That's why when we used to talk, we used to use some

10   words we only understand and we used to hide it, like we used     01:58PM

11   to use words we understand it between each other.  Because we

12   don't want those people to face any harms.

13           MR. KASTER:  I think at this time I have no further

14   questions.

15                      CROSS-EXAMINATION                               01:58PM

16   BY MR. BARTOLOMEI:

17   Q.  I'm not really sure if it's morning or afternoon, but good

18   day, Mr. Al-Dhari.  I would like to -- I have a number of

19   questions I'd like to cover with you.

20           Mr. Al-Dhari with regards to Mr. Hassan Alani, what        01:59PM

21   was the nature of his work for you?

22   A.  Yes, sir.  It's a correction for the interpreter.  The name

23   is Hassan Alani.  And since I own an office in Syria, Damascus,

24   and he used to work for me in a media or a press company.

25   Q.  How long did he work for you, sir?                             02:00PM

1    A.  So he used to work for me before that when I was in Iraq.

2    After 2003 I was an official representing a political party in

3    Abu Ghraib, and he used to work for me at that time.

4    Q.  And what were his duties?

5    A.  Okay.  So I used to issue magazine, or I used to have or                02:02PM

6    own a magazine in Abu Ghraib, and he used to help me in issuing

7    that magazine, that political magazine.  And since that day he

8    used to work for me, and he was very sincere to me and to his

9    work.

10   Q.  Was he involved with communications for your company?                   02:02PM

11   A.  Yes.

12   Q.  I'd like to jump ahead a little bit.  When did you meet

13   with the FBI about this case?  Well, let me rephrase that.  I

14   withdraw that.

15        Did you meet with the FBI while you were still living                   02:03PM

16   in Iraq up until 2005?

17        THE INTERPRETER:  So for, sir, for the record did you

18   say 2003 or 2002?

19   BY MR. BARTOLOMEI:

20   Q.  Before he left Iraq in 2005, did he meet with the FBI at                 02:03PM

21   all?

22   A.  No.  No.

23   Q.  Who set up your first meeting with the FBI in this case?

24   A.  Okay.  So as you know, I am a resident of Latvia, and I

25   reside in Riga, the capitol, and I was -- and I was shocked or              02:05PM

1    stunned by a phone call I received that there is a group or a

2    team of people that they asked to meet me.  And there's some

3    individuals, some Americans and other individuals from Latvia

4    and that happened in June of last year.  Yes.  June of last

5    year.                                                        02:06PM

6    Q.  Now, during -- did you set up a meeting with the FBI right

7    after that?

8    A.  So that happened a short period of time right after that in

9    Riga, and I had to visit D.C. after that and I coordinated a

10   meeting with them.                                           02:07PM

11   Q.  Okay.  But you had a meeting with the FBI on June 16 --

12   June 10th, 2016 in Latvia, correct?

13   A.  All that I can recall it was June, and it was the month of

14   Ramadan, and I was fasting.  I really cannot recall more than

15   this.  But if you really want me to get you the exact date, I  02:07PM

16   can go back to my papers and find for you the exact date.

17   Q.  You testified earlier today that you became aware of my

18   client being arrested in Turkey, correct?

19   A.  Correct.

20   Q.  And that arrest occurred around 2011?                    02:08PM

21   A.  Yes.

22   Q.  And you did not follow -- I'm sorry.  You did not follow

23   the change of any developments in that case after you learned

24   of my client's arrest?

25   A.  So I heard the news from some friends, and I tried to offer  02:09PM

1    my help when he was in Turkey.  But, unfortunately, we could

2    not release him out of his prisons or out of where he was

3    detained.  And the Turkish were not very responsive to us or to

4    our arbitration, and right after that I heard that he was

5    deported to the United States and we were unable to do                    02:10PM

6    anything.

7    Q.  And did you believe at that time that when he was deported

8    to the United States, as you phrased it, he was facing criminal

9    charges?

10   A.  So I was not sure at that time why he was deported.               02:10PM

11   Because I did not learn from the first place why he was

12   detained or he was arrested in Istanbul and why he was

13   deported.  But I was kind of predicting because of his

14   assistance to the resistance.

15   Q.  Do you remember, the first meeting with the FBI in Latvia,         02:11PM

16   was that videotaped?

17   A.  I don't recall there was a videotape.

18   Q.  Was it recorded in any manner that you observed?

19   A.  I don't know, because I entered a room and there were lots

20   of documents and papers.  And I did not recall if there were          02:12PM

21   any video recording or not.

22   Q.  Nobody forced you to attend that meeting, correct?

23   A.  Correct.

24   Q.  Do you recall telling the FBI during that meeting that you

25   were not aware of the kinds of products that were being shipped        02:12PM

1    from China?

2    A.  Okay.  We were generally speaking at that time.  I cannot

3    recall that we talked about any shipment or materials from

4    China.

5    Q.  But you were discussing allegations against my client that    02:13PM

6    he was shipping products from China, correct?

7    A.  Correct.

8    Q.  And during that -- and you were talking about parts being

9    shipped from China into Iraq at that time?

10            MR. KASTER:  Objection as to the form.  Ambiguous    02:14PM

11   especially to the phrase "at that time."

12   BY MR. BARTOLOMEI:

13   Q.  I will rephrase the question.

14            During that first meeting with the FBI, were you

15   discussing with them the shipment of parts from China into Iraq    02:14PM

16   which you say involved my client?

17   A.  So do you mean our first meeting with them in Riga?

18   Q.  Yes, sir.

19   A.  I cannot recall that we talked in details or what we talked

20   about our relationship or my relationship with the resistance    02:15PM

21   only and the people that used to work with us.

22   Q.  You agree that you were discussing the 1920 Revolutionary

23   Brigade movement, correct?

24   A.  That is correct.

25   Q.  So for clarification, you were discussing the 1920    02:16PM

1   Revolutionary Brigade even at that first meeting, correct?

2           (Videotape deposition paused.)

3           MR. PIMSNER:  Your Honor, if you could direct us as to

4   when you want us to break, this is a rather long clip.  So I

5   just don't know when the Court prefers.                    02:16PM

6           THE COURT:  How much longer will this witness be

7   testifying?

8           MR. PIMSNER:  This witness has -- there's an hour and

9   10 minutes on this remainder of this clip and about 20 minutes

10  after that.                                                02:17PM

11          THE COURT:  Let's take a break.  I think everybody is

12  in favor of that.

13          All right.  We'll take a 20-minute break.

14          (Recess from 2:17 p.m. until 2:46 p.m.)

15          THE COURT:  Please be seated.  Are you ready to go?  02:46PM

16          MR. KASTER:  Yes, Your Honor.

17          THE COURT:  So we'll get the jury in.

18          (Jury in at 2:48 p.m.)

19          THE COURT:  Please be seated.  Thank you.

20          And Mr. Pimsner, or the group, ready to go?         02:48PM

21          MR. PIMSNER:  Thank you, Your Honor.

22          THE COURT:  Yes.

23          (Videotape deposition resumed in open court:)

24          THE WITNESS:  So yes, sir, we talked about it and we

25  talked about all the other people were members with it or they  02:48PM

1    were assisting in it.

2    BY MR. BARTOLOMEI:

3    Q.  And do you recall telling the FBI that you did not know how

4    my client, Mr. Alahmedalabdaloklah, was assisting the 1920

5    Revolutionary Brigade?                                         02:49PM

6         THE INTERPRETER:  May the interpreter ask for the name

7    you just mentioned, please?

8         MR. BARTOLOMEI:  Mr. Alahmedalabdaloklah.

9         THE INTERPRETER:  Is that Ahmed?

10        MR. BARTOLOMEI:  My client.                                02:49PM

11        THE INTERPRETER:  So the interpreter asks to repeat

12   the question, sir, please.

13   BY MR. BARTOLOMEI:

14   Q.  Do you recall telling the FBI during that meeting in June

15   of 2016 that you did not know how Ahmed, my client, was        02:50PM

16   assisting the 1920s Revolutionary Brigade?

17   A.  I cannot recall, but I recall that we talked about some

18   details.  But I did not recall that he was assisting Mukhtar.

19   And truly and honestly I cannot recall most of the details,

20   because it was Ramadan month, and I was fasting.  I was tired  02:51PM

21   and the meeting happened during the first day of my arrival.

22   Q.  I want to clarify my question, because I think I may have

23   confused you.  And I apologize for that.

24        Did you tell the FBI during that meeting in June 2016

25   that my client, the person I represent, that you did not know  02:52PM

1    how he was assisting the 1920s Revolutionary Brigade?

2              MR. KASTER:  Objection.  Asked and answered.

3              THE WITNESS:  So were you asking, sir, about his

4    involvement in that revolution or his assistance?  What was

5    your question exactly?                                          02:53PM

6    BY MR. BARTOLOMEI:

7    Q.  My question is whether you made the statement that you did

8    not know exactly how my client, Ahmed, was helping or assisting

9    the 1920s Revolutionary Brigades.

10             MR. KASTER:  Same objection.  I think it's confusing   02:54PM

11   as to "my client Ahmed."  That's not how he referred to it.  Go

12   ahead.

13             THE WITNESS:  I cannot recall that I talked exactly

14   how he was helping or assisting the 20th revolution.  But let

15   me tell you it was my first meeting, and there was some of the   02:54PM

16   matters were very unclear and not clear to me.  But now I am

17   here and I am talking and I am clarifying things.

18   BY MR. BARTOLOMEI:

19   Q.  You had a second meeting with the FBI in October of 2016,

20   correct?                                                         02:55PM

21   A.  Yes.

22   Q.  You had a third meeting with the FBI on April 4, 2017, this

23   year, correct?

24   A.  Correct.

25   Q.  And that meeting had to do with this case, is that right?    02:55PM

1   A.  Correct.

2   Q.  That meeting was held in Washington, D.C.?

3   A.  Correct.

4   Q.  And at that meeting, you met with the prosecutors in this

5   case, is that right?                                          02:56PM

6   A.  So I met all of those people they work on this portfolio,

7   but I don't know what's their positions there.

8   Q.  By their conditions you mean their positions?

9          THE INTERPRETER:  Their position, yes.  The

10  interpreter said position.                                    02:57PM

11  BY MR. BARTOLOMEI:

12  Q.  Did you observe whether or not that meeting, that third

13  meeting, was recorded in any way whatsoever?

14  A.  No, I did not observe.

15  Q.  By the time you had that third meeting in Washington with  02:57PM

16  the prosecutors -- I'm sorry -- yes, in Washington D.C., had

17  you already agreed to testify in this case?

18  A.  So I said, and I say now, that I had nothing to be ashamed

19  of talking about this case.  I can talk about this case at any

20  time and under any circumstances and in any circumstances      02:58PM

21  because it is a case of prideness and I am proud to talk about

22  it at any time.

23  Q.  My question was whether you had already agreed to testify

24  as a witness for the United States government.

25  A.  Yes.                                                       02:59PM

1   Q.  Did you write any notes regarding this case after or during

2   -- during or after that third meeting?

3   A.  No.

4   Q.  You had a fourth meeting in D.C. on April 5th of 2017, is

5   that correct?                                               02:59PM

6   A.  Correct.

7   Q.  And that meeting was to discuss your testimony in this

8   case?

9   A.  Correct.

10  Q.  In preparing for your testimony today, you are aware of the   03:00PM

11  kinds of charges that have been filed in this case, is that

12  right?

13  A.  I don't know exactly the charges but I know that I can

14  answer any question.

15  Q.  Did you understand that some of the charges involved what's   03:01PM

16  known as conspiracy crimes?

17          MR. KASTER:  Objection.  Relevance.  Improper

18  question.  Seeking an opinion from a lay witness.

19          You can answer.

20          THE WITNESS:  I think or I believe -- so, I believe   03:01PM

21  that either Mukhtar or the resistance did not commit any crime.

22  And I believe that this is a right for anybody or any side to

23  resist an invasion or occupation to their country.

24  BY MR. BARTOLOMEI:

25  Q.  I understand that's your position.  My question is this:    03:02PM

1  With regards to this case, this criminal case, were you aware

2  that this case involved crimes about illegal agreements?

3        MR. KASTER:  Same objection.  Also asked and answered.

4        THE WITNESS:  I'm very determined on my opinion, and I

5  believe that what did the resistance do, it was very legal and        03:04PM

6  the resistance had the right to do what did they do against the

7  American invasion or occupation.

8  BY MR. BARTOLOMEI:

9  Q.  At the time you agreed to testify as a witness in this

10  case, did you understand that you were also considered to be a        03:04PM

11  co-conspirator in this case?

12        MR. KASTER:  Objection.  Calls for improper opinion

13  and also contravenes the Court's order about counseling the

14  witness.

15        MR. BARTOLOMEI:  Was it your understanding --        03:05PM

16        MR. PIMSNER:  Go ahead and answer the question.

17        MR. KASTER:  Oh, I'm sorry.

18        MR. PIMSNER:  No, I think he should rephrase it.

19  That's an improper question.

20  BY MR. BARTOLOMEI:        03:05PM

21  Q.  Was it your understanding that you had potential exposure

22  in this case?

23        MR. KASTER:  Objection again.  The Court's instruction

24  was not to counsel this witness about any legal matters and

25  this question is contravening that order.  Question goes solely        03:06PM

 1   to bias.

 2   BY MR. BARTOLOMEI:

 3   Q.  Is it your testimony that when you agreed to testify in

 4   this case, you did not receive any promises from the United

 5   States?                                                         03:06PM

 6   A.  I did not receive any promises.

 7   Q.  Is it your testimony that you have not received any benefit

 8   from the United States by agreeing to be a witness in this

 9   case?

10   A.  That's correct.                                             03:06PM

11   Q.  At your first meeting in June of 2016, you were provided

12   with an e-mail address for an FBI agent in this case.  Is that

13   right?

14   A.  So do you mean before the meeting, during the meeting, or

15   after the meeting?                                              03:07PM

16   Q.  At the meeting, or immediately after, and I'm referring to

17   Agent Whitson.

18   A.  Yes.  Yes.  During the meeting, yes.

19   Q.  And after that meeting, you maintained e-mail contact with

20   him?                                                            03:08PM

21   A.  Correct.

22   Q.  Did you believe after your meeting in June of 2016 that you

23   were expected to maintain contact with Agent Whitson?

24   A.  So I was positive that if there is anything he wants to

25   discuss with me he was going to send me an e-mail.              03:09PM

1    Q.  Am I correct that you established a very friendly

2    relationship with FBI Agent Whitson?

3    A.  There is nothing called friendship in this relationship,

4    sir.

5    Q.  I'm sorry.  Could you read that back to me?                  03:09PM

6           THE INTERPRETER:  Yes.  There was nothing called a

7    friendship in such a relationship.

8    BY MR. BARTOLOMEI:

9    Q.  Did you wish each other well during the holidays?

10   A.  Definitely not.                                              03:10PM

11   Q.  Did you refer to him as "my friend"?

12   A.  So the word "friend" I use personally, and I call my

13   friends like "friend," but I don't mean the exact meaning of

14   that word.  Because, again, personally, I know that the

15   Americans, they destroyed Iraq.  And that's why I was talking  03:11PM

16   with the administrative about that and call them my friends but

17   it has nothing to do with the real meaning of friendship.

18   Q.  In September of 2016 you traveled to Turkey, is that

19   correct?

20   A.  Truly and honestly, I traveled a lot during the month, and 03:12PM

21   I travel several times.  So every year I need a new passport.

22   That's why I really don't keep track in the dates on my

23   travels.

24   Q.  Well, let me see if this will help:  In September of 2016,

25   did you have difficulty returning to Latvia from Turkey?        03:12PM

1    A.  So I reside there.  I live there.  And I have to renew my

2    residency there every year.  And I used to renew it naturally

3    in the normal way every year before I met with the FBI.  But

4    after meeting with the FBI, renewing my residency was blocked

5    until it became something impossible.  And that's why I was --      03:13PM

6    I mean, I was forced to travel to the embassy, to the Latvia

7    embassy in Turkey to obtain a new visa.  So I believe this is

8    the understanding of meeting with those FBI agents that

9    everything got very complicated.

10   Q.  You are not saying they caused the problems with your visa,    03:14PM

11   is that correct?

12   A.  No.  I did not say that, but I said several things became

13   more complicated than usual.

14   Q.  When you had some problems with your visa, isn't it true

15   that you contacted the FBI for help?                               03:15PM

16   A.  All that I can remember that there was a meeting, and I was

17   supposed to attend that meeting in Riga.  So that's when I

18   contacted them and I told them that my green card or residency

19   expired and I am unable to attend that meeting if you did not

20   help in renewing my visa.                                          03:16PM

21   Q.  And after you contacted them your visa was renewed, is that

22   right?

23           MR. KASTER:  Objection.  Assumes facts not in

24   evidence.

25           THE WITNESS:  Okay.  Normally, they should renew it.       03:16PM

1    Because it's normal.  But unfortunately, they did not renew it.

2    So that's why I did not seek any help in renewing my residency.

3    BY MR. BARTOLOMEI:

4    Q.  I'd like to show you what's been marked Defendant's Exhibit

5    506.  Do you have that in front of you?                          03:18PM

6    A.  Yes, sir.

7    Q.  I'd like you to turn to the page with the disbursement

8    amounts.

9         THE INTERPRETER:  The interpreter asks you repeat the

10   question, sir.                                                   03:19PM

11   BY MR. BARTOLOMEI:

12   Q.  Yeah.  Would you please turn to the page that has the

13   disbursement amounts?

14   A.  Yes.

15   Q.  Were these monies disbursed from an account that you were    03:19PM

16   the account holder of?

17   A.  So this is an e-mail from Mr. Hassan Alani who was working

18   for me sending that e-mail to my personal e-mail and informing

19   me that he paid some money to some people or individuals based

20   on my orders to him and asking me to pay up the amount of money  03:21PM

21   because he considered it a debt.

22   Q.  For the record, this was -- you have previously seen this

23   today as Government's Exhibit Number 11.  Correct?

24        MR. KASTER:  For the record, I'm handing to defense

25   counsel what was previously marked and accepted as Government's  03:21PM

CR 12-1263 USA v Alahmedalabdaloklah-Jury Trial-Day 2 - P.M.-Al-Dhari - Cross

1    Exhibit 11.

2              MR. BARTOLOMEI:  And it is the Arab -- Arabic writing,

3    correct?

4              MR. KASTER:  That's what I'm referring to.

5              THE WITNESS:  Yes, sir.                              03:22PM

6    BY MR. BARTOLOMEI:

7    Q.  My question is:  The amounts that are there, you see them 1

8    through 13?

9    A.  Yes.  I see that.

10   Q.  Was that your personal money that was being paid to these   03:22PM

11   people?

12   A.  Yes, sir.

13   Q.  Did your employee provide any kind of proof or evidence to

14   show that this money was necessary to be disbursed to these

15   people?                                                        03:23PM

16   A.  So there was no need for them to prove it to me because

17   personally, I knew or I learned about the way that they

18   disbursed that money.  And let me tell you one thing here that

19   we did between each others based on trust.  So we trust each

20   others.                                                        03:24PM

21   Q.  Was this American money or was it in a different currency?

22             MR. KASTER:  Objection.  Relevance.

23             THE WITNESS:  The currency was dollar.

24   BY MR. BARTOLOMEI:

25   Q.  Did this money come from an organization that you were in   03:24PM

1   charge of, or was it strictly your personal funds?

2   A.  It was from me personally, sir.

3   Q.  Do you recall after that first meeting in June of 2016

4   making plans to come to the United States?

5   A.  Yes, sir.  I was planning before that date, two years                  03:25PM

6   before that date, on that date, on visiting the United States.

7   Q.  Did you run into difficulties with the processing of your

8   visa to come here?

9   A.  So, sir, you mean "here" to the United States, right?

10  Q.  I apologize.  My mistake.                                              03:26PM

11  A.  So yes, sir.  Obtaining a visa to go to the United States

12  was not an easy thing to do.

13  Q.  Did you ask the FBI to assist you with that process of

14  obtaining your visa for the United States?

15  A.  No.                                                                    03:27PM

16  Q.  When you came to the United States, did you pay for your

17  own flight?

18  A.  Yes.

19  Q.  Did -- okay.  Did any Iraq group in the United States

20  sponsor you to come to the United States?                                 03:27PM

21  A.  So, sir, the financial burden, it was on my shoulders.  But

22  let me tell you that I have an office for public relations in

23  Washington, D.C.

24  Q.  Okay.  Were you also attempting to schedule meetings with

25  members of Congress?                                                      03:28PM

1    A.  Yes, I did.

2    Q.  When you entered the United States you flew directly into

3    Washington, is that right?

4    A.  Correct.

5    Q.  When you arrived, the FBI did not meet you at the airport.    03:29PM

6    Is that right?

7    A.  Correct.

8    Q.  You were not escorted everywhere you went by the FBI?

9    A.  Correct.

10   Q.  You did not have to report to anyone in person or by       03:29PM

11   telephone when you arrived in the United States.  Is that

12   correct?

13   A.  So what do you mean, sir?  Do you mean the FBI agent?

14   Q.  Anyone from law enforcement in the United States, including

15   the FBI.                                                        03:30PM

16   A.  Can you please repeat the question or rephrase it in a

17   better clear way, sir?

18   Q.  When you arrived in Washington, D.C., am I correct that you

19   did not have to report to anyone about your arrival in our

20   country?                                                        03:31PM

21          MR. KASTER:  Objection as to form.  I think he's just

22   confused about "have to."  Maybe use the word "require" or --

23          THE WITNESS:  I had an appointment that I planned to

24   meet with them at the beginning of the month of April.  So

25   that's why I reported my arrival at that time.                  03:31PM

1    BY MR. BARTOLOMEI:

2    Q.  And your reporting of your arrival was only because of that

3    meeting you had scheduled, is that correct?

4    A.  Correct, sir.

5    Q.  Otherwise, you were free to go anywhere you wanted to          03:32PM

6    during your visit.  Is that true?

7    A.  What do you mean by afraid?  Afraid?  What did you mean by

8    afraid of going anywhere else?

9    Q.  I'm sorry.  I did not mean "afraid."  I meant was he free

10   to go anywhere he wanted to in the United States?                 03:33PM

11   A.  It was not in my plan to go anywhere else.  I only planned

12   to go to Washington, D.C.  And then right before I left, I went

13   to New York City.

14   Q.  How long did you stay in New York City?

15          THE INTERPRETER:  Excuse me.  The interpreter wants to      03:34PM

16   clarify if the question was how long or with whom did you stay?

17   BY MR. BARTOLOMEI:

18   Q.  How long?

19   A.  Three nights.

20   Q.  Mr. Al-Dhari, I would like you to look at Defense Exhibit      03:34PM

21   Number 501.  What is that document, sir?

22   A.  I can see a personal photo for Dr. Mahdi Al Kubaisi.

23   Q.  Do you know who he is?

24   A.  He's a professor at Al-Azhar University, and he teaches

25   engineering.                                                      03:35PM

1  Q.  Have you known him for a long time?

2  A.  He has some personal relations with the family, not with me

3  personally.  And I met him after the invasion.

4  Q.  Since the, what you referred to as "the invasion," have you

5  spent a lot of time together?                                03:36PM

6  A.  Yes.  I used to meet with him several times.

7  Q.  Is this photograph a fair and accurate representation of

8  what he looks like?

9  A.  Yes.  This is his personal photo.  So what do you mean?

10 Yes.  This is him.                                           03:37PM

11 Q.  Okay.  Is Dr. Mahdi Thamer also involved with the 1920

12 Revolutionary Brigade?

13 A.  So, yes, Dr. Mahdi has a relationship with the 20th

14 revolutions and he was very sympathized with it.  And Number 2,

15 he used to help in the press matters.                        03:37PM

16 Q.  Was he the political spokesman for the 1920 Revolutionary

17 Brigade?

18 A.  I don't know exactly.

19 Q.  By the way, do you have a title that you are known by with

20 the 1920 Revolutionary Brigade?                              03:38PM

21 A.  What do you mean by "title," sir?

22 Q.  Are you referred to as a sheikh?

23 A.  I am a sheikh of a tribe, yes.

24 Q.  I'm just using that as an example of the title.  What my

25 question is, did the 1920 Revolutionary Brigade give you a    03:39PM

1   title based upon your role and your assistance to them?

2   A.  No.

3           MR. BARTOLOMEI:  I move Defense Exhibit 501 into

4   evidence.

5           MR. KASTER:  No objection.                         03:40PM

6   BY MR. BARTOLOMEI:

7   Q.  Mr. Al-Dhari, with regards to the Peace Ambassadors of

8   Iraq, you are the founder of that organization, correct?

9           THE INTERPRETER:  The interpreter asks if you may

10  repeat the question, please.                               03:40PM

11  BY MR. BARTOLOMEI:

12  Q.  Were you the founder of the Peace Ambassadors for Iraq?

13  A.  Yes, sir.

14  Q.  Did you receive any money or salary for the work you do

15  with PAFI?                                                 03:41PM

16          MR. KASTER:  Objection.  Relevance.

17          THE WITNESS:  I did not receive any money.  I was not

18  responsible about any financial matters.  Mrs. Harita Tohme,

19  from Latvia, she was the person in charge of all the financial

20  matters.                                                   03:41PM

21  BY MR. BARTOLOMEI:

22  Q.  But you used your own money to create this organization,

23  correct?

24          MR. KASTER:  Object to relevance.

25          THE WITNESS:  Correct.                             03:42PM

1    BY MR. BARTOLOMEI:

2    Q.  You testified earlier that this organization was originally

3    a political project, is that correct?

4    A.  No.  An organization is different than political project.

5    So Iraq National Project is the political project.                    03:43PM

6    Q.  Is that related to PAFI?

7            THE INTERPRETER:  Excuse me, sir.  The interpreter did

8    not hear the last letters, few letters.

9    BY MR. BARTOLOMEI:

10   Q.  Is the National Iraq Project associated or related with          03:43PM

11   Peace Ambassadors for Iraq?

12   A.  So, yes, it was a result of the big destruction volume that

13   happened in Iraq after the invasion.  And yes, I am positive

14   and sure that it was achieving something to the European union

15   and it was working on some of the political matters within          03:44PM

16   Iraq.  And, yes, since I had some goals to achieve, I was

17   responsible for those goals to achieve inside Iraq.

18   Q.  Is the position of the National Iraq Project and the Peace

19   Ambassadors of Iraq politically opposed to any intervention by

20   Iran?  Any Iraqi opponents?                                          03:45PM

21           MR. KASTER:  Objection.  Relevance.

22           THE WITNESS:  So we consider Iran as part of that

23   dilemma or the problem in Iraq.  So that's why Iran did not

24   feel comfortable toward that Iraqi National Project.

25   BY MR. BARTOLOMEI:                                                   03:46PM

1   Q.  Have you gone by the name or have you used the name Abu

2   Asim?

3   A.  Abu Asim, yes.

4   Q.  Is that a name created as an alias?

5   A.  Okay.  So let me explain to you, sir, yes, this name,                03:46PM

6   people used to call me with this name since 1990.  And let me

7   explain to you, it's a culture that we used the last name and

8   it's a kind of respect.  And I was known with this name as Abu

9   Asim.  It's culture or custom traditions to use the last name.

10  Q.  Okay.  Have you also used the name Jamal Abdulwahhab?              03:48PM

11  A.  Yes.  Yes, sir.  Jamal Al-Wahhab is my father and sometimes

12  they call me Wahhab.  Yes, sir.

13  Q.  You also used the name, am I correct, that you may have

14  used the name Ali Hadid?

15  A.  So Ali Hadid -- okay.  So Ali Hadid, this is not a name.  I       03:49PM

16  remember greatly, of course, I remember that I asked Hassan to

17  create an e-mail address for me.  And that e-mail address was

18  under Ali Hadid Alkawaser65.  And why 65, because that was the

19  year when I was born.  And I was surprised that the name was

20  Ali Hadid and it stayed under this name.  But I never used this      03:50PM

21  name.  So we don't choose e-mails for a personal

22  identification.  And I started to use this e-mail after I lost

23  access and password to my previous e-mail Dhari Jamal.

24  Q.  You have a number of different e-mail names and addresses,

25  correct?                                                              03:51PM

1          MR. KASTER:  Objection.

2          THE WITNESS:  So it was not strange, sir, for us to

3    have different e-mails under different names.  So this is not

4    something that's strange for us, because we used to create that

5    e-mail and then forget the password, and that's when we create          03:52PM

6    another e-mail address.  So that was not something strange.

7    But let me tell you, I had Dhari Jamal e-mail and I lost that

8    one.  And then right after that happened, created for me the

9    Alkawaser65@yahoo.com.  And since then I have been using that

10   e-mail address.                                                          03:53PM

11   BY MR. BARTOLOMEI:

12   Q.  Have you also used a name Lora Asaad?

13   A.  So Lora Asaad was my secretary in my company located in

14   Lebanon.  And she's the one who created my Arabic e-mail

15   underscore 04, 2004.  So again, Lora Asaad was my secretary in          03:54PM

16   my company in Lebanon and she's the one who created the e-mail

17   Alarbi@2004.  But when she left work, I used to have the

18   password for that e-mail but now I lost it.

19   Q.  Let me rephrase the question.  Do you have any photos of

20   Muthana with my client?                                                  03:55PM

21          MR. KASTER:  Objection.

22          THE WITNESS:  No.  No.  No.  I don't have -- so no,

23   no.  I don't have any portraits, but do you mean, sir, like

24   photos for both of them together?

25   BY MR. BARTOLOMEI:                                                       03:55PM

1    Q.  I'm referring to photos of both of them together, yes.

2    A.  So with Dr. Muthana and Mukhtar, I really can't recall

3    that.

4    Q.  From 2005 to 2011, did you visit Ahmed in China at any

5    time?                                                            03:56PM

6    A.  I never visited China, sir.

7    Q.  Do you know where his office was located in China?

8    A.  No.  No.

9    Q.  You don't know anything about his business in China, is

10   that correct?                                                    03:56PM

11            MR. KASTER:  Objection.  Argumentative.

12            MR. BARTOLOMEI:  I will rephrase the question.

13   BY MR. BARTOLOMEI:

14   Q.  Do you know if he had employees in China?

15   A.  So through my talks or communications with him, I learned    03:57PM

16   that he owned an office, like a business office, in China for

17   import and export, you know, goods or merchandise into Iraq.

18   Q.  Do you know where he lived in China during that period of

19   time?

20   A.  I did not know exactly where did he live in China during     03:58PM

21   that time.

22            (Videotape deposition paused.)

23            MR. PIMSNER:  Your Honor, we have one last clip of 19

24   minutes long.

25            THE COURT:  Sure.                                       03:58PM

1    BY MR. BARTOLOMEI:

2    Q.   When my client was arrested in Turkey in 2011, did you at

3    any time send money to him?

4    A.   So when I heard the news, I asked Hassan Alani to

5    communicate with him and offer him any kind of assistance if          03:59PM

6    needed for him or for his family or if he needs anything, yes.

7    Q.   But you were not contacted by him?

8    A.   Correct.  I did not.

9    Q.   Did you tell the FBI that you paid for a lawyer to

10   represent my client?                                                  04:00PM

11   A.   So I asked Hassan at that time to do anything, to do

12   anything in favor of your client.  And I asked Hassan

13   personally to do anything once again.  But for me personally, I

14   did not do anything.  But if Hassan appointed any attorney for

15   him in this regards, I can check with him and ask him.  And          04:01PM

16   when I said I asked Hassan to do and help or do anything to

17   assist your client, meaning I gave an order to Hassan to do

18   anything if your client needed at that time.

19   Q.   You have heard the word "Mukhtar" before this case, is that

20   correct?                                                             04:01PM

21   A.   I know Mukhtar.  Mukhtar, yes.  True.

22   Q.   Isn't the word "Mukhtar" a word that is used for other

23   people to show respect?

24            MR. KASTER:  Objection.  Calls for an opinion.

25            THE WITNESS:  Okay.  In regards of this word, Mukhtar,      04:02PM

1    this word used in Iraq, not to call a person with this name,

2    like it's not a name like your name is Mukhtar.  The only name

3    Mukhtar I know is the photo that represented in front of me and

4    that's Mukhtar.  But in Iraq, and we have what we call him

5    Mukhtar, meaning a leader, the leader of the community or like          04:03PM

6    a small community, you know, where's a group of people they

7    live.  Now we call that person who represents that little small

8    community Mukhtar.

9    BY MR. BARTOLOMEI:

10   Q.  So it can be a title that is given to somebody, is that            04:03PM

11   right?

12   A.  Okay.  So this title Mukhtar, there is another word

13   associated with it, like if you want to give this title to an

14   area we should say, like, the Mukhtar of you know, bla bla,

15   that Mukhtar of the small community, the region.  So it should         04:04PM

16   be associated with another word with it.

17   Q.  Regarding your testimony earlier about a reservation in

18   Lebanon, do you recall your testimony there?

19   A.  Yes.

20   Q.  You did not personally attend any conference at that time          04:05PM

21   in Lebanon that you recall?

22   A.  No.  I was -- or I attended some of those conferences or I

23   organized to attend those conferences.

24   Q.  Did you receive an e-mail from anyone named Ahmed Farhan

25   thanking you for the reservation?                                      04:06PM

1    A.  No.

2    Q.  With regards to a cell phone, my client was in China around

3    the time you say that an offer was made to get you a cell

4    phone, is that correct?

5    A.  If you can rephrase the question, sir, please.                    04:06PM

6    Q.  Do you recall where my client was at the time that you say

7    he offered you a cell phone?

8    A.  I did not know exactly where was he at that time, but all

9    what I can remember, that code of that phone I used to call him

10   from, it was a Chinese code.                                          04:07PM

11   Q.  Okay.  Did you ever receive a cell phone like that from

12   him?

13   A.  I remember that he sent me a cell phone like that one, but

14   I did not receive him.  I asked someone else to receive it, and

15   we never used it.                                                     04:08PM

16                     REDIRECT EXAMINATION

17   BY MR. KASTER:

18   Q.  Mr. Al-Dhari, you earlier testified about Harith, the

19   military leader of the 1920 Revolutionary Brigade.  Do you

20   recall that?                                                          04:08PM

21   A.  Yes.

22   Q.  And then you were asked by Mr. Bartolomei about a man named

23   Muthana Harith?

24   A.  Correct.

25   Q.  Muthana Harith is not the same person as Harith, the             04:09PM

1    military leader?

2    A.  Yes, sir.  We're talking about two different people here.

3    Muthana Harith, he's the son of the Dr. Harith Al-Dhari, Dr.

4    Harith Al-Dhari, and he is the chairman of the scholars

5    committee.  But Mr. Harith, the military leader, he is the --    04:10PM

6    he's my brother-in-law.  He's married to my sister and he's my

7    cousin, too.

8    Q.  Mr. Al-Dhari, you were also asked about Dr. Mahdi and shown

9    a picture of him.  Do you recall that?

10   A.  That's correct.  Yes, sir.                                  04:10PM

11   Q.  Do you recall if Dr. Mahdi had an e-mail address?

12   A.  I recalled that he used to have an e-mail address but I

13   cannot exactly tell you or remember that e-mail.

14   Q.  What do you remember about his e-mail address?  Do you

15   remember any portion of it?                                     04:11PM

16   A.  Okay.  I cannot remember exactly, but he used to use like a

17   lot of letters in it.

18           MR. KASTER:  The witness is actually correcting.

19           THE INTERPRETER:  A few letters.

20           THE WITNESS:  So as far as I know, the people that      04:11PM

21   don't use their official e-mails.  But since he used to use a

22   few letters in his e-mail, if you show it to me I might

23   remember.

24   Q.  That's fine.

25           Did -- you were asked some questions regarding your     04:12PM

1   visit to the United States.  When you were in the United

2   States, did you visit any members of the United States

3   Congress?

4   A.  So yes.  I remember I received an invitation from the

5   chairman of the Foreign Affairs Committee, Mr. Royce, I                04:13PM

6   believe.

7           THE INTERPRETER:  Ed Royce.  Yes.  I'm sorry.  Ed

8   Royce.

9           THE WITNESS:  And I remember that I was supposed to

10  meet with him and with another congressman members and senate        04:13PM

11  members as well.

12  BY MR. KASTER:

13  Q.  Did you end up meeting with any senators?

14  A.  Yes, sir.  I remember that I had a meeting scheduled with

15  Senator Graham, the deputy chairman for the Defense Committee.        04:14PM

16          (Videotape deposition concluded.)

17          MR. PIMSNER:  That concludes the deposition, Your

18  Honor.

19          THE COURT:  I'm sorry?

20          MR. PIMSNER:  That concludes it.                              04:14PM

21          THE COURT:  I think that concludes the day for my

22  jury.  So we'll see you tomorrow at 8:30.  We'll start at 8:30.

23          Have a nice evening, and don't forget not to talk

24  about the case to anyone or read anything or see anything that

25  pertains to it.  Good evening.                                       04:14PM

1          (Jury out at 4:14 p.m.)

2          THE COURT:  Counsel, please be seated.

3          So this is the list I have for tomorrow is Mr. Wilson,

4    Huff, Mullins, Reede, Bogad, Mum, Luhowy, Aleman, and Gray.

5    That's not all for tomorrow.  I presume that's going to be over      04:15PM

6    a couple of days.

7          MR. PIMSNER:  We anticipate that, Your Honor.  That is

8    the intended order of our witnesses.

9          THE COURT:  How far do you believe we'll get tomorrow

10   so everybody has got a good sense of what they have to prepare      04:15PM

11   for?

12         MR. PIMSNER:  I think it's possible we could get to

13   Luhowy.

14         THE COURT:  Oh, that's good.

15         MR. PIMSNER:  But I don't want to promise that.      04:16PM

16         THE COURT:  Okay.  Well, just make sure that defense

17   counsel knows so that they can be prepared.

18         MR. PIMSNER:  Well, that's the order we intend to

19   call, and it's a little bit out of our control depending on how

20   long they take for cross-examination.      04:16PM

21         THE COURT:  Yes.  That's correct.  I agree with you.

22         So we'll see you tomorrow unless there's something

23   else to take up.

24         I will tell you, Mr. Bartolomei, I was glad that I had

25   the translation in listening to that deposition.  I am not sure      04:16PM

1   the jury could hear you or understand what you were asking.

2   But they will have, I guess, an opportunity later to see it

3   again if they want to in deliberations.  But that's -- that was

4   your decision.

5          All right.  Is there anything else from the                04:17PM

6   government?

7          MR. PIMSNER:  Just confirming it is a half-day on

8   Friday?

9          THE COURT:  Half-day on Friday, this Friday?  Do we

10  have a half-day?  Yes.  It's because -- yes.  That is correct.    04:17PM

11         MR. PIMSNER:  Okay.  And we do have one more

12  deposition.  It's much shorter.  It's approximately two hours

13  after the edits.

14         THE COURT:  Is that Mr. Ali Ways?

15         MR. PIMSNER:  Correct.                                       04:17PM

16         THE COURT:  Okay.

17         MR. PIMSNER:  So we're not -- just kind of in talking

18  about this I think we're going to talk tonight and we can let

19  defense counsel know.  We may want to play that Friday morning

20  because that would -- but I don't think we have made that final   04:17PM

21  decision yet.

22         THE COURT:  That's fine.  All right.

23         MR. PIMSNER:  Thank you.

24         THE COURT:  And that's fair.  You just need to let

25  them know.                                                         04:17PM

1          MR. PIMSNER:  Will do.

2          THE COURT:  Anything else from the defense?

3          MS. JOHNSON:  No, Your Honor.

4          THE COURT:  All right.  We're adjourned.  See you

5     tomorrow about 8:15.  I'm sure you will be here.                    04:18PM

6          (Proceeding concluded at 4:18 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9          I, LAURIE A. ADAMS, do hereby certify that I am duly

10   appointed and qualified to act as Official Court Reporter for

11   the United States District Court for the District of Arizona.

12          I FURTHER CERTIFY that the foregoing pages constitute

13   a full, true, and accurate transcript of all of that portion of

14   the proceedings contained herein, had in the above-entitled

15   cause on the date specified therein, and that said transcript

16   was prepared under my direction and control.

17          DATED at Phoenix, Arizona, this 4th day of February,

18   2017.

19

20                              s/Laurie A. Adams
                                _____
21                              Laurie A. Adams, RMR, CRR

22

23

24

25