UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | CR-12-1263-PHX-ROS |
| ) | |
| vs. ) | Phoenix, Arizona |
| ) | February 1, 2018 |
| Ahmed Alahmedalabdaloklah, ) | 8:49 a.m. |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

BEFORE:  THE HONORABLE ROSLYN O. SILVER, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Jury Trial – Day 3 – A.M. Session)


Official Court Reporter:
Elva Cruz-Lauer, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 33
Phoenix, Arizona  85003
(602) 322-7261

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        A P P E A R A N C E S

2       For the Government:

3                    U.S. Attorney's Office
                     By:  DAVID A. PIMSNER, ESQ.
4                         WILLIAM C. SOLOMON, ESQ.
                          MELISSA KARLEN, ESQ.
5                    40 North Central Avenue, Suite 1800
                     Phoenix, AZ  85004
6
                     U.S. Department of Justice
7                    By:  JOSEPH N. KASTER, ESQ.
                     950 Pennsylvania Avenue, NW, Suite 2649
8                    Washington, DC  20530

9

10      For the Defendant:

11                   Federal Public Defender's Office
                     By:  GREGORY A. BARTOLOMEI, ESQ.
12                        JAMI S. JOHNSON, ESQ.
                          SHISHENE JING, ESQ.
13                   850 West Adams Street, Suite 201
                     Phoenix, AZ  85007
14
        ALSO PRESENT:
15              STEVEN SCHEPS, USAO Intelligence Specialist
                OSCAR CASTILLO – FPDO Investigator
16              RENEE RIVERA-THOMAS – FPDO Paralegal

17

18

19

20

21

22

23

24

25

### INDEX OF WITNESSES

| WITNESSES FOR THE GOVERNMENT: | Direct | Cross | Redirect |
|---|---|---|---|
| Todd L. Wilson | 4 | 20 | 35 |
| William Huff | 36 | 100 | |

### INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| 46 | Scene photographs for CEXC IZ/7935/06 (Omar Cache) (46-46Z) Photograph of Room A1 (Inventory) Bates 004450 | 89 |
| 46A | Photograph Room A4(Inventory)Bates 004451 | 91 |
| 46C | Photograph Room A6(Inventory)Bates 004455 | 94 |
| 46E | Photograph Room A1(Desk)Bates 004459 | 16 |
| 46F | Photograph Room A1(Overall)(Q55)Bates 004460 | 55 |
| 46G | Photograph Room A1(Desk)Bates 004461 | 56 |
| 46L | Photograph Room 6(Photo of floor/side)Bates 004492 | 58 |
| 46P | Photograph Room 6(Photo of room)Bates 004514 | 66 |
| 46T | Photograph (exterior Omar)Bates 004592 | 8 |
| 46U | Photograph (exterior Omar)Bates 004596 | 9 |
| 46V | Photograph (exterior Omar)Bates 004595 | 11 |
| 46W | Sketch CEXC 7935-06(Room B)Bates 020931 | 52 |
| 46X | Sketch CEXC 7935-06(Room A)Bates 020930 | 50 |
| 46Y | Photograph of Work Station(Q55)Bates 04458 | 66 |
| 47 | Scene photographs for CEXC IZ/7935/06 (Omar Cache) (47-47Y) Photograph of Bookshelf (Q38) Bates 004477 | 67 |
| 47A | Photograph of Xelibri Box(Q38)Bates 004478 | 69 |
| 47B | Photograph of Q38 Bates 004483 | 70 |
| 47C | Photograph of 5A (Q38) Bates 004454 | 87 |
| 47D | Photograph of Alahmedalabdaloklah's ID Card Bates 04487 | 96 |
| 47Q | Photograph NRD-545 DSP Receiver (close-up)004465 | 74 |
| 47S | Photograph of Transceivers Bates 004449 | 75 |
| 47Y | Photograph of Drill Presses | 77 |
| 47Z | Photograph of Table in Room B4 Bates 004583 | 78 |
| 1578 | photograph – 50 Omar Street_052 | 105 |
| 2118 | Photograph – 50 Omar Street (Bates:37135) | 30 |

1              P R O C E E D I N G S

2         (Proceedings are called to order at 8:49 a.m.)

3         (The defendant was assisted by the Official Court

4    Interpreter.)

5              THE COURT:  Please be seated.  Good morning.

6              Counsel, are you ready to proceed?

7              MR. PIMSNER:  Yes, Your Honor.

8              THE COURT:  Call your next witness.

9              MS. KARLEN:  Your Honor, the United States calls Todd

10   Wilson to the stand.

11              TODD L. WILSON, GOVERNMENT'S WITNESS, SWORN

12              THE WITNESS:  Todd L. Wilson, W-I-L-S-0-N.

13              THE CLERK:  Have a seat up here, sir.

14                          DIRECT EXAMINATION

15   BY MS. KARLEN:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Mr. Wilson, were you ever employed by the military?

19   A.  Yes, ma'am, I was.

20   Q.  Can you tell us when?

21   A.  From May of 2000 until last June, June 13th, 2017.

22   Q.  What was your rank when you retired?

23   A.  When I retired, I was first class, an E7.

24   Q.  And what group were you assigned to?  What battalion?

25   A.  When I retired out of the Army, I was -- I retired from

1   Germany from the 7th Army Non-Commissioned Officer Academy as a

2   senior small group instructor.

3   Q.  During your time with the military, were you ever deployed

4   to Iraq?

5   A.  Yes, ma'am.

6   Q.  And can you tell us when and where you were deployed to?

7   A.  Multiple locations through Iraq.  Mosul, um, mainly

8   Baghdad.

9   Q.  Were you assigned to Iraq in August of 2006?

10  A.  Yes, ma'am, I was.

11  Q.  And do you remember which camp you were assigned?  What

12  base you were assigned to during that time?

13  A.  Yes, ma'am.  I was assigned BIAP, and that was at Baghdad

14  International Airport.

15  Q.  Do you remember in August of 2006, what rank you would have

16  held?

17  A.  In August of 2006, I was an E6 staff sergeant.

18  Q.  And can you tell us what that means?  Were you in charge of

19  men?  Were you part of a group?  Please explain.

20  A.  Basically, a staff sergeant in the infantry, I was in

21  charge of a weapons squad, but my primary designation was I was

22  a squad leader.  All a squad leader is, is I was in charge of

23  anywhere from a 9- to 12-man element when we were doing our

24  patrols.

25  Q.  In August of 2006, can you tell us what your battalion or

1    what your group -- specifically what operation they were

2    involved in?

3    A.   In that time frame, we were tasked out to go door to door

4    through Baghdad and clear every single house.

5    Q.   Why do you remember being in Iraq in August of 2006 so

6    vividly?

7    A.   Well, it was kind of bittersweet.  You know, we were

8    extended.  We were one of the first groups extended to go from

9    a 12-month tour to an 18-month tour.  And I remember it because

10   we had already turned in all of our equipment.

11          We were in the, I guess, the truce or tents.  We were

12   on the tarmac, we are ready to go home, and about 18 hours

13   before we went home, it came down, hey, no, you are getting

14   extended for six more months.

15          So we went and got all of our equipment back and went

16   back to our designated sectors and started doing our patrols

17   again.

18   Q.   Now, you said that in August 2006, you were doing a

19   clearing operation with your battalion.  Did you receive

20   training on what to do while you were doing this operation?

21   A.   Yes, ma'am.  I received training prior to as well, because

22   that wasn't my first deployment.  That was actually my third

23   deployment.

24          I had done two previous deployments.  One to

25   Afghanistan and one to Iraq, with 3rd 187 from Fort Campbell

1    Kentucky.  So I had had previously pieces of instruction on

2    clearing materials and things, so it just continued when we got

3    to country and we just passed the knowledge on to everybody

4    that we then taught.

5    Q.  This clearing operation, was this in Baghdad?

6    A.  Yes, ma'am.

7    Q.  And you said you went house to house.  What does that mean?

8    A.  Basically all it means is we were given a sector, and our

9    instructions were, you will go from house to house, you will go

10   in every residence.  If the residence is locked, you will

11   remove the locks.  We replaced the locks, and we went in and --

12   basically just that.  We went into every residence, cleared it

13   and made sure that there was nothing there that was out of the

14   ordinary.

15   Q.  What -- when you say, making sure nothing was out of order,

16   what were you looking for?

17   A.  We were looking for specific components, components that

18   from our training we knew -- large amounts of cell phones,

19   wiring, soldering equipment, analyzers, things of that nature.

20   Anything that was being used in that time frame, we knew were

21   being used to make a device, explosives or anything.

22        MR. BARTOLOMEI:  Objection, lack of foundation.

23        THE COURT:  Overruled.

24        MS. KARLEN:  Your Honor, may I show this witness

25   what's been marked for identification as Government's Exhibit

1        46T.

2                    THE CLERK:  You said 46T?

3                    MS. KARLEN:  T as in Tom.

4     BY MS. KARLEN:

5     Q.  Mr. Wilson, can you look at this image?

6     A.  Yes, ma'am.

7     Q.  Do you recognize this image?

8     A.  Yes, ma'am, I do.

9     Q.  What is this a picture of?

10    A.  This is the picture of the residence where we went into and

11    found the spectrum analyzer, the radios, computers that were

12    taken apart, wires, soldering equipment, cell phones.

13    Q.  And is this the picture of the outside of the residence

14    that you described of the building?

15    A.  Yes, ma'am.

16    Q.  Does it fairly and accurately depict a building you went

17    into in August of 2006?

18    A.  Yes, ma'am.

19                    MS. KARLEN:  At this time, the government would move

20    to admit Exhibit 46T.

21                    MR. BARTOLOMEI:  No objection.

22                    THE COURT:  It is admitted.

23                    (Exhibit 46T is admitted.)

24                    MS. KARLEN:  Can we publish to the jury, please?

25                    THE COURT:  Yes.

1    BY MS. KARLEN:

2    Q.  Mr. Wilson, just to be clear, is this a building that you

3    went into in August of 2006 during a clearing operation?

4    A.  Yes, ma'am.

5            MS. KARLEN:  Your Honor, may I show this witness

6    what's been marked for identification as Government Exhibit

7    46U?

8            THE COURT:  Yes.

9    BY MS. KARLEN:

10   Q.  Mr. Wilson, if you would look at these photos.  Same

11   questions.  Do you recognize what this is a photograph of?

12   A.  Yes, ma'am.  It's the same photograph as before, just

13   moving slightly over to the left.

14   Q.  Does it fairly and accurately depict the building that you

15   entered in August of 2006, during your clearing operation?

16   A.  Yes, ma'am.

17           MS. KARLEN:  At this time, the government would move

18   to admit into evidence Government's Exhibit 46U and publish to

19   the jury.

20           MR. BARTOLOMEI:  No objection.

21           THE COURT:  It's admitted, and you may publish.

22           (Exhibit 46U is admitted.)

23   BY MS. KARLEN:

24   Q.  Mr. Wilson, in looking at this photograph, do you see in

25   this photograph where your group entered into this building?

1    A.  It's actually over here.

2    Q.  And you are pointing to the right side?

3    A.  Yes, ma'am.

4           THE COURT:  Christine, can we use that so he can --

5           THE CLERK:  If you touch it, it should be able to.

6           THE COURT:  It should work?  We have had a little

7    problem with it before, so let's see.  We've got great

8    technology, but it doesn't always work.

9           MS. KARLEN:  While you are doing that, if I may return

10   to the original photograph, which is 46T.  T as in Tom.

11          THE CLERK:  Judge, I think this one doesn't work.

12          THE COURT:  Of course, just when we need it.

13   BY MS. KARLEN:

14   Q.  If I can see where it is maybe, I can see if I can point to

15   the right area.

16          THE COURT:  How about this, do you have it down there?

17          MS. KARLEN:  I do, I just want to see where he is

18   pointing so I can accurately make sure that I portray it.

19          THE WITNESS:  We went in, where you can see the doors

20   being cut open, we went in, we went out --

21   BY MS. KARLEN:

22   Q.  So you are pointing to like this general area right here?

23   Is that -- is it showing up?  It is showing up as red.  Can you

24   see it?

25   A.  Yes.

1          THE COURT:  And you are doing it from yours?

2          MS. KARLEN:  I am.

3    BY MS. KARLEN:

4    Q.  Okay.  Thank you very much.  Showing you one last image.

5    This is what's been marked for identification as Government's

6    46V as in victory.  Same questions.

7          Can you look at this photograph?

8    A.  Yes, ma'am.  When we were going in -- this is bringing

9    back -- I'm sorry.  This is bringing back a lot of memories.

10   Q.  Take a moment, please.

11   A.  I remember it because when we were going through, it was

12   significant to me because we had found the spectrum analyzer.

13   And we were looking through the window, and it was overlooking

14   our main MSR.

15   Q.  Does this photograph you are looking at here fairly and

16   accurately depict one of the buildings that you went into in

17   August of 2006?

18   A.  Yes, ma'am.

19          MS. KARLEN:  At this time, Your Honor, the government

20   would move to admit into evidence what is Exhibit 46V as in

21   victory.

22          MR. BARTOLOMEI:  No objection, Judge.

23          THE COURT:  It is admitted.

24          (Exhibit 46V is admitted.)

25          MS. KARLEN:  We ask it to be published to the jury.

1            THE CLERK:  Is this V on the screen right now or U?

2            MS. KARLEN:  Let me check.  It is V.  I had U earlier.

3     I switched to V.  I'm sorry.

4            THE CLERK:  Okay.

5            THE COURT:  And you may publish.

6     BY MS. KARLEN:

7     Q.  Now, you were pointing to a window, and that's where you

8     said the spectrum analyzer is.  Is that window you believe in

9     this photograph?

10    A.  Yes, ma'am.  Because the spectrum analyzer would have been

11    slightly off over here, and it was significant because, like I

12    said, the window is open.

13           MR. BARTOLOMEI:  Objection, Judge.  Lack of

14    foundation.  Lack of personal knowledge.

15           THE COURT:  Overruled.

16    BY MS. KARLEN:

17    Q.  Please continue.  Please finish your answer.

18    A.  It was significant to us, especially to me from my prior

19    experiences.  It overlooked a main MSR four-way intersection to

20    where vehicles were routinely going through.  So tactically it

21    was a great spot.

22    Q.  Now, you said you were going door to door to door entering

23    into buildings and searching for the items you have described;

24    is that correct?

25    A.  Yes, ma'am.

1    Q.  And focusing you on this building in particular, can you

2    tell us what happened when you entered that building?

3    A.  Upon entering the building, ma'am, we went -- as I stated

4    before, we were just going from room to room.  When we went

5    from the ground floor up to the next level, we went in and me

6    and, at the time, PFC Spiers, we went into the room, saw the

7    spectrum analyzer.

8         We started looking around and the volume of all the

9    components, with all the components that were in there, coupled

10   with the spectrum analyzer, the cell phones and everything, I

11   immediately told my squad to stop, secure the area, don't let

12   anybody in this building.

13        At that time, I called forward to my ground force

14   commander, Captain Richard Lowe, and he came up and said, keep

15   the building secure, and we radioed forward until oncoming unit

16   came in and relieved us.

17   Q.  Now, you indicated that there were cell phones that you

18   saw.  How many cell phones?  Please describe to us, we are not

19   there, what you saw, the quantity in different rooms.  Describe

20   it for us, please.

21   A.  It was -- I can't give you an exact number.  It was just a

22   mass amount of stuff.  I can't tell you a specific number,

23   ma'am.  I don't know.

24   Q.  When you say "stuff," is that what you were talking about

25   before, the electronics, the cell phones?

1    A.  Yes, ma'am.

2            MR. BARTOLOMEI:  Objection.  Leading, Your Honor.

3            THE COURT:  Sustained.

4    BY MS. KARLEN:

5    Q.  Please describe what you mean to us when you say "stuff"?

6    A.  When we came in and saw the spectrum analyzer, there were

7    radios that were very similar to what we had at the time, and

8    the radios were called N-Cons, small man-to-man radios.  There

9    were radios that were almost accurate to our MBITRs.

10           MR. BARTOLOMEI:  Objection, lack of foundation.

11           THE COURT:  Go ahead and provide some foundation.

12   BY MS. KARLEN:

13   Q.  When you said that you had training before you were doing

14   clearing operations, can you describe what that training

15   entailed?

16   A.  What the training entailed was we were taught to look for

17   uncommon amounts of types -- large amounts of bars of soap,

18   cell phones that were taken apart, computer terminals that were

19   taken apart, soldering equipment, large amounts of wiring, all

20   of these things that were used, coupled -- could be used to

21   make different types of devices that we were searching for.

22   Q.  And in this building that you were searching, is that what

23   you were looking for?

24   A.  We were looking for weapons.  We were looking for devices

25   used in IEDs.  We were looking for anything out of the

1    ordinary.

2    Q.  And when you arrived -- let me back up one second.  I am

3    sorry.

4            When you arrived at this location, was it secured in

5    any way?

6    A.  When we arrived at the location, it was closed.  It was

7    locked up.

8    Q.  And what, if anything, did you do when you found it locked?

9    A.  Well, our rules of engagement was, if you come to a house

10   that's locked, you cut the lock, you enter the house.  Upon

11   leaving, or as soon as you cut the lock, you replace it with a

12   lock and key.

13   Q.  Is that what you do -- is that what you did in this case?

14   I'm sorry.

15   A.  Yes, ma'am.

16   Q.  And this building looks like it has multiple levels.  Did

17   you go to each floor and each room?

18   A.  Upon entering, we went to the bottom floor in order to

19   reach the next level.  Once we hit that next level, that's when

20   I stopped my search.  We secured the building.  Because like I

21   said, we found significant items for me to call forth to

22   Captain Lowe.  And once he came in, he agreed.  We stopped the

23   search, secured the entire building and waited for the follow

24   on group.

25   Q.  Showing you what's been marked for identification as

1    Government Exhibit 46E.  Can you look at this photograph?  Do

2    you recognize what this is a photograph of?

3    A.  Yes.  It is in the back corner of the room, slightly off

4    there's a window over -- sorry.  There's a window off to the

5    left.  This is the spectrum analyzer.  The radios in the back

6    are the ones --

7              THE COURT:  Let's have it admitted first.

8              MS. KARLEN:  Thank you, Your Honor.

9    BY MS. KARLEN:

10   Q.  Does this fairly and accurately depict one of the rooms in

11   the building that you've been discussing in August of 2006?

12   A.  I'm sorry.  Yes, ma'am.

13             MS. KARLEN:  At this time, Your Honor, the government

14   moves to admit Exhibit 46E and publish to the jury.

15             MR. BARTOLOMEI:  No objection.

16             THE COURT:  It is admitted.

17             (Exhibit 46E is admitted.)

18   BY MS. KARLEN:

19   Q.  Please describe -- if there's anything of note that you

20   would like to discuss, please do so.

21   A.  Yes, ma'am.  Off in the lower left-hand side, you can see

22   the spectrum analyzer, and what I was talking about.  Yes,

23   ma'am, the one you just circled.  Off to the right you have the

24   two N-Cons and style radios that we had, which we were able to

25   communicate from team to team.

1          I would have one, as well as an MBITR where I would be

2    able to communicate with my alpha team and bravo team.  Like I

3    said, large amounts of wiring, soldering equipment.  The main

4    thing that stuck out to me was spectrum analyzer and the window

5    that overlooked the MSR.

6    Q.  You were previously indicating off to the side a window.

7    Do you believe -- can you -- was there a window somewhere in

8    relation to this photograph?

9    A.  Yes, ma'am.  It's hard to explain off to the left.  If you

10   keep going to the left, there is a windowsill, and it was one

11   of the windows that would overlook the MSR, and it was

12   significant to me, like I said, because the location being

13   where it was, plus this, it -- just very odd.

14   Q.  Why was the -- you keep mentioning the spectrum analyzer.

15   Why was that of note to you?

16   A.  Spectrum analyzer was one that I went through -- we had

17   received training on what to look for when I was at Fort

18   Campbell, and we received more training when I was with the

19   Stryker Company and we got in country, we received counter ID

20   classes.  The spectrum analyzer was significant because it

21   detects frequencies that some of our equipment can use.

22          MR. BARTOLOMEI:  Objection, Your Honor, requires

23   expert testimony.

24          MS. KARLEN:  Your Honor, this evidence -- may I have

25   one moment?

1          This evidence is being admitted solely for the effect

2     it had on him as a witness and his recollection of this event.

3          THE COURT:  Well, that's okay.  It may be -- I am not

4     sure yet whether it is expert witness testimony or whether it

5     is lay witness testimony.  You believe it is lay witness

6     testimony, then lay some more foundation, based upon

7     his reasonable and reliable experience.

8          MS. KARLEN:  Absolutely, Your Honor.

9     BY MS. KARLEN:

10    Q.  Can you give us more information about the training you had

11    received regarding what to look for, both before your

12    deployment and during your deployment?

13    A.  Before deployment, we would have our communication people

14    come in, and they would show us exactly how some of the

15    equipment worked, so we would know exactly what we were looking

16    for.

17          Basically, the spectrum analyzer, it would be able to

18    detect a specific frequency that something worked on, and it

19    would be able to emulate our frequency or interfere with a

20    frequency.

21    Q.  During your training, did you have an opportunity to see

22    the devices that were being described to you and explained to

23    you for the different purposes, such as a spectrum analyzer?

24    A.  Yes, ma'am.  Like I said, we had the communication

25    personnel.  We had our CID and specific entities come in and

1    show us exactly how they worked.

2    Q.  So this wasn't the first time you had seen a spectrum

3    analyzer?

4    A.  No, ma'am.

5    Q.  You had some familiarity with it?

6    A.  Yes, ma'am.

7    Q.  And you had an opportunity to see how it works and to

8    actually see it so you would recognize it if you saw it again?

9    A.  Yes, ma'am.

10   Q.  Now, in some of your answers, you referred to MSR.  Can you

11   tell us what that means?

12   A.  You know, sorry, military jargon still gets processed that

13   way.

14        MSR basically just stands for main supply route.  It

15   is just a common route that was used for us in order to get

16   from one place to another.

17   Q.  You were saying that the spectrum analyzer was located next

18   to a window out overlooking an MSR, the major supply route; is

19   that right?

20   A.  Yes, ma'am.

21   Q.  And why again was that significant to you?

22   A.  Because our countermeasures run off frequencies.  Once you

23   find that frequency, you can effectively render a

24   countermeasure null and void.

25   Q.  Now, you said after you saw the spectrum analyzer and the

1    electronics, you contacted your chain of command and then what

2    happened next?

3    A.  At that point, ma'am, after I contacted Captain Lowe and we

4    secured the building, that was where my portion of it, I guess

5    you could say, essentially stopped, as the squad leader.

6            I went around ensuring that all of the security

7    elements were in place and relayed further to Captain Lowe and

8    we waited for the follow on element to come in and relieve us.

9    At that point, once we were relieved, we went on continuing to

10   do clearing.

11   Q.  You indicated earlier that when you would leave a scene,

12   you would leave a padlock or a way to secure it behind you, did

13   you do that in this case?

14   A.  Yes, ma'am, every single door we cut into.

15           MS. KARLEN:  May I have one moment, Your Honor?

16           THE COURT:  Yes.

17           MS. KARLEN:  No further questions at this time, Your

18   Honor.  Thank you.

19           THE COURT:  Cross-examination.

20                   CROSS-EXAMINATION

21   BY MR. BARTOLOMEI:

22   Q.  Good morning, sir.

23   A.  Good morning, sir.

24   Q.  You were deployed to Iraq in 2006; is that correct?

25   A.  Yes, sir, I was.

1    Q.  And by August of 2006, how long had you already been in

2    Iraq?

3    A.  By August 2006, sir, we had been in Iraq right about a

4    year.  As I said earlier, we had already been in a year and we

5    had been extended.

6    Q.  Okay.  You had had two previous employments -- deployments

7    as well?

8    A.  Yes, sir.

9    Q.  And you had multiple locations throughout Iraq?

10   A.  Between -- sir, just different areas of Iraq, yes, sir.

11   Q.  Okay.  During that time, were you assigned to the 423

12   Infantry Battalion the entire time, 2006?

13   A.  Yes, sir.

14   Q.  In 2006, were you assigned to a specific section outside of

15   Baghdad?

16   A.  Just -- I can't give you the exact section of Baghdad.  I

17   don't remember that.

18   Q.  Did you become familiar with a town called Radwaniyah?

19   A.  I -- I don't remember.

20   Q.  Now, Baghdad International Airport where you were

21   stationed, was that part of Camp Liberty?

22   A.  It was such a large area.  I know that there was -- we had

23   Victory North, Victory South.  I didn't go to every single

24   area, so I couldn't tell you.

25   Q.  On August 6th, 2006 -- August 30th, 2006, when you went to

1   50 Omar Street, where did you leave from that morning?

2   A.  Our normal camp.

3   Q.  Okay.  That was where?  Just so I am clear.

4   A.  It was within BIAP.

5   Q.  Did you go directly to 50 Omar Street?

6   A.  That wasn't the first building we had entered, no.

7   Q.  Okay.  You traveled in an armored vehicle?

8   A.  Yes, sir.

9   Q.  You parked that armored vehicle in front of 50 Omar Street?

10  A.  We parked it not directly in front.  We were offset and

11  then we started our just line of patrol.

12  Q.  What time of the day was it when you arrived at 50 Omar

13  Street?

14  A.  It was in the morning time frame at some point.  I can't

15  give you the exact time.

16  Q.  You had never been at that specific location before; is

17  that correct?

18  A.  No, sir.

19  Q.  But you had traveled on Omar Street before?  That's a major

20  street; is that right?

21  A.  I had not traveled on it, no.

22  Q.  But you consider that a supply route?

23  A.  It was considered an MSR for different elements, yes.

24  Q.  Okay.  Now, when you were there, did you observe the area

25  to be residential, mixed residential and business?

1    A.  Yes.

2    Q.  All right.  Businesses on the street level, residences

3    higher up, if it was a multi-level building?

4    A.  Yes, sir.

5    Q.  Now, August 30th, 2006, that was a Wednesday; do you

6    remember?

7    A.  I do not, sir.

8    Q.  Okay.  You recall shops being open for business?

9    A.  Some were, some were not.

10   Q.  You recall people walking around in the area?

11   A.  Yes, sir.

12   Q.  You recall people sitting outside some of the shops?

13   A.  Some, yes.

14   Q.  There was traffic on the street on occasion as well; is

15   that correct?

16   A.  Due to it being a main route, yes.  We weren't the only

17   ones that used it.

18   Q.  So you weren't the only ones, so there were private

19   vehicles that used it?

20   A.  Yes, sir.

21   Q.  Taxis?  Things like that?

22   A.  Yes.

23   Q.  All right.

24          MR. BARTOLOMEI:  May I show the witness defense

25   Exhibit 1690?

1          THE COURT:  Yes.  Do you have that also?

2          MR. BARTOLOMEI:  It came to my screen.  Thank you,

3    Judge.

4    BY MR. BARTOLOMEI:

5    Q.  Sir, do you see Defense Exhibit 1690 before you?

6    A.  Yes.

7    Q.  Do you recognize that street?

8    A.  From that viewpoint, no.

9    Q.  Do you recognize any item in that -- well, first of all, is

10   it a photograph?

11   A.  Yes.

12   Q.  Do you recognize any item in the photograph?

13   A.  The striker.

14   Q.  Okay.  Do you recall whether that was your striker?

15   A.  Without seeing the bumper number, I couldn't tell you.

16   Q.  Do you recall while you were at 50 Omar Street looking

17   across the street?

18   A.  Looking across the street?  Yes.

19   Q.  Is there anything in the photograph that you recall as

20   being located across the street from 50 Omar?

21   A.  Not in this photograph, no.

22   Q.  Okay.  Mr. Wilson, when you first arrived at 50 Omar

23   Street, first thing you did was ensure that security was in

24   place?

25   A.  Yes, sir.

1    Q.  All right.  And then you personally entered the building?

2    A.  Yes, sir.

3    Q.  You went through each floor; is that correct?

4    A.  We went through, as I said before, we went through --

5    initially we went through the bottom floor.  Then we went to

6    the next floor, and then at that point when we saw all of the

7    equipment, that's when we stopped.  So we did not go all the

8    way to the top floor.  I just had it secured so -- in case

9    there was anybody from the top floor, they wouldn't be able to

10   come down behind us.

11   Q.  So the table that you saw with some items that was in the

12   government's exhibits, were items that you found on the second

13   floor; is that correct?

14   A.  Yes.

15   Q.  Okay.  You personally went through each room in that first

16   and second floor?

17   A.  Personally, I did not go through every single room, no.

18   Once we found the room with the analyzer, I had my elements

19   stop.

20   Q.  Okay.  You saw electronics in some of those rooms?

21   A.  Say again, sir?

22   Q.  You saw electronics in some of those rooms?

23   A.  Yes, sir.

24           MR. BARTOLOMEI:  Your Honor, may I show the witness

25   Defense Exhibit 1689?

1          THE COURT:  Yes.

2     BY MR. BARTOLOMEI:

3     Q.  Do you have that exhibit in front of you, sir?

4     A.  It is a picture.

5     Q.  Sorry?

6     A.  Yes, sorry.

7     Q.  That's okay.  Do you recognize anything in that photograph?

8     A.  No.

9     Q.  Do you -- again, my question with regards to looking across

10    the street from 50 Omar Street, does that refresh your

11    recollection in any way?

12    A.  No, it does not.

13    Q.  Okay.  At the time that you entered the building, you were

14    looking for all kinds of items, right?

15    A.  We -- just specific items, yes.

16    Q.  So you saw electronics in the room?

17    A.  Yes, sir.

18    Q.  You saw personal computers in the room?

19    A.  Yes.

20    Q.  You saw cell phones?

21    A.  Pieces, yes.

22    Q.  You saw shelves with different kinds of items in them,

23    electronic items?

24    A.  Yes, sir.

25    Q.  All right.  You saw bins filled with electrical components?

1   A.  I'm trying to remember.  I can't remember every single

2   thing that I saw, sir.

3   Q.  Okay.  When you entered the building, did you have a camera

4   with you?

5   A.  I did not have -- I'm sorry, I did not have a camera with

6   me, no.

7   Q.  Did some of the men you were with have cameras?

8   A.  The individual that had the camera was Captain Lowe, he

9   took the pictures.  After that, I was just strictly the

10  security element after he came on, and we had the building

11  secured, sir.

12  Q.  Okay.  You also had an Arabic interpreter, did you not?

13  A.  I did not have one with -- attached directly to me, no.

14  Q.  The 423rd, when you entered that building, did not have an

15  Arabic interpreter?

16  A.  We had one, just not there because there was nobody in the

17  building.

18  Q.  Okay.  Did you see documents in that building?

19  A.  I do not remember, sir.

20  Q.  Did you see filing cabinets in that building?

21  A.  Again, I don't remember everything.

22  Q.  So you don't recall whether you asked the interpreter to go

23  inside and look for documents?

24  A.  After -- when we went in initially and cleared the

25  building, we would never have the interpreter initially go in.

1    We initially did the clearing of the building.  At that point,

2    after it was cleared, we -- I would never just send an

3    interpreter into a building, especially if it was locked and I

4    didn't know what was in there.

5    Q.  I understand that.  After you had secured it.  After you

6    had been in the building, did you have the interpreter go in?

7    A.  I -- I did not, no.

8    Q.  Did you see the interpreter go in?

9    A.  I did not, no.

10   Q.  Okay.  Do you recall any documents of particular importance

11   being brought to you for review that had been found at 50 Omar

12   Street?

13   A.  No, sir.

14   Q.  Now, after you went through the different rooms, you

15   maintained security there?

16   A.  Yes, sir.

17   Q.  And you had referenced that you saw a table with what you

18   believed to be the spectrum analyzer?

19   A.  Yes, sir.

20        MR. BARTOLOMEI:  May the witness be shown Defense

21   Exhibit 2118, please?

22        THE COURT:  Yes.

23   BY MR. BARTOLOMEI:

24   Q.  Do you see that before you, sir?

25   A.  Actually, yeah.

1   Q.  Do you recognize the table?

2   A.  I do.

3   Q.  Is that the table, the same table that was in the

4   government's exhibit that you identified earlier?

5   A.  Well, a couple of things are missing, but it does appear to

6   be --

7   Q.  Yes, what's missing?

8   A.  The --

9   Q.  The spectrum analyzer?

10  A.  Yes, the spectrum analyzer.  The radios that were behind

11  this antenna right here.

12  Q.  Okay.  But between that table -- well, is there a window to

13  the left?

14  A.  It appears to be the windowsill right here, sir.

15  Q.  But between the window and the table, there's a shelf, is

16  there not?

17  A.  Yeah.

18  Q.  And the shelf has six different levels on it?

19  A.  Yes, sir.

20  Q.  And the spectrum analyzer was on the corner of that table?

21  A.  Yes, sir.

22  Q.  That would be the far left corner of the table, correct?

23  A.  Yes.

24  Q.  So you recognize this photograph?  Is it a fair and

25  accurate representation of what you saw on that day?

1    A.  Minus the items that we just talked about, yes, sir.

2            MR. BARTOLOMEI:  Move to admit, Your Honor.

3            MS. KARLEN:  No objection.

4            THE COURT:  It is admitted.

5            (Exhibit 2118 is admitted.)

6            MR. BARTOLOMEI:  May it be published to the jury?

7            THE COURT:  Yes.

8    BY MR. BARTOLOMEI:

9    Q.  Now, Mr. Wilson, again, the table we are discussing is a

10   table to the right of the photograph; is that right?

11   A.  Yes, sir.

12   Q.  And the corner that I was referring to would be actually

13   against the wall, that would be the back wall, the left-hand

14   corner of that table; is that right?

15   A.  Yes.

16   Q.  So the spectrum analyzer wasn't exactly at the window; is

17   that correct?

18   A.  It was offset.

19   Q.  And between that spectrum analyzer and the window is the

20   six levels of shelfing?

21   A.  Yes.

22   Q.  And those shelvings have items on them?

23   A.  Yes.

24   Q.  The training that you received before your deployment,

25   where was that provided?

1    A.  The training we received before deployment, we received it

2    at our respective posts or bases where we were stationed, and

3    then we received it when we got in country.

4    Q.  That was general training on what to look for when you

5    arrived at a particular -- at any location, to look for

6    electrical items and things like that?

7    A.  It was -- yes, it was training that we were taught,

8    components for IEDs.  It was training that we were taught for

9    specific elements.

10   Q.  Okay.  How long was that training?

11   A.  When we got into country, the training was seven days long.

12   Q.  Okay.  And that was the only training you received before

13   the deployment; is that correct?

14   A.  Before this deployment, sir?

15   Q.  Yes.

16   A.  Well, as I stated before, I had received training from

17   when I was at Fort Campbell for two previous deployments.  Then

18   we received training before we left for this deployment, and

19   then we received the counter IED and IED training when we got

20   into country as well.

21   Q.  Okay.  And how long was that second training for?

22   A.  It was the week-long period I talked about earlier.  That

23   is -- it was required.  Once we got into country, everyone went

24   through that training.

25   Q.  Now, after you secured the building, you formed the

1   perimeter of safety around 50 Omar Street?

2   A.  We -- as far as the security, sir, we just secured that

3   building.

4   Q.  Okay.

5   A.  I can't speak to the other elements of my platoon, what

6   they were doing.  I just know what my squad, we had secured

7   that building.

8   Q.  And how much time had elapsed since you arrived at 50 Omar

9   Street and you engaged in securing that building?

10  A.  I can't give you an exact time.

11  Q.  I don't want an exact amount.  Can you give me your best

12  guess?

13  A.  By the time we entered the building and then got the follow

14  on, I'm guessing maybe an hour and a half, two hours.  I don't

15  know.

16  Q.  So for an hour and a half to two hours, your men were

17  inside of that building?

18          MS. KARLEN:  Objection, Your Honor.  Misstates his

19  testimony.

20          THE COURT:  Sorry?

21          MS. KARLEN:  Objection.  Misstates his testimony.

22          THE COURT:  Sustained.

23  BY MR. BARTOLOMEI:

24  Q.  During the two hours that you were there, did members of

25  your unit go in and out of the building?

1          MS. KARLEN:  Objection, Your Honor.  Misstates his

2    testimony.

3          THE COURT:  Well, I am going to overrule it because he

4    said "to secure the building."  So it is overruled, but you

5    might want to clarify one and a half hours versus two hours, if

6    you can.

7    BY MR. BARTOLOMEI:

8    Q.  During the one and a half hours or so, excuse me, that you

9    were there, did you remain outside of the building until you

10   were relieved of that post?

11   A.  No.  My squad was at the door and then internally.  We

12   never -- we were not outside until the element came in,

13   relieved us.  Once they relieved us, we left.

14   Q.  And the squad that was internal, inside, what were they

15   doing?

16   A.  They were positioned at areas where I had placed them in

17   order to prevent people from coming in.

18   Q.  Okay.  And during this time that you were waiting for the

19   other group to arrive, there were still civilians on the

20   street?

21   A.  Well, yes, but not in that building.

22   Q.  Right.  I am not saying in the building, but on Omar

23   Street?

24   A.  Yes, sir.

25   Q.  And there were still cars going by?  There was still

1    traffic?

2    A.  I can't remember exactly.

3    Q.  All right.  During the time that your unit maintained

4    security, there were no incidents against your unit?  By

5    incidents, I mean any kind of crimes of violence?

6    A.  No.

7    Q.  There was no sniper fire?

8    A.  No, not that day, no.

9    Q.  No assaults of any kind?

10   A.  No.

11   Q.  All right.  And if there had been, you would have reported

12   that, wouldn't you?

13   A.  If it had been against us, yes.  That was just standard

14   operating procedures.  I would have reported it up to Captain

15   Lowe.

16           MR. BARTOLOMEI:  May I have a moment, Your Honor?

17           THE COURT:  Yes.

18   BY MR. BARTOLOMEI:

19   Q.  Sir, that day when you went to Omar Street, how many

20   entrances were there to the building?

21   A.  To my knowledge, there was just the one we went into.

22   Q.  You don't know if there were multiple entrances to the

23   apartments in that building?

24   A.  I couldn't tell you, no.

25   Q.  And I'm talking about entrances from 50 Omar -- from Omar

1    Street, you don't recall?

2    A.  No.  We went in and secured the entrance that was at the

3    bottom.

4    Q.  Okay.  There was some shops at the bottom floor; is that

5    correct?

6    A.  Yes, sir.

7    Q.  All right.

8            MR. BARTOLOMEI:  Judge, I have no further questions.

9    Thank you.

10           THE COURT:  Redirect?

11           MS. KARLEN:  Yes, Your Honor, thank you.

12                         REDIRECT EXAMINATION

13   BY MS. KARLEN:

14   Q.  Mr. Wilson, once you were relieved by another group, did

15   your group stay on the scene?

16   A.  No, ma'am.  Once we were relieved, we -- as I said earlier,

17   ma'am, we left that area and we continued to move and clear.

18   Q.  And was your role that day a clearing mission, going door

19   to door to door to door as you described?

20   A.  Yes, ma'am.

21   Q.  When you entered into 50 Omar Street on August 30th, did

22   you or any of your group to your knowledge touch anything or

23   remove anything?

24   A.  No, ma'am.  Once we went in and we saw that, I told them,

25   touch nothing.  Put them in secure, and -- I basically secured

1    the building, told them -- gave them specific instructions, "Do

2    not touch anything," and called Captain Lowe.

3              MS. KARLEN:  May I have a moment, Your Honor?

4              THE COURT:  Yes.

5              MS. KARLEN:  No further questions.  Thank you.

6              THE COURT:  All right.

7              MS. KARLEN:  May this witness be excused?

8              THE COURT:  Counsel?

9              MR. BARTOLOMEI:  Yes, Your Honor.

10             THE COURT:  And you may step down.

11             And your next witness?

12             MR. SOLOMON:  Your Honor, United States calls Will

13   Huff to the stand.

14                 WILLIAM HUFF, GOVERNMENT'S WITNESS, SWORN

15                         DIRECT EXAMINATION

16   BY MR. SOLOMON:

17   Q.  Good morning, sir.

18   A.  Good morning.

19   Q.  Introduce yourself to the jury.

20   A.  My name is William Huff.

21   Q.  Mr. Huff, where do you currently work?

22   A.  I currently work at Towson University in Maryland.

23   Q.  What's your position there?

24   A.  My position there is the deputy athletic director.

25   Q.  And what's your educational background?

1    A.  My educational background, I graduated from the United

2    States Military Academy in 1991, and then through the military,

3    two additional, The Navy War College, and then the National War

4    College.

5    Q.  And did you receive master's degrees from both of those

6    latter colleges?

7    A.  Correct.

8    Q.  Sounds like you must have some military experience as well?

9    A.  Correct.

10   Q.  When were you employed by the United States military?

11   A.  From 1991 until 2015.

12   Q.  Okay.  And what happened in 2015 with respect to your

13   military employment?

14   A.  I retired.

15   Q.  What was your rank upon retiring?

16   A.  Colonel 06.

17   Q.  While you were employed by the military, were you ever

18   deployed to Iraq?

19   A.  Correct.

20   Q.  When were you deployed to Iraq?

21   A.  Initially, 2003, and then again in 2004, 2006, and 2007.

22   Q.  I would like to go back to the time you were in Iraq in

23   2006.

24           During that time period, were you assigned to a group

25   in the military called the Asymmetric Warfare Group?

1    A.   Yes.

2    Q.   Also known as AWG?

3    A.   Yes.

4    Q.   What was the mission of the Asymmetric Warfare Group?

5    A.   The Asymmetric Warfare Group was stood up by senior leaders

6    in the Army to address challenges that our forces were facing

7    from the enemy to include improvised explosive device, normally

8    known as IEDs, and methods that the enemy were employing that

9    were causing high casualties from our soldiers, sailors,

10   airmen, Marines.

11   Q.   Did you receive training with respect to your assignment

12   with AWG?

13   A.   Correct.

14   Q.   What type of training did you receive?

15   A.   The training consisted of additional study of the threat

16   and the environment.  Everyone was at least 10 years of

17   experience in the Army.  There was a selection process that

18   included problem-solving assessment capability.  Then

19   additional specific during this time was a training education

20   period on improvised explosive devices, learning how to make

21   them, learning the different components, and then having

22   practical exercises where we would go to local stores and buy

23   the components that could then subsequently be used in

24   improvised explosive devices, just so we learned the process.

25   Then to allow us to identify materials that had the dual use.

1    They both have a benign civilian use, then they can be

2    configured in a more lethal use as part of an improvised

3    explosive device.

4    Q.   In August of 2006, were you part of a major clearing

5    operation that took place in Baghdad?

6    A.   Yes.

7    Q.   We have heard a little bit about the clearing operation

8    this morning.  Can you please just give us a brief description

9    of that clearing operation?

10   A.   A brief description that -- the goal at the time was to

11   systematically go through the entire area of Baghdad, which is

12   a major metropolitan area, and to break it down into smaller

13   parts that over the course of weeks, and at this time, I think

14   it took months, to say that the U.S. and Iraqi partners had

15   cleared and verified the entire area of Baghdad.

16   Q.   The group you were with, AWG, were you part of the initial

17   clearing operation?

18   A.   No.

19   Q.   How was it that your group was called out to an event

20   during this operation?

21   A.   We were attached to the quick reaction force, which was

22   dedicated for the exploitation of a cache or a find, an

23   objective area, that the initial assessment would determine is

24   there a level of evidence that needs additional handling?  And

25   at that point, the decision would be made to call in the Quick

1    Reaction Force, or the QRF, that AWG was a part of.

2    Q.  You mention the term "exploitation of a site."  What does

3    it mean to exploit a site?

4    A.  Exploitation of a site is when you come across an area that

5    has materials, they could be overt military materials or they

6    could be, again, dual use materials that could be used in a

7    lethal means, that you want to handle that with the best care

8    that you can.

9         Although soldiers and the military are not law

10   enforcement, there's a level of intelligence that can help us

11   on all of these sites.  So by 2006, the armed forces, the Army

12   specifically, had learned that we needed to better understand

13   how to properly preserve this material and individuals on a

14   site to properly gain information from it.

15   Q.  You mention the term that there could be intelligence on

16   the site.  Can you describe more in detail what you mean by

17   that?

18   A.  Right.   When I use the term "intelligence," that could be

19   raw material that then would further analysis, can increase

20   your OA awareness.

21        For example, there could be a piece of paper on there

22   that describes the local names, individuals involved, that

23   would be something that we would want to turn in to

24   intelligence.  There could be hard materials there.

25        Things that could have identifying marks, whether

1    that's fingerprints or other leave-behind marks of an

2    individual.

3    Q.   You also mentioned that you -- because of the potential

4    intelligence value, you wanted to handle these things with

5    care.  Did you receive, and your group receive, some type of

6    training as far as how to handle this evidence when you did

7    come upon it?

8    A.   Yes.

9    Q.   And can you please describe that training for the jury?

10   A.   So the training that -- it was not just the Asymmetric

11   Warfare Group, but it was the entire Army was going through a

12   concerted effort to teach us basic evidence handling skills.

13         And that would include simple but key steps like

14   making sure that you have gloves on when you are handling.  So

15   we even went through the time -- the Army had a tremendous

16   scale, to make sure that we had the medical gloves.  You still

17   had the finger ambidextrous needed, but at the same time you

18   wouldn't leave incidental finger marks behind.

19         And we learned to handle everything with care.  We

20   wanted to make sure that everything with an assessment was

21   taken off site with proper procedure.

22         So the training consisted of back here in the United

23   States, training of site exploitation.  So every Army unit

24   deploying was exposed to this training.

25         And then we, with the Asymmetric Warfare Group being a

1    much smaller Army -- much smaller element, and also by design,

2    half of this unit were civilians who had vast experiences both

3    in the military and other agencies that had a great amount of

4    experience in evidence handling.

5          So we in the Asymmetric Warfare Group were designated

6    by the Army to be one of the key elements to help the Army

7    through this process.

8    Q.  You mentioned some training you received prior to going in

9    country.  Who provided you that training?

10   A.  For the Asymmetric Warfare Group or for the Army?

11   Q.  The Asymmetric Warfare Group.

12   A.  So the Asymmetric Warfare Group and -- our training was

13   done by a cadre of individuals that included experience in the

14   FBI, ATF, and other federal organizations.

15   Q.  In addition to the training that you received before going

16   in country, before going to Iraq, so the training you received

17   in the United States, did AWG receive additional training in

18   country once you arrived?

19   A.  Additional training?  I would not describe it as additional

20   training.  We spent a lot of time setting up training sites and

21   replicating some of the sophisticated environments we would

22   see.  So how do you identify a false floor or a false wall, a

23   false ceiling.  How do you find those small marks that could

24   lead you to then gather hidden additional small caches.

25   Q.  You mentioned as part of your training you were taught to

1    wear gloves.  Do you recall other parts of the training with

2    respect to how to handle the evidence or how to process a

3    scene?

4    A.  Yes, the simple concept of processing the scene would be an

5    initial walk-through to just identify --let me take a step

6    back.

7              This is assuming the site is secure.  So the part I am

8    going to pick up on, we have confirmed there's no active enemy.

9    We've confirmed that there's no risk or high probability risk

10   of a booby trap.

11             So assuming all of that has been completed, the first

12   step is just an initial walk-through to identify the scale, the

13   magnitude, and how many additional search teams would be

14   needed.  So step one is the initial walk-through to determine

15   how the search is going to be conducted subsequently.

16   Q.  And then once the initial walk-through is done, how does

17   the search proceed from there?

18   A.  After the initial walk-through, then our basic tactic was

19   to assign a search team to each room or dwelling.  Because

20   sometimes the rooms would blend together so you just didn't

21   have one set team per room.  But we would divide up our force

22   according to the size of the objective.

23             Would you like me to talk specifically of Omar?

24   Q.  Just generally first.

25   A.  So we are still generic.  So generically, you would divide

1    up your team according to the size of the site exploitation.

2    Q.   And then what would the teams do, once they were assigned

3    to conduct a search?

4    A.   Then they would go and start doing the more detailed

5    search.  So this is where they would take initial photographs.

6    They would start identifying everything visually with

7    photographs.

8              Once all of the photographs were taken, again, through

9    wearing gloves, they would start to then handle some of the

10   materials to identify what else is there.

11             One of the specifics, as I mentioned, what we had

12   learned, and it is not unique to Iraq, it's everywhere, but we

13   learned that you have to really detail, look through a lot of

14   the false walls, false floors, false ceilings, because most

15   nefarious activity people don't leave it out in the open.  They

16   are going to hide it.

17             So we were very conscious of that.  So there is just

18   some basic tactics, techniques, and procedures that we would go

19   through to be as thorough as possible.  And then one of the

20   factors that we had to account for, because it was a wartime

21   environment, was how long.

22             And that was one of the topics that just

23   differentiates from a peacetime environment, was in a wartime

24   environment, you do have a finite amount of time that you can

25   stay on the site.

1    Q.  Do you remember in late August 2006 being called out to a

2    site in Baghdad?

3    A.  Yes.

4    Q.  Can you describe the neighborhood in which this find was

5    located?  The neighborhood to which you responded?

6    A.  Yes.  This was a -- I would describe it as an affluent

7    area.  Other than the Arabic writing and some of the uniqueness

8    of their architecture, it could be any western city, a city in

9    the United States.  It was a well-developed neighborhood.

10          MR. SOLOMON:  Your Honor, may I show the witness

11   what's been admitted as Government's 46T?

12          THE COURT:  Yes.

13   BY MR. SOLOMON:

14   Q.  Sir, do you recognize this photograph?

15   A.  Yes.

16   Q.  What is this photograph?

17   A.  This photograph is what we described as 50 Omar Street.

18   Q.  So this is the building to which your group, AWG, responded

19   in late August 2006?

20   A.  Correct.

21   Q.  And you refer to this building, you mention a couple of

22   times, Omar Street.  You refer to this building as 50 Omar

23   Street; is that correct?

24   A.  Correct.

25   Q.  And in addition to having an address for this location, did

1   you do anything upon arrival to -- or did you use any other

2   means to determine the location of this building, the physical

3   location?

4   A.  Yes.  We used our Global Positioning System known as GPS.

5   Q.  That was a hand-held device that you had?

6   A.  Yes, there were several, but one included a hand-held

7   device.

8   Q.  And for those of us who don't often use the GPS, how are

9   you able to obtain a physical location of a building using a

10  GPS system?

11  A.  By having a GPS system, you just press a -- normally you

12  press a button for your location, and then you would get the

13  coordinates, the military graphical system reference, MGRS,

14  graphic, and it would tell you where you are in terms of a

15  specific precise location.

16  Q.  Before you were called out to this location, do you recall

17  how many site exploitations you had done during your 2006

18  deployment before this site?

19  A.  During my 2006 deployment, approximately 15.  But I had

20  been in Iraq three additional years, so there were many times

21  where I personally wasn't the one searching, but I was a part

22  of numerous.

23  Q.  Okay.  Why does this particular location stand out in your

24  mind?

25  A.  The amount of material that we found on site and the

1    uniqueness of that material.

2    Q.  When say the amount of material, could you elaborate on

3    that for us?  What type of material did you find?

4    A.  The type of material that is unique is some of the

5    sophisticated electronics equipment that in my three years at

6    that point, I had not witnessed or heard about before.

7    Q.  When you arrived at this location, can you describe the

8    environment?

9    A.  The environment is the initial search unit had done a

10   initial walk-through.  Their assessment was that this required

11   additional site exploitation.  So the call came from that

12   initial search unit to the quick reaction for us with AWG, and

13   then we move to the site.

14   Q.  Did you encounter any hostilities with anyone in the area

15   when you arrived?

16   A.  No.  At this point we simply moved in a relatively secured

17   area and initially dismounted our search team.

18   Q.  And did that security stay in place for the entire time you

19   were at the scene?

20   A.  Correct.

21   Q.  So when you arrived on scene at this particular location,

22   how do you proceed with the exploitation of this site?

23   A.  The first step we did was send in our initial search team

24   leaders to conduct the next level of assessment.

25   Q.  And once your team leaders did that assessment, did they

1   come back out to you to indicate to you that further

2   assessment, further exploitation was required?

3   A.  Correct.

4   Q.  Did you personally conduct a walk-through of this site?

5   A.  Correct.

6   Q.  Do you recall where the location that you searched, where

7   in the building the location that you searched was located?

8   A.  Yes.  If you look at this photo, that center building, if

9   the ground floor is considered level one, the next two would be

10  levels two and three.  And that was my recollection of the

11  search area, was that middle dwelling on the second or third

12  floors.

13  Q.  And it looks like on the ground floor of this building,

14  there may be some businesses in this building; is that correct?

15  A.  Correct.

16  Q.  And then what were the -- what was on the second and third

17  floor of the building?

18  A.  The second and third floor were, I don't want to -- the

19  configuration that we found them in or what are they in their

20  design?

21  Q.  Yes.

22  A.  I don't understand the question.

23  Q.  Were they apartments?  Were they homes?

24  A.  They were apartments.

25  Q.  After you conducted your initial walk-through of the

1    building, did you actually lay out a diagram of the rooms that

2    you were going to search?

3    A.  Simultaneous to the subsequent search is when I started

4    developing a diagram.

5    Q.  And how many rooms did you search at this location?

6    A.  Two areas that we considered worth capturing and doing the

7    initial site exploitation, so two rooms.  Two apartments is a

8    better description.

9    Q.  Okay.  And after you did the initial walk-through, did you

10   personally do a sketch of those two apartments or layout of

11   those two apartments?

12   A.  Correct.

13          MR. SOLOMON:  Your Honor, may I show the witness what

14   has been marked as Government's Exhibit 46X?

15          THE COURT:  Yes.

16   BY MR. SOLOMON:

17   Q.  Do you recognize the exhibit before you?

18   A.  Correct.

19   Q.  What is that exhibit?

20   A.  That is what we described as room A, a multi-roomed area.

21   So the term room is just the site that we looked at here, so

22   this is my sketch of the room A.

23   Q.  And does this fairly and accurately depict that apartment

24   or that room A as you saw it back in August of 2006?

25   A.  Yeah, within the limits of my skill to sketch it out, yes.

1          MR. SOLOMON:  Your Honor, the government would move

2     into evidence Exhibit 46X and request permission to publish.

3          MR. BARTOLOMEI:  No objection, Judge.

4          THE COURT:  It is admitted, and you may publish.

5          (Exhibit 46X is admittted.)

6     BY MR. SOLOMON:

7     Q.  Mr. Huff, looks like on the upper left hand-side of the

8     screen there's some writing there.  Let me ask you, first of

9     all, how did you create this sketch?

10    A.  Created the sketch using a tool on a computer.  So sitting

11    on the site, it was important to be able to draw the diagram so

12    that when we had subsequent references, people would understand

13    which room it came from, and there would be a common reference.

14    Q.  And it looks like within this apartment there are different

15    numbers beginning with A1 through A6, correct?

16    A.  Correct.

17    Q.  Were those rooms actually physically labeled as well, in

18    the apartment itself?

19    A.  To the best of our ability.

20    Q.  And would you have entered the information there on the

21    upper left-hand side?

22    A.  Correct.

23    Q.  What information is there?

24    A.  It's the date, time group.  And you can see -- that term L,

25    means local time.

1    Q.  Local time?

2    A.  Local time.  And the next line is the military grade

3    reference system, and then the third line is, to have a common

4    reference, we identified this as room A.

5    Q.  So the date you would have entered, and then the second

6    line there, the grade system, that would have been what you

7    obtained from your GPS system?

8    A.  Correct.

9          MR. SOLOMON:  Your Honor, may I show the witness

10   what's been marked as Government's Exhibit 46W?

11         THE COURT:  Yes.

12   BY MR. SOLOMON:

13   Q.  Sir, you recognize this exhibit?

14   A.  Yes.

15   Q.  What is this exhibit?

16   A.  This is a diagram that I drew on a second room on objective

17   Omar.

18   Q.  And does this exhibit also fairly and accurately depict the

19   layout of that second room as you saw it on August 30th of

20   2006?

21   A.  Correct.

22         MR. SOLOMON:  Your Honor, I would move to admit

23   Government's 46W, and publish to the jury.

24         MR. BARTOLOMEI:  No objection, Judge.

25         THE COURT:  You may publish.  It is admitted.

1              (Exhibit 46W is admitted.)

2     BY MR. SOLOMON:

3     Q.  So it looks like on the upper left-hand corner of the

4     diagram, you have the same information entered there, the date,

5     the grid location, and then here room B.

6     A.  Correct.

7     Q.  You would have entered all of this on your computer?

8     A.  Yes.

9     Q.  And would your teams have labeled the rooms just like they

10    did in apartment A or room A, would they have labeled the rooms

11    physically in the apartment as they are labeled here B1 through

12    B6?

13    A.  To our best ability, yes.

14    Q.  So after you had done the initial walk-through and you had

15    done the sketch, did you break up into different teams?

16    A.  Yes, we had two different teams, one assigned to the room

17    A, one to room B.

18    Q.  Was there a photographer for each of those teams?

19    A.  Each team had their own camera.  So we had multiple cameras

20    taking multiple pictures, and my job was to consolidate all of

21    the photos.

22    Q.  Did you also have a camera?

23    A.  Correct.

24    Q.  Did you take some photos as well?

25    A.  Yes.

1    Q.  And then once all of those photos are taken, you say you

2    consolidate all of those photos?

3    A.  Correct.

4    Q.  Showing you some of those photos now.  Actually, before I

5    show you the photos, let me ask you another question.

6            There was a room A and a room B.  Can you describe the

7    types of things that you found in -- first of all, in room A?

8    What were the types of things you located in room A?

9    A.  To my recollection, room A was a lot of material that has

10   dual use, but can be used both in, again, a benign way and also

11   in a military way.

12           And there was some distinctions that I remember, areas

13   that had a large electronic -- amount of electronic gear.

14   Areas that looked like a research area, like a fixing area

15   where people were making things.  And then an area that had

16   packages that appeared to be final complete material that was

17   ready to be sent out and employed.

18   Q.  So that was room A?

19   A.  Generically.

20   Q.  How about room B?

21   A.  I don't remember.

22           MR. SOLOMON:  May I show the witness what's been

23   admitted as Government's Exhibit 46D?

24           THE COURT:  Yes.

25

1    BY MR. SOLOMON:

2    Q.  Sir, do you recognize this photograph?

3    A.  Yes.

4    Q.  Okay.  Let me ask you, first of all, if you see in the

5    upper left-hand corner of the photograph there, there appears

6    there are two pieces of paper affixed to the wall.  What are

7    those two pieces of paper?

8    A.  Those two pieces of paper are to mark the area.

9    Q.  So one of your teams would have affixed those, the A and

10   the 1 to that wall?

11   A.  Correct.

12   Q.  Okay.  Can you describe to the jury what you see in this

13   photograph and what you remember?

14   A.  From what I remember, this was distinguishable because the

15   amount of electronics.  The item on the left-hand side is not

16   very common.

17   Q.  I'm just going to circle.  Is that the item?

18   A.  Correct.

19   Q.  And that item appears to have a screen, like a viewing

20   screen on it, and then some knobs on the electrical portion of

21   the item?

22   A.  Correct.

23   Q.  What else stood out to you?

24   A.  The item just to the -- as you look at it, just to the

25   right of it, was another item that is not -- had not been very

1   common to my experience.

2   Q.  And then it looks like there are various other items.  If I

3   could just zoom in here a little bit.  Looks like there's other

4   various electronic items and parts on that table as well in

5   addition to the two that you pointed out?

6   A.  Correct.

7           MR. SOLOMON:  Sorry, Judge, may I show the witness

8   Exhibit 46F?

9           THE COURT:  Yes.

10  BY MR. SOLOMON:

11  Q.  Sir, you recognize that exhibit?

12  A.  Yes.

13  Q.  What does this exhibit depict?

14  A.  That, again, is the area we refer to as A1.

15  Q.  So it is just a little further out view of that particular

16  room?

17  A.  Correct.

18  Q.  Does this fairly and accurately depict the room when you

19  saw it back on August 30th, 2006?

20  A.  Yes.

21          MR. SOLOMON:  Move to admit Government's 46F, Your

22  Honor.

23          MR. BARTOLOMEI:  No objection.

24          THE COURT:  It is admitted.

25          (Exhibit 46F is admitted.)

1              MR. SOLOMON:  Judge, sorry.  I neglected to ask

2       permission to publish that.

3              THE COURT:  And you may.

4              MR. SOLOMON:  Thank you.

5              Request permission to show the witness Exhibit 46G,

6       Your Honor?

7              THE COURT:  Yes.

8       BY MR. SOLOMON:

9       Q.  Recognize this exhibit, sir?

10      A.  Yes.

11      Q.  And what's this exhibit?

12      A.  The area we commonly refer to as A1.

13      Q.  So it is just another photograph of that same room?

14      A.  Correct.

15      Q.  Just a different vantage point?

16      A.  Correct.

17      Q.  And does this also fairly and accurately depict the room as

18      you saw it on August 30th of 2006?

19      A.  Yes.

20             MR. SOLOMON:  Your Honor, I move to admit 46G and move

21      to publish as well?

22             MR. BARTOLOMEI:  No objection.

23             THE COURT:  It is admitted and you may publish.

24             (Exhibit 46G is admitted.)

25

1    BY MR. SOLOMON:

2    Q.  So in this photograph, it looks like on the left-hand side

3    of the photograph is the desk on which the electronic equipment

4    that you pointed out in the earlier photographs is located; is

5    that right?

6    A.  Yes.

7    Q.  Do you notice anything else in this photograph that stood

8    out to you when you walked into this room?

9    A.  Yes.  As you look at it, the bottom right-hand side, those

10   four relatively large size electronic equipment devices.

11   Q.  And then it appears that there's something on the desk in

12   that room as well; is that a printer?

13   A.  Correct.

14   Q.  In addition to the large electronic items that you saw on

15   that day, did you see other electronic items in this particular

16   apartment?

17   A.  Yes.

18   Q.  Let me show you what's been marked as Government Exhibit

19   46L, if I may.

20          Do you recognize this exhibit?

21   A.  Yes.

22   Q.  And what is this exhibit -- well, let me ask you, first of

23   all, does this fairly and accurately depict the scene at 50

24   Omar Street on August 30th, 2006?

25   A.  Yes.

1          MR. SOLOMON:  Move to admit Government's 46L.

2          MR. BARTOLOMEI:  Objection, Your Honor, foundation.

3          THE COURT:  And I -- he's already -- I think I know

4    what you're saying, but I am going to overrule the objection.

5    It is admitted.

6          (Exhibit 46L is admitted.)

7    BY MR. SOLOMON:

8    Q.  Sir, let me ask you, first of all, do you remember any of

9    the specific items in this photograph?

10   A.  No.

11   Q.  Okay.  How is it that you remember this particular

12   photograph?

13   A.  When you showed it to me.

14   Q.  So you recall seeing this?

15   A.  After seeing it, after seeing the markings, then it was

16   very familiar.

17   Q.  And do you -- down on the bottom right-hand corner of this

18   exhibit, there appears to be a date, 08-31-2006?

19   A.  Yes.

20   Q.  Can you explain, are you able to explain that discrepancy

21   between the date on your diagram and the date on this

22   photograph?

23          MR. BARTOLOMEI:  Objection.  Lack of personal

24   knowledge.  Lack of foundation.

25          THE COURT:  I am going to ask you to get, if you can,

1    more foundation.

2              MR. SOLOMON:  Okay.

3    BY MR. SOLOMON:

4    Q.  Do you know who took this photograph?

5    A.  No.

6    Q.  Okay.  Is this how you saw the scene on August 30th of

7    2006?

8    A.  From what I remember, yes.

9    Q.  Are you able -- are you able to explain why the date on

10   this photograph is different from the date on your diagram?

11   A.  We had --

12             MR. BARTOLOMEI:  Objection, Judge.  Calls for

13   speculation.

14             THE COURT:  Overruled.

15             THE WITNESS:  Multiple cameras that day, as I

16   referenced before.  Each search team had their own individual

17   camera.

18   BY MR. SOLOMON:

19   Q.  And I just want to clarify, you don't have any specific

20   knowledge as to why the date is August 31st of 2006?

21   A.  No, but each camera may have had a different -- that is an

22   individual input on a camera, not an automatic.

23             MR. BARTOLOMEI:  Judge, again, speculation.  Lack of

24   foundation.

25             THE COURT:  Overruled.  Overruled.

1      Mr. Solomon, how much more time do you think you'll

2   have with this witness?

3      MR. SOLOMON:  Still have more time.

4      THE COURT:  Time for a break?  I bet everybody wants a

5   break.  All right.  20 minutes.  See you back here at 10:30.

6      THE CLERK:  All rise.

7      (Recess taken at 10:11 a.m. until 10:34 a.m..)

8      MR. PIMSNER:  Your Honor, may we address one thing

9   with you?

10      THE COURT:  Well, they might come in.

11      MR. PIMSNER:  Okay.  It is just about the deposition,

12   the second deposition.

13      THE COURT:  Okay.  Go ahead.

14      MR. PIMSNER:  Just depending on how fast it goes this

15   afternoon, we may try to use it tomorrow morning.

16      THE COURT:  Okay.  Good.

17      (Jury enters the courtroom.)

18      THE COURT:  We are going to take a break until we hear

19   back from the juror.  So we are in recess.

20      (Jury leaves the courtroom.)

21      (recess taken from 10:35 a.m. until 10:41 a.m.)

22      THE COURT:  And, Mr. Huff, you may step down and take

23   a break also.

24      So Mr. Huff, step down and go outside of the courtroom

25   for a minute, because I am going to talk to the lawyers.

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  It has nothing to do with you.

3          So, sadly, we have a problem with Juror Number 1

4  again, and we couldn't get her back.  She was downstairs.  They

5  couldn't find her.

6          As you might recall, she was a problem to some extent,

7  as much as I can be generous about it, during the selection of

8  the jury.  You know, you look at her background, she's a school

9  teacher, she has a BA, but I don't know.

10          The other jurors have told Christine that they are

11  very concerned about her.  That she's gotten aggressive with

12  the other jurors.

13          So this is what I propose doing is bring her in and

14  asking her if she understands that she has obligations.  She

15  has to be here on time.  When we have a break for a certain

16  period of time, she has to come back on time.

17          And I will say nothing about her aggressive attitude

18  because that, of course, can be read two ways, giving her the

19  benefit of the doubt.  But reminding her and in a stern manner,

20  that she took an oath to comply with the conditions that have

21  been imposed on all of the jurors.

22          Any other suggestion?

23          MR. PIMSNER:  No, Your Honor.

24          MR. BARTOLOMEI:  No, Your Honor.

25          THE COURT:  All right.

1              (Juror Number 1 enters the courtroom.)

2          THE COURT:  Hi.  How are you?

3          JUROR:  Good.  How are you?

4          THE COURT:  You remember at the beginning where I said

5     very clearly that everybody had to be here on time.  And that

6     there are breaks, but everybody has to maintain the timing for

7     those breaks.  Can you tell me if you have had a problem?

8          JUROR:  I actually lost my watch.  My grandma gave it

9     to me, and I lost it last night, so I don't have a watch on

10    right now.  I usually always keep track of time.

11         THE COURT:  Okay.  That's good.  But you know the way

12    you can keep track of time is by asking Christine and, she's

13    there for you.  She is -- her primary responsibility other than

14    me, is the jury.  And the other jurors know what time it is.

15         JUROR:  I know.  I'm sorry.

16         THE COURT:  Okay.

17         JUROR:  I actually literally -- I was asking --

18         THE COURT:  Why don't you get in front of the

19    microphone.  Pull your microphone up.

20         JUROR:  I was asking, like, people around me what time

21    it is because I could -- so I can get back here on time and --

22         THE COURT:  It is your responsibility.

23         JUROR:  I know.

24         THE COURT:  Okay.  And you took an oath, remember?

25         JUROR:  Uh-huh.

1          THE COURT:  That you would abide by all of the rules

2     and requirements.  We need that from all of our jurors.  And so

3     far we haven't had a problem.

4          JUROR:  Yeah.

5          THE COURT:  Okay.  All right.  Thank you.

6          JUROR:  You're welcome.  Thank you.

7          THE COURT:  Go back to the jury room and without any

8     doubt, with a watch, without a watch, you need to be here on

9     time.

10          JUROR:  You are right.  I do have a cell phone.  But I

11     turned it off because I don't want it to interrupt.  But

12     anyway, I will get here on time.

13          THE COURT:  You can't have it in the courtroom.

14          JUROR:  Oh, you can't?  Even -- well, it is turned

15     off.  The power is off.

16          THE COURT:  Okay.  That's good.  But then you can turn

17     it back on because it still keeps time, doesn't it?

18          JUROR:  And I did do that, I'm sorry.  I just will be

19     on time.  Okay?  I will.

20          THE COURT:  You be on time and just relax.  And listen

21     to -- it seems to me like you have been very attentive.  We all

22     appreciate that.

23          JUROR:  Oh, well, thank you.

24          THE COURT:  All right.  Christine.

25          (Juror Number 1 leaves the courtroom.)

1               (Jury enters the courtroom.)

2          THE COURT:  Please be seated.  Mr. Solomon.

3          MR. SOLOMON:  Thank you, Your Honor.

4     Q.  Sir, I would like to jump right back in to the exhibits

5     with you.

6          MR. SOLOMON:  Judge, may I show the witness

7     Government's Exhibit 46P?

8          THE COURT:  Yes.

9          THE CLERK:  What letter was that?

10          MR. SOLOMON:  46P as in Paul.

11     BY MR. SOLOMON:

12     Q.  Sir, do you recognize that exhibit?

13     A.  When you showed it to me.

14     Q.  And what is this -- well, let me ask you, first of all,

15     does this exhibit fairly and accurately depict the scene at 50

16     Omar Street on August 30th of 2006?

17     A.  Yes.

18     Q.  Okay.

19          MR. SOLOMON:  Move to publish -- move to admit

20     Government's 46P and request permission to publish to the jury,

21     Your Honor.

22          MR. BARTOLOMEI:  Judge, objection.  Foundation and

23     lack of personal knowledge.  I did not hear that he knew.

24          THE COURT:  He says he recognizes it.  Overruled.  And

25     you may publish.

1          (Exhibit 46P is admitted.)

2     BY MR. SOLOMON:

3     Q.  Sir, could you please describe to the jury how it is that

4     you recall this particular photograph?

5     A.  Yes, after being shown the photograph, I remember the

6     significance because, again, in my three years and even

7     subsequent time in Iraq, I had not seen quite such

8     distinguished furniture in a residence.

9     Q.  Okay.  Do you recall which of the rooms, A or B, this

10    furniture was located in?

11    A.  From my recollection, it was B.

12    Q.  I'm going to show you now what is marked as Government's

13    Exhibit 46Y.  Do you recognize that exhibit?

14    A.  Yes.

15    Q.  Okay.  And what does this exhibit depict?

16    A.  This is an area that we found on Omar Street, 50 Omar

17    Street.

18    Q.  Okay.  And does this appear to be a photograph of the same

19    room that you have previously described in 46F and 46G?

20    A.  Correct.  In the previous description commonly referred to

21    as the A area.

22    Q.  Okay.

23          MR. SOLOMON:  Move to admit Government's Exhibit 46Y

24    and request to publish to the jury?

25          MR. BARTOLOMEI:  No objection, Judge.

1        THE COURT:  It is admitted.  And you may publish.

2        (Exhibit 46Y is admitted.)

3   BY MR. SOLOMON:

4   Q.  Sir, does this just appear to be a closer view of the

5   electronic equipment that you saw in room A1?

6   A.  Correct.

7   Q.  Okay.  Now I am going to show you what has been marked as

8   Government's Exhibit 47.  Do you recognize that photograph?

9   A.  Yes.

10  Q.  And how is it that you recognize this particular

11  photograph?

12  A.  When you showed it to me, I remembered this because of the

13  uniqueness of its configuration.

14  Q.  And what is it that is unique about it?

15  A.  Would you like me to show?

16  Q.  Just --

17  A.  Verbally it was unique in that if you remember the

18  subsequent photos, excuse me, that in this area, there was an

19  area that clearly was a work station area.

20        And then this area we described it as something that

21  was packaged up and ready for what it would appear to be

22  distribution.  And you can see that on this small white box,

23  approximately middle of the picture.

24  Q.  And does this photograph fairly and accurately depict 50

25  Omar Street as you saw it on August 30th of 2006?

1    A.  Yes.

2            MR. SOLOMON:  Move to admit and publish, Your Honor?

3            MR. BARTOLOMEI:  Judge, based on what's presented,

4    foundation.  Lack of personal knowledge.

5            THE COURT:  Overruled on personal knowledge.  But you

6    may ask him before it is admitted about the perhaps discrepancy

7    in terms of the date.

8            MR. SOLOMON:  Okay.

9    Q.  Let me point you again to the bottom of the exhibit, the

10   bottom right-hand corner of the exhibit.  Do you see a date

11   depicted there?

12   A.  Yes.

13   Q.  Okay.  And what is the date depicted there?

14   A.  08-31, 2006, or August, the first numbers being August.

15   The second numbers being the day, 31st.

16   Q.  Okay.  Is it your testimony today that you, despite that

17   date on the photograph, that you recall seeing this particular

18   object on that shelf on August 30th of 2006?

19   A.  Yes.

20           THE COURT:  It is admitted.  You may publish.

21           (Exhibit 47 is admitted.)

22           THE CLERK:  Counsel, I am sorry, is there a

23   corresponding letter or is it just 47?

24           MR. SOLOMON:  It's just 47.

25           THE CLERK:  Okay.  Thank you.

1    BY MR. SOLOMON:

2    Q.  Sir, could you please point to the jury, you mentioned a

3    box in your testimony.  Could you please point to the jury

4    where it is that you see that box?

5    A.  Yes.

6    Q.  So you've circled the box towards the left middle portion

7    of the photograph; is that correct?

8    A.  Correct.

9    Q.  Could you describe that box, just color and if there's any

10   distinguishing --

11   A.  It was just white and it had been taped up, what appeared

12   to be an effort to make it secured for the environment.

13          MR. BARTOLOMEI:  Objection, Judge.  Speculation.

14          THE COURT:  I am going to sustain, without further

15   foundation.

16   BY MR. SOLOMON:

17   Q.  Without describing why it may have been in that condition,

18   what was the condition of the box when you saw it?

19   A.  Just as you see it in the photo.

20   Q.  And you testified that there was actually tape on the box?

21   A.  Correct.

22   Q.  Do you recall seeing that box open at the scene of 50 Omar

23   Street the day you were there?

24   A.  When you showed me the picture.

25   Q.  And do you remember seeing it open that day at Omar Street?

1          MR. BARTOLOMEI:  Objection, Your Honor.  Hearsay.

2     Nonresponsive.

3          THE COURT:  No, no.  He asked, do you recall seeing it

4     open?  He can answer that yes or no.

5          THE WITNESS:  Yes.  When you showed me the picture,

6     yes.

7     BY MR. SOLOMON:

8     Q.  Going to show you what has been marked as Government's

9     Exhibit 47A.  What does this photograph depict?

10    A.  An item we found on site.

11    Q.  Does it appear to be the same item?

12    A.  Correct.

13    Q.  Okay.  And does this photo fairly and accurately depict

14    that box that you saw at 50 Omar Street on August 30th of 2006?

15    A.  Yes.

16    Q.  Okay.

17         MR. SOLOMON:  We would move to admit Government's 47A

18    at this time, Your Honor.

19         MR. BARTOLOMEI:  No objection.

20         THE COURT:  It is admitted.

21         (Exhibit 47A is admitted.)

22    BY MR. SOLOMON:

23    Q.  Sir, this appears, as you said, to be a close-up view of

24    the box?

25    A.  Yes.

1   Q.  And are you able to see the tape that you described on the

2   box in this photograph?

3   A.  Yes.

4   Q.  Okay.  I'm going to now show you Government's 47B.  Can you

5   tell us what this photograph depicts, please?

6   A.  This depicts the items after we opened the white box.

7   Q.  And does it appear to be on that same shelf?

8   A.  Correct.

9           MR. SOLOMON:  Move to admit Government's 47B, Your

10  Honor?

11          MR. BARTOLOMEI:  Objection.  Foundation, Judge.

12          THE COURT:  Overruled.  He's identifying it.

13          (Exhibit 47B is admitted.)

14  BY MR. SOLOMON:

15  Q.  Can you describe to the jury what you recall seeing at 50

16  Omar as it is depicted in this photograph, please?

17  A.  Yes, this was the item that we opened the box and we took

18  this picture because, as you can see, this configuration is

19  used as part of an improvised explosive device.

20          MR. BARTOLOMEI:  Objection, Your Honor.  It calls for

21  expert opinion.  Lack of personal knowledge.

22          THE COURT:  I am going to strike it, but allow you to

23  lay some foundation.  He is technically a lay witness, but I

24  don't know if you can establish foundation for a lay witness.

25  But that's what you have to do because he hasn't been qualified

 1    as an expert under Rule 702.

 2              MR. SOLOMON:  Yes, Your Honor.

 3    BY MR. SOLOMON:

 4    Q.  Sir, you described some training that you received here in

 5    the United States before you went to Iraq, correct?

 6    A.  Correct.

 7    Q.  And part of that training was to be able to detect items

 8    that may or may not be associated with IEDs once you arrived in

 9    country?

10              MR. BARTOLOMEI:  Objection.  Leading.

11              THE COURT:  Sustained on leading.

12    BY MR. SOLOMON:

13    Q.  Could you please describe again your training here in

14    country before you went to Iraq?

15    A.  Yes.  One of the aspects that we were taught is how to go

16    into a hardware store, a toy store, traditional benign areas

17    and put together the equipment needed to make an improvised

18    explosive device.

19              MR. BARTOLOMEI:  Judge, I am going to object as

20    unnoticed and unprovided expert testimony.

21              THE COURT:  Well, it is not expert testimony so far.

22    We are still waiting for foundation.  So you can continue to

23    lay foundation.

24              MR. SOLOMON:  Thank you, Your Honor.

25

1   BY MR. SOLOMON:

2   Q.  And as part of that training, you were then taught to

3   detect items in the field as you saw them in the field; is that

4   correct?

5   A.  Correct, because there are dual-use items, what I would

6   describe as dual-use items.

7   Q.  And are you relying on that training and your experience

8   with your deployments to Iraq to determine what this item

9   was -- or did you rely on that training on August 30th of 2006,

10  when you first saw this item?

11  A.  Yes, and why we took the photo.

12  Q.  Okay.  And what led you to determine that this was

13  something of significance when you saw it on August 30th of

14  2006?

15          MR. BARTOLOMEI:  Same objection, Judge.

16          THE WITNESS:  The environment.

17          THE COURT:  If it is the same objection, it is

18  foundation, and he said something about his training.  I don't

19  know if his training would in fact establish it.

20          MR. SOLOMON:  Do you want more information on his

21  training, Your Honor?  I can ask him that.

22          THE COURT:  Well, I am not sure.  But I will sustain

23  it at this point on foundation, since there hasn't been further

24  evidence through this witness as to what that foundation might

25  be.

1          MR. SOLOMON:  That's fine, Your Honor.  I will move on

2     to another line of questioning, and we will talk about this

3     with a later witness.

4     BY MR. SOLOMON:

5     Q.  So let me ask you this, without describing why this was

6     something of significance, did you determine on August 30th of

7     2006, based on your training and your experience, that this was

8     in fact something of significance that you should take?

9     A.  Yes.

10          THE COURT:  I am not sure, did you move that into

11     evidence or not?  Was that moved into evidence?

12          THE CLERK:  47B?

13          MR. SOLOMON:  I believe so, Your Honor, yes.

14          THE COURT:  Okay.

15     BY MR. SOLOMON:

16     Q.  Before I move on to the next exhibit, was this one of the

17     items that was actually taken from the Omar cache on August

18     30th?

19     A.  Yes.

20     Q.  I'm now showing you what has been marked as Government's

21     47Q.  Do you recognize that photograph?

22     A.  Yes.

23     Q.  And what is depicted in this photograph?

24     A.  That's a closer view of previous photographs we've

25     discussed.

1     Q.  And specifically of room A1?

2     A.  Correct.

3     Q.  Okay.  And does that fairly and accurately depict the room

4     A1 as you saw it in August of 2006?

5     A.  Yes.

6              MR. SOLOMON:  Move to admit 47Q, Your Honor.

7              MR. BARTOLOMEI:  No objection.

8              THE COURT:  It is admitted.

9              (Exhibit 47Q is admitted.)

10    BY MR. SOLOMON:

11    Q.  So can you describe for the jury -- again, this is just a

12    portion of that table it appears, what you see in this

13    photograph that you thought was of significance?

14    A.  Yes.  Some items of significance I will draw --

15    Q.  So, for the record, you are circling a piece of electronic

16    equipment.  It looks like it's gray in color towards the

17    left-hand side of the photograph, correct?

18    A.  Correct.

19    Q.  Okay.  Do you see anything else that you recall in this

20    particular photograph that stands out?

21    A.  Nothing that was -- that stands out to me.

22    Q.  Okay.  Now, showing you what has been marked as

23    Government's 47S.  Do you recognize that exhibit?

24    A.  Yes.

25    Q.  What is this exhibit?

1    A.  That was an exhibit of items we found on 50 Omar Street.

2    Q.  Okay.  And do you recall seeing these items at 50 Omar

3    Street on August 30th of 2006?

4    A.  Yes.

5    Q.  Okay.  And does this photograph fairly and accurately

6    depict those items as you saw them in place on August 30th of

7    2006?

8    A.  Yes.

9            MR. SOLOMON:  Move to admit Government's Exhibit 47S,

10   Your Honor.

11           MR. BARTOLOMEI:  No objection, Judge.

12           THE COURT:  It is admitted.

13           (Exhibit 47S is admitted.)

14   BY MR. SOLOMON:

15   Q.  Can you please describe to the jury what you see in this

16   photograph?

17   A.  Yes.  Those are military -- correction.

18           THE COURT:  And you are publishing this to the jury,

19   right?

20           MR. SOLOMON:  Yes, Your Honor.

21           THE COURT:  Okay.

22           MR. SOLOMON:  Thank you.

23           THE WITNESS:  Those are radios.

24   BY MR. SOLOMON:

25   Q.  So the -- and, just for the record, there are some blue

1    rectangular boxed items; is that correct?

2    A.  Correct.

3    Q.  Are those what you are referring to as the radios?

4    A.  Would you like me to mark it?

5            (Indicating.)

6            These six items here are radios --

7            THE COURT:  Christine, thank you for getting the

8    screen fixed.

9            THE CLERK:  You're welcome.

10   BY MR. SOLOMON:

11   Q.  So you've drawn a circle around it looks like six

12   rectangular blue in color items?

13   A.  Yes.

14   Q.  Okay.  And those are the radios?

15   A.  Correct.

16   Q.  Okay.  Do you see the black pieces in front of those

17   radios?

18   A.  Yes.

19   Q.  What are those?

20   A.  Would you like me to mark it?

21   Q.  Sure.

22   A.  Those appear to be antennas.

23   Q.  Okay.  Now, placing before you what has been marked

24   Government's Exhibit 47Y.  Do you recognize this exhibit?

25   A.  After you showed me the picture.

1    Q.  Okay.  And do you recall seeing the items depicted in this

2    photograph when you were at the Omar Street location in August

3    of 2006?

4    A.  Yes.

5    Q.  Okay.  And does this photograph fairly and accurately

6    depict the way that those items appeared to you in August of

7    2006?

8    A.  Yes.

9         MR. SOLOMON:  Move to admit Government's Exhibit 47Y,

10   Your Honor, and request permission to publish?

11        MR. BARTOLOMEI:  Your Honor, object.  Hearsay and lack

12   of personal knowledge.

13        THE COURT:  He has said he recognizes it.  Overruled.

14        (Exhibit 47Y is admitted.)

15   BY MR. SOLOMON:

16   Q.  Please describe to the jury what you see in this photograph

17   that you remember seeing back in August of 2006 at the Omar

18   Street location.

19   A.  What distinguishes, that this appears to be heavy machinery

20   items.

21   Q.  And do you recall what type of machinery these items?

22   A.  No.

23   Q.  Okay.  Now showing you what is marked as Government's

24   Exhibit 47Z.  Do you recognize this photograph?

25   A.  After you showed me the picture.

1    Q.  Okay.  And do you remember seeing the items depicted in

2    this photograph when you were at the Omar Street cache back in

3    August of 2006?

4    A.  Yes.

5    Q.  And does this photograph fairly and accurately depict the

6    way that those items appeared to you when you saw them at the

7    Omar location in August of '06?

8    A.  Yes.

9          MR. SOLOMON:  Your Honor, I would move to admit

10   Government's Exhibit 47Z and request to publish?

11         MR. BARTOLOMEI:  Same objections, Your Honor.

12         THE COURT:  Overruled.  He has said he recognizes it.

13   And you may publish.

14         (Exhibit 47Z is admitted.)

15   BY MR. SOLOMON:

16   Q.  What is it about this particular photograph that stands out

17   in your mind and allows you to remember seeing this?

18   A.  Would you like me to mark it?

19   Q.  Sure, if you would, please.

20   A.  This item here is a U.S. ammunition can.

21   Q.  Okay.  And, for the record, you have circled an item on the

22   upper portion of the photograph.  It looks like it's a box

23   in -- green in color with some white lettering on it; is that

24   correct?

25   A.  Correct.

1    Q.  Okay.  And why did that particular item stand out in your

2    mind?

3    A.  Because it was not common to find U.S. ammo crates in a

4    enemy cache.

5             MR. BARTOLOMEI:  Objection.  Calls for speculation,

6    Your Honor.  Lack of foundation.

7             THE COURT:  I am going to sustain it on foundation.

8    BY MR. SOLOMON:

9    Q.  Had you seen this in a location -- you testified earlier

10   that you had completed many searches during your multiple

11   deployments to Iraq, correct?

12   A.  Correct.

13   Q.  Had you seen an item such as this in any of your other

14   searches of other locations in Iraq?

15   A.  Not my personal searches.

16   Q.  Now, we've talked a lot today -- or you've talked a lot

17   today, we've discussed a lot of the electronic items that you

18   saw at the Omar location.  Were there other items of interest

19   that you saw at this location back in August of 2006?

20   A.  In addition to the electronics and the radios that we've

21   reviewed, there was nothing additional.

22   Q.  Did you see any paperwork there at the Omar Street

23   location?

24   A.  Yes.

25   Q.  Okay.  Did you take some -- we will get to what happened

1    with this evidence in a few minutes, but how were you able to

2    determine, or were you able to determine what type of paperwork

3    you might take with you or what might be of interest and have

4    intelligence value?

5    A.   Yes.  Well, during -- part of our search team was a

6    linguist who spoke and read Arabic.

7    Q.   And he was actually with your search team when you arrived

8    at the 50 Omar location?

9    A.   Correct.

10   Q.   Okay.  So how -- and I don't want you to tell us what the

11   interpreter said or the linguist said, but how was it that the

12   linguist was able to assist you to determine what documentary

13   items may be significant for you?

14   A.   Yes, through reading -- the ability to read Arabic.

15   Q.   And was the interpreter right there with you as the search

16   team brought evidence to your location?

17   A.   With the search teams and with me at various times.

18   Q.   So we've talked about a lot of the things that you saw in

19   that location.  I want to turn now to how your teams actually

20   processed gathering this information once the photographs --

21   once the walk-through was completed, once the photographs were

22   taken of the items in place, how did your teams actually go

23   about gathering the items that you determined needed to be

24   taken?

25   A.   Yes.  We had items that were specific, so as you would

1   acquire those items, you would put them into a bag.  And then

2   we would prioritize what was going to come off of that site,

3   what was coming off of the objective, because we had limited

4   hauling capability.

5   Q.  So as the evidence was gathered, what happened to the

6   evidence as your search teams gathered the evidence?

7   A.  We gathered the evidence, first we took all of the

8   pictures.  Then we started to bag it and tag it, and then put

9   it into subsequent bags to then bring to an intermediate site.

10  Q.  And were your search teams -- you testified about taking

11  care to preserve the evidence.  Were your search teams taking

12  those measures that you spoke about earlier today as they

13  gathered this evidence?

14  A.  Correct.  Gloved -- so the key items were gloves for

15  handling, and then marking on the bag.

16          MR. BARTOLOMEI:  Objection, Judge.  Foundation.  Lack

17  of personal knowledge as to what others were doing.

18          THE COURT:  Overruled.

19          THE WITNESS:  So our standard operating procedure was

20  again, gloved, marking, bagging and tagging every item.

21  BY MR. SOLOMON:

22  Q.  So as these items were gathered and you -- they were placed

23  in bags there at the scene?

24  A.  Correct.

25  Q.  And there were some markings placed on those bags at the

1    scene?

2    A.  Correct.

3    Q.  Okay.  Once all of the items of evidence were gathered,

4    what happened with that evidence?

5    A.  We moved it from 50 Omar Street into vehicles, and then

6    from vehicles to a location we refer to as the Ministry of

7    Defense, the MOD site.

8    Q.  All right.  Before we get to that transport, I want to ask

9    you just a couple more questions about 50 Omar before we

10   actually get to the evidence at the MOD site.  Did you locate

11   any explosives at this particular location?

12   A.  No.

13   Q.  Did you have anyone on your team who dusted this particular

14   scene for fingerprints?

15   A.  No.

16   Q.  Why?

17   A.  We did no have that capability at our level.

18   Q.  Did you have anybody on your team who swabbed the scene for

19   DNA samples?

20   A.  No.

21   Q.  Why?

22   A.  We did not have that capability at our level.

23   Q.  Before you left the location of 50 Omar Street, did you

24   locate anyone at this particular -- at the building, the

25   overall building that we showed you earlier?

1    A.   The overall building, yes.

2    Q.   Okay.  Was there ever -- other than military personnel, was

3    there ever anyone inside of these two locations that you

4    searched, other than military personnel?

5    A.   No.

6            MR. BARTOLOMEI:  Objection.  Lack of personal

7    knowledge, Judge.

8            THE COURT:  It's --

9            MR. SOLOMON:  I can ask another question.

10           THE COURT:  Just hold on for a second.

11           MR. SOLOMON:  I'm sorry, Judge.

12           THE COURT:  I am going to strike the answer, and you

13   may lay some foundation.

14           Ladies and gentlemen, ignore the last answer.  And if

15   you can lay foundation, you can do so.

16   BY MR. SOLOMON:

17   Q.   While this search was proceeding, were you actually at the

18   location of these --

19   A.   Yes.

20   Q.   Okay.  While you were inside and while your personnel were

21   inside, did you personally ever see anyone else, other than

22   military personnel, in these two locations?

23   A.   No.

24   Q.   So getting back to the evidence, once the evidence was

25   bagged and there was some markings placed on the bags that the

1    evidence was in, it was taken down to the vehicles you had

2    there on site?

3    A.  Yes.

4    Q.  Okay.  And then you said it was transported to another

5    location, correct?

6    A.  Correct.

7    Q.  Did you accompany the vehicles in which the evidence was

8    located back to this other location?

9    A.  Yes.

10   Q.  Okay.  And I think you said it was taken to the MOD.  What

11   is the MOD?

12   A.  That was the place that we were staging, we were working

13   out of.  So it is a ministry of interior complex.

14   Q.  And what do the letters MOD stand for?

15   A.  Ministry of Defense.

16   Q.  So was that actually the former Iraqi Ministry of Defense?

17   A.  Correct.

18   Q.  Okay.  And you say you were operating out of that location.

19   Were you actually physically located -- is that where you were

20   living at the time?

21   A.  Yes, that is where we were living.

22   Q.  When you got back to the Ministry of Defense location, what

23   happened to the evidence, at that point?

24   A.  At that point, we kept security of the evidence, moved it

25   into an open area, a bay-type area where we could then start to

1    lay it all out and conduct the next level of quality control,

2    and the next level of photographs, bagging and tagging.

3    Q.  Okay.  Let me ask you just a couple of more questions about

4    this MOD or Ministry of Defense site.  Was it open to the

5    public while you were there?

6    A.  No, no.

7    Q.  Okay.  So it was secured by military personnel?

8    A.  Yes.

9    Q.  Okay.  And what particular location in the Ministry of

10   Defense did you take the evidence to?

11   A.  To a quad-type area.

12   Q.  So it was on the interior portion of the Ministry of

13   Defense?

14   A.  Correct.

15   Q.  And once you got the evidence to this quad area, I think

16   you said you laid out the evidence?

17   A.  Correct.

18   Q.  What other things did you do once you laid the evidence

19   out?  What other things did you do with the evidence there at

20   the MOD?

21   A.  Again, we tried to lay it all out, and then take additional

22   photographs, and then have an overall inventory list, and then

23   make sure that we were capturing everything with the -- to the

24   best of our ability.

25   Q.  Was there any particular method as to the way you laid out

1    the evidence?

2    A.   By rooms.

3    Q.   Okay.  And I think you said there was additional labeling

4    done with the evidence at that point as well?

5    A.   Correct.

6    Q.   Why was there additional labeling done at the Ministry of

7    Defense?

8    A.   Simply because we wanted to ensure that each individual

9    item had the adequate marking.

10   Q.   Were you present when the evidence was laid out and

11   photographed?

12   A.   Yes.

13   Q.   Okay.  And as the additional markings were placed on it,

14   you were present for that as well?

15   A.   Correct.

16   Q.   Okay.

17          MR. SOLOMON:  If I may have just a moment, Your Honor?

18   Thank you.

19   BY MR. SOLOMON:

20   Q.   Sir, I am going to show you some additional exhibits now

21   and ask if you can identify these exhibits.  I am going to show

22   you first what is marked as Government's Exhibit 47C.  Do you

23   recognize this exhibit?

24   A.   Yes, after you showed me the picture.

25   Q.   Okay.  It is a photograph; is that correct?

1    A.  Correct.

2    Q.  Okay.  And what does this particular photograph depict?

3    A.  Items that we had taken off of 50 Omar Street.

4    Q.  Okay.  Do you recall where this photograph was taken?

5    A.  Yes, this is at the Ministry of Defense.

6    Q.  Okay.  So this would be one of the photographs taken after

7    the evidence was laid out there in the plaza you described?

8    A.  Correct.

9          MR. SOLOMON:  Judge, I would move to admit

10   Government's Exhibit 47C and request to publish?

11         MR. BARTOLOMEI:  Judge, foundation.  Hearsay.  Lack of

12   personal knowledge.

13         THE COURT:  Overruled.  He said he recognizes it.  And

14   you may publish it.

15         (Exhibit 47C is admitted.)

16         MR. SOLOMON:  Thank you, Your Honor.

17   BY MR. SOLOMON:

18   Q.  Sir, let me direct your attention -- I'm sorry.

19         Let me direct your attention, first of all, to the

20   bottom portion of this particular photograph.  Can you tell us

21   what you see in the bottom portion of the photograph?

22   A.  The first item?

23   Q.  The paperwork there.

24   A.  Yeah, we have the marking 5A.

25   Q.  Okay.  And what was that marking?  What did it correspond

1    to?

2    A.  To the room area in the subsequent diagrams.

3    Q.  Okay.  Do you recognize any of the items in this particular

4    photograph?

5    A.  After you showed it to me.

6    Q.  Okay.  And what do you recognize in this particular

7    photograph?

8    A.  Would you like me to mark it?

9    Q.  If you would, please.

10   A.  (Indicating.)

11           The box that I circled.

12   Q.  So, for the record, you've circled the box in the center

13   portion of the photograph.  It is a white box with some black

14   writing on it; is that correct?

15   A.  Correct.

16   Q.  Okay.  And what is it that makes this particular item stand

17   out in your mind?

18   A.  From my mind it was the fact that it had been sealed the

19   way it was, and then when we opened it up, what we discovered.

20   Q.  Does this appear to be the same item that you saw on the

21   shelf that you've described earlier today, back at 50 Omar

22   Street?

23   A.  Correct.

24   Q.  Now, showing you what has been marked as Government's

25   Exhibit 46.  Does that appear to be another photograph?

1    A.  Yes.

2    Q.  Okay.  And can you tell where that photograph was taken?

3    A.  Yes.

4    Q.  Where?

5    A.  At the MOD.

6    Q.  Okay.  And does this photograph depict evidence gathered in

7    one of the rooms at 50 Omar Street?

8    A.  Correct.

9    Q.  Which room?

10   A.  We marked the A1 down at the bottom.  Would you like me

11   to --

12   Q.  And does this photograph fairly and accurately depict the

13   evidence from room A1 at Omar Street as it was laid out at the

14   Ministry of Defense?

15   A.  Yes.

16          MR. SOLOMON:  Judge, I would move to admit

17   Government's 46 and request to publish?

18          MR. BARTOLOMEI:  Same objection.

19          THE COURT:  Overruled.  He recognizes it.  You can

20   publish.

21          (Exhibit 46 is admitted.)

22   BY MR. SOLOMON:

23   Q.  So on the bottom portion of this photograph is where the A1

24   is noted, correct?

25   A.  Correct.

1    Q.  Okay.  And then do you see any of the items in this

2    photograph that you recall seeing at the 50 Omar Street

3    location?

4    A.  Yes.

5    Q.  Okay.  And what are those items?

6    A.  Would you like me to mark them?

7    Q.  Go ahead and mark them if you would.

8    A.  (Indicating.)

9    Q.  No longer working?

10   A.  No longer working.

11          THE COURT:  See if Christine can help you out.  Thank

12   you again.

13   BY MR. SOLOMON:

14   Q.  And, for the record, you've circled some items in the upper

15   portion towards the middle right-hand side of the photograph;

16   is that correct?

17   A.  Yes.

18   Q.  Okay.  And what are those items?

19   A.  Those are the electronic items that we took off of 50 Omar

20   Street.

21   Q.  And it appears that you have also partially circled to the

22   right of those items, is that the printer that you saw at 50

23   Omar Street?

24   A.  Correct.

25   Q.  Now showing you what's been marked as Government's 46A.  Do

1    you recognize that exhibit?

2    A.  Yes.

3    Q.  Okay.  And what is that exhibit?

4    A.  The items that we consolidated at MOD, and as you can --

5    the bottom, the markings A4.

6    Q.  Okay.  And do you recognize this picture as a fair and

7    accurate depiction of the photograph taken of the items from

8    A4, from the Omar Street location A4, that was taken at the MOD

9    as well?

10   A.  Correct.

11        MR. SOLOMON:  Move to admit Government's 46A, Your

12   Honor, and request to publish?

13        MR. BARTOLOMEI:  Same objections.

14        THE COURT:  Overruled.  You may publish.

15        (Exhibit 46A is admitted.)

16   BY MR. SOLOMON:

17   Q.  It appears that these items -- well, let me ask you, the --

18   it appears there are some Ziploc bags in these photographs; is

19   that correct?

20   A.  Correct.

21   Q.  Are those the bags into which the items were placed at the

22   Omar Street location?

23   A.  Yes.

24   Q.  Okay.  And then it appears that with each of these Ziploc

25   bags, there is a white sheet on top of the Ziploc bag; is that

1    correct?

2    A.  Yes.

3    Q.  And there are markings on that white sheet; is that

4    correct?

5    A.  Correct.

6    Q.  Can you describe what those markings are?

7    A.  Those markings are what we used to add additional

8    information in the transient of this material.  So starting in

9    the upper left, you have the date, time group.

10   Q.  Just a minute.  I'm sorry to interrupt you.  Let me just

11   see if I can zoom in just a little bit more.  A little easier

12   to see?

13   A.  Yes.  So I will just highlight, in this area that I am

14   touching, that's the date, time group.

15   Q.  So that's on the top left-hand corner of the piece of

16   paper?

17   A.  Correct.

18   Q.  Okay.

19   A.  Then moving to the right, the grid is another way to -- for

20   the geographic reference, identification number.

21   Q.  So that's what would have come from your GPS device at the

22   scene?

23   A.  Correct.

24   Q.  Okay.

25   A.  And then the objective name, and then you can see a

1    description.  And then each of the items that we continued to

2    describe from building, room, who was involved, and then our

3    initial description.

4    Q.  And building Alpha is the military term for A, correct?

5    A.  Correct.

6    Q.  So building A, room 4?

7    A.  A4.

8    Q.  Okay.  Did you personally write these?

9    A.  No, I did not.

10   Q.  Okay.  But you were present when they were marked?

11   A.  Yes.

12   Q.  Now, showing you Government's Exhibit 46C.  What is that

13   exhibit?

14   A.  Items that we took off of 50 Omar.

15   Q.  Okay.  And it looks like those items would have been taken

16   from room 6A; is that correct?

17   A.  Correct.

18   Q.  And again, this photograph, where was it taken?

19   A.  At MOD.

20   Q.  Okay.  And does this photograph appear to fairly and

21   accurately depict the items that were photographed at the MOD

22   on August 30th of 2006?

23   A.  Yes.

24          MR. SOLOMON:  Move to admit Government's 46C, Your

25   Honor?

1          MR. BARTOLOMEI:  Objection.  Foundation and 602.

2          THE COURT:  Overruled.  It is admitted.

3          (Exhibit 46C is admitted.)

4          MR. SOLOMON:  And request to publish?

5          THE COURT:  Yes.

6    BY MR. SOLOMON:

7    Q.  Do you see any items in this particular photograph that you

8    recall seeing at the scene of the 50 Omar Street location?

9    A.  Yes.

10   Q.  And what are those items?  And you can mark them if it

11   helps you.

12   A.  The items that I remember are those blue radios that I have

13   circled.

14   Q.  And, for the record, you've circled what appear to be,

15   again, six rectangular objects, blue in color?

16   A.  Correct.

17   Q.  So you testified that you located at the Omar Street

18   location several electronics, both large electronics and small

19   electronics, correct?

20   A.  Yes.

21   Q.  And you also located documents at the scene of the Omar

22   location?

23   A.  Yes.

24   Q.  Did you locate any personal identifying information at the

25   scene that may have identified anyone associated with the

 1    scene?

 2    A.  Yes.

 3    Q.  What types of items --

 4    A.  There was an identification that our linguist informed us

 5    of.

 6            MR. BARTOLOMEI:  Objection.  Hearsay.

 7            THE COURT:  Overruled.

 8    BY MR. SOLOMON:

 9    Q.  Did you actually see the identification that you are

10    testifying about?

11    A.  Yes.

12    Q.  Okay.  So, without telling us what your linguist said about

13    the photograph, you specifically recall seeing an

14    identification on scene?

15    A.  Right.  Because then he showed it to me.

16    Q.  Okay.  Showing you what has been marked as Government's

17    Exhibit 47D.  Do you recognize that exhibit?

18    A.  Yes.

19    Q.  And what is that exhibit?

20    A.  The identification that we found on 50 Omar Street.

21    Q.  Okay.  And you recall seeing that particular identification

22    at the location of 50 Omar Street?

23    A.  Yes.

24    Q.  Okay.  And this photograph, is it a depiction of a

25    photograph taken at the MOD?  Is this particular photograph one

1    that was taken at the MOD location?

2    A.  Yes, at MOD location.

3         MR. SOLOMON:  Move to admit Government's Exhibit 47D,

4    Your Honor?

5         MR. BARTOLOMEI:  Foundation.  Hearsay.

6         THE COURT:  Overruled.

7         (Exhibit 47D is admitted.)

8         MR. SOLOMON:  Request to publish?

9         THE COURT:  And, just to make sure, can't see what's

10   written on there, but it is not being offered for the proof of

11   what is asserted but what you have identified it as being?

12        MR. SOLOMON:  Yes.  We are not offering to prove the

13   truth of what's on the actual item itself.

14        THE COURT:  Exactly.  So it's just being offered for

15   exactly what the witness has said, there has been a picture

16   taken at MOD.  So you may publish it.

17        MR. SOLOMON:  Thank you, Your Honor.

18   BY MR. SOLOMON:

19   Q.  Sir, does that appear to be the item that you described,

20   the ID item that you described that was taken, and that you saw

21   at the Omar cache on August 30th of 2006?

22   A.  Yes.

23   Q.  And it appears that that item was taken from room A6; is

24   that correct?

25   A.  Yes.

1        MR. BARTOLOMEI:  Objection.  Hearsay.  Move to strike.

2        THE COURT:  Overruled.

3        MR. SOLOMON:  If I may have just a moment, Your Honor?

4        THE COURT:  Yes.

5   BY MR. SOLOMON:

6   Q.  Sir, once you had completed laying out the evidence from

7   the Omar Street cache at the MOD, had completed the labeling,

8   and had taken the photographs of the evidence gathered from

9   each room, what happened with the evidence at that point?

10  A.  We took the evidence, the pictures, and the best of our

11  ability to report them and we sent the report up through the

12  chain of command.

13  Q.  And that was the same day that you found this evidence?

14  A.  Correct.

15  Q.  Did you eventually take the evidence to another location?

16  A.  Correct.

17  Q.  Did you do it that day, do you recall?

18  A.  I recall we did not do it that first day.

19  Q.  Okay.  So what happened with the evidence?  So I am taking

20  it the evidence must have stayed at the Ministry of Defense?

21  A.  Correct.

22  Q.  Okay.  Where was the evidence located as it was kept at the

23  Ministry of Defense?

24  A.  As I mentioned, this quad area was the center of our living

25  area, and that is where it was kept.

1   Q.  Okay.  Were there -- was anybody watching the evidence as

2   it was kept?

3   A.  Yes, yes.

4   Q.  Who?

5   A.  Soldiers.

6   Q.  And then do you remember when you took the evidence to a

7   different location?

8   A.  From my memory, it was the next day.

9   Q.  And why was it that you were taking the evidence from the

10  Ministry of Defense to another location?

11  A.  For further exploitation.

12  Q.  Okay.  Are you familiar with an entity called the Combined

13  Explosives Exploitation Cell?

14  A.  Yes.

15  Q.  It's commonly known by its acronym CEXC?

16  A.  Correct.

17  Q.  C-E-X-C?

18  A.  Yes.

19  Q.  Okay.  Do you recall where CEXC was located in Iraq?

20  A.  On a large base in Baghdad.

21  Q.  Okay.  Was that the Liberty base?

22  A.  Correct.

23  Q.  Okay.  Is that the location to which the evidence was

24  transported from the MOD?

25  A.  Yes.

1    Q.  Okay.  Did you accompany the evidence from the MOD to the

2    Liberty camp location of CEXC?

3    A.  Yes.

4    Q.  Okay.  How was it transported there?

5    A.  By vehicle.

6    Q.  By military vehicle?

7    A.  By military vehicle.

8    Q.  And without giving us a large description, because I know

9    you didn't work at CEXC, can you just describe briefly -- we

10   will have more testimony on this later.  Can you describe

11   briefly your understanding of why the evidence was taken to

12   CEXC?

13   A.  Yes, because they had the capability for further

14   exploitation.

15   Q.  So they would be able to further analyze the evidence?

16   A.  Correct.

17   Q.  When you arrived at CEXC, did you discuss the evidence with

18   anyone at CEXC?

19   A.  Yes.

20   Q.  Okay.  Do you recall with whom?

21   A.  No.

22   Q.  Okay.  What type of information do you recall conveying

23   regarding the evidence?

24   A.  The key that we highlighted was the amount of the

25   electronic equipment that was distinguishable on site.

1       MR. SOLOMON:  If I may just have a moment, Your Honor?

2       THE COURT:  Yes.

3       MR. SOLOMON:  I have no further questions for this

4   witness, Your Honor.

5       THE COURT: All right.  Cross.

6       MR. BARTOLOMEI:  May I have a second, Judge?

7       THE COURT:  Yes.

8                    CROSS-EXAMINATION

9   BY MR. BARTOLOMEI:

10  Q.  Good morning, sir.

11  A.  Good morning.

12  Q.  Sir, I would like to draw your attention --

13      MR. BARTOLOMEI:  May I have Government's Exhibit 46W,

14  which has been admitted?

15      May I have that published, Your Honor?

16      THE COURT:  Yes.

17  BY MR. BARTOLOMEI:

18  Q.  Do you see that in front of you, sir?

19  A.  Yes, I do.

20  Q.  Okay.  Now, you have indicated that on the top left of

21  that, that's your sketch?

22  A.  Correct.

23  Q.  And on the top left that has the date and the time?

24  A.  Yes.

25  Q.  It has got right underneath that the coordinates, was that

1    your testimony?

2    A.  Yes.

3    Q.  Now, to the right of the coordinates, you have the letter N

4    with an arrow; do you see that, sir?

5    A.  Correct.

6    Q.  So that indicates the direction of north; is that correct?

7    A.  Correct.

8            MR. BARTOLOMEI:  Your Honor, may the witness and the

9    jury be shown Government's Exhibit 46Y, which has been

10   admitted?

11           THE COURT:  Yes.  There it is.

12           MR. BARTOLOMEI:  That's the wrong -- I'm sorry, I

13   think 46T.  I apologize.

14           THE COURT:  All right.  T.  Okay.

15           MR. BARTOLOMEI:  Nope.  Still wrong.  May I have a

16   second, Judge?

17           THE COURT:  Yes.

18           MR. BARTOLOMEI:  46X, Your Honor.

19           THE COURT:  X.

20   BY MR. BARTOLOMEI:

21   Q.  Again, that's another sketch that you made?

22   A.  Yes.

23   Q.  And that was made by you while at 50 Omar Street?

24   A.  Yes.

25   Q.  And on the top left of that sketch are the coordinates

1   again?

2   A.  Yes.

3   Q.  And to the right of that is an N with the arrow indicating

4   north?

5   A.  Yes.

6   Q.  Now --

7       MR. BARTOLOMEI:  May the witness be shown Government's

8   Exhibit 35?

9       THE COURT:  Yes.

10  BY MR. BARTOLOMEI:

11  Q.  Do you have that before you, sir?

12  A.  Yes.

13  Q.  And do you recognize what that is?

14  A.  Only the picture.

15  Q.  Okay.  You recognize the photo?

16  A.  Yes, the photo.

17  Q.  You recognize the -- what is depicted in the photo?

18  A.  Yes.

19  Q.  Is that a travel route?

20  A.  I don't remember.

21  Q.  You don't recall?

22  A.  I do not recall.

23  Q.  Does the exhibit have a name -- well, does the route have a

24  name, without saying what it is?

25  A.  I don't remember.

1    Q.  Can you look at the exhibit?

2    A.  Yes, on the exhibit there seems to be a name.

3    Q.  Does that refresh your recollection?

4    A.  No.

5              THE COURT:  Has this been admitted already?

6              MR. BARTOLOMEI:  No, Judge, so I am not asking for

7    specifics about the photo.  I was leading in that direction.

8              THE COURT:  Okay.  I don't know if the government has

9    an objection to its admission?

10             MR. SOLOMON:  I don't believe there's foundation for

11   it at this point, Your Honor.  He doesn't remember.

12             THE COURT:  All right.

13   BY MR. BARTOLOMEI:

14   Q.  Sir, the spectrum analyzer that you were referring to was

15   found in room A1; is that correct?

16   A.  From what I remember, yes.

17             MR. BARTOLOMEI:  May we -- may the witness and the

18   jury view Government's Exhibit 46E?

19             THE COURT:  Yes.

20   BY MR. BARTOLOMEI:

21   Q.  You see that in front of you, sir?

22   A.  Yes.

23   Q.  And that table has what you called the spectrum analyzer?

24   A.  Yes.

25   Q.  And above the spectrum analyzer, it has the room number?

1    A.  Yes.

2    Q.  And that room number is A1?

3    A.  Yes.

4    Q.  Now, there was a window to the left of that table; do you

5    recall that, sir?

6    A.  I don't recall.

7    Q.  Okay.  Sir, 50 Omar -- I'm sorry, Omar Street runs north

8    and south, doesn't it?

9    A.  I don't remember.

10   Q.  You do not remember.  When you enter the building at 50

11   Omar Street, there's some stairway that leads up to the second

12   and third floor?

13   A.  Yes.

14   Q.  And the apartments that you referred to are to the left?

15   A.  I don't remember.

16   Q.  You don't remember?  If you look at your sketch at 46X --

17          MR. BARTOLOMEI:  May that be published again, please?

18          THE COURT:  Yes.

19   BY MR. BARTOLOMEI:

20   Q.  Do you see to the right of that exhibit where it says,

21   "front door"?

22   A.  Yes.

23   Q.  That would be the entrance?

24   A.  Yes.

25   Q.  Okay.  And if you are entering the -- if you are entering

1    the apartments coming up from the street level, that indicates

2    that the apartment A would be on your left?

3    A.  I don't remember.

4    Q.  If you enter -- okay.

5         MR. BARTOLOMEI:  May the witness be shown Defense

6    Exhibit 1578?

7         THE COURT:  Yes.

8    BY MR. BARTOLOMEI:

9    Q.  Do you recall seeing that, what is depicted in that?

10   A.  After I was shown the picture, yes.

11   Q.  Okay.

12        MR. BARTOLOMEI:  I am not sure -- was this admitted?

13   I don't believe so.  Okay.

14   BY MR. BARTOLOMEI:

15   Q.  Is that a photo taken at 50 Omar Street?

16   A.  Yes.

17   Q.  Is that a fair and accurate representation of what you saw

18   at 50 Omar Street?

19   A.  Yes.

20        MR. BARTOLOMEI:  Move to admit.

21        MR. SOLOMON:  No objection, Your Honor.

22        THE COURT:  It is admitted.

23        (Exhibit 1578 is admitted.)

24   BY MR. BARTOLOMEI:

25   Q.  Now, the windows are from building 6, correct?

1    A.   According to the mark, but I don't remember it.

2    Q.   It's my fault.  The windows are from room A6, correct?

3    A.   Again, from the picture it was -- you would draw that

4    conclusion.

5    Q.   Okay.  Is there a six on the --

6    A.   Yeah, on this photo, there's no A or B, so the only thing

7    the photo shows is 6.

8    Q.   All right.  So --

9              MR. SOLOMON:  I'm going to object.  May we approach

10   for just a moment?

11             THE COURT:  All right.

12             MR. SOLOMON:  Or can I speak with counsel for just a

13   moment and see if we need to approach?

14             THE COURT:  Yes.

15             (Off-the-record discussion held between counsel.)

16             MR. SOLOMON:  May we approach, Your Honor?

17             THE COURT:  Yes.

18             (The following sidebar discussion is held:)

19             MR. SOLOMON:  For the record, it's Bill Solomon.

20             Judge, the photograph is actually a photograph taken

21   from day two at Omar.  So I think it is misleading to ask him

22   whether it's room A or B6, because they were labeled the second

23   day.  So I think --

24             THE COURT:  Well, he said he recognized it, though.

25             MR. SOLOMON:  He said he recognized the photo.

1          THE COURT:  Yeah.  But he said he recognized the area.

2    You can -- you now know, but you can either ask him or you can

3    ask him on redirect.

4          MR. SOLOMON:  But this witness -- I'm sorry, Judge.

5    This witness won't have knowledge that there were photos taken

6    on day two because he was not there on day two.

7          THE COURT:  Well, you could establish that.

8          MR. SOLOMON:  Okay.  Sorry.  Thank you.

9          (Sidebar discussion concludes.)

10          MR. BARTOLOMEI:  May I continue, Your Honor?

11          THE COURT:  Yes.

12          MR. BARTOLOMEI:  Thank you.

13   BY MR. BARTOLOMEI:

14   Q.  Sir, with regards to the photo that is before you, my

15   question is simple, is that a room that you recognized during

16   the time that you were at that location?

17   A.  This particular picture, I have less recollection.

18   Q.  Does it refresh your recollection?

19   A.  It does.

20   Q.  Okay.  And is that a photo of 50 Omar Street, inside 50

21   Omar Street?

22   A.  I don't know for this picture.  This is not as vivid --

23   some of the others are very vivid, this is less so.

24   Q.  I understand.  But you do recall seeing what is depicted in

25   the photo?

1    A.  Yes.

2            MR. BARTOLOMEI:  Move to admit, Your Honor?

3            THE COURT:  I think we have already admitted it.

4            MR. BARTOLOMEI:  Okay.  Then I will proceed from

5    there.

6    BY MR. BARTOLOMEI:

7    Q.  Now, you see two windows in that photograph?

8    A.  Yes.

9    Q.  And the sun is coming through the windows there?

10   A.  Yes.

11   Q.  Did you happen to look out the windows?

12   A.  I don't remember.

13   Q.  All right.  Do you recall 50 Omar Street, the building

14   facing east?

15   A.  I don't remember which direction the building faced.

16   Q.  Okay.

17           MR. BARTOLOMEI:  Now, again, if he may see

18   Government's -- well, what's in evidence, 46W.

19   BY MR. BARTOLOMEI:

20   Q.  That's your sketch?

21   A.  Yes.

22   Q.  There is at the bottom of your sketch, a B6?

23   A.  Correct.

24   Q.  Okay.

25           MR. BARTOLOMEI:  May the witness be shown 46X again?

1   BY MR. BARTOLOMEI:

2   Q.   That's your sketch?

3   A.   Yes.

4   Q.   And the bottom of that sketch there's an A6?

5   A.   Correct.

6   Q.   Okay.  So now, returning to the prior exhibit of the room

7   at 50 Omar Street?  1578.  You don't know if that's B6 or A6,

8   correct?

9   A.   I don't.  I do not remember whether that's A6 or B6.

10  Q.   But either way, you would agree it's on the same side of

11  the building, based upon the drawings that you made?

12  A.   I don't understand the question.

13  Q.   Okay.  Comparing the sketches you made of the apartment A

14  with the sketch of apartment B?

15  A.   Yes.

16  Q.   Both sketches have A6 and B6 at the bottom of your sketch,

17  correct?

18  A.   Correct, correct.

19  Q.   Okay.  So that indicates to you, does it not, that what is

20  depicted with the number 6 is on the same side as the 6s that

21  are reflected in both of your sketches, correct?

22  A.   I don't know.  And can I expand why I don't have that -- to

23  answer a simple yes or no?  Because this picture doesn't strike

24  strong recollection, I have trouble stating with confidence

25  whether that 6 was what we did that day on August 30th, or was

1    subsequently done.  Because the next day there was activity

2    that I am totally unaware of that occurred.

3    Q.  Well, let me ask you this, when you prepare -- when you

4    returned back to -- no, let me even back further.

5              While you were at 50 Omar Street --

6    A.  Yes.

7    Q.  -- you prepared these sketches, correct?

8    A.  Correct.

9    Q.  Those sketches became part of your report, correct?

10   A.  Correct.

11   Q.  Those sketches and part of that report were sent up the

12   chain of command?

13   A.  Yes.

14   Q.  So, in fact, those sketches and the depictions in those

15   sketches are what's the official version of what you saw there

16   at 50 Omar Street, correct?

17   A.  Yes.

18   Q.  All right.  You are not aware of any other sketches that

19   differ regarding 50 Omar Street?

20   A.  Not that I am aware of.

21   Q.  Okay.  Now, I would like to show you what I believe was

22   Government's --

23              MR. BARTOLOMEI:  May I have a moment, Judge?  I want

24   to be clear on the exhibits.

25              THE COURT:  Yes.

1          MR. BARTOLOMEI:  May the witness be shown Exhibit 35?

2          THE COURT:  Yes.  Not 35?

3          MR. BARTOLOMEI:  I apologize, Your Honor.  I found it,

4     46T.

5          THE COURT:  Yes.

6     BY MR. BARTOLOMEI:

7     Q.  You have that in front of you, sir?

8     A.  Yes, I do.

9     Q.  Is that 50 Omar Street?

10    A.  Yes.

11    Q.  And do you see the sun hitting the building?

12    A.  Yes.

13    Q.  Okay.  And in the prior photo, regarding the room with the

14    number 6 on it, you saw the sun hitting the windows?

15    A.  Yes.

16    Q.  Okay.  So the rooms in your sketches that refer to A6 or

17    B6, would be facing Omar Street, correct?

18    A.  I don't know.  I am just having trouble following the

19    logic.

20    Q.  Okay.  We have already established that when you enter the

21    building, you go up the steps and the apartments are to the

22    left or to the right, correct?

23    A.  I thought I said I don't remember whether they were left or

24    to the right.

25          MR. SOLOMON:  Misstates his testimony.

1          THE COURT:  I'm sorry?

2          MR. SOLOMON:  That misstates his testimony.  I believe

3     his testimony is --

4          THE COURT:  I am going to sustain that objection.

5     BY MR. BARTOLOMEI:

6     Q.  Do you recall the apartments being to the left and to the

7     right of a walkway?

8     A.  All I remember is that there was a staircase.

9     Q.  Okay.  Do you remember having to turn to the left or to the

10    right?

11    A.  See, I don't -- I can't say with confidence because

12    oftentimes in the dwellings you would actually head straight

13    into another entry point and then you would go left to right,

14    so that's specifics I can't remember.

15    Q.  Okay.

16         MR. BARTOLOMEI:  I will move on.

17         THE COURT:  You know, let me help you not move on.

18         MR. BARTOLOMEI:  Oh.

19         THE COURT:  We will take a break for lunch here.

20    Ladies and gentlemen, we will see you back here at 1:00.  That

21    means we will start at 1:00.  We are in recess.

22         And, Mr. Huff, you may step down.

23         (Jury leaves the courtroom.)

24         THE COURT:  All right.  Please be seated.

25         And you may step down.

1          Okay.  We will start at 1:00 and presume that everyone

2     will be here.  We are in recess.

3               (Recess taken at 11:56 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, ELVA CRUZ-LAUER, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7   a full, true, and accurate transcript of all of that portion of

8   the proceedings contained herein, had in the above-entitled

9   cause on the date specified therein, and that said transcript

10  was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 5th day of February,

12  2018.

13

14                              s/Elva Cruz-Lauer
                            Elva Cruz-Lauer, RMR, CRR
15

16

17

18

19

20

21

22

23

24

25