JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona  85007
Telephone: 602-382-2700

GREGORY A. BARTOLOMEI, Bar No. 011803
SHISHENE JING, CA Bar No. 315067
JAMI JOHNSON, NY Bar No. 4823373
MOLLY A. KARLIN, Bar No. 032902
Assistant Federal Public Defenders
gregory_bartolomei@fd.org
shishene_jing@fd.org
jami_johnson@fd.org
molly_karlin@fd.org

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | CR-12-01263-PHX-ROS |
|---|---|
| Plaintiff, | **MOTION TO DISMISS FOR PROSECUTIORIAL MISCONDUCT; ALTERNATIVELY, FOR A MISTRIAL OR TO STRIKE THE TESTIMONY OF MOHAMED ALI AND ALL TRANSLATED GOVERNMENT EXHIBITS** |
| vs. | |
| Ahmed Alahmedalabdaloklah, | |
| Defendant. | **(Oral Argument Requested)** |
| | Assigned to the Hon. Roslyn O. Silver |

Defendant Ahmed Alahmedalabdaloklah, through undersigned counsel, respectfully moves this Court to dismiss this case due to the Government's improper and undisclosed *ex parte* communication with the Court's translator, Mohamed Ali. In the alternative, the Court should grant a mistrial; or, alternative to a mistrial, strike the testimony of Mr. Ali and exclude all Government translations he prepared.

This Motion is supported by the accompanying Memorandum of Points and Authorities, incorporated herein by reference.  Excludable delay under 18 U.S.C.

i

§ 3161(h)(1)(D) may result from this Motion or from an order based thereon.[1]  LOCAL R. CRIM. P. 12.2(a).

      Respectfully submitted:      March 8, 2018.

                                    JON M. SANDS
                                    Federal Public Defender

                                   *s/Molly A. Karlin*
                                    MOLLY A. KARLIN
                                    Assistant Federal Public Defender

                                    *Attorneys for Defendant*
                                    *Ahmed Alahmedalabdaloklah*

---

[1] *But see Bloate v. United States*, 559 U.S. 196, 206 (2010) ("Subparagraph D . . . renders automatically excludable only the delay that occurs 'from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of,' the motion.") (quoting 18 U.S.C. § 3161(h)(1)(D)) (emphasis omitted).

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT & BACKGROUND

### A. The Court Appoints an Independent Translator to Translate the Arabic-language Email Exhibits.

When this Court (Silver, J.) took over this case in October 2017, the parties were embroiled in a dispute regarding the translations of the Government's email exhibits. The Court made clear, as its first order of business, that it was "not going to allow a battle of the Arabic translators. I have had in my court a court-certified Arabic translator. That's what we are going to use, okay? That's what we are going to use." (Ex. 1, Hr'g Tr. Oct. 13, 2017 at 68:16-19.) Because the interpreter was to be retained by the Court, rather than the parties, the Court intended that he or she would be independent and therefore free from the biases and judgments of the expert interpreters retained by the parties. (*See id.* at 68:24-69:26 (THE COURT: "So there will be no issue about whether or not the individual understood the Muslim religion or anything else, understand?").)

To effectuate its decision, the Court ordered the Government "to use that individual, provide the 71 [email] exhibits for translation, and then we will get the translation," which would be "immediately provided to defense counsel." (*Id.* at 68:20-21, 69:8-9; *see also id.* at 69:5-6 ("all of the evidence will be provided [by the government] that needs to be translated by that individual [the court's translator]"). It likewise ordered the defense to submit any portions of the Government's email evidence that the defense wished to use at trial to the Court's expert. (*Id.* at 69:10-14.)

There could be no misunderstanding that the Court's expert (1) was to be independent, or (2) that the parties were to submit emails, and *only* emails, for translation. The Court's written order, issued following the hearing, reads, in pertinent part:

> As discussed at the status conference on October 13, 2017, the parties disagree on the proper translation of the emails the government plans on using at trial. The Court will

1

>appoint an independent interpreter to translate those emails…. Accordingly, IT IS ORDERED an independent interpreter is appointed to produce translated copies of the emails the government plans on presenting at trial.

(Doc. 548.)

To maintain the interpreter's independence, the parties were not provided the interpreter's identifying information. Numerous subsequent emails from the Court's law clerk further confirm that the Court expressly did not intend the parties to have any *ex parte* communications with the interpreter. (*See* Ex. 2, Jan. 23, 2018 Email from Court's law clerk to the parties ("Judge Silver would like any disputes regarding these translations to come through her instead of having the parties contact him directly.").) Nor did the Court want the interpreter to be aware of which side wanted input into any particular translation. (*See* Ex. 3, Jan. 29, 2018 Email from Court's law clerk to the parties ("Once the Court has objections to the translations from both sides, she will submit them to the translator without identifying which side is objecting.").) In short, it could not have been plainer that the Court had appointed the interpreter to be a neutral party who would not even be exposed to information that could lead him, even subconsciously, to favor either side.

### B. The Defense Objects But Complies With the Court's Order.

The defense followed the Court's order to the letter, sending three Arabic-language emails, accompanied only by an index, to the Court for forwarding to the interpreter. (*See* Ex. 4, Emails Submitted for Translation by the Defense Pursuant to Doc. 548, together with Index.)[2]

---

[2] Despite the Court's intent that the interpreter not be apprised of either parties' positions in this matter, when the complete packet of all materials for translation from both parties was sent to the interpreter by the local interpreter in this district, the local interpreter identified specifically which documents had been submitted for interpretation by the defense and which had been submitted by the Government. (*See* Ex. 5, Nov. 3, 2017 Cover Letter from P. Brandlin to M. Ali.)

2

### C. The Government Does *Not* Object, Instead Opting Surreptitiously to Send Extraneous, Ex Parte Communications to the Court's "Independent" Expert.

The Government did not object to the Court's appointment its own translator, or to any related matters. Instead, it opted surreptitiously to turn the Court's independent expert into its own, biased one.

Despite the Court's unambiguous order, the Government's submission to the interpreter was not limited to the 71 or so Arabic-language emails it stated it would seek to introduce into evidence. Instead, in addition, it sent its own experts' translations of those emails—effectively, *ex parte* communications proposing the Government's own preferred interpretations for the Court's translator to adopt. (Ex. 6, Emails Submitted for Translation by the Government.)

Not only did the Government send the interpreter its own proposed email translations along with the emails, it also sent numerous, lengthy Arabic-language documents *other than* emails. (Ex. 7, Documents (Other than Emails) Submitted for Translation by the Government.) These documents comprise approximately 60% of the Government's 546-page submission. (*See id.*) Included in these documents were substantially prejudicial materials, including, for example, a manual of instructions that purports to state how to detonate explosives.

Despite the Court's clear and repeated statements affirming that the interpreter was to be independent, the Government never disclosed that it had sent the Court's interpreter the translations by its *own* expert along with the untranslated Arabic emails. Nor was the defense aware, until just prior to the (first) Final Pretrial Conference, on January 17, 2018, that the Government had provided the translator with documents other than emails. (*See* Ex. 8, Hr'g Tr. Jan. 17, 2018, at 22:12-15 (MS. JOHNSON: "We did not agree, and would not have agreed to, apparently, unbeknownst to us, the

3

1  government also included a large volume of documents to be sent out without our
2  knowledge, without our consent.").)[3]

3  Due to fact that the translations were not completed until the eve of trial (*see* Ex.
4  4), the extraordinary volume of those translations (546 pages), that Arabic translation is
5  extremely time-consuming (as Mr. Ali testified), that the documents are in many cases
6  difficult to read (as Mr. Ali also testified), and that the defense's Arabic-language expert
7  is not local, the defense was unable to consult with him regarding the accuracy of the
8  translations—especially the original documents at the Phoenix FBI Field Office in light
9  of legibility problems with the copies—due to time constraints.

10  Thus, only by sheer luck did the defense discover, in the course of the court
11  interpreter, Mohamed Ali's, cross-examination, that the Government had sent him its
12  own proposed interpretations.  This revelation occurred when Mr. Ali testified that
13  Government Exhibit 124D reads, "Connect the cable with the IED and then open the
14  switch." (*See* Ex. 9, Trial Tr. Feb. 28, 2018, at 2545:6-7.)  When questioned about this
15  document, Mr. Ali first explained that the writer was "writing the letters for IED in
16  English but in the Arabic translation." (*Id.* at 2545:15-16.)  When presented with the
17  original document, however—which was much clearer than the original—he no longer
18  believed that the writer was spelling "IED" using Arabic letters, but instead testified that
19  "it looks like the word (Arabic sound) which means the explosive or the explosives or
20  explosive device." (*Id.* at 2547:22-23.)  When questioned yet further, however, he
21  testified that the word in question meant "controlling device" (*id.* at 2548:22), and that
22  that "was one of the contested words that [he] spent time processing" (*id.* at 2548:24-
23  25). Ultimately, he testified that he interpreted the word as "IED" *based on the context*
24  *of the other documents that had been provided to him:*

---

[3] The Court interpreter's inability to complete the translations of the Arabic-language documents other than emails ultimately resulted in a continuance, over the Defendant's objection.

4

> Q. There's only one sentence on this piece of paper, so can you tell me what context you are referring to when you say "context"?
>
> A. We had several situations before where it says we destroyed the Humvee, we killed one, we did this, that is the text I'm working with.
>
> Q. Oh. Okay. So when you say the context, what you are saying is that you inferred from other documents that you translated that these were documents about explosives, so when you saw connect the cable to the controlling device, you inferred that the controlling device must be an explosive?
>
> A. It's the best meaning I could get out of it in this particular context. Sometimes when I have access to the owner or the writer of the document, I communicate with them directly and they show me and I act according to what they tell me. But in the absence of this situation, that is the context and there are many examples in the whole document. That was 50,000 words, 200 pages.

(*Id.* at 2551:7-2552:24.)   Ultimately, he admitted that the document did *not*, in fact, read "IED" or anything even relating to explosives:

> Q. So just so we're clear, is your testimony that this, the literal statement here, I'm not asking about context or inference, is "connect the cable to the controlling device and then turn the switch on"?
>
> A. That is a little bit more with this copy than with the other one. The other one that is not clear, it looks a lot more like (Arabic sound) was the IED.
>
> Q. And this one does not look like that word?
>
> A. No. This copy is clearer.

5

(*Id.* at 2552:9-17.)[4]

The "context" that influenced Mr. Ali's erroneous and prejudicial interpretation was not limited to the numerous non-email documents the Government sent. Mr. Ali's interpretation of the difficult-to-read copy as "IED" also coincided with the translation of the Government's expert, which was also provided to him. (Ex. 4 at AIA013501.) Only because the defense happened to recall that the Government's interpretation of this document did it discover that Mr. Ali had been provided the Government's expert's interpretations. (*See id.* at 2557:5-13 ("Q. Did you, to your knowledge, did you receive in the stack of materials that you received, were there proposed translations or draft translations of certain either documents or phrases on documents? A. Some of the documents were in English that looked like translation of what I am translating. And it was a very good thing in the sense that I was reading both the Arabic and the English and seeing what somebody else had said, how I would do it, and how different I would be or which I think is good.").)

The Defendant speaks Arabic, of course, but that would not be enough in this instance to identify the flaw in the translation, since the copy was illegible. Here, he is familiar with the particular document that was the subject of questioning, as it contains his fingerprints. He was thus able to identify the particular flaw in Mr. Ali's translation, despite the lack of clarity in the copy. Neither he, nor defense counsel, nor the defense's retained translator, is able to do likewise with respect to the remainder of the 546 pages of translations.

## **ARGUMENT**

It is beyond dispute that "the Court has the authority to prohibit ex parte communications between a party and a court-appointed expert, as well as the authority to direct that all communication with the expert be done through the Court." *United*

---

[4] Should the Government incorrectly state in closing that Mr. Ali interpreted the document as reading "IED," the defense will move for a mistrial.

1  *States v. Kight*, No. 1:16-CR-99-WSD, 2017 WL 2963033, at *3 (N.D. Ga. July 12, 2017).  The Court did so here, unequivocally, at the October 13, 2017 hearing; in its written order respecting the submission of emails; and repeatedly in communications to the parties through its law clerk.  And it did so to effect "[o]ne of the primary functions of a court appointed expert"—namely, "to provide the court with an unbiased information, information not tinged by the position of the party retaining the expert. *Bd. of Managers of Bay Club Condominum v. Bay Club of Long Beach, Inc.*, 15 Misc. 3d 282, 286 (N.Y. Sup. Ct. 2007).

The Government's undisclosed delivery of its own experts' interpretations and highly prejudicial documents along with its emails—when the *only* documents the Court authorized for submission to its interpreter were Arabic-language emails—violated the letter as well as the spirit of the Court's order and compromised Mr. Ali's impartiality as an independent expert.  *G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp.*, 671 F. Supp. 2d 1203, 1215 (D. Nev. 2009); *In re David W.*, 759 A.2d 89, 92 (Conn. 2000) (assistant attorney general's request to court-appointed expert for independent assessment of child was improper *ex parte* communication).  In effect, the Government whispered to Mr. Ali, unbeknownst to either the Court or the defense and in plain violation of the Court's order, how it believed each specific email should be interpreted, and it supported its position by inundating him with documents concerning IEDs and related matters that are substantially absent from the emails themselves.  In other words, had the Government sent Mr. Ali *only* the emails, as the Court ordered, Mr. Ali's interpretations likely would have been mundane.  In short, the Government's conduct substantially prejudiced Mr. Alahmedalabdaloklah.

Mr. Alahmedalabdaloklah, moreover, was equally entitled to Mr. Ali's unbiased testimony and unbiased translations.  The Government's conduct—which it kept secret—deprived him of that testimony and those translations, and, accordingly a fair trial under due process.

The Government knew better—at least, in knew enough to hide what it did. The simple fact is that its improper *ex parte* communications were intended to, and did, alter the testimony of the Court's independent witness to the Government's favor. Those acts were deliberate and intentional and constitute prosecutorial misconduct. Dismissal of the indictment is warranted. *See United States v. Chapman*, 524 F.3d 1073, 1085-88 (9th Cir. 2008); *United States v. Kojayan*, 8 F.3d 1315, 1324-25 (9th Cir. 1993). In the alternative, because Mr. Ali was not ultimately the unbiased expert the Court intended, a mistrial should be granted, or, alternatively, his testimony stricken and all Government translations he prepared excluded. *See, e.g.*, *G.K. Las Vegas Ltd. P'ship*, 671 F. Supp. 2d at 1215 (excluding independent expert's analysis where defendants delivered to the expert *ex parte*, unsanctioned documents).

## **CONCLUSION**

For the foregoing reasons, this case should be dismissed with prejudice. In the alternative, the Court should grant a mistrial; or, alternative to a mistrial, the Court should strike the testimony of Mr. Ali and all Government exhibits that encompass translations he prepared.

Respectfully submitted:     March 8, 2018.

                                    JON M. SANDS
                                    Federal Public Defender

                                    *s/Molly A. Karlin*
                                    MOLLY A. KARLIN
                                    Assistant Federal Public Defender

                                    *Attorneys for Defendant*
                                    *Ahmed Alahmedalabdaloklah*

Copy of the foregoing transmitted by ECF for filing March 8, 2018, to:

CLERK'S OFFICE
United States District Court
Sandra Day O'Connor Courthouse
401 West Washington Street
Phoenix, Arizona 85003

DAVID PIMSNER
MELISSA KARLEN
JOSEPH N. KASTER
WILLIAM C. SOLOMON
Assistant U.S. Attorneys
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408

Copy mailed to Defendant:

AHMED ALAHMEDALABDALOKLAH
USM #30021-408
CCA/CADC
PO Box 6300
Florence, Arizona 85132

*s/ny*

9