1  ELIZABETH A. STRANGE
   First Assistant United States Attorney
2  District of Arizona

3  DAVID A. PIMSNER
   MELISSA KARLEN
4  BILL C. SOLOMON
   Assistant United States Attorneys
5  JOSEPH N. KASTER
   Trial Attorney, National Security Division
6  Arizona State Bar No. 007480
   Arizona State Bar No. 033145
7  Arizona State Bar No. 020012
   Illinois State Bar No. 6207197
8  Two Renaissance Square
   40 N. Central Ave., Suite 1200
9  Phoenix, Arizona  85004
   Telephone:  602-514-7500
10 David.Pimsner@usdoj.gov
   Melissa.Karlen@usdoj.gov
11 William.Solomon@usdoj.gov
   Joseph.Kaster@usdoj.gov
12 Attorneys for Plaintiff

13            IN THE UNITED STATES DISTRICT COURT

14              FOR THE DISTRICT OF ARIZONA

15
   United States of America,              CR-12-01263-PHX-ROS
16
                    Plaintiff,     **RESPONSE TO DEFENDANT'S**
17                                 **OBJECTIONS TO THE DRAFT PRE-**
          v.                       **SENTENCE REPORT**
18
   Ahmed Alahmedalabdaloklah,
19
                    Defendant.
20

21        The United States of America, by and through its undersigned attorneys, hereby

22 responds to Defendant's Objections to the Draft Pre-Sentence Report ("Def. Obj.").

23   **I.    Legal Argument**

24        **A. This Court May Consider Almost Any Information to Impose a Sentence.**

25        This Court has the solemn obligation in this case to "impose a sentence sufficient,

26 but not greater than necessary" to comply with the purposes of sentencing.  18 U.S.C. §

27 3553(a).  In determining the particular sentence to be imposed, the Court must consider

28 "the nature and circumstances of the offense and the history and characteristics of the

defendant." 18 U.S.C. § 3553(a)(1). Pursuant to Rule 32(c)(1), of the Federal Rules of Criminal Procedure, the probation officer has conducted a presentence investigation and submitted a presentence report to assist the Court in fashioning an appropriate sentence. Not only may the Court consider the information in the presentence report, but it may consider any other information it deems appropriate to assist in sentencing.

In fact, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. "[M]ost of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination." *Williams v. People of State of N.Y.*, 337 U.S. 241, 250 (1949). Sentencing courts need not "abandon their age-old practice of seeking information from out-of-court sources to guide their judgment toward a more enlightened and just sentence" because the Federal Constitution does not restrict "the view of the sentencing judge to the information received in open court." *Id.* at 250-251.

"In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4. In fact, in order to fashion an appropriate sentence, district courts "may receive and consider virtually any information concerning the background, character and conduct of a defendant." *United States v. Cervantes-Valenzuela*, 931 F.2d 27, 28-29 (9th Cir. 1991). And, "[i]n resolving any dispute concerning a factor important to a sentencing consideration, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Moreover, "use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy

concerns in resolving disputes regarding application of the guidelines to the facts of the case." U.S.S.G. § 6A1.3, Commentary.

The defendant objects to the Court's consideration of the aliases and dates of birth listed on pages 3 and 4 of the PSR, as well as the statements contained in paragraphs 6-17 of the PSR, apparently because they "were not proven at trial." Def. Obj. at 1-3. As set forth above, such information need not be presented, or proved, at trial for the Court to consider it at sentencing. Because there is no legal basis to preclude the Court from considering the aliases and dates of birth on pages 3 and 4 of the PSR, or the facts set forth in paragraphs 6-17 of the PSR, the defendant's objections should be overruled.

**B. Because Section 2M6.1 May Not Be the Correct Guideline Provision to Determine the Base Offense Level, the Defendant's Objections to that Guideline are Moot.**

The draft PSR utilizes § 2M6.1 for its offense level computation. (PSR at 8-9.) Although the Defendant raises several objections to § 2M6.1, he does not assert that § 2M6.1 does not apply to his conduct. Def. Obj. at 4-12. Rather, Defendant argues that § 2M6.1(a)(2), instead of § 2M6.1(a)(1), should apply to his conduct. Def. Obj. at 9-10. Upon scrutiny of the Application Notes for § 2M6.1, however the United States has determined that the base offense level may be more appropriately determined by applying section 2K1.4 in lieu of § 2M6.1.[1] Accordingly, the defense's objections to § 2M6.1 should be overruled as moot. *See, e.g., United States v. McNeil*, 90 F.3d 298, 300 (7th Cir. 1996) (objections which do not affect the sentencing range should be denied as moot).

---

[1] Upon receipt of the draft PSR, the United States believed that § 2M6.1 had been correctly applied to Defendant's conduct. For this reason, the United States did not object to the draft PSR. While conducting research to respond to Defendant's objections to the PSR, however, the United States learned that § 2M6.1 may not apply to Defendant's conduct. To the extent this Court construes this argument as an objection to the PSR, the United States seeks leave to object to the PSR on this narrow ground only. Should the Defendant need additional time to respond to this argument, the United States would not object to a continuance of the current sentencing date.

**1. The Guideline Provisions Applicable to the Defendant's Conviction Under Count One (Conspiracy to Use a Weapon of Mass Destruction) are Sections 2K1.4 and 2A1.5/2A2.1.**

Section 2M6.1 generally applies to unlawful activity (including attempts or conspiracies) involving weapons of mass destruction. *See* U.S.S.G. § 2M6.1. The Application Notes, however, define the term "weapon of mass destruction" for purposes of the Guideline by cross-referencing the statutory definition of that term – but only in part. *See* U.S.S.G. §2M6.1, Application Note 1 ("weapon of mass destruction" has the meaning given that term in 18 U.S.C. §2332a(c)(2)(B),(C), and (D)."). These subsections specify chemical, biological, and radiological weapons. The Defendant's conduct, by contrast, involved "destructive devices" (that is, "improvised explosive devices" or "IEDs"). As a result, the computation of the offense level, per Appendix A, should actually begin with § 2K1.4, and not § 2M6.1. *See United States v. Wright*, 2012 WL 5507254, at *17 (N.D. Ohio Nov. 14, 2012); *United States v. Aref*, 2007 WL 804814, at *3 (N.D.N.Y. Mar. 14, 2007). *But see United States v. Suarez*, 893 F.3d 1330, 1336 (11th Cir. 2018) (applying, without discussing, § 2M6.1 for a conviction under §2332a involving an attempt to build bombs).

Under Section 2K1.4, then, the "most analogous guideline from Chapter Two, Part A" should be applied where "the offense was intended to cause death or serious bodily injury." *See* U.S.S.G. §2K1.4(c)(1). Because the IEDs the Defendant was convicted of conspiring to use against U.S. military personnel were plainly intended to cause death or seriously bodily injury, the most analogous Guideline to apply is either § 2A1.5 or § 2A2.1. In any event, under either of those Guidelines, the Defendant's base offense level, prior to any adjustments, is 33. *See* U.S.S.G. §§ 2A1.5, 2A2.1(a)(1).

**2. Even if Section 2M6.1 is the Applicable Guideline Provision, the Defendant's Objections to it are Meritless.**

Because Defendant was convicted in Count 1 of conspiracy to use a weapon of mass destruction, the draft PSR utilized § 2M6.1 to determine his base offense level. In the event the Court determines that § 2M6.1 is the applicable guideline provision, the

Defendant's objections to that section lack merit. Section 2M6.1(a)(1) provides for a base offense level of 42 "if the offense was committed with intent (A) to injure the United States; or (B) to aid a foreign nation or a foreign terrorist organization." Defendant objects to the application of Section 2M6.1(a)(1) because his conduct was directed toward a United States national-not against the United States as a country. Def. Obj. at 4.

Defendant's objection is based on his conviction on Counts 1, 3, and 4, which he claims are interdependent because they "allege criminal conduct directed towards *a United States national*. *Id*. (Emphasis in original). But in making the claim that his conduct was directed only toward a United States national, not against the United States as a country, Defendant ignores both the conduct at issue in Count 2 and the characteristics of the United States nationals toward whom his conduct was directed. In addition to finding Defendant guilty of Counts 1, 3, and 4, the jury also found Defendant guilty of Count 2, which alleged Defendant conspired to maliciously damage or destroy U.S. government property by means of an explosive. Inherent in such conduct is an intent to injure the United States.

Furthermore, the United States nationals toward whom Defendant's conduct was directed were members of the Armed Forces of the United States. An intent to injure those individuals is, by extension, and intent to injure the United States. In fact, the intent of the conspiracy of which Defendant was a part was to sufficiently injure the United States so that it would be motivated to remove from Iraq its property and the members of its Armed Forces. Indeed, the primary goal of the 1920 Revolution Brigades was to resist the American occupation of Iraq by engaging in military operations against it. Reporter's Transcript of Proceedings, Jury Trial, Day 2, 125:23-24; 126:13-15 (hereafter, R.T., J.T., Day __, page:line). Because Defendant committed the offense with intent to injure the United States, the PSR properly applies § 2M6.1.

Even if Defendant had not committed the offense with intent to injure the United States, Section 2M6.1 would still apply here because Defendant committed the offense with intent to aid a foreign terrorist organization, which is defined as an "organization that engages in terrorist activity that threatens the security of a national of the United States or

the national security of the United States….” U.S.S.G. § 2M6.1, Application Note 1. Defendant concedes that Counts 1, 3, and 4 allege criminal conduct directed towards *a United States national*. Testimony presented at trial established that the defendant committed the offense to aid the 1920 Revolution Brigades, a group that threatened the security of nationals of the United States by using improvised explosive devices predominantly against United States military forces and convoys. R.T., J.T., Day 2, 24:24 - 26:2. In fact, “one of the things that distinguished the 1920s from other groups was that they were fairly discriminating in trying to target U.S. military personnel, rather than civilians or others.” R.T., J.T., Day 14, 2190:8-11. Because Defendant committed these offenses with intent to injure the United States and to aid an organization that engaged in terrorist activity that threatened the security of nationals of the United States, the defenses's objections to § 2M6.1 are unavailing.

**C. A Life Sentence in This Case Would Comply with *Apprendi*.**

Defendant correctly sets forth the constitutional principle that “any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.” *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *see* Def. Obj. at 5. He is mistaken, however, that *Apprendi* prohibits this Court from imposing a life sentence in this case. *Apprendi* is not implicated unless the district court sentences a defendant above the statutory maximum. *United States v. Toliver*, 351 F.3d 423, 433 (9th Cir. 2003).

The statutory penalties for Counts 1 and 4 are identical; on each of those counts, the defendant “shall be imprisoned for any term of years or for life.” 18 U.S.C. §§ 2332a and 924(o). Thus, the statutory maximum for each of those counts is imprisonment for a life term. Defendant takes pains to claim that this Court is required to consider “aggravating factors,” beyond those the jury found, in order to impose a life sentence. Def. Obj. at 8-9. But as discussed below, that claim falls well short of the mark.

With respect to Count 1, Section 2332a provides, simply, that “[a] person who, without lawful authority, … conspires to use, a weapon of mass destruction … against a

national of the United States … shall be imprisoned for any term of years or for life…." The jury found that Defendant, without lawful authority, conspired to use a weapon of mass destruction against nationals of the United States. That finding alone, with no requirement that other "aggravators" be found, triggers the statutory maximum of a life term of imprisonment. Thus, in accordance with *Apprendi*, this Court need not make any additional finding, beyond what the jury found, in order to impose the statutory maximum sentence.

Section 2332a further provides that "if death results, [the person] shall be punished by death or imprisoned for any term of years or for life." *Apprendi* would apply to this case if the United States were to seek the imposition of a sentence of death by asking this Court to find that death resulted from the conspiracy. The fact that death resulted from the crime would increase the statutory maximum from a life term of imprisonment to a sentence of death. Such a judicial finding to increase the statutory maximum would implicate *Apprendi*. But because this Court need make no factual finding, beyond what the jury found, to impose a life term of imprisonment, *Apprendi* is not implicated here. *See Toliver*, 351 F.3d at 433.

With respect to Count 4, section 924(o) provides that a person who conspires to possess a firearm that is a destructive device "shall be imprisoned for a term of years or life." The jury found that Defendant conspired to possess a firearm that was a destructive device. Thus, similar to Count 1, this Court need not make any factual finding, or find any "aggravators," beyond what the jury found, in order to impose a life term of imprisonment on Count 4. Because the Ninth Circuit has held repeatedly that a defendant cannot obtain relief under *Apprendi* when his sentence does not exceed the statutory maximum authorized by the jury's verdict, *see United States v. Saya*, 247 F.3d 929, 942 (9th Cir. 2001), a life sentence here would be consistent with *Apprendi*.

In an effort to bolster his claim that this Court must make additional findings in order to impose a life term of imprisonment, Defendant cites *Jones v. United States*, 135 S.Ct. 8 (2014). But the opinion he cites dissents from the denial of certiorari in a case

where the sentencing judge found that the defendants had engaged in a conspiracy to distribute drugs–even though the jury had acquitted them on that charge–and "imposed sentences that the petitioners say were many times longer than those the Guidelines would otherwise have recommended." *Jones*, 135 S. Ct. at 8. Because the dissenting opinion did nothing more than restate the *Apprendi* holding, it lends no support to Defendant's position.

Defendant also cites *Blakely v. Washington*, 542 U.S. 296 (2004), to support his contention that this Court must find facts, beyond what the jury found, in order to impose a life term of imprisonment. But *Blakely*, a case in which a judicial finding was necessary to increase a statutory penalty, actually demonstrates that no judicial fact finding is necessary in this case to impose the maximum statutory sentence.

In *Blakely*, the Washington Sentencing Reform Act specified that the standard range for the offense of second-degree kidnapping with a firearm was a 49 to 53 month prison term. *Id.* at 299. The Act permitted a judge to impose a sentence above the standard range upon finding "substantial and compelling reasons justifying an exceptional sentence," and listed aggravating factors that justified such a departure. *Id.* at 300. Although, pursuant to a plea agreement, the State recommended a sentence within the standard range of 49 to 53 months, the judge rejected the recommendation and imposed an exceptional sentence of 90 months. *Id.* The exceptional sentence was based on a finding that the defendant "had acted with 'deliberate cruelty,' a statutorily enumerated ground for departure in domestic violence cases." *Id.*

Reversing the judgment, the Supreme Court stated that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* at 303. (Emphasis in original). "In other words," the Court stated, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at 303-304. (Emphasis in original). The Court further stated that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to

the punishment, and the judge exceeds his proper authority." *Blakely*, 542 U.S. at 304. (Citation and internal quotation marks omitted).

As demonstrated above, the maximum sentence this Court may impose solely on the basis of the facts reflected in the jury verdict is a life term of imprisonment. Unlike the Washington court in *Blakely*, this Court need not find any further aggravating factors to impose the maximum sentence here. Were the United States to seek an enhanced sentence of death on Count 1, this Court, similar to the sentencing court in *Blakely*, would be required to make an additional finding, namely, that death resulted from Defendant's crime. But because the United States is not seeking a sentence of death in this case, a sentence of a life term of imprisonment is fully supported solely on the basis of the facts reflected in the jury's verdict. For this reason, imposition of a life sentence would fully comply with the principles set forth in both *Apprendi* and *Blakely*.

**D. The Guidelines Are Not Mandatory; Neither is a Life Sentence.**

It appears that Defendant incorrectly interprets the sentencing provision in Section 2332a. Specifically, he states, "A plain reading of the statute makes it clear that the Court has the authority to impose any term of years it determines to be appropriate punishment for the crimes of conviction and if death resulted from the crimes, the Court may impose a life term." Def. Obj. at 6. But the imposition of a life term of imprisonment is not contingent upon a finding that death resulted from the crimes. *See* 18 U.S.C. § 2332a. Instead, as set forth above, the facts underlying the jury's verdict, standing alone, trigger the maximum penalty of life imprisonment. *Id.* A finding that death resulted from the crime would enhance the maximum sentence from life imprisonment, to death, and would leave to the sentencing court the option of imposing imprisonment for any term of years or for life, instead of death.

Defendant further states, "Death was not proven at trial and nothing in the plain wording of the statute itself mandates or requires the *automatic* imposition of a life sentence…." Def. Obj. at 6 (emphasis in original). The United States concedes that it did not prove at trial that death resulted from Defendant's crimes. A sentence of death,

therefore, is not an option in this case. The United States also agrees that the imposition of a life sentence is not automatic in this case. But, the draft PSR properly indicates that the guideline imprisonment range for defendant's conduct is a life term, albeit not a mandatory life term.

Further demonstrating his erroneous reading of the penalty provisions of the applicable statutes, Defendant states, "the clear language of the criminal statutes of conviction authorized the Court to impose '<u>any</u> term of years' up to life, with specific reference to a life term '…if death results…'." Def. Obj. at 8. This, he claims, "effectively means that it was incumbent upon the government to prove to [sic] those aggravators to the jury which could later justify the Court imposing the maximum prison term of life." Def. Obj. at 8. As set forth above, there are no "aggravators" to be proved before this Court is authorized to impose a life sentence based on the jury's verdict. And to the extent that Defendant is referring to the facts in U.S.S.G. § 2M6.1(a)(1) as "aggravators" that must be proved to the jury, his "argument fundamentally misunderstands the current state of constitutional law on sentencing." *United States v. Hickey*, 580 F.3d 922, 932 (9th Cir. 2009).

As enacted, the federal Sentencing Reform Act made the Sentencing Guidelines binding so that, except in limited circumstances, district courts had no discretion to depart from the Guidelines range. *Dillon v. United States*, 560 U.S. 817, 820 (2010) (citations omitted). "Under that regime, facts found by a judge by a preponderance of the evidence often increased the mandatory Guidelines range and permitted the judge to impose a sentence greater than that supported by the facts established by the jury verdict or guilty plea." *Id.* (Citation omitted). But the Supreme Court held, in *United States v. Booker*, 543 U.S. 220 (2005), "that treating the Guidelines as mandatory in these circumstances violated the Sixth Amendment right of criminal defendants to be tried by a jury and to have every element of an offense proved by the Government beyond a reasonable doubt." *Dillon*, 560 U.S. at 820 (citation omitted). To remedy the constitutional problem, the Supreme Court rendered the Guidelines advisory. *Id.*

Now, "[u]nder the advisory Guidelines, district courts are free to make factual determinations not made by the jury and may base their ultimate decisions regarding the length of a convicted criminal's sentence on those determinations." *United States v. Staten*, 466 F.3d 708, 719 (9th Cir. 2006). Because the Sentencing Guidelines are advisory after *Booker*, the Sixth Amendment does not require that the sentencing factors leading to a guideline calculation be proved to a jury beyond a reasonable doubt. *See Hickey*, 580 F.3d at 932. Instead, the district court may engage in judicial fact finding at sentencing that does not elevate a sentence above the statutory maximum, without implicating the Sixth Amendment, so long as it treats the Sentencing Guidelines as advisory and takes account of the Guidelines together with the sentencing goals set forth in 18 U.S.C. § 3553(a). *See Booker*, 543 U.S. at 245, 259. Thus, the "'advisory guidelines' remedy gives the sentencing judge discretion to sentence outside the guideline range, but still allows the sentencing judge (as distinct from a jury) to make the findings of fact necessary to determine the guideline range in the first place." *United States v. Dupas*, 419 F.3d 916, 919 (9th Cir. 2005).

Defendant makes it clear that he "fundamentally misunderstands the current state of constitutional law on sentencing," *see Hickey*, 580 F.3d at 932, by asserting to this Court that "after Apprendi [sic.], supra [sic.], a sentencing Court is not authorized to impose the maximum prison term of life by reviewing and considering additional factors on its own that were not presented to the jury and proven at trial." Def. Obj. at 9. A life sentence in this case is not an "aggravated sentence," as the defendant further contends. *Id*. Rather, a life sentence is the statutory maximum sentence that the jury's verdict supports, with no need for additional facts to be proved. *See* 18 U.S.C. §§ 2232a and 924(o).

Contrary to Defendant's erroneous assertion, under the current state of constitutional law on sentencing, so long as this Court treats the Sentencing Guidelines as advisory, it may properly consider facts not proved to the jury in imposing a proper sentence. Moreover should the Court find those facts have been proved by a preponderance of the evidence, it may consider those facts in applying the Guidelines and determining a

proper sentence in this case.

Finally, Defendant's alternative calculation of the base offense level under U.S.S.G. § 2M6.1(a)(2) (Def. Obj. at 10) is inapplicable here because if this Court finds that § 2M6.1 is applicable here, the draft PSR correctly calculates the base offense level under U.S.S.G. § 2M6.1(a)(1) in accordance with *Apprendi*, *Blakely*, and *Booker*.

## F. A Life Sentence for an Adult Convicted of Conspiring to Use a Weapon of Mass Destruction Against United States Nationals Does Not Violate the Eighth Amendment.

Boiling Defendant's Eighth Amendment argument down to its essence, he claims that "automatically imposing the maximum sentence that is reserved for aggravated conduct that was not proven to a jury violates the 8th Amendment for being excessive, cruel and unusual, and disproportional to the offenses of conviction." Def. Obj. at 12. But as already discussed above, Defendant's argument is fatally flawed because the maximum sentence is not being imposed automatically, it is not reserved only for aggravated conduct, and the jury's verdict alone, without further fact finding, authorizes a maximum sentence.

Defendant does not cite a single case that finds the imposition of a life sentence upon an adult convicted of federal terrorism crimes involving weapons of mass destruction violates the Eighth Amendment's prohibition against cruel and unusual punishment. The United States is not aware of any such case. Although Defendant cites three cases in support of his Eighth Amendment claim, none of those cases actually supports his claim. First, *Hope v. Pelzer*, 536 U.S. 730 (2002), is not even a sentencing case. Rather, it is a civil suit filed by an inmate seeking to recover damages from prison guards who handcuffed him to a hitching post on two occasions while he was serving a prison sentence. *Id*. at 734-735. It lends no support to Defendant's claim of a potential Eighth Amendment violation here.

Similarly, neither of the other two cases supports Defendant's claim of an Eighth Amendment violation here, because they both involve unconstitutional sentences imposed upon juvenile offenders. In *Graham v. Florida*, 560 U.S. 48, 53, 57, 82 (2010), in which the defendant was sentenced to life without parole for a robbery he attempted at age 16,

the Supreme Court held that the "Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." In *Miller v. Alabama*, 567 U.S. 460, 465-466, 479 (2012), in which the 14-year-old defendant was sentenced to life without parole for a robbery he and two other boys committed that resulted in a death, the Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."

Significantly, the *Graham* Court highlighted some of the differences between juvenile and adult offenders. For example, the Court stated that "because juveniles have lessened culpability they are less deserving of the most severe punishments." *Graham*, 560 U.S. at 68 (citation omitted). In addition, "[a]s compared to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility; they are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure; and their characters are not as well formed." *Id.* (Internal quotation marks and citation omitted). But Defendant was well into adulthood when he committed the offenses at issue here. The Court also emphasized "that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are the murderers." *Id.* at 69 (citation omitted). But surely a person who conspires to use a weapon of mass destruction against a national of the United States, as Defendant did here, foresees that life will be taken.

Thus, not only does *Graham* lend no support to Defendant's Eighth Amendment claim, but it actually cuts against that claim because Defendant was an adult who could foresee that life would be taken when he committed these offenses involving weapons of mass destruction. Indeed, the Supreme Court and the Ninth Circuit have repeatedly rejected Eighth Amendment challenges to life sentences imposed upon adult offenders convicted of crimes that did not result in death. *See*, *e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 1009 (1991) (life sentence without parole for first offense of possession of cocaine did not violate Eighth Amendment); *United States v. Bland*, 961 F.2d 123, 128 (9th Cir. 1992) (upholding a life sentence without parole imposed on a felon in possession of a

firearm where defendant had an extensive criminal record); *Norris v. Morgan*, 622 F.3d 1276, 1290-1291 (9th Cir. 2010) (life sentence without parole under Washington's two strikes rule for sex offenders did not violate Eighth Amendment).

The Eighth Amendment, which forbids cruel and unusual punishments, contains a narrow proportionality principle that applies to noncapital sentences. *Ewing v. California*, 538 U.S. 11, 20 (2003) (internal quotation marks and citations omitted). "The Eighth Amendment does not require strict proportionality between crime and sentence." *Harmelin*, 501 U.S. at 1001. "Rather, it forbids only extreme sentences that are grossly disproportionate to the crime." *Id.* (Internal quotation marks and citation omitted). In fact, "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272 (1980). This is because "[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case." *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003).

This is not the extraordinary case. Defendant conspired to use a weapon of mass destruction against United States nationals (members of the Armed Forces of the United States) and United States property (United States military equipment) in Iraq. A weapon of mass destruction is not only capable of inflicting serious injuries, death, and damage or destruction of property, but it is normally designed for those very purposes. A life sentence here would not be an extreme sentence that is grossly disproportionate to the serious crimes Defendant committed. Plainly, a life sentence imposed upon an adult, who could foresee that his conduct would result in life being taken, would not violate the Eighth Amendment.

**G. The PSR Correctly Applies U.S.S.G. § 3A1.4 to Defendant's Conduct.**

The draft PSR properly applies an appropriate adjustment from Chapter 3 of the Sentencing Guidelines. *See* U.S.S.G. § 1B1.1(a)(3). The only applicable adjustment from Chapter 3 used in the draft PSR is the terrorism enhancement, which directs that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, [the district court is to] increase [the offense level] by 12 levels" and to set the defendant's

criminal history category as category VI. U.S.S.G. § 3A1.4.[2] A federal crime of terrorism is an offense that "is calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct," and is a violation of, among many others, sections 844(f)(2) (relating to arson and bombing of Government property risking or causing death) (Count 2), and 2332a (relating to use of weapons of mass destruction) (Count 1). *See* U.S.S.G. § 3A1.4, Application Note 1; 18 U.S.C. § 2332b(g)(5).

Defendant's conduct clearly was calculated to influence or affect the conduct of the government by intimidation or coercion, and was to retaliate against government conduct, specifically military conduct, in Iraq. Defendant not only shared the overall goals of the 1920 Revolution Brigades, but he also directly supported the Brigades by using his technical background to improve improvised explosive devices and to defeat United States military countermeasures against those devices. R.T., J.T., Day 2, 131:11-18, 132:4-133:5, 133:22-134:11, 135:12-13. One of the primary goals of the 1920 Revolution Brigades was its "laser like focus on expelling the Americans" from Iraq. R.T., J.T., Day 14, 2183:22-24. The group "focused very much on, we are going to conduct military operations against U.S. military targets, and we are going to expel the Americans from Iraq." *Id*. at 2184:1-4. In fact, the Brigades were known for their use of improvised explosive devices in particular, which would allow the group to inflict casualties at a reasonably low risk. *Id*. at 2188:24-2189:19. And "more Americans being killed or wounded was a factor encouraging us [the United States] to pull out of Iraq, which is their primary goal." *Id*. at 2189:23-25. By sharing the overall goals of the 1920 Revolution

---

[2] Indeed, because the targets of the IEDs were U.S. military employees, an upward adjustment of six levels for "official victims" should also have been applied. *See* U.S.S.G. §3A1.2(b); *In re. Terrorist Bombings*, 152 F.3d 93, 153 (2d Cir. 2008); *United States v. Polk*, 118 F.3d 286 (5ᵗʰ Cir. 1997). The adjusted offense level would be 51 (33+12+6) as opposed to 54 in the draft PSR. However, the total offense level resulting from the application of sections 2K1.4, 2A1.5, and/or 2A2.1, and 3A1.4 again exceeds 43 so adding 6 additional levels would have no effect. *See* U.S.S.G. § Ch. 5, Pt. A, n. 2.

Brigades, as manifested by his hands-on technical support to the Brigades' use of improvised explosive devices against nationals of the United States, Defendant's conduct in committing federal crimes of terrorism was calculated to influence or affect the conduct of the government by intimidation or coercion, and to retaliate against government conduct in Iraq.

The terrorism enhancement was adopted by the Sentencing Commission at the express direction of Congress when, in 1994, Congress instructed the Commission to "provide an appropriate enhancement" for certain terrorism offenses. *See* Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 120004, 108 Stat. 1796, 2022. In response, the Commission adopted an enhancement that provided for a 12-level increase in the offense level and an adjustment of the criminal history category to VI. U.S.S.G. § 3A1.4(a) (1995).

After the Commission adopted the initial terrorism enhancement, Congress then directed the Commission to expand the application of that provision to apply to all federal crimes of terrorism. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No 104-132, § 730, 110 Stat. 1214, 1303; *see also* H. Rept. 104-518 at 123 (1996) (Conf. Rep.) (explaining that this provision was enacted to "expand the scope of the [terrorism] enhancement"). The Commission did so by promulgating the current version of the terrorism enhancement, which applies "more broadly" to terrorism crimes. U.S.S.G. App. C, Amend. 565 (1997) (permanent amendment). That terrorism enhancement is properly applied to Defendant's conduct here, making his adjusted offense level 43, and his criminal history category VI. *See United States v. Tubbs*, 290 Fed. Appx. 66 (9th Cir. 2008).

### 1. Application of U.S.S.G. § 3A1.4 Does Not Violate the Double Jeopardy Clause.

Defendant challenges the dual application of U.S.S.G. §§ 2M1.6 and 3A1.4, claiming that "application of U.S.S.G. §3A1.4 violates the Double Jeopardy Clause of the 5th Amendment of the U.S. Constitution." Def. Obj. at 13. He asserts that "application of U.S.S.G. §3A1.4 is nothing less than punishing the Defendant twice for having been

convicted of a crime alleging terrorism without anything more than again looking at the title of the offense in the Count of conviction." Def. Obj. at 13. But he provides no legal support for this contention. Moreover, if U.S.S.G. § 2M1.6 does not apply to Defendant's offenses, his argument is rendered moot.

"The Double Jeopardy Clause protects against multiple punishments for the same offense." *United States v. Jernigan*, 60 F.3d 562, 564 (9th Cir. 1995) (citation omitted). "[T]he Clause serves the function of preventing both successive punishment and successive prosecution." *United States v. Dixon*, 509 U.S. 688, 704 (1993) (citation omitted). But both the Supreme Court and the Ninth Circuit have already made it clear that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted." *Witte v. United States*, 515 U.S. 389, 401 (1995) (upholding prosecution of a cocaine offense even though the conduct underlying the cocaine offense was used to enhance the sentence on a previous marijuana offense); *see also Jernigan*, 60 F.3d at 564-565 (consecutive sentence for failure to appear, on top of earlier sentence that was enhanced for the same failure to appear, not double jeopardy).

To the extent Defendant continues to argue that dual application of U.S.S.G. § 3A1.4 and any other applicable guideline provision violates the Fifth Amendment, he is mistaken. "As a general rule, it is appropriate for a court to consider all applicable Guidelines provisions in calculating the guidelines range for an offense." *United States v. Smith*, 719 F.3d 1120, 1123 (9th Cir. 2013). In fact, the Guidelines provide that "[a]bsent an instruction to the contrary, enhancements under Chapter Two, adjustments under Chapter Three, and determinations under Chapter Four are to be applied cumulatively," and "may be triggered by the same conduct." U.S.S.G. § 1B1.1, Application Note 4(B); *see also Smith*, 719 F.3d at 1123-1124.

In accordance with the Guidelines' instructions, the Ninth Circuit has "long held that the Sentencing Commission understands double counting and expressly forbids it where it is not intended." *Id.* at 1124. (Internal quotations marks and citations omitted).

Thus, "when each invocation of the behavior serves a unique purpose under the Guidelines," the Ninth Circuit concludes "that the Commission authorized and intended the cumulative application of both provisions." *Id.* (Internal quotation marks and citations omitted). For these reasons, the Ninth Circuit has "routinely concluded that two Guidelines provisions serve unique purposes when applied cumulatively." *Smith*, 719 F.3d at 1124; *see also*, *e.g.*, *United States v. Wright*, 373 F.3d 935, 942-943 (9th Cir. 2004) (finding appropriate the application of enhancements for both vulnerable victim under 12 years old and for victim's extreme youth and small physical size); *United States v. Holt*, 510 F.3d 1007, 1011-1012 (9th Cir. 2007) (upholding enhancements for both vulnerable victim and sadistic or masochistic conduct); *United States v. Williams*, 693 F.3d 1067, 1074 (9th Cir. 2012) (finding that application of guideline provision dealing with offenses of extortion by force, threat of force or serious damage in addition to enhancement for offense that involved an express or implied threat of death, bodily injury, or kidnapping was not impermissible double counting).

Applying both U.S.S.G. §§ 2M6.1 and 3A1.4 to defendant's conduct would not violate the Fifth Amendment because they serve different sentencing considerations. *Suarez*, 893 F.3d at 1337. While the attempted use of dangerous materials with the intent to injure the United States or to aid a foreign nation or foreign terrorist organization is addressed by § 2M6.1, § 3A1.4 enhances the sentence for an offense that involved, or was intended to promote, a federal crime of terrorism, which is an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5); *see also Suarez*, 893 F.3d at 1337. Because "[t]hese are conceptually distinct consideration that account for different harms[,] [i]t is irrelevant that these adjustments will often be triggered by the same conduct. *Id.* "Indeed, Congress and the Sentencing Commission intended the terrorism enhancement to apply to [Defendant's] crime." *Id.* The definition of a federal crime of terrorism in § 3A1.4, by incorporating § 2332b(g)(5), specifically includes convictions under 18 U.S.C. § 2332a and 18 U.S.C. § 844(f)(2), both crimes for which Defendant was convicted. *See*

*Suarez*, 893 F.3d at 1337.  For these reasons, application of the terrorism enhancement in § 3A1.4, in addition to §§ 2M6.1, 2K1.4, 2A1.5 and/or 2A2.1, or any other guideline provision, is constitutionally permissible.

### 2.  U.S.S.G. § 3A1.4 Is Not Overly Broad.

Contrary to Defendant's unsupported assertion, U.S.S.G. § 3A1.4 is not overly broad.  It applies only to felonies that involve or are intended to promote a federal crime of terrorism.  U.S.S.G. § 3A1.4(a).  The specific federal crimes of terrorism to which the section applies are set forth at 18 U.S.C. § 2332b(g)(5).  The specific crimes set forth there do not encompass, as Defendant asserts, "literally every crime alleged that might come under the wide umbrella of the word 'terrorism....'" Def. Obj. at 14.  Moreover, two of Defendant's crimes (Count 2: 18 U.S.C. §§ 844(f)(2), and Count 1: 2332a) clearly fall under the definition of a federal crime of terrorism in 18 U.S.C. § 2332b(g)(5).

### 3.  U.S.S.G. § 3A1.4 Sets a Rational Criminal History Category.

The United States agrees that "the Sentencing Commission views criminal history as a useful tool that serves as an indicator of the likelihood of recidivism."  Def. Obj. at 15.  That same Sentencing Commission concluded that an increase in the criminal history category of a defendant who commits a crime that involves, or is intended to promote, a federal crime of terrorism is an appropriate enhancement for certain federal terrorism offenses, such as those Defendant committed here.  Defendant proclaims that "[p]lacing the Defendant in Criminal History Category VI is not based on any data, facts or evidence."  Def. Obj. at 14.  To the contrary, Defendant is placed in criminal history category VI based on the evidence presented to the jury at trial and based on the fact that he committed felony offenses that involved, or were intended to promote, federal crimes of terrorism.

In the estimation of the Sentencing Commission, "[g]eneral deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence."  U.S.S.G. § 4A1.1, Introductory Comment.  And according to that same Commission, deterrence of conduct that involves, or is intended to promote, a federal crime of terrorism dictates that a clear message be sent

to society that a single act of terrorism will aggravate the need for punishment. "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2nd Cir. 2003). In fact, "[c]onsidering the dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level…." *Id.* Because Defendant engaged in acts of terrorism, Congress and the Sentencing Commission have rationally concluded that the need to incarcerate him is as great as the need to incarcerate a defendant who has engaged in repeated criminal behavior. As several courts have observed, "Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *See United States v. Ressam*, 679 F.3d 1069, 1090 (9th Cir. 2012) (citing cases).

### 4. U.S.S.G. § 3A1.4 Properly Reflects the National Experience that Federal Crimes of Terrorism are Extremely Serious Offenses.

As Defendant points out, *Kimbrough v. United States*, 552 U.S. 85, 108 (2007) says that the Sentencing Commission "has the capacity courts lack to base its determinations on empirical data and national experience…." Def. Obj. at 8. But *Kimbrough* clearly does not say that a guideline provision lacks legitimacy if it is not based on empirical data or national experience. *Kimbrough* also clearly does not say that a guideline provision deserves less consideration than other guideline provisions if it is not based on data and national experience. Given the complete lack of legal authority for his argument, Defendant is forced to turn instead to an article penned by a criminal defense attorney who "has represented defendants in terrorism cases" to support his claim that U.S.S.G. § 3A1.4 "is not entitled to the legitimacy that the Courts afford other Guidelines." Def. Obj. at 17-18 (citing James P. McLoughlin, Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist

- 20 -

Organizations, Law & Inequality: A Journal of Theory and Practice, Vol 21, Issue 1 (2010), p. 51).

Even assuming, *arguendo*, that U.S.S.G. § 3A1.4 was not based on data or national experience, it should not be treated differently than any other guideline provision. In fact, although the Commission referred to data to create the criminal history guideline provisions, it "made no definitive judgment as to the reliability of the existing data." U.S.S.G., Chapter Four, Part A, Introductory Comment. That does not make those provisions any less legitimate than other guideline provisions. The only data or national experience Congress needed in order to direct the Sentencing Commission to adopt a terrorism enhancement are the data and national experience showing that federal crimes of terrorism are grave offenses that threaten the security of the United States, its property, and its citizens. In fact, the courts have held that both Congress and the Sentencing Commission "had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *Meskini*, 319 F.3d at 92. "Thus, the terrorism guideline legitimately considers a single act of terrorism for [increasing] both the offense level and the criminal history category." *Id*.

### 5. U.S.S.G. § 3A1.4 Creates No Mandatory Minimum Sentence.

By conceding that the Sentencing Guidelines are not mandatory, but advisory, Defendant resolves his claim that "U.S.S.G. § 3A1.4 effectively creates a mandatory minimum" sentence. Def. Obj. at 18. "Without the 'mandatory' provision, the [Sentencing] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals." *Booker*, 543 U.S. at 259. Moreover, without the mandatory provision, the Sentencing Act still "requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care." *Id*. at 260. Because the Guidelines

are advisory, U.S.S.G. § 3A1.4 does not create a mandatory minimum sentence.

**6.  This Court May Constitutionally Consider Acquitted Conduct.**

Defendant next mistakenly claims that the U.S.S.G. § 3A1.4 base offense level increase and criminal history increase are "enhancements … based on conduct alleged in Counts 5 and 6 which resulted in acquittals by jury verdict." Def. Obj. at 19.  But as already set forth above, Defendant was convicted of two federal crimes of terrorism in Counts 1 and 2, conspiracy to use a weapon of mass destruction and conspiracy to maliciously damage or destroy U.S. government property by means of an explosive, respectively.  Thus, the base offense level increase and the criminal history category increase that U.S.S.G. § 3A1.4 calls for are based on the conduct underlying the convictions on Counts 1 and 2, alone, without consideration of any other conduct, acquitted or otherwise.

Even if this Court were to consider acquitted conduct in reaching an appropriate sentence–which, again, it need not do–it "could constitutionally consider the acquitted conduct."  *United States v. Mercado*, 474 F.3d 654, 657 (9th Cir. 2007).  Although Defendant correctly states that the "United States Supreme Court previously held that a sentencing court may consider conduct of which the defendant has been acquitted so long as that conduct has been proven by a preponderance of the evidence," he urges that the *Watts* holding "has been effectively overruled because the low standard of preponderance of the evidence to be used by a Judge - as a substitute for a jury finding - for purposes of imposing an enhanced sentence <u>predates</u> the United States Supreme Court's decision in *Apprendi*…."  Def. Obj. at 20 (emphasis in original).  The Ninth Circuit, however, has already squarely addressed this contention post-*Apprendi*, and is "satisfied that the core principle of *Watts* lives on and the district court could constitutionally consider the acquitted conduct."  *Mercado*, 474 F.3d at 657.  A jury acquittal, after all, is simply a finding that the government has not proved the elements of a crime beyond a reasonable doubt; the acquittal, however, sheds no light on whether a preponderance of the evidence established the defendant's participation in that crime.  *See*, *United States v. Watts*, 519 U.S. 148, 157 (1997).  Although it need not do so, should it choose to do so, this Court

- 22 -

may constitutionally consider acquitted conduct to reach an appropriate sentence.

**H. A Role Reduction is Not Warranted.**

Defendant seeks a four-level mitigating role adjustment pursuant to U.S.S.G. § 3B1.2, based at least in part on his contention that "the language in this Guideline shows an intent on the part of the Sentencing Commission to write the Guideline in a way that encourages it's application and the awarding of offense level reductions when supported by the facts in the case." Def. Obj. at 24. Surely, though, if the PSR recommended an aggravating role adjustment, Defendant would not concede that the language of that guideline (which is quite similar to the language in the mitigating-role guideline) also shows an intent on the part of the Sentencing Commission to write the guideline in a way that encourages its application and the "awarding" of offense level enhancements when supported by the facts in the case. What the Sentencing Commission has made clear, is that it does not encourage either mitigating or aggravating role adjustments. Rather the Commission has said, "When an offense is committed by more than one participant, §3B1.1 or §3B1.2 (or neither) may apply." U.S.S.G. Chapter 3, Part B, Introductory Commentary (emphasis added).

The United States does not dispute that Defendant acted with others to commit the criminal conduct at issue in this case. The United States shares Defendant's frustration that he may be the only member of the conspiracy who will be brought to justice for the serious crimes all those who participated in the conspiracy committed. Unfortunately, though, to date, insufficient evidence has been obtained to bring Defendant's co-conspirators to justice. There exists no agreement that the United States will not prosecute any other member of the conspiracy; it simply has not acquired sufficient evidence to do so. And although the United States possesses information that others, including Mr. Al-Dhari, participated in the conspiracy, there is a vast difference between information indicating participation in criminal activity and evidence sufficient to bring charges and sustain a conviction for having engaged in that criminal activity.

Defendant correctly points out that this Court must evaluate "his role relative to all

participants in the criminal scheme for which he was charged." *United States v. Rojas-Millan*, 234 F.3d 464, 472 (9th Cir. 2000); Def. Obj. at 22. But, just as there is insufficient evidence to bring Defendant's co-conspirators to justice, there is also insufficient evidence to support a role adjustment, either mitigating or aggravating. "The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, Application Note 3(C). Although Defendant argues that his role, as compared to the role of Mr. Al-Dhari, factually justifies his request for a mitigating role, his argument is not supported by the facts he provides.

The sum total of the information Defendant provides to distinguish his role from that of Mr. Al-Dhari is as follows: Mr. Al-Dhari: 1) Mr. Al-Dhari "has direct ancestral lineage to the founding father of the original 1920 Revolutionary Brigades," and "is proud of this historical fact"; 2) He was a financier "using his financial resources to assist persons in need in Iraq"; 3) he is involved "in the re-building efforts in Iraq through organizations he personally created, seeking to establish peaceful and integrated relationships among the various factions in Iraq"; 4) He had "direct involvement in the military aspect of the 1920 Revolutionary Brigades"; 5) He "participated in some other criminal activities against civilians in Iraq"; 6) He is a "sheik with unknown but ample financial resources"; 7) "He can and does make things happen and he clearly and admittedly has people in his employ"; and 8) "[G]iven his creation of at least two political organizations, he obviously has organizational skills." Def. Obj. at 21-23. Defendant: 1) He "is a small time shop owner"; 2) He was "a poor Syrian refugee living in Iraq"; and 3) He "was a businessman who sold electronics and other items as part of his regular course of business." Def. Obj. at 23-24.

First, with respect to Defendant's role in the offense, the United States stipulated that he was a businessman who sold electronics as part of his regular course of business. But there was no testimony, or other evidence presented at trial, that Defendant was just a "small time shop owner" or that he was "a poor Syrian refugee" living in Iraq. With respect to Mr. Al-Dhari, other than the information that he was involved in the military aspect of

- 24 -

the 1920 Revolution Brigade, no other fact Defendant provides is related to Mr. Al-Dhari's participation in the criminal conspiracy.

Thus, Defendant's attempt to compare Mr. Al-Dhari to a drug kingpin, and himself to a low-level member of a drug-distribution conspiracy, fails. An individual who provided technical expertise not only on how to improve improvised explosive devices but also on how to defeat United States countermeasures in order to continue to carry out attacks on United States military forces with those weapons of mass destruction, and who participated in the process of manufacturing remote-controlled improvised explosive devices for use against United States military forces, is hardly comparable to a low-level participant in a drug-distribution conspiracy. In fact, because Defendant's role in the conspiracy included not only his hands-on involvement in manufacturing improvised explosive devices, but also included providing technical expertise on how to overcome United States countermeasures designed to defeat those devices, it could be argued that an upward adjustment pursuant to U.S.S.G. § 3B1.3 for use of special skill would be appropriate here. A mitigating role adjustment, however, is not appropriate.

## II. Conclusion

Whether Defendant's base offense level is calculated using § 2M6.1 or §§ 2K1.4, 2A1.5 and/or 2A2.1, his total offense level is 43, after the § 3A1.4 terrorism enhancement is applied. His criminal history category is VI. His guideline imprisonment range is life. Because the Guidelines are advisory, a life sentence is not mandatory. And because the imposition of a life sentence is supported by the jury's verdict and does not exceed the statutory maximum penalty, such a sentence would comply with *Apprendi*, *Blakely*, and *Booker*. This Court should deny each of Defendant's objections to the PSR and sentence

//

//

//

Defendant in accordance with the Guidelines and the sentencing goals set forth at 18 U.S.C. § 3553(a).

Respectfully submitted this 31st day of August, 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*s/ David A. Pimsner*
*s/ Melissa Karlen*
*s/ Bill C. Solomon*
*s/ Joseph N. Kaster*
DAVID A. PIMSNER
MELISSA KARLEN
BILL C. SOLOMON
Assistant U.S. Attorneys
JOSEPH N. KASTER
Trial Attorney
National Security Division

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of August, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

Jon Sands
Gregory Bartolomei
Jami Johnson
Molly Karlin

*s/Theresa A. Hanson*
U.S. Attorney's Office